

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**11/12/2008**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **SKYPORT GLOBAL** | § | **CASE NO. 08-36737-H4-11** |
| **COMMUNICATIONS, INC.,** | § | |
| | § | |
| **DEBTOR** | § | **Chapter 11** |

**FINAL ORDER (I) AUTHORIZING USE OF CASH**
**COLLATERAL; AND (II) APPROVING SECURED**
**DEBTOR IN POSSESSION POST-PETITION FINANCING**

**(Relates to Docket Nos. 5, 9 and 12)**

Came on to be considered the Debtor's (i) Motion for Final Approval of Secured Debtor in Possession Post-Petition Financing (the "DIP Motion," Docket No. 9); and (ii) Emergency Motion for Authority to Use Cash Collateral ("Cash Collateral Motion," Docket No. 5, together with the DIP Motion, the "Motions"). The Court set a final hearing on the Motions for November 12, 2008, at which counsel for the parties appeared and presented evidence and oral argument. After careful consideration of all matters before it, the Court is of the opinion that the estate would incur irreparable injury if the Motions are not granted; **IT IS HEREBY FOUND THAT:**

**I.     The Debtor's Bankruptcy Case**

A.     On October 24, 2008 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

B.     The Debtor has continued as debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been appointed in these cases, and no official creditors committee has been formed as of the date hereof.

C.      This Court has jurisdiction, pursuant to 28 U.S.C. sections 157(b) and 1334, over these proceedings, and over the persons and property affected hereby.

## II.     The Prepetition Aegis Debt

D.      Aegis Texas Venture Fund, LP ("Aegis"), and CenturyTel, Inc. ("CenturyTel"). are the Debtor's primary prepetition secured creditors (together, the "Secured Creditors").

E.      Before the Petition Date, the Aegis made certain loans and advances to the Debtor pursuant to and in accordance with the terms and conditions of the Loan and Security Agreement and Promissory Note dated as of December 21, 2007 (together with all other documentation executed in connection therewith, the "Aegis Loan Documents").

F.      Without prejudice to the rights, if any, of CenturyTel, the Debtor admits that, as of the Petition Date, the Debtor is the Borrower (as such terms are defined in the Loan Documents) under the Loan Documents and is justly and lawfully indebted and liable, without defense, counterclaim, or offset of any kind, to Aegis in the aggregate principal amount of $2,250,000.00 plus accrued and unpaid interest, costs and fees to the full extent authorized under the Aegis Loan Documents, the Bankruptcy Code and other applicable law (together, the "Aegis Indebtedness").

G.      Without prejudice to the rights, if any, of CenturyTel, the Debtor admits that the Aegis Indebtedness constitutes the legal, valid, and binding obligations of the Debtor, enforceable in accordance with their terms, and that no portion of the Aegis Indebtedness or any amounts paid to Aegis or applied to the obligations owing under the Loan Documents prior to the Petition Date is subject to any Claim (as defined in the Bankruptcy Code), counterclaim, cause of action, defense, setoff, avoidance, subordination, re-characterization, recovery, or attack of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, including Bankruptcy

Code section 105 or Chapter 5, of any other similar provisions of applicable state or federal law (in any case, a "Defense").

H.  Without prejudice to the rights, if any, of CenturyTel, the Debtor admits that, pursuant to the Aegis Loan Documents and the corresponding UCC-1 filed on December 21, 2007 (together, the "Aegis Collateral Documents"), that Aegis holds valid, binding, perfected, enforceable, liens and security interests (the "Aegis Prepetition Liens") on and in the property described in the Aegis Collateral Documents, including without limitation, all of the Debtor's assets, including personal property, accounts receivable, contracts, intellectual property, equipment, general intangibles, inventory, investment property and the proceeds from any of this collateral (together, the "Aegis Prepetition Collateral").

I.  Without prejudice to the rights, if any, of CenturyTel, the Debtor further admits that Aegis's liens upon and security interests in the Aegis Prepetition Collateral are not subject to any Defense.

J.  Without prejudice to the rights, if any, of CenturyTel, all proceeds of the Prepetition Collateral are Cash Collateral of Aegis within the meaning of section 363(a) of the Bankruptcy Code

K.  In the event CenturyTel is determined by order of the Bankruptcy Court to have a lien senior to Aegis as to the Aegis Prepetition Collateral, this Order is without prejudice to CenturyTel requesting adequate protection commensurate with such priority.

## III.    The Debtor's Cash Collateral Needs

L.  On October 30, 2008, the Court conducted a preliminary hearing on the Cash Collateral Motion.  The Court granted interim approval of the Cash Collateral Motion pursuant to terms of an agreed order between the Debtor and Aegis (the "Interim Cash Collateral Order",

Docket No. 12), granting the Secured Creditors, including Aegis, post-petition liens on the Debtor's assets equal to the amount of the cash collateral used by the Debtor under the Interim Cash Collateral Order (the "Interim Replacement Liens"). The Interim Cash Collateral Order expires on November 12, 2008.

M.    Debtor has requested Aegis permit the use of Cash Collateral in order to provide necessary funds to avoid harm to Debtor's estate. Without the use of Cash Collateral, the Debtor will not have the funds necessary to pay post-petition payroll, payroll taxes and expenses of the Debtor's business. Thus, the Debtor requires use of Cash Collateral as provided in this Order.

N.    The use of Cash Collateral to the extent authorized by this Order is in the best interest of, and will benefit, Debtor, its creditors and its estate. Good, adequate, and sufficient cause has been shown to justify the granting of the relief request in the Cash Collateral Motion, subject to the terms of this Order. The use of Cash Collateral by Debtor as set forth in this Order will avoid harm to Debtor, its estate and assets.

O.    To permit the Debtor's use of Cash Collateral, Aegis is entitled, pursuant to sections 105, 361, 362, and 363(e) of the Bankruptcy Code, to adequate protection of its interest in the Aegis Prepetition Collateral, including the Cash Collateral, for any diminution in value of the Aegis Prepetition Collateral, including, without limitation, resulting from the use of Cash Collateral and the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code. Accordingly, as detailed in this Order, Aegis is provided adequate protection in the form of the Replacement Liens and the Aegis Superpriority Claim, as defined and described below.

P.    The Aegis Prepetition Lien, the Interim Replacement Liens and all security interests, liens, claims and rights granted in this Order to Aegis, including, without limitation, the Replacement Liens and the Aegis Superpriority Claim, shall have priority over any lien, claim or

right provided to the Lenders (as defined below) in this Order or the DIP Loan Documents, including the DIP Liens and the DIP Obligations.

## IV.    The Debtor's Financing Needs

Q.    The ability of the Debtor to finance its ongoing operations requires the additional availability of working capital, the absence of which would immediately and irreparably harm the Debtor, its estate, and its creditors and the possibility for a successful reorganization.

R.    The Debtor is unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, or to obtain credit for borrowed money without granting liens on various of the assets of the Debtor pursuant to Bankruptcy Code section 364(c), as provided by this Order.

S.    The relief requested in the DIP Motion is necessary, essential, and appropriate for the continued operation of the Debtor's management and preservation of its properties, subject to the terms of this Order.

T.    Certain shareholders of Balaton Group, L.P.[1] (the "Lenders") have agreed to make an $800,000.00 debtor-in-possession financing loan to the Debtor (the "DIP Loan"), secured by the DIP Liens defined in this Order and subject to the terms of this Order.

U.    The terms of this Order were negotiated in good faith.  The loan advances to be made under the DIP Loan will be so extended in good faith, in consequence of which the Lenders are entitled to the protection and benefits of Bankruptcy Code section 364(e).

V.    Good cause has been shown for the entry of this Order and authorization for the Debtor to obtain loans and other credit from the Lender pursuant to the DIP Loan Documents. The Debtor's need for financing of the type afforded by the DIP Loan Documents is immediate

---

[1] Balaton is the Debtor's majority shareholder.

and critical.  Entry of this Order will enable the Debtor to preserve the assets of its estate, will increase the possibility of a successful reorganization of the Debtor and is in the best interests of the Debtor, its creditors and its estate.  The terms of the financing authorized hereby appear fair and reasonable, reflect Debtor's exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration.

## V.    Notice

W.    Debtor's counsel has certified that a copy of the Motions and notice of the final hearing on the Motions have been served either by electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon the United States Trustee, the Lenders,  the Secured Creditors, all creditors known to have any liens against the Debtor's assets, and the twenty largest unsecured creditors.  The notice of the hearing at which this Order was entered constitutes adequate notice under the circumstances in accordance with Bankruptcy Rules, 2002 and 4001(b) and (c), BLR 4001 and Bankruptcy Code section 102(l), as required by Bankruptcy Code sections 363 and 364(c).

NOW THEREFORE, on the Motion of the Debtor and the record before the Court with respect to the Motion made by the Debtor, and good cause appearing, it is hereby **ORDERED**:

### Approval of the Debtor's use of Cash Collateral and Authorization as to Granting of the Replacement Liens, Security Interests, and Administrative Priority Claim

1.    The Cash Collateral Motion is hereby granted, subject to the terms and conditions of this Order.

2.    For purposes of this Order, the term "Cash Collateral" shall be deemed to include, without limitation, all "cash collateral" as defined by Section 363 of the Bankruptcy Code, all deposits subject to setoff and cash arising from the collection, rental, sale, refund or other conversion to cash of property of the Debtor in which Aegis has a security interest or lien,

whether the property converted to cash existed as of the commencement of these cases or arose or was generated thereafter. Nothing in this Order shall constitute, or be deemed to constitute, either the consent of Aegis, or authority for the Debtor, to use any Cash Collateral other than in accordance with this Order.

3.      Aegis, as the holders of secured claims against the Debtor, is entitled to adequate protection of its interests, if any, in the Aegis Prepetition Collateral and the Cash Collateral under Sections 361 and 363(e) of the Bankruptcy Code; provided, however, that the Replacement Liens (as defined below) shall have the same validity, perfection, relative priority, and enforceability as Aegis's prepetition security interests.

4.      The Debtor may only use Cash Collateral strictly in accordance with the budget attached hereto as "Exhibit "X" and approved herein (the "Budget"), subject to a 10% total variance on budgeted amounts, from the date this order is signed, subject to the terms of this Order. The Debtor shall have no right to use any Cash Collateral to make any payment to the Lenders or on the DIP Obligations, unless and until the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens and the Aegis Superpriority Claim have been satisfied in full and released by Aegis or otherwise dealt with pursuant to the terms of a confirmed plan of reorganization.

5.      As adequate protection of Aegis's interests in the Aegis Prepetition Collateral and Cash Collateral, this Court grants Aegis, a, perfected replacement lien and security interest to the same extent, validity and priority of its pre-petition lien in the Aegis Prepetition Collateral, the Cash Collateral and all other property of the Debtor now owned or hereafter acquired, including without limitation real and personal property, accounts receivable, contracts, intellectual property, general intangibles, equipment, inventory and investment property, all supporting

obligations, all instruments, all proceeds, products, rents, and profits of any of the foregoing, whether existing now or in the future (the "Replacement Liens"). The Replacement Liens shall be valid and perfected, whether arising from section 552(b) of the Bankruptcy Code or otherwise, and include all the Debtor's property in which Aegis did and did not have a lien because of the operation of Section 552 of the Bankruptcy Code.

6.    Aegis is also granted a superpriority cost of administration priority claim under 11 U.S.C. §§ 503(b) and 507(b) to the extent of the postpetition diminution of its interests in the Aegis Prepetition Collateral and the Cash Collateral (the "Aegis Superpriority Claim") with priority over all other administrative claims in this Case, subject only to the Carve-Out.

7.    No costs or expenses of administration or other costs or expenses of the Debtor that have been or may be incurred in its Chapter 11 case shall be charged either against the Aegis Prepetition Collateral or Cash Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior express written consent of Aegis

8.    The Debtor's authorization to use Cash Collateral pursuant to the terms of this Order shall immediately terminate on the earlier of:

    (a)    February 27, 2009 at 5:00 p.m. (central time) (the "Termination Date") which may be extended for a subsequent budget period with the written consent of Aegis, all provisions of this Order shall apply to any such further Cash Collateral usage;

    (b)    the Maturity Date;

    (c)    the occurrence of any Event of Default under this Order or the DIP Loan Documents;

    (d)    entry of an order granting relief from the automatic stay with respect to any party;

    (e)    the Debtor's failure to deliver to any of the documents or other information required to be delivered to Aegis pursuant to the Order five (5) business days of when initially due, or the presence of any material misrepresentation in the same;

    (f)    the Debtor's failure to adhere to the Budget except as permitted by the terms of this Order;

    (g)    consummation of a Chapter 11 plan for the Debtor;

(h)　　the date of the closing of a sale of any of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code; and

(i)　　entry of an order reversing, staying, vacating, or otherwise modifying the terms of the Order in any material respect.

9.　　Upon termination of the Debtor's authorization to use Cash Collateral under paragraph 8 above, Aegis has authority to immediately seek an order from the Court to lift the stay under Bankruptcy Code § 362 to collect the Aegis Prepetition Collateral, the Cash Collateral and all collateral covered by the Replacement Liens and the Interim Replacement Liens.

10.　　Debtor shall deliver to Aegis's counsel: (i) any and all information provided to the Lenders, or required to be provided to the Lenders under the DIP Loan Documents, at the same time this information is due to or provided to the Lenders; (ii) on a monthly basis, a financial report consisting of Debtor's balance sheet and income statement as of the end of such period; (iii) copies of all monthly operating reports delivered to the office if the United States Trustee or any committee appointed in this case within two (2) days after such filing, (iv) on a weekly basis, each Wednesday a report of the difference between budgeted and expended Cash Collateral for the prior week, and (v) any other reporting the Debtor is required to provide under the Aegis Loan Documents within the time required by the Aegis Loan Documents.

11.　　The Aegis Prepetition Lien, the Interim Replacement Liens and all security interests, liens, claims and rights granted in this Order to Aegis, including, without limitation, the Replacement Liens and the Aegis Superpriority Claim, shall have priority over and are senior to any lien, claim or right provided to the Lenders in this Order or the DIP Loan Documents, including the DIP Liens and the DIP Obligations, but is subject to the Carve Out.

**Approval of the DIP Loan Documents and
Authorization as to Borrowing and Granting of Liens,
Security Interests, and Administrative Priority Claim**

12.     Subject to the other terms and conditions of this Order, the terms and
conditions of the DIP Credit Agreement, Security Agreement, and DIP Promissory Note attached
as Exhibits A, B and C (collectively, the "DIP Loan Documents") are hereby approved, as
follows:

(a)     the total amount of the DIP Loan to be provided by the Lenders pursuant
to the terms and conditions of this Order shall be up to $800,000.00;

(b)     the proceeds of the DIP Loan shall be used by the Debtor solely for the
purposes described in the Budget subject to the variances described in this Order.  The
Debtor and the Lenders reserve the right to amend the budget subject to further order of the
Court, after notice and hearing;

(c)     the Debtor is authorized to satisfy the conditions to the financing set forth
above, and is directed to perform all obligations hereunder in accordance with the terms
hereof and the provisions of the DIP Loan Documents;

(d)     interest due on the DIP Obligations (defined herein) shall be paid at the
prime rate published in *The Wall Street Journal* plus four percent existing on the date of the
entry of this order (i.e. 8% per annum);

(e)     the maturity date of the DIP Loan shall be the earliest to occur of (a) May
1, 2009; (b) the date of the closing of a sale of all or substantially all of Borrower's assets
pursuant to Section 363 of the Bankruptcy Code or a confirmed plan of reorganization, (c)
the effective date of a plan of reorganization or arrangement in the Chapter 11 Case; or (d)
on the occurrence of an Event of Default (the "Maturity Date").

13.     The Debtor is hereby authorized and directed to do and perform all acts and to make, execute, and deliver all instruments and documents which the Lender may request to evidence the Debtor's obligations and the DIP Liens (defined herein) as provided in the DIP Loan Documents and the perfection of such DIP Liens.  However, this provision does not authorize any action that in any way impairs the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens, the Aegis Superpriority Claim or any of Aegis's rights under this Order.

14.     As security for the Debtor's obligations to the Lenders arising under this Order (collectively, the "DIP Obligations"), and subject to the  Professional Fee Carve Out as hereinafter defined and subordinate and junior to the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens and the Aegis Superpriority Claim,  the Lender shall have and is hereby granted (effective as of the Date of this Order) security interests and liens (collectively, the "DIP Liens" or "DIP Lien") in the following properties of the Debtor:

(a)     pursuant to Bankruptcy Code section 364(c)(3) junior, perfected, valid, and enforceable Liens upon all personal property of Debtor, including, without limitation, all of Debtor's accounts, inventory, equipment, general intangibles (including all claims and counter-claims in any present and future litigation involving the Debtor), intellectual property (including, but not limited to, the patents and patent applications held by the Debtor), investment property, documents, instruments, chattel paper, deposit accounts, books and records of Debtor and all cash and non-cash proceeds of the foregoing,other than causes of action arising under chapter 5 of the Bankruptcy Code (the "DIP Collateral")[2]

15.     Notwithstanding any other provision of this Order or the DIP Loan Documents, the DIP Liens, and any other rights granted to the Lenders under this Order or the DIP Loan

---

[2] By this order, Lender is not being granted a senior lien provided for in Section 364(d).

Documents, shall be and are subordinate and junior to the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens, the Aegis Superpriority Claim and any of Aegis's other rights under this Order.

16.     Subject to the Professional Fee Carve Out as defined hereafter, the DIP Obligations created under this Order shall also be an allowed administrative expense claim (the "Super-Priority DIP Claim") with priority under Bankruptcy Code section 364(c)(1) and otherwise over all administrative expense claims and unsecured claims against the Debtor, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 326, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), and 1114, *provided however*, that the Super-Priority DIP Claim shall be subordinate to the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens, the Aegis Superpriority Claim and the Aegis Prepetition Indebtedness.

17.     Subject to the Professional Fee Carve Out, as defined hereafter, no costs or expenses of administration incurred in the Chapter 11 case are, or will be, prior to or on a parity with the DIP Obligations arising under the DIP Loan Documents, or with any other claims of the Lenders arising hereunder, *except however*, that the DIP Obligations, Superpriority DIP Claim and DIP Liens shall be subordinate to the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens, the Aegis Superpriority Claim or any of Aegis's rights under this Order.

18.     All DIP Obligations shall be due and payable upon the Maturity Date; however, no payments on account of the DIP Obligation shall be made, unless and until the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens and the Aegis

Superpriority Claim have been satisfied in full and released by Aegis or otherwise dealt with pursuant to the terms of a confirmed plan of reorganization.

19.     Unless and until the DIP Obligations, the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens and the Aegis Superpriority Claim are paid or satisfied in full, the protections afforded to Aegis and the Lenders under this Order, and any actions taken pursuant thereto, shall survive the entry of any order confirming a plan of reorganization or converting the Debtor's case into a case pursuant to Chapter 7 of the Bankruptcy Code, and the liens provided herein shall continue to be valid and enforceable in this case and in any such successor case, and such liens shall maintain their priority as provided by this Order until the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens, the Aegis Superpriority Claim and the DIP Obligations have been satisfied in full and released.

20.     To the extent any of the terms and conditions of the DIP Loan Documents are in conflict with the terms and conditions of this Order, the provisions and intent of this Order shall control.

## **Events of Default**

21.     The following shall constitute an event of default under this Order and the DIP Loan Documents (the "Events of Default"):

   (a)   Debtor shall fail to comply with any of the terms and conditions of this Order in any material respect;
   (b)   a trustee shall be appointed in this Chapter 11 case;
   (c)   an examiner shall be appointed in the Chapter 11 case with enlarged powers (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; and
   (d)   the Chapter 11 case shall be dismissed or converted to a case under Chapter 7.

### Remedies upon a Post-Petition Event of Default

22.     Any automatic stay otherwise applicable to the Lenders shall remain in effect, subject to the right of the Lenders to seek expedited relief from the automatic stay upon the occurrence of an Event of Default and at any time thereafter, and without further order of the Court, the Lender may declare the principal of and accrued interest, fees and other liabilities constituting the DIP Obligations to be due and payable, subject to the restrictions of this Order, including the requirement that no payments on account of the DIP Obligation shall be made, unless and until the Aegis Prepetition Lien, the Replacement Liens, the Interim Replacement Liens and the Aegis Superpriority Claim are satisfied in full and released by Aegis or otherwise dealt with pursuant to the terms of a confirmed Chapter 11 plan of reorganization.

23.     After an Event of Default, the Debtor shall have no right to use the proceeds advanced under the DIP Credit Agreement other than towards the satisfaction of the DIP Obligations.  Subject to the Professional Fee Carve Out as hereinafter defined, in no event shall the Debtor be authorized to use any proceeds of the DIP Loan to pay any cost or expenses of administration in this Chapter 11 case or in any superseding Chapter 7 case after the occurrence of an Event of Default until such time as all of the DIP Obligations are paid and satisfied in full or otherwise dealt with pursuant to the terms of a confirmed Chapter 11 plan of reorganization of the Debtor..

### Miscellaneous Provisions

24.     Consistent with 11 U.S.C. § 364(e), if any or all of the provisions of this Order are hereafter modified, vacated or stayed:

(a)     such stay, modification or vacation shall not affect the validity of any obligation incurred pursuant to this Order where such obligation was incurred prior to the

effective date of such stay, modification or vacation, nor shall such stay, modification or vacation affect the validity, enforceability or priority of any lien securing such obligation;

(b)    any obligation incurred by Debtor to the Lenders or Aegis under this Order prior to the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Lenders and Aegis shall be entitled to all the rights, remedies, privileges and benefits, including the liens and priorities granted herein with respect to any such obligation; and

(c)    the indebtedness resulting from the DIP Loan made prior to the effective date of any stay, modification or vacation of this Order cannot (i) be subordinated, (ii) lose its priority lien or super-priority administrative expense claim status, or (iii) be deprived of the benefit of the status of the liens, security interests and claims granted under this Order as a result of any subsequent order in the Chapter 11 case, or any superseding case, of Debtor.

25.    The time and manner of payment of the DIP Obligations pursuant to the terms of this Order, the DIP Liens in and to the DIP Collateral, the Super-Priority DIP Claim, the Replacement Liens, the Interim Replacement Liens and the Aegis Superpriority Claim shall not be altered or impaired by any plan of reorganization which may hereafter be confirmed, or by any other order which may hereafter be entered.

26.    All the payments made to the Lenders, the DIP Liens and the Super-Priority Claim granted to the Lenders under this Order, and the priority thereto shall be binding on the Debtor, any successor trustee for the Debtor's estate, and all creditors of the Debtor, as provided in Bankruptcy Code section 364(e), except as otherwise provided by this Order.

27.     The Lenders, Aegis and the Debtor may modify the Budget or amend or waive any provision of this Order or the DIP Loan Documents, *provided* that such waiver or modification or shall not be effective unless set forth in writing, signed by the parties hereto and approved by the Court after notice and hearing.

28.     As used in this Final Order, "Carve-Out" means, at any time of determination, the sum of (a) allowed administrative expenses payable pursuant to 28 U.S.C. §1930(a)(6), (b) Unpaid Priority Professional Expenses (as defined below) incurred by Weycer, Kaplan, Pulaski & Zuber, P.C. ("WKPZ"), which sum shall not exceed $100,000, *provided, however*, that in no event shall the Carve-Out include professional fees and disbursements incurred in connection with the actual filing of any claims or causes of action against Aegis challenging or raising any Defense to the Aegis Prepetition Indebtedness or any liens of Aegis.   "Unpaid Priority Professional Expenses" means allowable fees, costs and reasonable expenses of WKPZ in the Chapter 11 Case pursuant to sections 327, 328 and/or 1103 of the Bankruptcy Code which have not been paid pursuant to interim fee application orders, from draw down of retainers, from draw downs of the DIP Loan for attorney fees as set forth in the budget, or any fee procedure order that may be entered in this case. Unpaid Priority Professional Expenses subject to the Carve Out will have priority over the DIP Obligations. Except as otherwise provided pursuant to the terms of a confirmed plan of reorganization, any Unpaid Priority Professional Expenses in excess of the Carve Out shall be paid only after the DIP Obligations, the Aegis Prepetition Lien, the Replacement Lien, the Interim Replacement Lien and the Aegis Superpriority Claim have been satisfied in full and released.

29.     This Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the Replacement Liens upon the Debtor's property without the need for filing or

record any financing statements or other documents that may otherwise be required under Federal of state law in any jurisdiction.  The terms and provisions of this Order and any actions taken pursuant hereto, shall survive entry of any order that may be entered (i) converting to Chapter 7 or dismissing the Debtor's case (ii) any asset of the Debtor passing out of the estate by foreclosure (and any lien created by this Order shall specifically survive any such foreclosure), or (iii) confirming or consummating any plan of reorganization in the Debtor's case.  The terms and provisions of this Order as well as the priorities in payment, liens, and security interests granted pursuant to this Order shall continue in any superseding case under the Bankruptcy Code of the Debtor.

30.     The provisions of this Order shall inure to the benefit of Debtor, Aegis, and the Lenders, and they shall be binding upon Debtor, Aegis, the Lenders, together with their respective successors and assigns, including any trustees or other fiduciaries hereafter appointed as legal representatives of Debtor or with respect to property of the estate of Debtor, whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case, and shall also be binding upon all creditors of Debtor and other parties in interest.

31.     If an order is entered, whether sua sponte by the Court or otherwise, dismissing or converting Debtor's case, such order shall recognize that such dismissal or conversion shall not affect or diminish Aegis's rights, priorities or remedies granted hereunder.

32.     The stay of section 362 of the Bankruptcy Code is hereby modified to permit the parties to accomplish the transactions contemplated by this Order.

33.     Nothing in this Order shall be deemed to terminate, modify, or release any obligations of any non-debtor guarantors to Aegis with respect to the Aegis Prepetition Debt.

SIGNED     *Nov. 12, 2008*

UNITED STATES BANKRUPTCY JUDGE

AGREED TO BY:

WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

By: _____

  Edward L. Rothberg
  State Bar No. 17313990
  Hugh M. Ray, III
  State Bar No. 24004246
  Eleven Greenway Plaza, Suite 1400
  Houston, Texas  77046
  (713) 961-9046 (telephone)
  (713) 961-5341 (facsimile)

ATTORNEYS FOR THE DEBTOR

  and

DIAMOND MCCARTHY LLP

By: _____

  Kyung S. Lee
  Texas Bar No. 12128400
  SDTX No. 862
  klee@diamondmccarthy.com
  Jason M. Rudd
  Texas Bar No.  24028786
  SDTX No. 28081
  jrudd@diamondmccarthy.com
  909 Fannin, Suite 1500
  Houston, Texas 77010
  (713) 333-5100 (telephone)
  (713) 333-5195 (facsimile)

COUNSEL FOR AEGIS TEXAS VENTURE FUND, LP

## DIP CREDIT AGREEMENT

This **DIP CREDIT AGREEMENT** (this "Agreement"), dated as of November __, 2008, is entered into by and between SkyPort Global Communications, Inc., a Texas corporation, as debtor-in-possession ("Borrower"), and Balaton Group, LP, as agent for Franklin Craig, Adrien Pouliot, Bob Donaldson, Elvio Del Sorbo. Wayne Fox and the Semper Group ("Lender").[1]

## W I T N E S S E T H:

**WHEREAS**, on October 24, 2008 (the "Petition Date"), Borrower commenced Chapter 11 Case No. 08-36737-H4-11 (the "Chapter 11 Case") by filing a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). Borrower continues to operate its business and manage its property as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrower has requested that Lender provide a secured, non-revolving credit facility to Borrower of up to eight hundred thousand dollars ($800,000) to fund the working capital and general corporate requirements of Borrower, including reorganization costs, during the pendency of the Chapter 11 Case;

**WHEREAS**, Lender shall from time to time, upon the request of Borrower and subject to the conditions set forth below, make loans to Borrower hereunder in amounts not exceeding in the aggregate at any time outstanding eight hundred thousand dollars ($800,000);

**WHEREAS**, Borrower has agreed to secure all of its obligations under this Agreement by granting to Lender, under and pursuant to the Security Agreement (as hereinafter defined) and the Financing Orders (as hereinafter defined), a security interest in and lien upon the Collateral having the priority specified in the Financing Orders.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and of the mutual covenants, conditions and provisions hereinafter set forth, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1.      Definitions. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Approved Budget" means the budget prepared by the Borrower and approved by the Lender which details the manner in which Loan proceeds are to be utilized by the Borrower, a copy of which is annexed hereto as Exhibit 1.

"Business Day" means any day on which banks are open for business in Houston, Texas other than a Saturday, Sunday or legal holiday.

---

[1] The members of this group are equity holders of Balaton Group, LP.



EXHIBIT
A

"Carve-Out Amount" means one hundred thousand dollars ($100,000).

"Collateral" shall have the meaning assigned to such term in the Security Agreement and the Financing Orders.

"FCC" means the Federal Communications Commission.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender (including such additional provisions not present in the Interim Order as Lender shall require), and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) debt, and grant Liens under this Agreement and the Security Agreement and provides for the super priority of Lender's claim under 11 U.S.C. § 364(c)(1) and (3) with respect to amounts borrowed hereunder, Priority Professional Fees and Expenses not to exceed the Carve-Out Amount, and fees of the US Trustee and Clerk of the Court.

"Financing Order" means, the Final Order (I) Authorizing Use of Cash Collateral and (II) Approving Secured Debtor in Possession Post-Petition Financing entered on November 12, 2008.

"Governmental Authority" means any nation or government, any state, city, province or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, the FCC.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever.

"Loan" and "Loans" shall have the meanings ascribed to said terms in Section 2(a) hereof.

"Material Adverse Effect" means, when used herein, any change or effect that is materially adverse to the business, financial, condition, assets, properties, operations or results of operations of either party which would prevent (or would reasonably be expected to prevent) the fundamental and basic operation of such business entity after giving effect to the Loans contemplated by this Agreement; provided, however, that any of the following shall not constitute a "Material Adverse Effect" on or with respect to such business entity; (a) any adverse change, event, or effect that is demonstrated to be directly caused by conditions affecting the United States economy generally, or the economy of any nation or region in which either party conducts business that is material to the business of such entity, which does not have a disproportionate effect on SkyPort, or (b) any adverse change, event, or effect that is demonstrated to be directly caused by conditions generally affecting the telecommunications industry, which does not have a disproportionate effect on SkyPort, as the case may be.

"Maturity Date" means the earliest of (a) May 1, 2009; (b) the date of acceleration of the Obligations of Borrower hereunder pursuant to Section 6, (c) the date of the closing of a sale of all or substantially all of Borrower's assets pursuant to Section 363 of the Bankruptcy Code or a confirmed plan of reorganization, or (d) the effective date of a plan of reorganization or arrangement in the Chapter 11 Case.

"Maximum Amount" means eight hundred thousand dollars ($800,000).

"Note" shall have the meaning ascribed to such term in Section 2(b) hereof.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans and all other expenses, reimbursements, indemnities and other obligations of Borrower to Lender hereunder.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or Governmental Authority.

"Priority Professional Fees and Expenses" means the allowed fees and expenses of attorneys, accountants, and other professionals retained in the Chapter 11 Case pursuant to sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code by the Borrower.

"Security Agreement" means the Security Agreement to be executed by Borrower in favor of Lender granting Lender a Lien on the Collateral.

2.    Facility.

(a)    Loans.  Upon request of Borrower in accordance with Section 2(c), and subject to compliance with the conditions set out in section 4 Lender shall make loans to the Borrower in whole multiples of $100,000 up to the Maximum Amount in the aggregate for the purposes set forth in the Approved Budget to finance current liabilities during the pendency of the Chapter 11 Case.

(b)    Note.  The Loans made by Lender to Borrower hereunder, if any, shall be evidenced by a promissory note of Borrower, substantially in the form of Exhibit A attached hereto and made a part hereof, with appropriate insertions, payable to the order of Lender (as amended, endorsed, renewed, extended, or otherwise modified from time to time, the "Note").  Lender is hereby authorized to record the date and amount of each Loan made by it to Borrower, if any, and the date and amount of payment of principal thereof by Borrower, and such recordation may be evidenced by Lender's internal records, and any such recordation shall constitute prima facie evidence of the accuracy of the information so recorded, provided that the failure to make any such recordation or any error in such recordation shall not affect Borrower's obligations hereunder or under the Note executed by Borrower.

(c)    Borrowing Requests.  Borrower may from time to time request a Loan under Section 2(a) by providing Lender with a borrowing request in writing or by telephone (or as otherwise agreed between Borrower and Lender) specifying (i) the amount of the

requested Loan, (ii) the requested date thereof, which shall be a Business Day, and (iii) the intended use of the Loan's proceeds. If Lender elects, in its discretion, to make the Loan, Lender will make such Loan to Borrower by wire transfer in accordance with the instructions provided by Borrower (or as otherwise agreed between Borrower and Lender).

(d)     Interest. Each Loan evidenced by this Agreement shall bear interest from the respective date of borrowing until the date of repayment by maturity, acceleration or otherwise. Interest shall accrue on the principal balance of each Loan from time to time outstanding hereunder at the rate of 8% per annum compounded semi-annually based on a year of 365 days. Borrower shall pay interest in cash on each such Loan in arrears on the Maturity Date. If the Maturity Date is extended, the Borrower shall pay interest in cash on each such Loan in arrears on the new Maturity Date. Upon the occurrence and during the continuance of an Event of Default, (x) the outstanding principal amount of the Loans (and any overdue interest) shall bear interest at the rate of 10% per annum compounded semi-annually, computed and payable as provided above and (y) Lender may require the payment in cash of accrued interest on demand or at regular intervals more frequent than monthly. In no event shall the interest rate under this Section 2(d) exceed the maximum rate permitted under applicable law.

(e)     To the extent any term or provision of this Agreement conflicts in any way with the Financing Order, the Financing Order shall control. All terms of this Agreement are expressly subject to the provisions of the Financing Order.

3.     Payment.

(a)     Payment at Maturity. All Loans shall be repaid by Borrower on the Maturity Date together with any accrued and unpaid interest and any unpaid fees, costs or other expenses payable by the Borrower to the Lender.

(b)     Method of Payment. All payments hereunder, including without limitation all payments of principal of and interest on the Loans, shall be made to Lender at its address referred to in Section 7(a) (or as otherwise agreed between Borrower and Lender) in immediately available funds. Whenever any payment hereunder becomes due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the interest due. Any payment made to Lender shall be applied in the following order: first, to the payment of any fees, costs and expenses owing to Lender; second, to the payment of interest on the Loans; third, to the payment of the principal amount of the Loans outstanding; and fourth, to any other amounts owing to Lender hereunder.

(c)     Gross-up.     If, in respect of any amount required to be paid hereunder by the Borrower to the Lender whether in respect of principal, interest, fees or expenses, the Borrower is required by any Governmental Authority to withhold any amount on account of the taxes, levies or otherwise, the Borrower shall increase the affected payment so that the Lender receives the amount it would otherwise be entitled to receive but for the withholding requirements.

4.     Conditions to Initial Advance of Loans.     The obligation of the Lender to make available the initial Loan under this Agreement is subject to the terms and conditions of this Agreement and is conditional upon satisfactory evidence being given to the Lender and its counsel as to compliance with the following conditions:

(a)     Agreement.  This Agreement or counterparts hereof shall have been duly executed by, and delivered to, Borrower and Lender.

(b)     Approvals.  The Lender shall have received satisfactory evidence that the Borrower has obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement, the Security Agreement and Note;

(c)     Loan Documents. The Lender shall have received duly executed by the Borrower, and in form and substance satisfactory to it each of the documents, agreements, instruments and opinions listed in Schedule A to this Agreement.

(d)     Registrations. The Security Agreement has been registered, recorded or filed in all jurisdictions and in all registries deemed necessary by the Lender in its sole discretion.

(e)     Borrowing Request.  The Lender shall have received a borrowing request as provided in section 2(b).

5.     Events of Default.  Each of the following events shall be referred to herein as an "Event of Default":

(a)     failure to make any payment of any installment of principal of or interest upon any Loan when due; or

(b)     either Lender or Borrower shall have failed to receive, as and when required, any consent or approval from any Governmental Authority necessary in order for such party to perform its obligations hereunder in accordance with all applicable laws, rules and regulations; or

(c)     Borrower or its property shall become subject to any law, rule, regulation, tariff or rate ruling issued by any Governmental Authority that shall have, in the reasonable judgment of Lender, a Material Adverse Effect on the ability of Borrower to collect reasonable fees and charges for its products and services; or

(d)     any event occurs that has, or could reasonably be expected to have, a Material Adverse Effect on the business, assets, operations, prospects or financial or other condition of Borrower;

(e)     the occurrence of any of the following in the Chapter 11 Case:

(i)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Agreement or the Interim Order or the Final Order without

the written consent of Lender (other than the replacement of the Interim Order with the Final Order);

(ii)    the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a responsible person or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of Borrower;

(iii)    the dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(iv)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, (y) to permit the perfection of any Lien on the Collateral unless such Lien is or shall be junior in priority to the Liens of Lender therein (other than Liens equal to or senior to the Liens of Lender under and in accordance with the Financing Order) or (z) to allow any creditor to terminate an executory contract or unexpired lease of the Borrower;

(v)    the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(vi)    the filing of a challenge by any interested party to the Lender's lien or to the Lender's prepetition conduct;

(vii)    the grant of a change of venue with respect to the case or any adversary proceeding;

(viii)    filing of a plan of reorganization not supported by Lender;

(ix)    the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to Lender (other than claims and Liens equal to or senior to the claims and Liens of Lender under and in accordance with the Financing Order); or

(x)    the Financing Order ceases to be in full force and effect.

(f)    the Borrower breaches any term, condition or covenant in this Agreement or in the Security Agreement or the Note.

6.    <u>Remedies</u>.

(a)    <u>Certain Action Following a Default</u>. If any Event of Default shall occur, then in each and every such case, Lender may, in its sole discretion (i) by notice in writing to Borrower (with copies to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case, if any, and the Office of the United States Trustee; provided, however, that failure to deliver such copies shall not in any way affect the validity or effectiveness of such notice) declare all or any part of the unpaid balance of the Loans then outstanding to be

immediately due and payable and (ii) subject to such limitations, if any, set forth in the Financing Order, exercise any rights and remedies of Lender under this Agreement, this the Security Agreement, any other document executed in connection with this Agreement or applicable law.

(b)     Cumulative Remedies.  To the extent not prohibited by applicable law which cannot be waived, all of Lender's rights hereunder and under any other document between Lender and Borrower shall be cumulative.

(c)     Waivers.  To the extent that such waiver is not prohibited by the provisions of applicable law that cannot be waived, Borrower hereby waives (1) all presentments, demands for performance, notices of nonperformance (except to the extent required by this Agreement), protests, notices of protest and notices of dishonor; (2) any requirement of diligence or promptness on the part of Lender in the enforcement of its rights under this Agreement; (3) any and all notices of every kind and description which may be required to be given by any statute or rule of law; and (4) any defense (other than indefeasible payment in full) which it may now or hereafter have with respect to its liability under this Agreement.

7.     Covenants

(a)     Use of Proceeds.  The Borrower shall use proceeds of all Loans for the purposes contemplated in this Agreement and as set out in the Approved Budget.

(b)     Information.  The Borrower shall furnish to the Lender promptly on request such information in its possession respecting its financial condition and its business and operations as the Lender may from time to time reasonably require.

(c)     Corporate Existence.  The Borrower will do or cause to be done all such things as are necessary to maintain its corporate existence in good standing to ensure that it has at all times the right and is duly qualified to conduct its business and to obtain and maintain all rights, privileges and franchises necessary for the conduct of its business.

(d)     Property and Assets.  The Borrower will maintain, operate and use its properties and assets, and will carry on and conduct its business in a proper and efficient manner so as to preserve and protect such properties, assets and business and the profits thereunder ordinary wear and tear excepted.

(e)     Insurance.  The Borrower will insure and keep insured its properties and assets with such coverage and against such losses or damage to the full insurable value of such properties and assets as the Lender reasonably requires or in the absence of such requirement to the extent insured against by comparable corporations engaged in comparable business.

(f)     Books and Records.  The Borrower will at all times maintain and prepare records and books of account and therein make true and correct entries of all

dealings and transactions relating to its business and if requested by the Lender will make same available for inspection by the Lender.

(g)     Comply with Laws.  The Borrower will comply in all respects with all applicable laws in all material respects.

(h)     Inspections.  The Borrower will permit the Lender through its officers, employees or any consultant retained by it, upon request, to have reasonable access at any reasonable time and from time to time to any of the Borrower's premises and to any records, information or data in its possession so as to enable the Lender to ascertain the state of the Borrower's financial condition and operations and will permit the Lender to make copies or abstracts from such records, information and data.

8.     No Transfer of Control.  Notwithstanding anything to the contrary contained herein, this Agreement is not intended to transfer control of Borrower to Lender.  Lender will not take control of or manage the operations of the Borrower, nor will it take any action pursuant to this Agreement in furtherance of its security interest in the Collateral which would constitute or result in the transfer of control or the assignment of any FCC license or authorization without the prior consent or approval of the FCC.

9.     Miscellaneous.

(a)     Notices.  Any communication, notice or demand required or permitted to be given hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier at the address or telecopier number set forth in Schedule B hereto.  Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).

(b)     Entire Agreement; Severability.  This Agreement sets forth the parties' entire agreement and understanding in respect of the subject matter contained herein. Notwithstanding the foregoing, however, the Financing Order shall continue to govern the terms and conditions of the transactions contemplated hereby to the extent inconsistent with, or address matters not addressed in, this Agreement.  If any term or provision hereof, or its application to any person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such terms to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each term hereof shall be valid and enforceable to the fullest extent permitted by applicable law.

(c)     Assignment.  Neither this Agreement nor any of the rights, interests or obligations of Borrower hereunder shall be assigned or otherwise transferred by Borrower, nor may Borrower delegate performance hereunder, except with Lender's prior written consent.  Lender may assign all or a portion of its rights under this Agreement and the Loan Documents to any person upon notice to the Borrower effective as of a date stipulated in

such notice (the "Effective Date").  As of the Effective Date the assignee shall be a party hereto with all the rights of the Lender hereunder to the extent that the rights and obligations hereunder and under the Loan Documents have been assigned to it and to the extent that the Lender has assigned its rights and obligations hereunder and under the Loan Documents, it shall be released from its obligations hereunder and thereunder.  Should the Lender assign all or portion of its rights and obligations hereunder and under the Loan Documents, the term "Lender" hereunder shall mean the Lender and the assignees collectively and any decisions to be made  by the Lender hereunder shall require the approval of all lenders hereunder.

(d)     Amendments; Waivers.     All amendments, supplements or other modifications hereof must be made by written agreement of the parties hereto and approved by the Bankruptcy Court.

(e)     APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF TEXAS.  EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT, DURING THE PENDENCY OF THE CHAPTER 11 CASE, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND LENDER PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; PROVIDED, THAT LENDER AND BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED FURTHER,   THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON ENFORCE ANY AND ALL RIGHTS IT MAY CONCERNING THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, WHETHER UNDER THE TERMS OF THIS AGREEMENT OR OTHERWISE, AND/OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.

(f)     WAIVER OF VENUE.     BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN SECTION 7(e).   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(g)     SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 7(a). NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(h)     WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(i)     Counterparts.   This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  A facsimile copy of a signature hereto shall have the same effect as the original of such signature.

(j)     Reinstatement.  In the event that any payment hereunder, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(k)     Specific Performance. The rights of the parties under this Agreement are unique and, accordingly, the parties shall have the right, in addition to such other remedies as may be available to any of them at law or in equity, to enforce their rights hereunder by actions for specific performance in addition to any other legal or equitable remedies they might have to the extent permitted by law.

(l)     Binding Agreement.   This Agreement and all Liens created hereby or pursuant hereto shall be binding upon Borrower, the estate of Borrower, and any trustee or successor in interest of Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code.  This Agreement shall be binding upon, and inure to the benefit of, the successors of Lender and its assigns, transferees and endorsees.  The Liens created by this Agreement and the Financing Orders shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lenders file financing statements or otherwise perfect its security interests or Liens under applicable law.

(m)     Reimbursement of Expenses .  All statements, reports, certificates, opinions and other documents or information required to be furnished to the Lender by the Borrower under this Agreement shall be supplied without cost to the Lender.  Subject to the terms of the Financing Order, the Borrower agrees to pay promptly on demand or from the proceeds of the initial Loan as required by the Lender all of the Lender's reasonable legal fees, disbursements, documentation costs and other reasonable expenses incurred in connection with the preparation, negotiation, documentation and operation of this Agreement and any expenses incurred in connection with any documents or action contemplated in this Agreement, including without limitation, the Chapter 11 Case and any amendments of or supplement or modification hereunder or thereunder.

**IN WITNESS WHEREOF,** the parties have caused this DIP Credit Agreement to be duly executed as of the date first above written.

BORROWER:

**SKYPORT GLOBAL COMMUNICATIONS, INC.**

By: _____

Name:

Title:


LENDER:

**BALATON GROUP, LP, AGENT**

By: _____

Name:

Title:

SCHEDULE A

<u>Loan Documents</u>

1. The Security Agreement
2. The Note

SCHEDULE B

Notice Information

Borrower                                    Lender

SkyPort Global Communications, Inc.
11140 Aerospace Ave.
Houston, Texas 77034
Attn: Douglas Whitworth

with a copy to:                             with a copy to:

# SECURITY AGREEMENT

### by

## SKYPORT GLOBAL COMMUNICATIONS, INC.,
### as Debtor-In-Possession

### In Favor of

## BALATON GROUP, LP, AGENT
### as Lender

### Dated November __, 2008



## TABLE OF CONTENTS

SECTION 1        DEFINITIONS...............................................................................1

SECTION 2        GRANT OF SECURITY INTEREST.............................................3

SECTION 3        FURTHER ASSURANCES............................................................4

SECTION 4        INTENTIONALLY OMITTED.......................................................4

SECTION 5        PRIORITY OF SECURITY INTEREST............................................4

SECTION 6        JUSISDICTION OF ORGANIZATION; ORGANIZATION NUMBER........4

SECTION 7        RISK OF LOSS, SALE OF COLLATERAL...........................................4

SECTION 8        REMEDIES.................................................................................5

SECTION 9        EXPENSES...............................................................................6

SECTION 10       RIGHTS CUMULATVIE...............................................................6

SECTION 11       REMEDIES NOT EXCLUSIVE.........................................................6

SECTION 12       ASSIGNMENT.............................................................................6

SECTION 13       SUCCESSORS AND ASSIGNS.........................................................6

SECTION 14       NOTICES...................................................................................7

SECTION 15       GOVERNING LAW.......................................................................7

SECTION 16       SEVERABILITY...........................................................................7

SECTION  17      FCC CONSENT...........................................................................7

SECTION 18       COUNTERPARTS........................................................................7

SECTION 19       DISTRIBUTION OF PROCEEDS.......................................................7

SECTION 20       WAIVER OF JURY TRIAL.............................................................8

## SECURITY AGREEMENT

This SECURITY AGREEMENT (this "*Agreement*"), is entered into as of the ____ day of November, 2008, between SkyPort Global Communications, Inc., a Texas corporation (the "*Company*"), as debtor-in-possession (the "*Borrower*"), and Balaton Group, LP, as agent for Franklin Craig, Adrien Pouliot, Bob Donaldson, Elvio Del Sorbo. Wayne Fox and the Semper Group ("*the Lender*").

## RECITALS

**A.**     On October 24, 2008, the Borrower commenced Chapter 11 Case No. 08-36737-H4-11 (the "*Chapter 11 Case*") by filing a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "*Bankruptcy Code*"), with the United States Bankruptcy Court for the Southern District of Texas. The Borrower continues to operate its business and manage its property as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**B.**     The Borrower has requested that the Lender provide a secured, credit facility to the Borrower of up to eight hundred thousand dollars ($800,000) to fund the working capital and general corporate requirements of the Borrower during the pendency of the Chapter 11 Case.

**C.**     The Lender may from time to time, upon the request of the Borrower, make loans to the Borrower under the DIP Credit Agreement (the "*Credit Agreement*"), dated as of the date hereof, between the Borrower and the Lender in amounts not exceeding in the aggregate at any time outstanding eight hundred thousand dollars ($800,000).

**D.**     The Borrower has agreed to secure all of its obligations under the Credit Agreement by granting to the Lender, under and pursuant to this Agreement and the Financing Orders (as defined in the Credit Agreement), a security interest in and lien upon the Collateral (as hereinafter defined) having the priority specified in the Financing Orders.

NOW, THEREFORE, in consideration of the foregoing premises, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Borrower hereby agrees with the Lender, as follows:

**1.**     <u>Definitions</u>. As used in this Agreement, unless the context otherwise requires.

153822_1

"*Applicable Law*" means, in respect of any Person, all provisions of constitutions, statutes, rules, regulations and orders of governmental bodies or regulatory agencies applicable to such Person, including, without limiting the foregoing, the UCC, the Bankruptcy Code, the Communications Act and all orders, decisions, judgments and decrees of all courts and arbitrators in proceedings or actions to which the Person in question is a party or by which it is bound.

"*Carve-Out Amount*" means $100,000.

"*Communications Act*" means the Communications Act of 1934, and any similar or successor federal statute, and the rules and regulations of the FCC there under, all as the same may be in effect from time to time.

"*FCC*" means the Federal Communications Commission.

"*Financing Order*" means the Final Order (I) Authorizing Use of Cash Collateral; and (II) Approving Secured Debtor in Possession Post-Petition Financing entered by the Bankruptcy Court on November 12, 2008.

"*Lien*" means any lien, encumbrance, security interest, charge, or other similar claim on property.

"*Permitted Lien*" means, as applied to any Person:

**a)** Any Lien in favor of CenturyTel, Inc., Aegis Texas Venture Fund LP. or their successors and assigns given to secure the obligations under certain loan agreements, security agreements, promissory notes, debentures, and as to Aegis, under the Financing Order.

**b)** Liens for taxes, assessments, governmental charges or levies not yet delinquent and (ii) Liens for taxes, assessments, judgments, governmental charges or levies or claims the non-payment of which  is being diligently contested in good faith by appropriate proceedings and for which adequate reserves have been set aside on such Person's books, but only so long as no foreclosure, distraint, sale or similar proceedings have been commenced with respect thereto;

**c)** Liens of carriers, warehousemen, mechanics, laborers and material men incurred in the ordinary course of business for sums not yet overdue by more than thirty (30) days or being diligently contested in good faith, if reserves or appropriate provisions shall have been made therefore; provided, however, that no Liens in favor of satellite service providers shall be construed as permitted by this subsection;

**d)** Liens incurred in the ordinary course of business in connection with worker's compensation and unemployment insurance;

**e)** Restrictions on the transfer of the Licenses or assets of such Person imposed by any of the Licenses as presently in effect or by the Communication Act and any regulations thereunder;

**f)** Purchase money security interest liens in favor of equipment lenders and/or lessors; and

**g)** Liens granted, established or set forth under the Financing Orders to secure Priority Professional Feels and Expenses not to exceed the Carve-Out amount and U.S. Trustee Fees.

"***Person***" means an individual, corporation, limited liability company, association, partnership, joint venture, trust or estate, an unincorporated organization a government or any agency or political subdivision thereof, or any other entity.

"***Priority Professional Fees and Expenses***" means the allowed fees and expenses of attorneys, accountants, and other professionals retained in the Chapter 11 Case pursuant to sections 327, 328, 330, and 1103 of the Bankruptcy Code by the Borrower.

"***UCC***" means the Uniform Commercial Code as in effect in the State of Texas, as amended from time to time.

"***U.S. Trustee Fees***" means those amounts payable pursuant to 28 U.S.C. §1930(a)(6) and any fees payable to the Clerk of the Court.

2.       Grant of Security Interest. Subject to the terms of the Financing Order, the Borrower hereby grants and assigns to the Lender a continuing security interest (the "***Security Interest***") in the currently owned or hereafter acquired property and rights of the Borrower set forth below (collectively, the "***Collateral***"):

a)       Accounts;

b)       Inventory;

c)       Equipment and Fixtures. All equipment and fixtures as these terms, including without limitation, leasehold improvements fixed and attached to the real property, municipally known as 11140 Aerospace Avenue, Houston, Texas, and more particularly described in Schedule 1.

d)       Licenses. To the extent permitted by Applicable Law, all licenses issued by the FCC and other licenses necessary for the operation of the Borrower's operation, which are more particularly described on the date hereof on Schedule 2 attached hereto (the "Licenses")

e)       General Intangibles. All general intangibles to the extent permitted by Applicable Law; and

f)         Proceeds. All proceeds of any of the above, and all proceeds of any loss of any of the above, whether insured or not insured, and all other proceeds of any sale, lease or other disposition of any property or interest therein referred to above, or of any franchise, license, permit or operating right issued by the FCC or any other governmental or regulatory body or agency, whether or not constituting a License, including without limitation, the proceeds of the sale or other disposition of any License, together with all proceeds of, or payments under, or in respect of and policies of insurance covering any or all of the above, indemnity or warranty payments with respect to any of the above, the proceeds of any award in condemnation with respect to any of the property covered above, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds (the "*Proceeds*").

This Agreement and the Security Interest secure payment of all obligations owed to the Lender under this Agreement and the Credit Agreement and any promissory note issued pursuant thereto or thereof or any extension, renewals or amendments of the Agreement or the Credit Agreement or any such promissory note, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due (all of the foregoing obligations being hereinafter collectively referred to as the "*Secured Obligations*".

3.         Further Assurances. The Borrower hereby authorizes the Lender to file such financing statements, continuation statements, and such other documents as the lender may deem necessary or reasonably desirable to protect or perfect the Security Interest of the Lender may deem necessary or reasonably desirable to protect or perfect the security Interest of the Lender in the Collateral. In addition, the Borrower agrees to make, execute, deliver or cause to be done, executed and delivered, from time to time, all such further acts, documents and things as the Lender may reasonably require for the purpose of perfecting or protecting its rights hereunder or otherwise giving effect to this Agreement, all immediately upon request therefor.

4.         Intentionally Omitted.

5.         Priority of Security Interest. The Borrower further represents and warrants that the Security Interest in the Collateral granted to the Lender hereunder shall have at all times the priority granted by the Financing Orders.

6.         Jurisdiction of Organization; Organization Number. The Company represents and warrants that the Company is a Texas corporation whose organization number for purposes of the UCC is 1557975. Borrower will not change its name, corporate structure, or organization number unless it first provides at least thirty (30) days' advance written notice to the Lender of the intended change and cooperates with the Lender in filing new or amended financing statements to reflect the intended change.

7.  **Risk of Loss, Sale of Collateral.** Any and all injury to, or loss or destruction of, the Collateral shall be at the Borrower's risk. Except for Permitted Liens, the Borrower agrees not to sell, transfer, assign, dispose of, mortgage, grant a security interest in, or encumber any of the Collateral in any manner without the prior written consent of the Lender, except as otherwise ordered by the Bankruptcy Court.

8.  **Remedies.** Subject to the terms of the Financing Order and the Bankruptcy Code, upon the occurrence and during the continuance of an Event of Default (as defined in the Credit Agreement), or if the Borrower fails to fulfill its obligations under this Agreement within ten (10) days of demand from the Lender:

a)  The Lender shall have all the rights, powers and privileges of a secured party under the UCC and the personal property security legislation in force from time to time in any other applicable jurisdiction in which the Collateral is located, and all other rights and remedies available to the Lender at law or in equity. The Borrower covenants and agrees that any notification of intended disposition of any Collateral, if such notice is required by law, shall be deemed reasonably and properly given if given in the manner provided for in Section 14 hereof at least ten (10) days prior to such disposition. The rights of the Lender under this Section 8 shall be subject to the Financing Order and its prior compliance with the Communications Act, FCC rules and policies promulgated thereunder and state laws and regulations, to the extent applicable to the exercise of such rights. Notwithstanding the generality of the foregoing but only to the extent permitted by Applicable Law, upon the occurrence and during the continuance of an Event of Default, the Lender will have the right to require the Borrower to, and the Borrower, upon receipt of the Lender's written instruction, will. Sell any or all of the Licenses in one or more cash sales, and pay the proceeds received therefrom directly to the Lender, such proceeds to be applied by the Lender in accordance with Section 19 hereof. If permitted by Applicable Law, the Borrower will, promptly upon receipt of the Lender's written instruction to sell the Licenses, take all steps reasonably necessary to locate a purchaser for the Licenses and diligently proceed with the sale of the Licenses. Any sale of the Licenses pursuant to this Section 8 must be made in a commercially reasonably manner, in accordance with Applicable Law and on terms and conditions (including, without limitation, terms and conditions relating to price and timing of the sale) reasonably acceptable to the Lender. The Borrower will promptly provide the Lender with any and all documentation prepared or received by the Borrower in connection with any such sale. The Borrower will instruct the purchaser at any such sale to pay the full purchase price thereof directly to the Lender for application in accordance with Section 19 hereof; provided, however, that if the Borrower receives all or any portion of such proceeds, it would hold the same in trust for the Lender and will promptly deliver such proceeds to the Lender. Upon failure by the Borrower to comply with the terms of this Section 8, the Lender will have the right to pursue whatever remedies it may have in equity or at law to compel the Borrower's compliance with the terms hereof, including, without limitation, suit for specific performance.

b)      Subject to the terms of the Financing Order and the Bankruptcy Code, the Borrower shall, at the request and option of the Lender, notify account debtors and other persons obligated on any of the Collateral of the Security Interest of the Lender in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Lender or to any financial institution designated by the Lender as the Lender's agent therefor, and the Lender may itself, if a Default or an Event of Default shall have occurred and be continuing, without notice to or demand upon the Borrower, so notify account debtors and other persons obligated on the Collateral. After the making of such a request or the giving of any such notification, the Borrower shall hold any proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by the Borrower as trustee for the Lender without commingling the same with other funds of the Borrower and shall turn the same over to the Lender in the identical form received, together with any necessary endorsements or assignments. The Lender shall apply the proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by the Lender to the Secured Obligations, such proceeds to be immediately credited after final payment in cash or other immediately available funds of the items giving rise to them.

9.      Intentionally Omitted.

10.      Rights Cumulative. The Borrower agrees that the rights of the Lender under this Agreement, the Credit Agreement, the documents executed in connection therewith or any other contract or agreement now or hereafter  in existence among the Lender and the Borrower shall be cumulative, and that the Lender may from time to time exercise such rights and such remedies as It may have thereunder and under the laws of the United States and any state or province in which remedies may be exercised with respect to any party of the Collateral, in the manner and at the time that Lender in its sole discretion desires. The Borrower further expressly agrees that the Lender shall not in any event be under an obligation to resort to any Collateral prior to exercising any other rights that it may have against the Borrower or its other property, or to resort to any other collateral for the Secured obligations prior to the exercise of remedies hereunder.

11.      Remedies Not Exclusive. No transfer or renewal, extension, assignment or termination of this Agreement or of the Credit Agreement, or any other instrument or document executed and delivered by the Borrower to the Lender, nor the taking of further security, nor the retaking or redelivery of the Collateral to the Borrower by the Lender, shall release the Borrower from any obligation or payment of such obligation or upon full payment to the Lender and satisfaction of all the Secured Obligations. The Lender shall not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by the Lender then only to the extent therein set forth. A waiver by the Lender of any right or remedy on any

occasion shall not be construed as a bar to the exercise of any such rights or remedy which the Lender would otherwise have had on any other occasion.

12.     Assignment. The Borrower agrees that this Agreement and rights of the Lender hereunder may be assigned by the Lender to any successor or assignee. The Borrower may not assign its rights and obligations under this Agreement, in whole or in part.

13.     Successors and Assigns. This Agreement shall apply to and bind the respective successors and permitted assigns of the Borrower and the Lender.

14.     Notices. Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery to the party to be notified or upon deposit to be notified or upon deposit with the United States Post Office, by registered or certified mail, postage pre-paid and addressed to the party to be notified at the address indicated for such party on the signature page hereto; or at such other address as such party may designate by ten (10) days' advance written notice to the other party.

15.     Governing Law. The provisions of this Agreement shall be construed and interpreted, and all rights and obligations of the parties hereto determined, in accordance with the laws of the State of Texas except to the extent that another Applicable Law governs the exercise of the Lender's remedies hereunder.

16.     Conflict. To the extent that any term, condition, covenant or other provision contained in this Agreement is at any time inconsistent or conflicts with any term, condition, covenant or other provision contained in the Financing Order, the Financing Order shall govern. To the extent that any term, condition, covenant or other provision contained in this Agreement is at any time inconsistent or conflicts with any term, condition, covenant or other provision contained in the Credit Agreement and covering substantially the same subject matter then the relevant term, condition, covenant or other provisions of the Credit Agreement shall govern.

17.     Severability. If any paragraph or part thereof shall for any reason be held or adjudicated to be invalid, illegal or unenforceable by any court of competent jurisdiction, such Paragraph or part thereof so adjudicated invalid, illegal or unenforceable shall be deemed separate, distinct and independent, and the remainder of this Agreement shall remain in full force and effect and shall not be affected by such holding or adjudication.

18.     FCC Consent. Notwithstanding anything herein which may be construed to the contrary, no action shall be taken by the Lender with respect to the Licenses (or any Collateral relating to such Licenses) or any other license of the FCC unless and until all requirements of Applicable Law, including, without limitation, any state law, or any required approval under the Communications Act, and any applicable rules and regulations thereunder, requiring the consent to or approval of such action by the FCC or any governmental or other authority, have been satisfied. The Borrower covenants that upon request of the Lender after and during the continuance of an Event of Default it will

cause to be filed such applications and take such other action as may be requested by the Lender to obtain consent or approval of the FCC or any governmental or other authority which has granted any License to the Borrower to any action contemplated by this Agreement including, without limitation, the execution of an application for consent by the FC to an assignment or transfer involving a change in ownership or control pursuant to the provisions of the Communications Act.

19.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

20.     Distribution of Proceeds.  Subject to the terms of the Financing Order, the proceeds from any foreclosure, sale, liquidations, or other disposition of, or realization upon, the Collateral hereunder shall be applied by the Lender in the following manner: (a) to the payment of all costs and expenses, including reasonable attorney's fees, of the Lender related to such foreclosure, sale, liquidation, or other disposition of the Collateral hereunder, (b) to the Lender in payment of any accrued but unpaid interest under the Credit Agreement and/or the Note (as defined in the Credit Agreement), (c) to the Lender in payment of the outstanding principal amount of the Loan, and (d) to the Borrower or such other party as may be lawfully entitled to the proceeds thereof.

21.     Waiver of Jury Trial.  THE BORROWER AND THE LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY FURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*[Signatures follow on next page]*

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, by and through their duly authorized representatives, as of the day and year first above written.

SKYPORT GLOBAL COMMUNICATIONS, INC.

By: _____

    Name: _____

    Title: _____

Address:  11140 Aerospace Ave.
           Houston, Texas 77034
           800-822-2961 (Toll Free)
           281- 999-4455 (Fax)

BALATON GROUP, LP, AGENT

By: _____

    Name: _____

    Title: _____

Address: _____

           _____

SCHEDULE 1
REAL PROPERTY LEGAL DESCRIPTION


EXHIBIT A
PROPERTY DESCRIPTION
CURRENT LEASED PREMISES


A tract or parcel of land containing 7.44 acres more or less being part of and out of that tract of land commonly known as Ellington Field Airport, in Harris County, Texas, and being more particularly described by metes and bounds as follows:

Commencing at a set 5/8 inch iron rod being on the south line of the City of Pasadena Golf course tract and the Ellington Field Airport tract and from said 5/8 inc iron rod, City of Houston survey marker no. 5851 1507, having grid coordinates Y-665281.56 and X-3216024.18 and bears south 61° 00' 24" east, 1328.22 feet;

Thence, south 03° 01' 00", east 685.13 feet to a "X" set in the curb for the point of curvature for a tangent curve to the left. Southeasterly 30.62 feet along the arc of said curve to the left (central angle= 89° 58' 37"; Radius= 19.50 feet, chord bearing and distance= south 48 degrees 00 minutes 19 seconds east 27.57 feet) to a "X" set in the curb for the end of the curvature of the said curve;

Thence, north 87° 00' 23" east 281.00 feet along the north back of the curb of School Street to a "X" set in the curb for the point of curvature for a tangent curve to a left; northeasterly 34.89 feet along the arc of said curve to a left (central angle= 67° 45' 33"; radius= 29.50 feet, chord bearing and distance= north 53° 07' 37" east 32.89 feet) to a "X" set in the curb for the end of the curvature of the said curve;

Thence, north 19° 14' 50" east 461.73 feet along the west back of the curb of Aerospace Ave. to a "X" set in the curb for the point of curvature for a tangent curve to the left. Northeasterly 206.41 feet along the arc of said curve to the left (central angle= 23° 39' 10"; radius= 500.00 feet, chord bearing and distance= north 07° 25' 15" east 204.95 feet) to a "X" set in the curb for the end of the curvature of the said curve;

Thence, north 04° 24' 20" west 69.62 feet along west back of the curb of Aerospace Ave. to a "X" set in the curb for a angle point;

Thence, south 85° 42' 01" west 538.32 feet along the common line of the City of Pasadena Golf Course track to a set 5/8 inch iron rod, the place of the beginning of the herein describe tract of land and containing 7.44 acres.

EXHIBIT A CONTINUED

OPTION TRACT

A track or parcel of land containing 10.14 acres more or less being part of and out of that tract of land commonly known as Ellington Field Airport, in Harris County, Texas, and being more particularly described by metes and bounds as follows:

Commencing at a set 5/8 inch iron rod being on the South line of the City of Pasadena Golf course tract and the Ellington Field Airport tract and from said 5/8 inch iron rod, City of Houston survey marker no. 5851 1507, having grid coordinate Y= 665,281.56 and X=3,216,024.18 and bears south 71° 53' 31" east, 1910.76 feet;

Thence, north 85° 42' 01" east 634,83 feet to as et 5/8 inch iron rod for an angle point;

Thence, south 03° 03' 31" east 683.4 feet to a "X" set in west bck of curb of Avenue H for the point of curvature for a tangent curve to the right, south westerly 30.64 feet along the arc of said curve to aright (central angle= south 90° 01" 32" radius= 19.50 feet, chord bearing and distance= south 41° 57' 15" west 27.58 feet to a "X" set in the north back of curb of Scholl Avenue for the end of the curvature of the said curve;

Thence, south 86° 58' 01" west 615.48 feet along the north back of curb of Scholl Ave. to a set 5/8 iron rod for an angle point;

Thence, north 03° 01' 58" west 688.93 feet to a set 5/8 inch iron rod, the point of beginning of the herein described tract of land and containing 10.14 acres.

SCHEDULE 2

FCC Licenses

**PROMISSORY NOTE**

$800,000                                        November ___ , 2008

**FOR VALUE RECEIVED,** on or before the earlier (a) May 1, 2009; (b) the date of acceleration of the Obligations of Borrower, (c) the date of the closing of a sale of all or substantially all of Borrower's assets pursuant to Section 363 of the Bankruptcy Code or a confirmed plan of reorganization, or (d) the effective date of a plan of reorganization or arrangement in the Chapter 11 Case (the "Maturity Date"), the undersigned (hereinafter referred to as "Borrower") , promises to pay to the order of Balaton Group, LP, as agent for Franklin Craig, Adrien Pouliot, Bob Donaldson, Elvio Del Sorbo, Wayne Fox and the Semper Group (collectively, the "DIP Lenders") the principal amount of EIGHT HUNDRED THOUSAND AND NO/100 DOLLARS ($800,000) ("Total Principal Amount"), or such amount less than the Total Principal Amount which is outstanding from time to time if the total amount outstanding under this Promissory Note ("Note") is less than the Total Principal Amount, together with interest at the rate set forth below on such portion of the Total Principal Amount which has been advanced to Borrower from the date advanced until paid.

**Financing Order.** To the extent any term or provision of this Agreement conflicts in any way with The Final Order (I) Authorizing Use of Cash Collateral; and (II) Approving Secured Debtor in Possession Post-Petition Financing entered by the Bankruptcy Court on November 12, 2008 (the "Financing Order"), the Financing Order shall control. All terms of this Note are expressly subject to the provisions of the Financing Order.

**Interest Rate.** The unpaid principal amount of this Note shall bear interest at the rate of 8% per annum compounded semi-annually based on a year of 365; provided, however, that under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**Repayment Terms.** Subject to the terms of the Financing Order, the principal of and all accrued but unpaid interest on this Note shall be due and payable as follows: The outstanding principal balance of this Note, together with all accrued but unpaid interest, shall be due and payable on or before the Maturity Date.

All payments of principal or interest on this Note shall be made in lawful money of the United States of America in immediately available funds as the holder of this Note shall designate in writing to Borrowers. If any payment of principal of or interest on this Note shall become due on a day which is not a Business Day (as hereinafter defined), such payment shall be made on the next succeeding Business Day and any such extension of time shall be included in computing interest in connection with such payment. As used herein, the term "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which nationally chartered banking associations are ordinarily closed. All regularly scheduled payments of the indebtedness evidenced by this Note shall be applied first to any accrued but unpaid interest then due and payable hereunder and then to the principal amount then due and payable. To the extent that any interest is not paid on or before the fifth (5th) day after it becomes due and payable, the holder of this Note may, at its option, add such accrued interest to the principal of this Note. Notwithstanding anything herein to the contrary, upon an Event of Default (as hereinafter defined) or at maturity, whether by acceleration or otherwise, all principal of this Note shall, at the option of the holder of this Note, bear interest at a rate equal to prime plus 7% per annum

{SKY001\00011\0505581.DOC;1\ELR}

**EXHIBIT**

C

until paid, subject to the provisions of this Note entitled "Compliance with Usury Laws."

**Prepayment without Penalty.** Subject to terms of the Financing Order, Borrower may from time to time prepay all or any portion of the outstanding principal balance of this Note without premium or penalty in accordance with an appropriate order of the bankruptcy court in the Borrowers' bankruptcy cases styled *In re Skyport Global Communications Inc.*, Case No. 08-36737-H4-11 (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

**Loan Documents.** This Note is subject to the terms and conditions set forth in that certain DIP Credit Agreement ("DIP Agreement") and Security Agreement of even date herewith, This Note, the DIP Agreement and the Security Agreement are hereinafter collectively referred to as the "Loan Documents." The holder of this Note is entitled to the benefits and security provided in the Loan Documents.

**Advances.** Advances under the Note shall be made at the request of the Borrower pursuant to the terms of the DIP Agreement.

**Purpose.** Borrowers agree that no funds advanced under this Note shall be used for personal, family or household purposes, and that all advances hereunder shall be used solely for maintaining the assets of the Borrowers and continuing operation of the business.

**Security.** The security for this note is a lien on substantially all of the Borrowers' assets as set forth in the Security Agreement and in the Financing Order. Upon the occurrence of an event of default, the DIP Lender shall have all rights at both common law and as set forth in their Loan Documents to enforce their liens against these assets subject to the terms of the Financing Order.

**Event of Default.** Subject to the terms of the Financing Order, Borrowers agree that upon the occurrence of any one or more of the following events of default ("Event of Default"):

    (a)    The Borrowers fail to pay when due any installment of principal or interest on this Note owing by Borrower to Lender;

    (b)    The Bankruptcy Case is dismissed, a Chapter 11 Trustee is appointed, or converted to a case or cases under Chapter 7 of the Bankruptcy Code.

    (c)    A Chapter 11 plan of reorganization is proposed and confirmed in the Bankruptcy Case or an order approving sale of substantially all of the Debtors' assets without the consent and approval of the DIP Lender, unless such order proposes payment of this Note in full in cash on the sale closing date or the plan's effective date as the case may be;

    (d)    The Borrower defaults under the terms of any final order in the Bankruptcy Case approving, *inter alia,* this Note and/or the other Loan Documents;

    (e)    Any event of default specified in any of the other Loan Documents, including the Loan Agreement, occurs; or

the holders of this Note may, at their option, without further notice or demand, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and

payable, (ii) refuse to advance any additional amounts under the Note, (iii) pursue any and all other rights, remedies and recourse available to the holder hereof, including but not limited to any such rights, remedies or recourse under the other Loan Documents, at law or in equity, or (iv) pursue any combination of the foregoing; provided however, that when exercising such rights, the holder of this Note shall obtain a lifting or modification of the automatic stay under Section 362 of the Bankruptcy Code against the Borrower's property from the Bankruptcy Court, if necessary. The failure to exercise the option to accelerate the maturity of this Note or any other right, remedy or recourse available to the holder hereof upon the occurrence of an Event of Default hereunder shall not waive the right of the holder of this Note to exercise the same at that time or at any subsequent time with respect to such Event of Default or any other Event of Default. The rights, remedies and recourse of the holder hereof, as provided in this Note and in any of the other Loan Documents, shall be cumulative and concurrent and may be pursued separately, successively or together as often as occasion therefore shall arise, at the sole discretion of the holder hereof. The acceptance by the holder hereof of any payment under this Note which is less than the payment in full of all amounts due and payable at the time of such payment shall not (i) constitute a waiver of or impair, reduce, release or extinguish any right, remedy or recourse of the holder hereof, or nullify any prior exercise of any such right, remedy or recourse, or (ii) impair, reduce, release or extinguish the obligations of any party liable under any of the other Loan Documents as originally provided herein or therein.

**Compliance With Usury Laws**. This Note and the other Loan Documents are intended to be performed in accordance with, and only to the extent permitted by, all applicable usury laws. Accordingly, notwithstanding any provision to the contrary in this Note or any of the other Loan Documents, in no event whatsoever shall this Note or any of the other Loan Documents require the payment or permit the payment, taking, reserving, receiving, collection or charging of any sums constituting interest under applicable laws which exceed the maximum amount permitted by such laws. If any such excess interest is called for, contracted for, charged, taken, reserved, or received in connection with this Note or any of the other Loan Documents, or in any communication by any person to Borrower or any other person, or in the event all or part of the principal or interest shall be prepaid or accelerated, so that under any of such circumstances or under any other circumstance whatsoever the amount of interest contracted for, charged, taken, reserved, or received on the amount of principal actually outstanding from time to time under this Note or any of the other Loan Documents shall exceed the maximum amount of interest permitted by applicable usury laws, then in any such event it is agreed as follows: (i) the provisions of this Section shall govern and control; (ii) neither Borrower nor any other person or entity now or hereafter liable for payments under this Note or any of the other Loan Documents shall be obligated to pay the amount of such interest to the extent such interest is in excess of the maximum amount of interest permitted by applicable usury laws; (iii) any such excess which is or has been received notwithstanding this Section shall be credited against the then unpaid principal balance of this Note and the other Loan Documents or, if this Note or any of the other Loan Documents has been or would be paid in full by such credit, refunded to Borrower, and (iv) the provisions of this Note or any of the other Loan Documents, and any communication to Borrower, shall immediately be deemed reformed and such excess interest reduced, without the necessity of executing any other document, to the maximum lawful rate allowed under applicable laws as now or hereafter construed by courts having jurisdiction hereof or thereof. Without limiting the foregoing, all calculations of the rate of interest contracted for, charged, taken, reserved, or received in connection herewith which are made for the purpose of determining whether such rate exceeds the maximum lawful rate shall be made to the extent permitted by applicable laws by amortizing, prorating, allocating and spreading during the period of the full term of this Note or any of the other Loan Documents, including all prior and subsequent renewals and extensions, all interest at any time contracted for, charged, taken,

reserved, or received. The terms of this Section shall be deemed to be incorporated into every other Loan Document.

**Costs of Collection: Waivers.** Borrowers agree to pay, in addition to all other sums payable hereunder, all costs and expenses of collection of this Note, including but not limited to reasonable attorneys' fees. Borrowers and any and all endorsers and guarantors of this Note severally waive presentment for payment, notice of nonpayment, protest, demand, notice of protest, notice of intent to accelerate, notice of acceleration and dishonor, diligence in enforcement and indulgences of every kind and without further notice hereby agree to renewals, extensions, exchanges or releases of collateral, taking of additional collateral indulgences or partial payments, either before or after maturity.

**GOVERNING LAW; VENUE; SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.**
THIS NOTE SHALL BE GOVERNED BY AND BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF. THIS NOTE IS **PERFORMABLE** IN HARRIS COUNTY, TEXAS. BORROWERS AGREE THAT HARRIS COUNTY, TEXAS SHALL BE THE EXCLUSIVE VENUE FOR LITIGATION OF ANY DISPUTE OR CLAIM ARISING UNDER OR RELATING TO THIS NOTE, AND THAT SUCH COUNTY IS A CONVENIENT FORUM IN WHICH TO DECIDE ANY SUCH DISPUTE OR CLAIM. BORROWER CONSENTS TO THE PERSONAL JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN HARRIS COUNTY, TEXAS FOR THE LITIGATION OF ANY SUCH DISPUTE OR CLAIM. BORROWERS IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**WAIVER OF JURY TRIAL.** BORROWER HEREBYS IRREVOCABLY WAIVE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY OR ASSOCIATED HEREWITH.

**FINAL AGREEMENT.** THIS NOTE AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE DIP LENDER AND BORROWERS WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREIN AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIE.

BORROWERS:

SKYPORT GLOBAL
COMMUNICATION, INC..

Name:_____

Title:.



**120 Day Operating Budget**

| | (a)<br>Oct-08 | Nov-08 | Dec-08 | Jan-09 | Feb-09 | Total |
|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | |
| Customer Cash Receipts | 384,016 | 520,592 | 423,366 | 642,510 | 639,112 | 2,609,596 |
| DIP Financing ($800k line funded to cover deficit) | | 156,131 | 401,135 | 110,373 | 107,543 | 775,182 |
| | 384,016 | 676,723 | 824,501 | 752,883 | 746,655 | 3,384,778 |
| **Operating Cash Disbursements:** | | | | | | |
| **Satellite Capacity** | | | | | | |
| Echostar | 10,161 | 45,000 | 45,000 | 139,000 | 139,000 | 378,161 |
| Intelsat | 51,258 | 227,001 | 227,001 | 80,001 | 80,001 | 665,262 |
| SES Americom, Inc. | 644 | 2,850 | 2,850 | 2,850 | 2,850 | 12,044 |
| SES New Skies | 8,581 | 38,000 | 38,000 | 38,000 | 38,000 | 160,581 |
| Space Connection | 6,136 | 27,174 | 27,174 | | - | 60,484 |
| GSI (Globecomm) | 7,830 | 34,676 | 34,676 | 34,676 | 34,676 | 146,534 |
| Hunter Communications | 3,651 | 16,170 | 16,170 | 16,170 | 16,170 | 68,331 |
| Lyman Brothers (LBI Sat) | 6,374 | 28,226 | 28,226 | 20,532 | 20,532 | 103,890 |
| | 94,635 | 419,097 | 419,097 | 331,229 | 331,229 | 1,595,287 |
| **Terrestrial Services** | | | | | | |
| Alpheus | 6,435 | 28,500 | 28,500 | 24,250 | 24,250 | 111,935 |
| Paetec Internet (McCleod) | 804 | 3,560 | 3,560 | 3,560 | 3,560 | 15,044 |
| XO Communications PRI & Voice | 1,694 | 7,500 | 7,500 | 6,000 | 6,000 | 28,694 |
| MediSat Teleport | 1,520 | 6,730 | 6,730 | 6,730 | 6,730 | 28,440 |
| Intrado (E911) | 339 | 1,500 | 1,500 | 1,500 | 1,500 | 6,339 |
| RIPE (IP Address) | 23 | 100 | 100 | 100 | 100 | 423 |
| | 10,815 | 47,890 | 47,890 | 42,140 | 42,140 | 190,875 |
| **EFT Facility Costs** | | | | | | |
| Reliant Energy (Utilities) | 2,935 | 13,000 | 13,000 | 13,000 | 13,000 | 54,935 |
| Equipment Leases | | 9,466 | 29,225 | 29,225 | 29,205 | 97,121 |
| Houston Airport System-City of Houston (Lease) | | 3,507 | 3,507 | 3,507 | 3,507 | 14,028 |
| Support & Maintenance | 3,387 | 15,000 | 15,000 | 15,000 | 15,000 | 63,387 |
| Telephone & Communications | 1,027 | 4,550 | 4,550 | 4,300 | 3,550 | 17,977 |
| Utilities & Cleaning | | 1,335 | 1,335 | 1,335 | 1,335 | 5,340 |
| Security & Systems | | 2,500 | 2,500 | 2,500 | 2,500 | 10,000 |
| General Supplies | | 1,000 | 1,000 | 1,000 | 1,000 | 4,000 |
| Storage | 71 | 315 | 315 | 315 | 315 | 1,331 |
| Other | | | 1,500 | 1,500 | 1,500 | 4,500 |
| | 7,420 | 50,673 | 71,932 | 71,682 | 70,912 | 272,619 |
| **Reston Facility Costs** | | | | | | |
| Sunrise Properties (Lease) | | 11,500 | 11,500 | 11,500 | 11,500 | 46,000 |
| Utilities | 226 | 1,000 | 1,000 | 1,000 | 1,000 | 4,226 |
| Telephone & Communications | 452 | 2,000 | 2,000 | 1,750 | 1,500 | 7,702 |
| General Supplies | | 500 | 500 | 500 | 500 | 2,000 |
| | 678 | 15,000 | 15,000 | 14,750 | 14,500 | 59,928 |
| **Payroll, Contract Labor, T&E** | | | | | | |
| Salary & Wages | 109,763 | 236,239 | 199,415 | 197,415 | 191,707 | 934,539 |
| Commissions | 16,862 | 16,000 | 16,000 | 15,000 | 14,000 | 77,862 |
| Contract Labor | | | 17,500 | 22,500 | 27,500 | 67,500 |
| Travel & Expense | | 15,000 | 15,000 | 15,000 | 15,000 | 60,000 |
| | 126,625 | 267,239 | 247,915 | 249,915 | 248,207 | 1,139,901 |
| **Other Expenses** | | | | | | |
| Consultants and Professional Fees | - | 9,167 | 11,167 | 31,667 | 28,167 | 80,168 |
| Insurance | | 5,000 | 5,000 | 5,000 | 5,000 | 20,000 |
| Customer Equipment, Shipping, Field Services | - | 4,000 | 4,000 | 4,000 | 4,000 | 16,000 |
| Misc Expenses | | 2,500 | 2,500 | 2,500 | 2,500 | 10,000 |
| | | 20,667 | 22,667 | 43,167 | 39,667 | 126,168 |
| **Sub-total Operating Cash Expenses** | 240,173 | 820,566 | 824,501 | 752,883 | 746,655 | 3,384,778 |
| **Operating Cash Flow** | 143,843 | (299,974) | - | - | - | - |

The prorated amounts are scheduled to be paid in November

(a) Items in this column represent the prorated portion of post-petition monthly expenses and accrued payroll.



EXHIBIT D