IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SKYPORT GLOBAL | § | CASE NO. 08-36737-H4-11 |
| COMMUNICATIONS, INC. | § | |
| | § | |
| DEBTOR | § | CHAPTER 11 |

FIRST AMENDED DISCLOSURE STATEMENT UNDER
11 U.S.C. § 1125 AND BANKRUPTCY RULE 3016 IN SUPPORT
OF PLAN OF REORGANIZATION OF DEBTOR

THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF THE DEBTOR ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE DEBTOR'S PLAN OF REORGANIZATION. ALL CREDITORS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.

ON JULY 8, 2009, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE. SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND ATTACHED AS EXHIBIT A, IS BEING SOUGHT FROM CREDITORS WHOSE CLAIMS AGAINST THE DEBTOR ARE IMPAIRED UNDER THE PLAN OF REORGANIZATION. CREDITORS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT UPON COMPLETION IN THE ENVELOPE ADDRESSED TO WEYCER KAPLAN PULASKI & ZUBER P.C., ATTENTION: EDWARD L. ROTHBERG, ELEVEN GREENWAY PLAZA, SUITE 1400, HOUSTON, TEXAS 77046, NOT LATER THAN AUGUST 4, 2009, AT 4:30 P.M. HOUSTON TIME.

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................................2

DISCLOSURE STATEMENT .........................................................................................................4

I.     INTRODUCTORY STATEMENT .......................................................................................4

II.    VOTING PROCEDURES ....................................................................................................6

III.   IMPAIRMENT OF CLAIMS ..............................................................................................7

IV.   NATURE AND HISTORY OF BUSINESS .......................................................................9

    A.   SOURCE OF INFORMATION AND ACCOUNTING METHOD .......................................................9
    B.   GENERAL INFORMATION ABOUT THE DEBTOR ....................................................................9
       1.   The Debtor .........................................................................................................9
          a.   Business Operation Model ...........................................................................9
          b.   Assets ........................................................................................................10
          c.   Liabilities .................................................................................................10
       2.   Secured Claims (in Disputed Priority) .............................................................12
       3.   Financial Difficulties and Restructuring .........................................................13
       4.   The Credit Market Freeze .................................................................................13
       5.   Financial Situation as of Petition Date ............................................................14
       6.   Ownership and Management .............................................................................14
          a.   General Overview ......................................................................................14
          b.   Capital Structure .......................................................................................14
          c.   Current Management Team ........................................................................14
    C.   SIGNIFICANT ACTIONS IN MAIN BANKRUPTCY CASE .......................................................15
       1.   Voluntary Petition filing ..................................................................................15
       2.   Administration – "First Day" Motions .............................................................15
       3.   Employment of Professional Persons ...............................................................16
    D.   ADVERSARY PROCEEDINGS, SIGNIFICANT MOTIONS AND CONTESTED MATTERS ...........16
       1.   Intelsat .............................................................................................................16
          a.   Pleadings Filed ..........................................................................................16
          b.   Status of Litigation ...................................................................................17
       2.   Digital Networks LLC ......................................................................................17
          a.   Pleadings Filed ..........................................................................................17
          b.   Status of Litigation ...................................................................................17
       3.   Advanced Projects International, Inc. ...............................................................17
          a.   Pleadings Filed ..........................................................................................17
          b.   Status of Litigation ...................................................................................17
       4.   Globecomm ......................................................................................................18
       5.   Upstream Lease ................................................................................................18
       6.   iDirect ..............................................................................................................18
       7.   Drillsite ............................................................................................................18
    E.   CASE MANAGEMENT GOING FORWARD ...........................................................................18
       1.   Plan Negotiations .............................................................................................18
       2.   Assumption and Rejection ................................................................................19

V.    DESCRIPTION OF PLAN .................................................................................................19

    A.   OVERALL STRUCTURE OF THE PLAN ................................................................................19
    B.   MERGER WITH THE PARENT COMPANY, SKYCOMM ........................................................21
    C.   ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS AND TIMING OF PAYMENT ......22
    D.   CLASSES OF SECURED AND UNSECURED CLAIMS AND TREATMENT OF INTERESTS ...........22
    E.   SUMMARY OF FINANCIAL PROJECTIONS ..........................................................................24
    F.   BAR DATES ......................................................................................................................26

VI.   LIQUIDATION ANALYSIS ..............................................................................................26

    A.   METHODOLOGY. ..............................................................................................................26

B. ANALYSIS. ..................................................................................................................26

**VII. RISKS POSED TO CREDITORS** .........................................................................................**27**

A. COMPETITION ..........................................................................................................27
B. ECONOMY ...............................................................................................................27
C. TECHNOLOGY ...........................................................................................................27
D. LOSS OF KEY PERSONNEL ..........................................................................................28

**VIII. ALTERNATIVES** ...........................................................................................................**28**

A. CONVERSION TO CHAPTER 7 .......................................................................................28
B. DISMISSAL ...............................................................................................................28
C. NO ASSURANCE OF EITHER .........................................................................................29

**IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES** ...........................................................**30**

A. TAX CONSEQUENCES TO THE DEBTOR ..........................................................................30
 1. Net Operating Loss and Excess Interest Expense Carryforward of the Debtor ...................30
 2. Realization of Cancellation of Indebtedness Income ..........................................................30
 3. Limitation to Utilization of NOLs -- Section 382 of the Tax Code ......................................31
  a. General Rules. .............................................................................................31
  b. Section 382(l)(5) of the Tax Code. ..................................................................32
  c. Section 382(l)(6) of the Tax Code. ..................................................................33
  d. Section 368(a)(1)(g) ....................................................................................33
  e. Other NOL restrictions ..................................................................................33
 4. Alternative Minimum Tax ...............................................................................................33
B. TAX CONSEQUENCES TO CREDITORS .............................................................................33
 1. Generally .....................................................................................................................33
 2. Unsecured Claims .........................................................................................................34

**X. GOVERNMENTAL REGULATION** .....................................................................................**34**

**XI. PREFERENCES AND FRAUDULENT TRANSFERS** ...............................................................**35**

A. AVOIDABLE PREFERENTIAL TRANSFERS. .......................................................................35
B. AVOIDABLE FRAUDULENT TRANSFERS. .........................................................................35
C. POTENTIAL RECOVERIES. ............................................................................................36

**XII. LITIGATION** ...............................................................................................................**36**

**XIII. MANAGEMENT OF THE REORGANIZED DEBTOR** .............................................................**36**

A. MEMBERS OF THE BOARD ...........................................................................................36
B. MANAGEMENT COMPENSATION ...................................................................................36

**XIII. ACCEPTANCE AND CONFIRMATION OF THE PLAN** ...........................................................**37**

A. ACCEPTANCE OF THE PLAN .........................................................................................37
B. CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES .................................37
C. OTHER REQUIREMENTS FOR CONFIRMATION ................................................................38
 1. Best Interest of Creditors ...............................................................................................38
 2. Financial Feasibility .....................................................................................................38
D. CRAM-DOWN - CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES ..................38

**IV. CONCLUSION** ................................................................................................................**40**

**DISCLOSURE STATEMENT**

**SKYPORT GLOBAL COMMUNICATIONS, INC.**, debtor and debtor-in-possession herein (the "Debtor"), submits this First Amended Disclosure Statement ("Disclosure Statement") under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 in Support of its Chapter 11 Plan of Reorganization to all of its known Creditors.

## I.    INTRODUCTORY STATEMENT

SkyPort Global Communications, Inc. submits this Disclosure Statement Under 11 U.S.C. § 1125 in Support of its Chapter 11 Plan of reorganization under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") in connection with its solicitation of acceptances of the Plan under Chapter 11 of the United States Bankruptcy Code filed by the Debtor (the "Plan").  A copy of the Plan is attached as Exhibit A for your review.  All terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

The Debtor filed a petition under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on October 24, 2008 and has retained Weycer, Kaplan, Pulaski & Zuber, P.C. as bankruptcy counsel.  The Debtor has prepared this Disclosure Statement to disclose that information which, in its opinion, is material, important, and necessary to an evaluation of the Plan.  Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement must be presented to and approved by the Bankruptcy Court.  Such approval is that required by statute and does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

The material herein contained is intended solely for the use of known creditors and interest holders of the Debtor, and may not be relied upon for any purpose other than a determination by them of how to vote on the Plan.  As to Contested Matters, Adversary Proceedings and other actions or threatened actions, this disclosure statement shall not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations under Rule 408 of the Federal Rules of Evidence.  This disclosure statement shall not be admissible in any non-bankruptcy proceeding nor shall it be construed as to be advice on the tax, securities or other legal effects of the plan as to the holders of claims against or equity interests in the Debtor or its affiliates.

To ensure compliance with Treasury department circular 230, each holder of a claim or interest is hereby notified that: (a) any discussion of U.S. Federal Tax issues in this disclosure statement is not intended or written to be relied upon, and cannot be relied upon, by any holder for the purpose of avoiding penalties that may be imposed upon a holder under the Tax Code; (b) such discussion is included hereby by the Debtor in connection with the promotion or marketing (within the meaning of Circular 230) by the Debtor of the transactions or matters addressed herein; and (c) each holder should seek advice based upon its particular circumstances from an independent tax advisor.

Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments.  While the Debtor has made every effort to retain the meaning of such other instruments or the portions transposed, it urges that any reliance on the contents of such other instruments should depend on a thorough review of the instruments themselves.

No representations concerning the Debtor or the Plan are authorized other than those that are set forth in this Disclosure Statement.  Any representations or inducements made by any person to secure your vote which are other than those contained herein should not be relied upon, and such representations or inducements should be reported to counsel for the Debtor who shall deliver such information to the Bankruptcy Court.  Finally, all terms not otherwise defined in this Disclosure Statement shall have the meanings assigned to them under the Plan.

Creditors should read this Disclosure Statement in its entirety prior to voting on the Plan.  No solicitation of votes on the Plan may be made, except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.  No other party has been authorized to utilize any information concerning the Debtor or its affairs, other than the information contained in this Disclosure Statement, to solicit votes on the Plan.  Creditors and holders of equity interest should not rely on any information relating to the Debtor, other than that contained in this Disclosure Statement and the exhibits attached hereto.

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE ATTACHMENTS, NO REPRESENTATIONS CONCERNING THE DEBTOR, THE ASSETS, THE PAST OPERATIONS OF THE DEBTOR, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.**

**EXCEPT AS SPECIFICALLY NOTED, THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR IS NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. THE FACTUAL INFORMATION REGARDING THE DEBTOR, INCLUDING THE ASSETS AND LIABILITIES OF THE DEBTOR, HAS BEEN DERIVED FROM NUMEROUS SOURCES, INCLUDING, BUT NOT LIMITED TO, DEBTOR'S BOOKS AND RECORDS, SCHEDULES AND DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN.**

**THE DEBTOR ALSO COMPILED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT FROM RECORDS AVAILABLE TO IT, INCLUDING, BUT NOT LIMITED TO, PLEADINGS AND REPORTS ON FILE WITH THE BANKRUPTCY COURT, LOAN AGREEMENTS AND BUSINESS RECORDS.**

**THE APPROVAL BY THE BANKRUPTCY COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE**

**BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**NEITHER THE DEBTOR NOR COUNSEL FOR THE DEBTOR CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES.  NEITHER THE DEBTOR NOR ITS COUNSEL HAVE VERIFIED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.**

**IF THE REQUISITE VOTE IS ACHIEVED FOR EACH CLASS OF IMPAIRED CLAIMS, THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN), WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

## II.      VOTING PROCEDURES

Any creditor of the Debtor whose claim is IMPAIRED under the Plan is entitled to vote, if either (1) the claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent or unliquidated, or (2) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings, *provided, however*, any claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon motion by the creditor.  Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.  In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Holders of impaired claims who are entitled to vote and fail to do so will not be counted as either accepting or rejecting the Plan.  Nevertheless, if the requisite vote is achieved for your class of impaired claims, you will be bound by the terms of the Plan.

A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement and mailed to creditors entitled to vote.  A creditor must (1) carefully review the ballot and the instructions thereon, (2) execute the ballot, and (3) return it to the address indicated thereon by the deadline to enable the ballot to be considered for voting proposes.

<strong>THE DEADLINE FOR RETURNING YOUR BALLOT<br>IS 4:30P.M. CENTRAL TIME ON  AUGUST 4, 2009<br>(THE "VOTING DEADLINE").</strong>

After completion of the ballot, creditors should return the executed ballot in the self-addressed envelope to:

**SKYPORT GLOBAL COMMUNICTIONS, INC.**
**c/o EDWARD L. ROTHBERG**
**WEYCER KAPLAN PULASKI & ZUBER, P.C.**
**1400 SUMMIT TOWER**
**11 GREENWAY PLAZA**
**HOUSTON, TX  77046**

**VOTING INFORMATION AND INSTRUCTION FOR COMPLETING THE BALLOT:**

**FOR YOUR VOTE TO BE COUNTED YOU MUST COMPLETE THE BALLOT, INDICATE ACCEPTANCE OR REJECTION OF THE PLAN IN THE BOXES INDICATED ON THE BALLOT AND SIGN AND RETURN THE BALLOT TO THE ADDRESS SET FORTH ON THE PRE-ADDRESSED ENVELOPE.  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

**IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS UNDER THE PLAN, YOU MAY RECEIVE MORE THAN ONE BALLOT.  EACH BALLOT YOU RECEIVE VOTES ONLY YOUR CLAIMS FOR THAT CLASS.  PLEASE COMPLETE AND RETURN EACH BALLOT YOU RECEIVE.  YOU MUST VOTE ALL OF YOUR CLAIMS WITHIN A SINGE CLASS UNDER THE PLAN TO EITHER ACCEPT OR REJECT THE PLAN.  ACCORDINGLY, A BALLOT (OR MULTIPLE BALLOTS WITH RESPECT TO MULTIPLE CLAIMS WITHIN A SINGLE CLASS) THAT PARTIALLY REJECTS AND PARTIALLY ACCEPTS THE PLAN WILL NOT BE COUNTED.**

**THE BALLOT IS FOR VOTING PURPOSES ONLY AND DOES NOT CONSTITUTE AND SHALL NOT BE DEEMED A PROOF OF CLAIM OR INTEREST OR AN ASSERTION OF A CLAIM.**

### III.     IMPAIRMENT OF CLAIMS

A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interest of that class are modified under a plan.  Modification for purposes of determining impairment however, does not include curing defaults and reinstating maturity or cash payment in full. Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan and are thus not entitled to vote.  Classes of claims or interests receiving no distribution under a plan are conclusively presumed to have rejected the plan and thus are not entitled to vote.  Acceptances of the Plan are being solicited only from those persons who hold claims in an impaired class entitled to receive a distribution under the Plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan, **unless**, with respect to each claim or interest of such class, the plan:

1.      Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

2.      Notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default:

(a) Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankrupt Code;

(b) Reinstates the maturity of such claim or interest as it existed before the default;

(c) Compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

(d) Does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or interest; or

3.      Provides that, on the Effective Date the holder of such claim or interest receives, on account of such claim or interest, cash, equal to:

(a) With respect to a claim, the allowed amount of such claim; or

(b) With respect to an interest, if applicable, the greater of:

(c) any applicable fixed liquidation preference; or

(d) Any fixed preference at which the Debtor, under the terms of the security, may redeem the security.

4.      In Article 5 of the Plan, the Debtor has identified the impaired classes of creditors under the Plan.  In the event there are questions regarding whether a person is in an impaired class, the person should assume that his or her claim is impaired and vote.  If the claim is determined to be impaired, the vote will be considered by the Bankruptcy Court.  The Class 2, 3 and 4 holders of claims and the Class 5 interest holders of the Debtor are impaired under the Plan.

**IMPAIRED CREDITORS ANTICIPATED TO RECEIVE A DISTRIBUTION UNDER THE PLAN ARE BEING SOLICITED TO VOTE.  IF YOU HOLD AN ADMINISTRATIVE CLAIM OR UNIMPAIRED CLAIM, THE DEBTOR IS NOT SEEKING YOUR VOTE.  ADDITIONALLY, THE VOTE OF EQUITY HOLDERS IS NOT SOLICITED AND IS DEEMED A REJECTION VOTE SINCE THEY RECEIVE NO DIVIDEND UNDER THE PROPOSED PLAN.**

## IV.     NATURE AND HISTORY OF BUSINESS

### A. Source of Information and Accounting Method

The Debtor's books are maintained under the supervision of Douglas Whitworth, chief financial officer.  Accounting is on the accrual basis.  The historical financial information contained in this disclosure statement as well as the bankruptcy schedules and statement of affairs was derived from the Debtor's books and records.  **THE DEBTOR'S BOOKS HAVE NOT BEEN AUDITED BY AN INDEPENDENT PUBLIC ACCOUNTANT (OTHER THAN AS EXPRESSLY DESCRIBED HEREIN).  NO ABSOLUTE REPRESENTATION IS MADE AS TO THE ACCURACY OF THE DEBTOR'S RECORDS.  HOWEVER, THE DEBTOR HAS ATTEMPTED TO ACCURATELY REFLECT ITS BUSINESS OPERATIONS.**

### B. General Information about the Debtor

1.     THE DEBTOR

a. Business Operation Model

SkyPort Global Communication, Inc. operates a world-wide satellite communications facility from the Ellington Joint Reserve Base in Houston, Texas.  The Debtor's hardened, windowless facility was built in 2002 - 2003 and consists of a network operations center and with various satellite communications antennas, fiber-optic internet connections, and a staff trained in the highly specialized business of mission critical satellite communications equipment and managed services.  The building is designed to provide communications that are entirely secure and that work when others will not.  The satellite communication system can provide secure voice and data in extremely remote areas and in areas damaged by natural disaster.

The Debtor's business consists of buying satellite and terrestrial bandwidth directly from major satellite companies and terrestrial providers and then integrating this capacity with appropriate equipment, software and services to provide voice, data and internet services processed through the network operations center.  For instance, the Debtor may purchase a certain amount of transponder capacity operated by satellite company A that services North America and another amount of transponder capacity of a satellite owned by satellite company B, a satellite that services Africa.  The Debtor owns equipment to connect the satellite signals to the internet and to terrestrial land-lines.

The Debtor does not usually provide "retail" service to an end-user, unless the end-user is a large corporation or government entity with the need for an always-on satellite communications system connecting multiple facilities.  Smaller communications companies often re-sell access the Debtor's bandwidth to end-users.  The Debtor holds several key licenses issued by the U.S. Federal Communications Commission ("FCC").  The FCC licenses are vital to the Debtor's business, but have no cognizable value.

The Debtor is capable of providing, and has historically provided, communications for private entities, governmental agencies, and the National Guard Bureau and numerous State National; Guard units.

b. <u>Assets</u>

The Debtor's land is leased from the City of Houston for 35 years, with two 5 year extensions. The Debtor owns various large satellite antennas, which are attached to the land so as to be un-movable and thus considered real estate.  The Debtor also owns technical personal property and the facilities built on the leased land.   The Debtor also owns its business name, certain intellectual property as trade secrets, cash and accounts receivable.

The value of the personal property has been appraised and the appraisal is attached as Exhibit E. The personal property constitutes the bulk of the Secured lender(s) collateral.  This equipment largely consists of electronic satellite equipment not usable for any other purpose.  Otherwise, the Debtor owns some trailers with little or no resale value.  The intellectual property of the Debtor is not patented and therefore any valuation of it is speculative.

On the petition date, the Debtor held accounts receivable of $ 550,042.  The Debtor has made a concerted effort to collect on those accounts receivable, even suing Drillsite Broadcasting Co. during the bankruptcy in an attempt to collect.  With the exception of the amount due from Drillsite Broadcasting Co., The Debtor has collected 100% of the receivables outstanding on the petition date and only 28% of the post-petition receivables remain due more than 30 days after invoicing (excluding Drillsite Broadcasting Co).

c. <u>Liabilities</u>

The Debtor's liabilities on the petition date are set forth on the claims analysis attached as Exhibit B.  Generally, these liabilities consisted of the following:

Secured Liabilities – Approximately $5 Million consisting of the $2.5 Million claim of CenturyTel (excluding interests), and $2.25 Million claimed by Aegis (excluding interest), and several smaller claims of security deposits or setoffs.

Priority Tax Claims - Approximately $126,000, which includes some portion of the disputed claim of the Texas Comptroller.

Priority Non-Tax Claims - $ 18,123.37 (A claim by Debtor's former CEO is likely not owed)

General Unsecured claims – Approximately $2.5 Million.  This number consists of a raw number on the claims register and schedules of Approximately $7.5 Million, from which roughly $2.5 Million is deducted because it is owed to Balaton or other insiders, and approximately $2.5 million is disputed, not owed or subject to equitable subordination.

d.  Administrative Claims Analysis

The Debtor's May 2009 Monthly Operating Report shows post-petition liabilities in the total amount of $1,337,164.  However, this amount includes $399,320 in accrued post-petition interest on secured debt which need not be paid since the secured creditors are under secured.  This amount also includes $814,183 which the Debtor is disputing.  If these two amounts are deducted from the $1,337,164 figure, the outstanding, post-petition payables are only $123,662 and $72,012 of that amount represents professional fees.  So with respect to vendors, the Debtor believes that the total amount outstanding is only $ 51,650, which is payable in the ordinary course of business.

The $814,183 in disputed claims is made up of the following three claims:

| SES New Skies Satellites BV | $114,000 |
| --- | --- |
| Intelsat USA | $633,632 |
| GSI Globecomm | $  66,551 |
| Total | $814,182 |

GSI Globecomm.  The Debtor has reached a tentative settlement with GSI Globecomm which provides that GSI will forgive $36,000 of the debt and the remaining $30,000 will be paid over a 12 month period in equal installments.

SES.  The Debtor acknowledges owing SES $114,000 on a post petition basis.  However, within the 90 days prior to bankruptcy, the Debtor made preferential payments to SES in the amount of approximately $209,000.  The Debtor has not yet filed the preference suit, but reserves the right to do so.  It has been seeking an amicable settlement arrangement with SES.  The Debtor does not anticipate having to make any payment on this administrative claim.

Intelsat.   The $567,454 payable to Intelsat represents the total amount invoiced by Intelsat with no discount or adjustment for services not actually used by SkyPort.  SkyPort was forced to switch to an alternative provider and as such, significantly reduced its use of IntelSat bandwidth in December and January and used no IntelSat bandwidth in February.  SkyPort is due a significant credit from IntelSat for this unused bandwidth.   It was Intelsat's continued insistence on SkyPort paying for excess capacity that was a contributing factor in SkyPort's bankruptcy.  On a pre-petition basis, Intelsat received payments within the 90 days prior to bankruptcy in the amount of $550,000.  The Debtor has already filed a preference case against Intelsat along with a motion for summary judgment.  The Debtor has entered into negotiations with Intelsat for a settlement of this claim, but no definitive resolution has been reached.

In addition to the foregoing, an application for payment of administrative expenses has been filed by Advanced Projects International, Inc. ("API") seeking payment of $179,750.  The Debtor vigorously disputes this application.  Essentially, the Debtor contracted post-petition with API to outsource certain services performed by its employees.  The goal was to achieve a cost savings for the estate.  Instead, API breached the contract by failing to competently perform these services and the Debtor was not able to cut its staffing costs.  Ultimately, the Debtor terminated the contract and retained its employees.  The Debtor does not believe that any money is due API for this breach.  The parties have agreed to mediation.

API objects to certain facts and allegations made by the Debtor in regarding to API's administrative expense claim as stated above.  In particular, API disagrees with the Debtor's statements in referenced to the alleged breach of contract by API and the lack of savings achieved by the estate.  API strongly believes that upon a trial on the merits all matters will be resolved favorably for API.

In summary, the Debtor has ample funds to satisfy ordinary course post-petition payables and attorneys fees.  The only outstanding question is how much it will need to settle the disputed administrative claims referred to above.  There, is no way to predict the amount at this time particularly since any settlement might involve a pay out over time like the one reached with GSI Globecomm, which will not require up front cash.  To the extent the Debtor needs additional cash on the effective date to fund administrative expense claims, Balaton has agreed to advance up to $100,000.  Based on the foregoing, the Debtor believes that it will have sufficient funds to pay all administrative expense claims which will come due on the effective date.

2.    SECURED CLAIMS (IN DISPUTED PRIORITY)

Establishing a satellite network operations center is cost-intensive.  Originally, CenturyTel (a publicly-traded communications company) offered several tranches of convertible debentures secured by the Debtor's assets.  Those offerings were made at various times between 2001 and 2005.  These debenture offerings provided nearly $24 Million in senior, convertible secured financing to the Debtor.  Yet, the Debtor was not able to reach positive cash flow.  In 2007, the majority of CenturyTel's debentures were converted to equity, leaving approximately $2.2 Million unconverted.

Balaton Group Inc. ( "Balaton" - an insider Canadian entity) also invested millions in the Debtor, mostly as equity and a significant amount as unsecured debt.  Balaton had agreed to acquire the CenturyTel indebtedness and had given a $3 Million promissory note to CenturyTel to acquire the debentures.  According to Balaton, however, it paid only $500,000 of the $3 Million and CenturyTel never transferred the debentures.

Aegis Texas Venture Fund, L.P. is a hedge fund that invests for, among other things, the State of Texas.  Aegis provided $2.25 Million in financing to the debtor, also secured by a lien on the Debtor's personalty.  Balaton has subordinated all of its debt to Aegis.  Aegis believes it holds the first lien position due to its subordination agreement with Balaton.  However, Aegis did not obtain a subordination agreement from CenturyTel.

Aegis and CenturyTel both claim perfected first liens on the Debtor's assets.  It is unclear who holds a perfected first lien on certain assets, though a lien probably does exist on substantially all of the Debtor's assets in favor of CenturyTel and/or Aegis .

### 3.     FINANCIAL DIFFICULTIES AND RESTRUCTURING

In 2005, CenturyTel made the decision to end its investment in SkyPort and forced management to either sell or close the business.  It was at this time that management sought out Balaton for additional investment capital.  In 2005, SkyPort's board of directors placed the company into Chapter 11 due to the lack of continued financial support from CenturyTel.  Balaton– along with SkyPort's management, designed a plan to acquire the company from CenturyTel in a structured transaction which would allow the company to emerge from Chapter 11 and deal with its legacy accounts appropriately.  There was no confirmed "plan of reorganization".  Instead, the bankruptcy was dismissed by mutual agreement in March of 2006.

In August 2006, the FCC granted final approval for the restructuring transaction placing Balaton as the chief shareholder of SkyPort.  Due to the technical complexity of the SkyPort business, Balaton kept the current management and technical staff in place.  This continued until May 2007 at which time a decision was made by the SkyPort board to replace the existing executive lineup with a seasoned satellite communications team located in Reston, Virginia.  The board and Balaton expected the new management to focus on increasing sales and profit margins.

During this period, SkyPort garnered such prestigious awards as the National Guard's "Minuteman Award" for delivering unprecedented services during Hurricanes Katrina and Rita, World Teleport Association's 2004 Teleport of the Year and WTA's 2006 Fastest Growing Teleport.

### 4.     THE CREDIT MARKET FREEZE

With new management in place and a very frothy financial market, the Debtor planned to acquire multiple smaller service providers in the same field.  The theory was simple for a boom economy.  The infrastructure of SkyPort required a certain level of revenue to support its cost structure, and through acquisition, the company could fill this capability quickly.  Once "critical mass" was obtained, additional revenue would flow to the bottom line and profitability could increase to the goal of EBITDA at 30% of Revenue.  The theory was solid – assuming the creditors and capital markets would continue to tolerate negative cash flow.  They did not.

By mid 2007 the capital markets began to slip.  SkyPort had entered into an acquisition agreement with an organization preparing for a major Initial Public Offering ("IPO") in first half of 2007.  SkyPort's management team had spent millions of dollars in corporate costs to participate in an industry-wide consolidation along with its acquirer.  Financial sponsors for the IPO's strategy withdrew.  The IPO was shelved.

During the fall of 2008, management fell behind on trade accounts – putting the company in default with its suppliers and at risk of losing service.  Specifically, the Debtor's chief satellite provider was Intelsat – a supplier who sold service at a high price and required capacity that the Debtor could not re-sell.  Prior to bankruptcy, Intelsat threatened to terminate service for non-payment.  Such a termination would have put not only the Debtor at risk, but also its customers,

who, in many instances relied completely on SkyPort for communication services.  Thus, the board placed SkyPort into Chapter 11 in order to prevent the termination of the Intelsat service while transitioning over to a new contract with significant savings (in price-per megabyte and in total capacity) and to develop a plan to make the company cash flow positive.

5.    FINANCIAL SITUATION AS OF PETITION DATE

As mentioned above, SkyPort's secured indebtedness consists of claims totaling approximately $5 million.  The secured lenders (either one or both of them) have claimed a lien on virtually all of the Debtor's assets, whose value is significantly less than the total amount of secured claims. The extent, validity and priority of the liens remains in dispute.  SkyPort also has reported general unsecured trade debt on its schedules of approximately $6.2 Million (though proofs of claim total $7.5 Million).  These obligations are owed to approximately 100 trade creditors who have provided various goods and services to SkyPort. It should be noted that approximately $2 Million of the unsecured debt is owed to Balaton who provided trade credit during the period leading up to the filing of Chapter 11.  SkyPort employs approximately 16 full-time employees, and 3 contract laborers.

6.    OWNERSHIP AND MANAGEMENT

a. General Overview

The Debtor is a Texas Corporation wholly owned by a Delaware "C" corporation.  At present the Debtor and its parent have the same board of directors and officers, to which, Mr. Robert Kubbernus and Joseph Long are  the sole members of the board  The Management of the Debtor consists of Mr. Kubbernus and professionals hired by him to help the Debtor restore positive cash flow.

b. Capital Structure

The Debtor is a Texas "C" Corporation wholly owned by a Delaware "C" Corporation. SkyComm Technologies Corporation (a Delaware Corporation) owns 100% of the stock of the Debtor.  Balaton owns approximately 58% of the stock of the parent company.  Numerous other companies and individuals own the balance of those shares.  No other party individually owns more than 6.62%.  The party which owns 6.62% is CenturyTel, one of the Debtor's primary secured creditors.

c. Current Management Team

In November 2008 SkyPort's management team was released and the largest shareholder – Balaton, took over management of SkyPort.  Robert Kubbernus – Balaton's CEO, took the position of CEO for SkyPort and immediately put in place a number of key strategies and individuals to turn the company around.  Operations were consolidated and the company began concentrating on positive cash flow. Currently, Mr. Kubbernus, formerly a resident of Toronto, is moving to Texas to be closer to the SkyPort facilities and operations.

### C. Significant Actions in Main Bankruptcy Case

#### 1. VOLUNTARY PETITION FILING

The Debtor filed Chapter 11 on October 24, 2008 at approximately 3:00 P.M. CST. The Debtor had been threatened with the imminent termination of most of its satellite service by 4 p.m. CST on that same day from its major trade creditor, Intelsat. The filing of the bankruptcy acted as an automatic stay applicable to all parties that prohibited the collection of debts from the Debtor, and termination of service.

The Debtor continues to operate as debtor-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtor is authorized to operate its business and manage its properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval. An immediate effect of the filing of the Debtor's bankruptcy petition is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtor, and the continuation of litigation against the Debtor. The relief provides the Debtor with the "breathing room" necessary to reorganize its businesses and prevents Creditors from obtaining an unfair recovery advantage while the Chapter 11 Case is ongoing.

#### 2. ADMINISTRATION – "FIRST DAY" MOTIONS

Shortly after the first day of the Chapter 11 Case, the Debtors filed several applications and motions seeking relief by virtue of so-called "first day motions." First day motions are intended to facilitate the transition between a debtor's pre-petition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the bankruptcy court. The first day orders the Debtors obtained in the Chapter 11 Case, which are typical of orders entered in business reorganization cases across the country, authorize, among other things:

*Emergency Motion for Order Authorizing Payment of Prepetition Wages, Taxes, and Benefits*: By this motion, the Debtor requested that it be permitted to pay wages and benefits earned by its employees and contract labor pre-petition. If the Debtor was not permitted to pay its employees and contract labor, it would be at risk of losing valuable members of its staff, hindering its ability to continue operations and adversely impacting the value of the Debtor's assets. This motion was granted.

*Motion for Use of Cash Collateral and to Incur Secured Indebtedness*: The filing of a bankruptcy proceeding prohibits the debtor from using cash held in its own accounts to the extent that the cash constitutes collateral, unless the debtor obtains court permission or the lender consents. Thus, soon after the bankruptcy, the Debtor sought to use cash proceeds of the accounts receivable generated from its business to continue operations. The cash collateral was encumbered by one or both liens of Aegis or CenturyTel.

Without Cash Collateral, the Debtor could not have continued operations. The Court authorized cash collateral usage on an interim basis on October 30, 2008 and a final order was

entered by the Court on November 12, 2008, authorizing cash collateral usage through February 27, 2009.   Thereafter, the Debtor filed motions to correct the order to provide for notice to CenturyTel, to provide for Debtor-in-Possession financing by Balaton, and to extend (by agreement) the cash collateral deadline.   Currently, Cash collateral has been authorized until May 28, 2009, with a hearing to extend usage again set for that day.

The Debtor also sought to incur additional secured indebtedness through a line of credit extended by Balaton Group.

### 3. EMPLOYMENT OF PROFESSIONAL PERSONS

The Debtors are represented in this Chapter 11 Proceeding by the law firm of Weycer, Kaplan, Pulaski & Zuber, P.C.   The Debtors also retained special FCC Counsel of Wilkinson Barker Knauer, LLP and the accounting firm of Hein & Associates LLP.

On motion of the Debtor the Court also authorized the monthly payment of a portion of legal fees, under a procedure that requires 20% of the fees requested to be held back pending quarterly interim approval by a fee application.

### D. Adversary Proceedings, Significant Motions and Contested Matters

#### 1. INTELSAT

Intelsat was the main provider of service to the Debtor prior to the Bankruptcy filing and immediately thereafter.   Intelsat had been owed a substantial amount of money on the petition date.   Its demand for immediate payment was the event that precipitated the Debtor's Chapter 11 Bankruptcy.

#### a. Pleadings Filed

After the bankruptcy was filed, Intelsat filed:

> a.    motion to compel payment of administrative expenses for the post-petition provision of satellite service to the Debtor.
>
> b.    motion for the authorization to apply a "deposit".
>
> c.    a large unsecured proof of claim

The Debtor filed objections to those requests and alleged that Intelsat had received a large payment on the eve of bankruptcy by engaging in unusual collection activity and that the payment was avoidable as a preferential transfer.   The Debtor:

> a.    sued Intelsat for preferential transfer and requested return of over $500,000 paid within 60 days of bankruptcy.
>
> b.    disputed Intelsat's claim because of the preference was not returned after written demand.

      c.      argued that Intelsat did not provide a "benefit" to the Debtor.

b. <u>Status of Litigation</u>

The Debtor and Intelsat are currently conducting discovery relating to the preferential transfer and the value of the services provided.

2. DIGITAL NETWORKS LLC

One of the Debtor's largest customers was also one of the most difficult to service – Digital Networks LLC.  Digital re-sells the Debtor's satellite service to oilfield drilling and production companies, including offshore oil platforms and remote drilling rigs.  Digital and the Debtor have attempted to resolve disputes through mediation.  Digital remains a customer with 18 months remaining of a three-year contract with the Debtor.

a. <u>Pleadings Filed</u>

Digital filed a proof of claim form for about $15,000, to which the Debtor has objected.  At one time, Digital objected to the fees of counsel, but that objection was withdrawn.

b. <u>Status of Litigation</u>

Digital has been served with discovery relating to the claim objection.  The parties continue to attempt to negotiate a compromise.

3. ADVANCED PROJECTS INTERNATIONAL, INC.

Advanced Projects International, Inc. "API" is the counterparty to two contracts with the Debtor.  The first contract, signed prepetition, was never performed.  The second contract, signed post-petition, was essentially the same as the first.  Both contracts required API to provide customer support service.  The Debtor complained about API's quality of customer service.  After API caused a near system wide crash of service, the Debtor noted API's breach of service and stopped using API.  In the Plan, the Reorganized Debtor explicitly preserves all causes of action against API, including breach of contract.

a. <u>Pleadings Filed</u>

API filed an application for payment of administrative expense.  The Debtor sued API claiming API breached the contract and must return all money paid under legal or equitable theories.

b. <u>Status of Litigation</u>

API has been served with discovery and the Debtor has made initial disclosures.  The litigation is ongoing.  If the Debtor wins, then API will pay money into the estate.  If API wins, the Debtor may have a significant administrative expense.

### 4. GLOBECOMM

Globecomm is a provider of satellite service. It provides service to the Debtor and the Debtor has purchased from Globecomm. Globecomm moved to lift the stay to setoff a deposit. SkyPort agreed to that relief and worked with Globecomm to ensure that their mutual customers remained satisfied with the service. Globecomm is believed to have received an avoidable preferential transfer and the Debtor contests Globecomm's claim. As of now, no suit has been filed.

### 5. UPSTREAM LEASE

The Debtor owned an older version iDirect hub which was essentially surplus. The "hub", which connects satellite communications to the terrestrial internet, is not easily salable. Even if it were sold, the software and firmware needed to operate it is expensive, the hub requires a software license and satellite antennas to operate. The Debtor was able to lease the hub (with a purchase option to Upstream Investments, LLC) for a stream of payments equal to the current fair value. The hub, once sold, is sold free of any liens. The Debtor sought and obtained court approval for the approval of the lease with a purchase option free and clear of liens.

### 6. IDIRECT

iDirect sold over $600,000 in goods and services to the debtor that were delivered in the months prior to bankruptcy, but only a small fraction of those goods were delivered to the Debtor within 20 days of bankruptcy. IDirect filed an administrative expense claim for the full $600,000. The Debtor and iDirect settled upon $9,022.00 as the full amount owed.

### 7. DRILLSITE

Drillsite was a customer of the Debtor that signed a contract for service, was delivered goods, but who did not pay. The Debtor has sued Drillsite for breach of contract and to return those goods. If successful, the Debtor could obtain a judgment for as much as $483,967.37 and attorney's fees. The Debtor has not investigated the amount recoverable on any judgment. The summons, complaint and scheduling order were served May 1, 2009.

### E.  Case Management Going Forward

#### 1. PLAN NEGOTIATIONS

The Debtor has an exclusive period within which it may propose a plan of reorganization. The Debtor is proposing the Plan within that period. Before submitting the current Plan, the Debtor negotiated the use of Cash Collateral with, and investigated the lien position of, both Aegis and CenturyTel. The Debtor also negotiated with potential DIP lenders, potential exit financiers, and potential business partners. As of this date, however, there is no agreement with any entity except Balaton for the contribution of additional money to the Debtor, the provision of additional capital, or the discount of secured debt.

2. ASSUMPTION AND REJECTION

The bankruptcy law allows the Debtor to assume or reject any pending lease agreements or executory contracts that exist on the date of the order for relief. Additionally, the law provides that the Debtor can assign its interest in lease agreements and executory contracts provided it cures all defaults and provides adequate assurance that the assignee will comply with the terms of the lease or contract. Executory contract and lease assumption and rejection are treated in the Plan. Any contract or lease not specifically assumed in the Plan or by prior court order is deemed rejected.

The Debtor's facility is critical to the Debtor's ongoing business and so the Debtor will assume the lease of the facility and continue to operate the lease. The Debtor does not agree that the licenses of intellectual property (especially software licenses) are subject to assumption or rejection because they have been paid for and are therefore not executory. Nevertheless, the Debtor will assume all listed licenses of intellectual property.

The Debtor is a party to executory contracts with customers and providers of service. The Debtor's analysis of this is shown on Plan Exhibit A listing the contracts assumed and rejected and the proposed cure amounts. The cure amounts are the amount that will be paid upon assumption unless a claim is filed in a different amount. If a claim is filed in a different amount, the Debtor will either accept the claim or object to it. If objected to, the cure claim will be paid when allowed.

## V.      DESCRIPTION OF PLAN

### SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### A. Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and

shareholders.  Upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 Case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The Plan should be read carefully and independently of this Disclosure Statement.  The following analysis of the Plan is intended to provide a context for understanding the remainder of this Disclosure Statement and to assist in an understanding of the Plan and the proposed treatment of the Creditors.

The Debtor expects to implement its plan and continue in its business restructuring which should provide growth and full compliance with the plan.  The Debtor has a strong core business and intends to reorganize around that business which, together with certain other operational improvements, is expected to be the basis for a viable reorganization plan.

The terms of the Debtor's Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan, and pay its continuing obligations in the ordinary course of its business.  Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

A copy of the Plan is attached as Exhibit A.  Generally, If the Plan is confirmed by the Bankruptcy Court and consummated, (i) The Reorganized Debtor will pay $300,000 in satisfaction of the Allowed Claims of Unsecured Creditors and any Net Proceeds of Avoidance Actions, to be divided pro-rata among them, and (ii) the Allowed Claims of Secured Creditors will receive either the value of their secured claim over time, or a one-time discounted cash payment at their election, (iii) the priority of Secured Claims will be determined between the two competing secured lenders before Allowance, and (iv) in exchange for the voluntary subordination of its DIP Claim and release of all other Claims, and in exchange for any other funds provided, Balaton group receives releases and indemnifications, the right to 100% of the New Common Stock in the Reorganized Debtor, and old equity interests of the Debtor are cancelled.  The Debtor will merge with its parent during the reorganization.  All FCC licenses and similar licenses held by the Debtor (or SkyComm) will be retained by the Reorganized Debtor.  The Effective Date of the Plan is the date on which the Confirmation Order becomes a Final Order.

On the Effective Date (and at certain times thereafter), the Reorganized Debtor will distribute Cash, New Common Stock, New Notes, and other property in respect of Classes of Claims as provided in the Plan. Except for the Class 1 Allowed Secured Claims of Taxing Authorities, all Classes of Claims and Interests are "impaired" for voting purposes.  Because the Holders of Interests (after Merger with SkyComm) receive nothing on account of its interests, they are deemed to reject the plan and not entitled to vote.

### B. Merger With the Parent Company, SkyComm

To preserve favorable tax treatment and Net Operating Loss Carryovers, approximately $1.7 Million of which reside in the parent of the Debtor, the Debtor will, in the Plan, merge with the parent company.  Balaton Group holds over 58% of the common stock of SkyComm, which is a Delaware corporation.  Section 253 and of the Delaware General Corporation Law requires a vote of a majority of the parent's shares.  Balaton will vote those shares for merger as part of the Plan of Reorganization.

Under section 253 of the Delaware General Corporation Law, the parent may merge into the subsidiary provided:

   a. The Board of Directors of the Parent (by majority vote of those directors) shall approve a resolution to merge. The resolution shall include a provision for the pro rata issuance of stock of the subsidiary to the holders of the stock of the parent on surrender of their parent stock certificates;

   b. The proposed merger has to be approved by a majority of the outstanding stock of the parent corporation entitled to vote thereon at a meeting duly called and held after 20 days' notice of the purpose of the meeting.

Section 228 of the Delaware general corporation law specifically permits any action required to be taken at any meeting of shareholders to be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize the action at a meeting.

Prompt notice of the taking of the action without a meeting shall be given to those stockholders who did not sign the consent.

In the Plan, the directors will approve the merger, and a consent to approve the merger proposal will be signed by 51% of all shares entitled to vote (By Balaton), and there will be no meeting. While shareholders would normally have the right to dissent and seek a fair appraisal for their shares of a merger, a merger of a parent into the subsidiary and a subsidiary into the parent is exempt from this appraisal rights, so long as (as here) 100% of the shares of SkyPort are owned by SkyComm.  By vote of the majority shareholder, SkyPort and SkyComm will have identical bylaws and Articles of Incorporation prior to the merger.

### C. Administrative Expenses and Priority Tax Claims and Timing of Payment

The Holders of Administrative Expense Claims against the estate and Tax Claims are treated as generally described below

> Payment of Administrative Claims.  Each Holder of an unpaid Allowed Administrative Claim shall be paid in Cash in full on the later of thirty (30) days after the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless the Holder of such Claim agrees to a different treatment.

> Payment of Non-Tax Priority Claims.  Each Holder of an unpaid Allowed Non-Tax Priority Claim shall be paid in Cash in full on the later of thirty (30) days after the Effective Date or the date such Claim becomes an Allowed Non-Tax Priority Claim, unless the Holder of such Claim agrees to a different treatment.

> Payment of Unsecured Priority Tax Claims.  The Allowed Priority Tax Claims shall be paid beginning December 31, 2009, and continuing for a period of twelve (12) quarters, the sum of $11,278, per quarter until such Claims are paid in full.  Such deferred cash payments shall have a value as of the Effective Date the Plan, equal to the allowed amount of such Claims. In computing the present value of such Claims, the interest rate applied shall be the interest rate, which is currently 4.25%, as determined by Texas Tax Code Section 110.060(b) from the Effective Date until paid.

### D.  Classes of Secured and Unsecured Claims and Treatment of Interests

The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are generally described below

> Class 1.    Allowed Secured Claim of Taxing Authorities.  The Allowed Secured Claims of Taxing Authorities shall be paid beginning December 31, 2009, and continuing for a period of twelve (12) quarters, the sum of $7,414, per quarter until the Allowed Secured Claims are satisfied.  Such deferred cash payments shall have a value as of the Effective Date the Plan, equal to the allowed amount of such Claims. In computing the present value of such Claims, the interest rate applied shall be the interest rate, which is currently 12%, as determined by Texas Tax Code Section 33.01 from the Effective Date until paid. The Allowed Secured Class 1 Claims Holders shall retain their liens until such time as they are paid in full.

> Class 2.    Allowed Secured Claims of Aegis and CenturyTel.  Class 2 consists of the Allowed Secured Claims of Aegis and CenturyTel secured by claims against the Debtor's business assets.  There is currently a dispute between CenturyTel and Aegis as to the extent, validity and priority of their respective liens.  The Debtor believes that the going concern value of the entire business is $1.7 million.  The payment stream described in Treatment Alternative A below will be held in the Disputed Claim Reserve pending a determination by the Court with respect to the dispute.

Treatment Alternative A.   The Allowed Secured Class 2 Claims shall be paid beginning December 31, 2009, and continuing for a period of twelve (12) quarters, principal plus interest in the amount shown below:

| Date | Principal | Interest |
|------|-----------|----------|
| Dec 31, 2009 | $50,000 | $18,063 |
| Mar 31, 2010 | $50,000 | $17,531 |
| June 30, 2010 | $50,000 | $17,000 |
| Sep 30, 2010 | $50,000 | $16,469 |
| Dec 31, 2010 | $75,000 | $15,938 |
| Mar 31, 2011 | $75,000 | $15,141 |
| June 30, 2011 | $200,000 | $14,344 |
| Sep 30, 2011 | $200,000 | $12,219 |
| Dec 31, 2011 | $200,000 | $10,094 |
| Mar 31, 2012 | $250,000 | $ 7,969 |
| Apr 31, 2012 | $250,000 | $ 5,313 |
| June 30, 2012 | $250,000 | $ 2,656 |
| Total | $1,700,000 | |

Such deferred cash payments shall have a value as of the Effective Date the Plan, equal to the allowed amount of such Claims. In computing the present value of such Claims, the interest rate applied shall be 4.25% which is prime plus one. The Allowed Secured Class 2 Claims Holders shall retain their liens until such time as they are paid in full.

Treatment Alternative B.   The Allowed Secured Class 2 Claims shall be paid the sum of $800,000 to be divided between Aegis and CenturyTel as they agree in full satisfaction of their Allowed Secured Claims and their liens shall be released.  The balance of their Claims shall be treated as General Unsecured Claims.  Balaton is working on obtaining a standby exit facility to obtain these funds in the event Class 2 opts for Treatment Alternative B.  Balaton will guarantee the exit facility.

Class 3.     Allowed Secured and Unsecured Claims of Balaton.  Class 3 consists of the Allowed Secured and Unsecured pre and post petition Claims held by Balaton. In exchange for voluntary subordination of all of its Allowed Secured and Unsecured pre and post petition Claims, and in exchange for the pledge to fund Administrative Expenses as needed, Balaton shall receive 100% of the newly issued stock of the Reorganized Debtor (or any amount between 51% and 100%) free and clear of liens and Balaton shall receive the releases set forth in the Plan.

Class 4.     Allowed General Unsecured Claims.  Class 4 consists of the Allowed General Unsecured Claims which are not held by Insiders.  The Holders of Allowed Class 4 Claims will receive their Pro Rata share of $300,000 payable in twelve equal quarterly installments with no interest commencing December 31, 2009 and the Net Proceeds of

judgments on Avoidance Actions.   Assuming $2.5 Million in Allowed Claims of this Class, the return to unsecured creditors should be approximately 12 cents on the dollar.

Class 5.     <u>Allowed Interests of Equity Holders</u>.  Class 5 consists of the Allowed Equity Interests in the Debtor. Holders of Equity Interests shall receive no distribution or any property under the Plan on account of said Equity Interests.  Said Equity Interests shall be cancelled.

### E. Summary of Financial Projections

Attached hereto as Exhibit C are financial projections prepared by management.  These projections include actual results for the year 2009 up to April, monthly forecast results for the balance of 2009, and annual forecast for the term of the plan through 2012.  The statements include projected income statements, balance sheets, cash flow forecasts, assumptions and significant historical data.

The projections are conservative and establish that the Reorganized Debtor will be able to make the payments provided for in the Plan.  If the results are better than anticipated, the Plan contains a provision for accelerating payments to creditors.

SkyPort's ProForma financial projections are based upon its ability to achieve success in the following areas:

**Reach and Maintain Positive EBITDA.**  SkyPort has focused on its plan to reach positive EBITDA by managing its costs across the board.  This includes eliminating excess satellite capacity, negotiating reduced terrestrial costs, and trimming and restructuring personnel expenses.   SkyPort reached its goal of positive EBITDA in January of 2009 and continues to maintain and improve its EBITDA margin.   (February 2009 slightly negative EBITDA is attributable to bankruptcy costs not included in operational calculations)   This is the first time the Company has been able to maintain a sustained positive EBITDA since its inception.   This provides the company the stable financial base needed to implement its growth strategies.   An additional benefit in significantly reducing the Company's cost structure is that a significant percentage of these costs are fixed costs that do not increase as revenues increase.   Now that SkyPort is covering these fixed costs additional revenue accretes to the bottom line at a higher EBITDA margin.

**Senior Management Focused on Revenue Growth.**   With a stable positive EBITDA, senior management will have the time to focus on building a base of business as opposed to raising the capital necessary to deal with operating deficits and the multiple issues arising from those deficits.   Historically, SkyPort has been able to achieve success in growing revenue only to have that success undermined by its lack of profitability.   As an example, in the first nine months of 2008 revenue was more than doubled from approximately $400,000 per month to approximately $850,000 per month.

**Stabilize and Grow Existing Customer Base**.   A key asset of SkyPort is its base of blue chip customers. Since filing bankruptcy, SkyPort has successfully stabilized its customer base and limit its loss of customers.   While some low margin business was given up and a key National

Guard contract expired, SkyPort has focused on consolidating and improving its core high margin business.   Revenue has stabilized around the $500,000 per month mark and we are seeing growth in key customers.   This is in line with our plan that calls for moderate growth in our current customer base through improved operations and service.   Some of the accounts we are having success in are:

- National Guard Units – Renewal of several key state guard unit contracts.
- Cisco Systems - Closed a key contract to joint venture with Cisco and UnitedHealth Group.
- Sysco Foods – Closed a contract for additional business.

We are also close to closing renewal and/or expansion contracts with numerous other existing customers.

SkyPort plans to continue to leverage its relationship with fortune 1000 clients by focusing its efforts on growing these accounts through Key Account Management techniques.   The new management team has focused the majority of its efforts on growing revenues within its current customer base.  This has resulted in strong sales opportunities and growth.  The cost to increase revenue from existing customers is significantly less than finding new customers.

**Expansion of Customer Base**.   The plan calls for moderate revenue growth through closing contracts with new customers in each of our three focused verticals:

- **Oil and Gas**.    A large percentage of SkyPort's revenue has historically been through sales to oil and gas customers.   SkyPort plans to leverage this strength by focusing its resources and targeting new oil and gas customers over the next three years.   Under the plan, four small and two large customers will be added to its customer base per year.   Detailed marketing strategies have been developed and the resources necessary to achieve this goal has been factored into the budget.
- **Enterprise Business Continuity**.   SkyPort has had success with certain key customers in this segment and the plan calls for limited growth through one or two new key customers added each year.   Our current base of blue chip customers provides a stable base for expansion in this market.

- **Governmental  Expansion** .  SkyPort has a long history of servicing the communication needs of both the National Guard Bureau and the State National Guard Units.   The plan calls for expansion in the number of state units we serve over the next two to three years.   Given our track record with the National Guard, our stabilized financial position, and improved operations, we consider this goal to be very achievable.

F.**Bar Dates**

**Administrative Claims Bar Date**.  Any holder of an Administrative Claim against the Debtor, except for administrative expenses incurred in the ordinary course of operating the Debtor businesses, shall file proof of such Claim or application for payment of such Administrative Claim on or within 30 days from entry of the Order confirming the Plan.  Failure to file an administrative claim will cause such Holder's Administrative Claim to be forever barred and extinguished and such Holder shall, with respect to any such Administrative Claim, be entitled to no distribution and no further notices.  U.S. Trustee fees which accrue after confirmation shall be treated as an administrative expense.  The Debtor shall be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C. §1930(a)(6).  Any fees due as of the date of confirmation of the plan will be paid in full by the Debtor on the Effective Date of the plan.  After the Effective Date, the Debtor shall pay United States Trustee quarterly fees as they accrue until this case is closed by the Court.  The Debtor shall file with the Court and serve on the United States Trustee a monthly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United States Trustee.  It is not necessary for the U.S. Trustee to file a proof of claim.

**Unsecured Claims Bar Date**.  The deadline for filing a proof of claim for an unsecured claim (other than a claim for damages stemming from the rejection of an executory contract or lease) passed on March 4, 2009.

**Rejection Damage Claim Bar Date**.  An Unsecured Claim arising from the rejection of an executory contract or unexpired lease must be filed no later than 20 days after the Effective Date of the Plan.

## VI.     LIQUIDATION ANALYSIS

A.**Methodology.**

The starting point in determining the amount which members of each impaired class of unsecured claims and interests would receive in a Chapter 7 case is to estimate the dollar amount that would be generated from the liquidation of the Debtor (the "Liquidation Proceeds"). The Liquidation Proceeds of the Debtor would consist of the proceeds from the sale of all of the assets of the Debtor, augmented by the cash held by the Debtor.  The present value of the distributions from the Liquidation Proceeds are then compared with the present value offered to each of the classes of unsecured claims and interests of each such class**.**

B.**Analysis.**

A Liquidation Analysis is attached as Exhibit D.  The analysis reflects that in a liquidation the distribution to all classes of claims, other than Allowed Secured Claims, would be zero.  Essentially, that information projects approximately $460,000 in personal property (liquidated

valuation). These assets are encumbered by secured, administrative and priority claims well in excess of their value, approximately $2,250,000 by Aegis and $2,500,000 by CenturyTel. This leaves no money to pay unsecured claims. The Debtor's plan proposes a guaranteed payment of $300,000 to unsecured creditors (plus Net Proceeds of judgments in Avoidance Actions), which is more than they would reasonably expect to obtain in a liquidation. Assuming the claims analysis of $2.5 Million in Allowed General Unsecured Claims, a successful reorganization would net the Holders of Allowed Unsecured Claims 12 cents for every dollar owed.

## VII.    RISKS POSED TO CREDITORS

The principal risk to the creditors is that the Debtor will not generate sufficient profits to make all payments required by the Plan. This can result from competition, changes in the overall economy, changes in technology and the loss of key personnel. Each of these factors is discussed below along with a discussion of how the Debtor is dealing with them.

### A. Competition

Competition is a risk faced by all non-monopolies. The Debtor has several direct competitors in the satellite network data/telecom industry and numerous indirect competitors. The threat of losing business to competitors is minimized by the Debtor's leaner balance sheet and its ability to continue to provide premium quality voice and data services. The considerable investment in man hours and/or equipment required in moving or switching to a competitor further insulates SkyPort from its competition. Its communications facilities located at the Ellington Joint Reserve Base is uniquely qualified to serve the satellite communications industry and sets SkyPort aside from organization who have not invested in infrastructure equal to the SkyPort facilities. This capability and infrastructure allows SkyPort differentiate itself from many others. Additionally SkyPort can expand its offerings and customer reach by leveraging the infrastructure currently in place.

### B. Economy

SkyPort's clients rely on its services for mission critical data, voice and internet connectivity. As such, this service is considered a must have versus a dispensable service. With the exception of Oil and Gas clients who have experienced a near 50% decline in drilling sites and locations, all other clients are dependent on the services provided by SkyPort. The current economic client may impact additional expansion plans by current SkyPort clients thus impacting the overall growth rate. However, core services and existing applications remain firmly imbedded in SkyPort's infrastructure.

### C. Technology

Technology obsolescence is another risk factor all companies must face. SkyPort's solutions and products are dependent on delivering the most current technical solutions and as such equipment refreshment will always impact financial performance. Technical failure is also a significant risk factor. A technical failure if not corrected can cause an outage of service to SkyPort customers and potential cancellation of services.

### D. Loss of Key Personnel

The loss of key personnel is a concern for all companies. However, given the current market conditions key employees are significantly concerned about making any lateral moves to competitive organizations. Employees remain committed to their existing positions vs taking the risk of any change in employment. SkyPort is currently interviewing for marketing assistants and other growth related position and is experiencing solid application results. SkyPort believes that it will be able to retain current key executives plus improve the company's capabilities through enhancement programs and training.

## VIII.   ALTERNATIVES

Although the Disclosure Statement is intended to provide information to assist creditors in making a judgment on whether to vote for or against the Plan, and although creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief discussion of alternatives to the Plan may be useful. These alternatives include conversion to a Chapter 7 or dismissal of the proceedings. The Debtor of course, believes the proposed Plan to be in the best interests of creditors.   The Debtor assesses the alternatives as follows:

### A. Conversion to Chapter 7

The first alternative would be to convert the Chapter 11 case to a Chapter 7 liquidating bankruptcy. If this occurred, the Bankruptcy Court will appoint a trustee to liquidate the Debtor's assets for the benefit of its creditors. The costs associated with a trustee would then be added to the additional tier of administrative expenses entitled to priority over general unsecured claims upon conversion. Such administrative expenses include the Chapter 7 Trustee's commissions, as well as fees for professionals retained by the Chapter 7 Trustee to assist in the liquidation. The Trustee's commissions are based on disbursements to creditors. The Trustee receives 25% of the first $5,000, 10% of the next $45,000, 5% of the next $950,000 and 3% on all amount disbursed in excess of $1 million.

In a Chapter 7 case, the Debtor would likely cease operating (as the Chapter 7 Trustee would not have FCC approval or experience), the secured lenders would lift the stay and foreclose on the Debtor's assets, and unsecured creditors would receive very little, if any money.

### B. Dismissal

Dismissal of the proceeding would likely result in the Debtor defending debt-collection litigation and numerous new lawsuits to collect debts. The Secured lenders would foreclose on substantially all of the Debtor's assets, halting the Debtor's operations. Even if there were unencumbered assets, the creditors who receive quick judgments will be able to execute and recover their claims leaving nothing for the remaining creditors.

### C. <u>No Assurance of Either</u>

There are other possibilities which are less likely, such as a competing plan proposed by a different party.  The Debtor has attempted to set forth the reasonable alternatives to the proposed Plan. However, the Debtor must caution creditors that a vote must be for or against the Plan. The vote on the Plan does not include a vote on alternatives to the Plan.  There is no assurance what course the proceedings will take if the Plan fails acceptance.

THE FOLLOWING INFORMATION IS INCLUDED IN THE DISCLOSURE STATEMENT AT THE REQUEST OF AEGIS TEXAS VENTURE FUND, LP, THIS INFORMATION DOES NOT EXPRESS THE VIEW OF THE DEBTOR.

Aegis, a creditor in this bankruptcy case, believes that the Debtor's proposed Plan is unfair to creditors.  First, Aegis believes that the Debtor designed the Plan to give substantially all the value of the Debtor's business not to creditors, but to Balaton Group, Inc., an entity owned and run by the Debtor's CEO, Robert Kubbernus.  Second, Aegis believes that the financial projections the Debtor presents in support of the Plan are unsupported and unreasonably speculative.  Aegis explains these positions below.  Aegis urges creditors to consider these issues in making their decisions on whether or not to support the Debtor's Plan.

**A.** **Aegis believes the Plan is unfair because it rewards Balaton at the expense of the creditors.**

The Debtor's Plan gives most of the value of the Debtor's business to Balaton Group, Inc., an entity owned and run by the Debtor's CEO, Robert Kubbernus.  Balaton is the Debtor's primary equity holder and an insider of the Debtor.  Robert Kubbernus is Balaton's representative and decision maker.  Mr. Kubbernus is also the Debtor's CEO and the estate's primary decision maker and identified as the signatory for by the Plan and Disclosure Statement.

The Debtor asserts that the total value of its business assets on the Plan's Effective Date will be $1.7 million.  Yet, only a small fraction of this value goes to the unsecured creditors. Balaton is also an unsecured creditor of the Debtor, but the Plan gives Balaton a greater recovery than any other creditor.  To do this, the Plan places Balaton in its own creditor class (Class 3) separate from all other unsecured creditors (Class 4), and gives Balaton 100% of the stock in the Reorganized Debtor.  **The Disclosure Statement estimates that all non-Balaton unsecured creditors will receive only 12 cents on the dollar (a 12% recovery), paid over three years. The Disclosure Statement estimates that Balaton holds a $2 million claim for which Balaton receives stock worth over $4 million in the same three-year period, a 200% recovery for Balaton (or $2 for every $1 of its claim)**.  *See* Exhibit C to this Disclosure Statement, ProForma Statement of Operations through 2012.  Why is Balaton entitled to such favorable treatment, when all other creditors receive much less?

**B.** **The Plan depends on an unsupported and speculative two-fold increase in the Debtor's business.**

The Debtor's Plan's entire premise is that if the Debtor continues business as usual - with no change in operations, management or recapitalization – its business will double in the next three years.  The only support offered for this dramatic business turnaround is a one-page

spreadsheet, setting forth the Reorganized Debtor's projected performance for the next three years.

Based on the Debtor's projections, the Debtor's revenue will more than double in three years, with a similar increase in EBITDA.  Yet, the same spreadsheet reflects that the Debtor's revenues *decreased* by 25% last year.  Again, there is no new capital, no change in management and no discernable change in the business plan to generate an amazing 100% increase in revenues.  Where does this sudden and dramatic increase come from?  If the Reorganized Debtor is going to be so profitable, why are the non-insider creditors not allowed to share in the profits?  What happens if the Debtor is unable to double its revenues in three years?

Aegis urges all creditors to consider these questions when reading this Disclosure Statement and deciding how to vote on the Debtor's Plan.

The Debtor vigorously disagrees with the foregoing statement of Aegis Texas Venture Fund.  The Court required this statement to be included so other creditors could be informed of its position.

## IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A. Tax consequences to the Debtor

#### 1. NET OPERATING LOSS AND EXCESS INTEREST EXPENSE CARRYFORWARD OF THE DEBTOR

The Debtor and its affiliates have an approximate $15 million consolidated net operating loss ("NOL") carryover related solely to the operations of the Debtor and its subsidiaries and that is attributable to taxable years ending on or before December 31, 2009.

#### 2. REALIZATION OF CANCELLATION OF INDEBTEDNESS INCOME

Generally, a taxpayer recognizes cancellation of indebtedness ("COD") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price. The amount of COD income is, in general, the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the issue price of any new indebtedness issued by the taxpayer, the amount of cash and the fair market value of any other consideration (including stock of the taxpayer) given in exchange for the indebtedness satisfied.

However, COD income is not included in gross income to a debtor if the discharge occurs in a Title 11 case or the discharge occurs when the debtor is insolvent (except with respect to certain discharged intercompany debt which is treated as both income and an offsetting loss to the group). Rather the debtor generally must, after determining its tax for the taxable year of discharge, reduce its NOLs and any capital loss carryovers first and then, as of the first day of the next taxable year, reduce the tax basis of its assets by the amount of COD income excluded from gross income by this exception. Recently issued temporary Treasury Regulations provide that, to the extent that the excluded COD income of a debtor is applied to reduce the tax basis in the stock of a subsidiary member of the U.S. consolidated group, such excluded COD income is treated as recognized by the subsidiary. These regulations also provide that to the extent that the

excluded COD income recognized by the debtor is not applied to reduce its tax attributes, such remaining excluded COD income is applied to reduce the tax attributes of the members of the debtor's U.S. consolidated group (other than the tax basis in their assets). As an exception to the order of such reduction set forth in the Tax Code, a debtor may elect to reduce its tax basis in its depreciable assets first, then its NOLs.

As a result of such an election, the debtor would reduce the tax basis in its directly held depreciable assets, and thereafter the tax basis in the depreciable assets held by the next lower-tier U.S. consolidated subsidiary to the extent that the subsidiary consents. A debtor can apply this rule successively down the chain of U.S. consolidated subsidiaries. To the extent that the tax basis in the depreciable assets held by a lower-tier subsidiary is reduced, the tax basis in its stock held by a group member will also be reduced. After the reduction in tax basis in depreciable assets held by a debtor and all consenting U.S. consolidated subsidiaries, the tax attributes of the debtor and the members of its U.S. consolidated group would be reduced as set forth above to the extent of any remaining excluded COD income.

The COD income recognized by a Debtor as a result of consummation of the Plan will not be includable in the income to the Debtor realizing such income but will generally first reduce the NOL carryover of the Debtor after the calculation of tax for the taxable year of discharge, then would reduce the tax basis of the assets held by the Debtor on the first day of the taxable year after discharge. To the extent that the tax basis in the stock of a subsidiary member of the U.S. consolidated group of the Debtor is reduced, such excluded COD income is to be treated as recognized by the subsidiary resulting in a corresponding reduction in the tax attributes of the subsidiary. Thereafter, any remaining excluded COD income of the Debtor would be applied to reduce the tax attributes of members of the U.S. consolidated group (other than tax basis). Notwithstanding the foregoing, an election may be made to first reduce the tax basis of the depreciable assets held by the Debtor and held by its consenting subsidiaries prior to the reduction of the tax attributes of the Debtor and its U.S. consolidated group as discussed above.

### 3. LIMITATION TO UTILIZATION OF NOLs -- SECTION 382 OF THE TAX CODE

a. General Rules.

In general, Section 382 of the Tax Code limits the amount of pre-change losses (i.e., NOLs, losses incurred in the current year prior to the "ownership change" and losses and deductions recognized in a period after an "ownership change" that are attributable to a "built-in-loss" existing on the date of the "ownership change") that a loss corporation may use to offset its income in any year (or portion thereof) following an "ownership change" (as described below) (hereinafter, the limitation under Section 382 of the Tax Code is referred to as the "Section 382 Limitation"). The Section 382 Limitation on the use of prechange losses in any post-change year is equal to the product of the fair market value of the corporation's outstanding stock immediately before the ownership change and the long-term tax exempt rate (which is published monthly by the Treasury Department and is intended to represent current interest rates on long-term tax-exempt debt obligations) in effect for the month in which the ownership change occurs. For the year in which an "ownership change" occurs, the Section 382 Limitation is pro rated for the portion of the year that follows the "ownership change."

An "ownership change" occurs under Section 382 of the Tax Code if the percentage of stock of the corporation owned actually or constructively by one or more "5-percent shareholders" increases by more than 50 percentage points by value on any "testing date" (taking into account all relevant adjustments as of the end of a "testing date") as compared to the lowest percentage of stock of the corporation owned by those 5-percent shareholders at any time during the statutory "testing period" (generally, the past three years or, if shorter, since the last ownership change). Generally, a "testing date" is any date there is any change in the stock ownership that affects the percentage stock ownership of a 5-percent shareholders. A "5-percent shareholder" is one who owns, directly or indirectly, at least five percent of the stock of the corporation (not including certain nonvoting nonparticipating preferred stock), and stock owned by shareholders, who are not 5-percent shareholders (hereinafter referred to as a "public group"), is treated as being owned by one or more separate 5-percent shareholder. That is, a public group is generally created as a result of an issuance of stock and, absent an exception, is treated as a separate public group from any other public group existing prior to the stock issuance. For purposes of determining whether an "ownership change" has occurred, interests other than stock are treated as stock if (i) as of the time of issuance to a 5-percent shareholder (or a person who would be a 5-percent shareholder if the interest not constituting stock were treated as stock), such interest offers a potential significant participation in the growth of the corporation; (ii) treating the interest as constituting stock would result in an ownership change and (iii) the amount of the pre-change losses is more than twice the amount determined by multiplying (a) the value of the loss corporation by (b) the federal long-term tax exempt rate.

b. Section 382(l)(5) of the Tax Code.

Section 382(l)(5) of the Tax Code provides that the general Section 382 Limitation does not apply to an "ownership change" resulting from transactions that are pursuant to a Title 11 case if shareholders and "qualified creditors" of the debtor receive (as a result of being shareholders or "qualified creditors" immediately before such change) at least 50 percent of the stock of the debtor by vote and value after the ownership change. "Qualified creditors" of a debtor include (i) creditors that either (a) have held their indebtedness for at least 18 months prior to the bankruptcy filing or (b) creditors whose indebtedness arose in the ordinary course of the debtor's trade or business. However, where there is an "ownership change" under Section 382 of the Tax Code and Section 382(l)(5) of the Tax Code applies, the NOLs that may be carried forward subsequent to the "ownership change" are computed as if no deduction were allowable for interest paid or accrued for the current year and the three prior years with respect to debt that is converted to stock. Further, if Section 382(l)(5) of the Tax Code applies with respect to an ownership change, if there is an ownership change within two years of the Effective Date, the Section 382 Limitation with respect to that ownership change will be zero.

The Debtor believes that the percentage of stock of Debtor owned actually or constructively by Balaton for the past three years is already in excess of 50 percent and thus cannot mathematically increase more than 50 percentage points as a result of the consummation of the Plan by more than 50 percentage points by value as compared to the lowest percentage of stock owned by each such 5-percent shareholders during the three- year period ending on the Effective Date. As a result, absent the applicability of Section 382(l)(5) of the Tax Code, the ability of each Debtor to utilize any NOLs and other pre-change losses (including depreciation to the extent attributable to any built- in- losses existing on the change date) remaining after

reduction by excluded COD income would not be subject to the Section 382 Limitation. Moreover, even if applicable, Section 382(l)(5) of the Tax Code may prevent the application of the Section 382 Limitation to the extent that more than 50 percent of the Interests of the Debtor will be received in exchange for the Indebtedness to Balaton that constitutes "qualified indebtedness" for purposes of Section 382(l)(5) of the Tax Code. The Debtor and Balaton intend that the Section 382 Limitation will not apply to the restructuring in the Plan, although there can be no assurance that the Plan will so qualify.

c.  Section 382(l)(6) of the Tax Code.

If the requirements of Section 382(l)(5) of the Tax Code are not satisfied, Section 382(l)(6) of the Tax Code would provide that the Section 382 Limitation would be determined by using the value of the stock of the Debtor as reflected by any increase in value resulting from the surrender or cancellation of Claims pursuant to the Plan.

d.  Section 368(a)(1)(g)

Under Section 368(a)(1)(g), the Debtor loses its NOL carryforward if the Debtor's assets are transferred to a new corporation and the stock in the new corporation is transferred to the bankruptcy claimants in a tax free transfer under Sections 354, 355 or 356. The Plan does not provide for that event to occur. Rather, the Debtor maintains its assets as the Reorganized Debtor.

e.  Other NOL restrictions

The reorganized debtor must continue the substantial pre-bankruptcy line of business. Treas. Reg. § 1.269-3(d)(1). The Plan proposes the Reorganized Debtor will continue in the Debtor's business.

### 4. ALTERNATIVE MINIMUM TAX

A corporation generally must pay an alternative minimum tax ("AMT") equal to 20 percent of its alternative minimum taxable income ("AMTI") reduced by certain credits allowable for AMT purposes to the extent that the AMT exceeds the tax of the corporation calculated at the normal progressive income tax rates. In calculating the AMTI, a corporation's income and losses are subject to various adjustments. For example, in computing AMTI, a corporation's NOLs are adjusted for the adjustments and preferences under the AMT sections of the Tax Code and such resulting NOLs can be utilized to fully offset the corporation's AMTI (determined prior to the NOL deduction). However, COD income that is excluded from taxable income under the rules discussed above similarly is excluded from AMTI.

### B.  Tax Consequences to Creditors

#### 1. GENERALLY

The tax consequence to any particular creditor may vary depending on their own circumstances and they should consult with their own tax professional for advice regarding the impact on them of their acceptance or rejection of the plan.

2. UNSECURED CLAIMS

Holders of Class 4 Unsecured Claims will receive distributions from the Debtor.  A Class 4 Claimholder should either be treated as (i) recognizing ordinary income in an amount equal to cash received and recognizing a loss in an amount equal to the tax basis in the Claim or (ii) recognizing a loss equal to the difference between the amount of cash received and their tax basis in their Claim.

A Claimholder's tax basis in a Claim should generally equal the amount included in income as a result of the provision of goods or services to the Debtor, except to the extent that a bad debt loss had previously been claimed. The gain or loss with respect to the Claim should be ordinary to the extent that it arose in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtor.

**DUE TO THE COMPLEX NATURE OF APPLICABLE TAX LAWS, CLAIMANTS SHOULD CONSULT WITH THEIR TAX PROFESSIONAL CONCERNING COMPLIANCE WITH AND THE AFFECT OF BOTH STATE AND FEDERAL TAX LAWS ON THEIR INTEREST BEFORE THEY CAST A BALLOT TO ACCEPT OR REJECT THE PLAN.**

**THE ACCOUNTANTS, ATTORNEYS, AND THE MANAGEMENT OF THE DEBTOR MAKE NO REPRESENTATIONS HEREIN CONCERNING THE IMPACT OF THE TAX LAW ON ANY INDIVIDUAL TREATED UNDER THE PLAN.**

## X.      GOVERNMENTAL REGULATION

The Debtor's operations are subject to various comprehensive laws and regulations related to the transmission of radio waves and communication and data provision. Among other things, such laws and regulations, (i) impose liability for improper operation of a broadcast facility and (ii) require the Debtor to maintain, monitor, disclose and/or intercept information in connection with Federal law, regulations, or subpoenas.  Additional requirements may also be imposed as conditions of operating permits or licenses that are subject to renewal, modification or revocation.  These laws and regulations have become and are likely to continue to become increasingly stringent.  Existing laws and regulations, and new laws and regulations, may require the Debtor to modify, supplement, replace or curtail its operating methods, facilities or equipment at costs which may be substantial without any corresponding increase in revenues. The FCC or other governmental agencies may change rules and regulations relating to the issuance of licenses and the operations of the Debtor's facility which could have adverse consequences for the Debtor.

In the normal course of its business, and as a result of the extensive governmental regulation of the satellite communication industry, the Debtor may become the subject of administrative and judicial proceedings by the government and subject to requirements to change equipment, alter procedures, or pay fines or fees.

There are additional government regulations that that apply to operation on the Reserve Air Base where the debtor's facility located and working with military and non-military governmental entities.  Those regulations may change and adversely affect the Debtor's business.  Skyport maintains close supervision over its employees to assure compliance with both Federal and State laws and employs counsel to assist it in complying with FCC regulations.

## XI.     PREFERENCES AND FRAUDULENT TRANSFERS

### A. Avoidable Preferential Transfers.

Under the Bankruptcy Code, a debtor or Trustee may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the Debtor been liquidated under Chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.  There are certain defenses to such recoveries.  Transfers made in the ordinary course of the debtor's and transferee's business or according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable.  Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property.

The Debtor's schedules and statements list payments made within these preference periods.  Attached as Exhibit F is a list of the payments made within 90 days before the bankruptcy which may be preferential.   The Debtor notes that payments were made to Alpheus, EchoStar, GlobeComm, Intelsat, SES New Skies, SES Americom, VT iDirect and Virgo Publishing within 90 days that may have been outside the ordinary course of business.   With the exception of the payment to Intelsat and SES New Skies, the Debtor has not concluded whether those payments were preferential and may decide not to pursue recovery of them.   Nevertheless, any creditor should be aware that payments received within the preference period may be recoverable in a subsequent action by the Chapter 11 Trustee or Reorganized Debtor.

### B. Avoidable Fraudulent Transfers.

Under the Bankruptcy Code and various state laws, the Debtor may avoid certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered the debtor insolvent.  The Debtor has identified some payments for the benefit of insiders such as Lavell Systems and former management, however it has not concluded whether those payments were fraudulent transfers and may decide not to pursue recovery of them.   It is possible that transfers to or for the benefit of insiders made within four years of the filing of the Bankruptcy petition were fraudulent transfers under the Texas or Virginia Uniform Fraudulent Transfer Act, or otherwise recoverable under Sections 544, 548, and 550 of the Bankruptcy Code, or other law.

### C. Potential Recoveries.

The Debtor conducted a limited analysis of potential recoveries under Chapter 5 of Title XI and attached the analysis as Exhibit F, but the analysis is not exhaustive.   Any and all avoidance actions and rights pursuant to sections 542, 543, 544, 545, 547, 548, 549, 550 and 553 of Title XI, United States Code, and all causes of action under state, Federal or other applicable law shall be retained and may be prosecuted or settled by the Chapter 11 Trustee or Reorganized Debtor. To the extent that material amounts are recovered, it will enhance the returns to the holders of Interests. The Debtor can also sue entities on non-bankruptcy causes of action such as breach of contract.  Those rights are unaffected by the plan and thus the Reorganized Debtor may bring suit for breach of contract after consummation of the Plan.

### XII.   LITIGATION

The Debtor was not a party to any litigation prior to the Petition Date.  The Debtor has been party to litigation and administrative actions in the past and anticipates that the Reorganized Debtor will commence litigation in the future.  The Reorganized Debtor's right to bring suit is unfettered by the Plan, except for the releases granted Balaton Group in the Plan.

### XIII.   MANAGEMENT OF THE REORGANIZED DEBTOR

### A. Members of the Board

Robert Kubbernus and Joseph Long are the sole members of the Board of Direction. The Plan provides for Mr. Kubbernus and Joseph Long to continue in this capacity.  Other members of the management team will become members of the Board of Directors upon plan confirmation.

### B. Management Compensation

At the time of the bankruptcy, Mr. Kubbernus' received no compensation for his work. Upon plan confirmation and going forward, he will receive an annual salary of $85,000 and bonus incentives keyed to the profitability of the company.  In addition, Balaton may have the Debtor transfer shares directly to key members of the management group, such as the CFO, so long as the ownership does not dilute Balaton Group's direct or indirect ownership below 50%.

## XIII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A. Acceptance of the Plan

Confirmation of a Plan under Chapter 11 requires, among other things, that at least one class of creditors or claimants, such as the secured or unsecured creditors in this case, vote in favor of the Plan.   This vote is calculated by only counting those creditors who actually send in a ballot on time.  If two thirds in total dollar amount and a majority in number of claims actually voting in a class approve the Plan, that class of creditors is considered an accepting class.  If the vote is insufficient, the Court can still confirm the Plan, but only upon being provided additional proof regarding the ultimate fairness of the Plan to the creditors.   The Debtor believes that the unsecured creditors will support the Plan when they consider the fact that the secured and priority creditors will receive the majority of all of the assets of the Debtor in the event the reorganization is unsuccessful.

The proponent of a Plan also must meet all other applicable requirements of Section 1129(a) of the Bankruptcy code (except Section 1129(a)(8), if the proponent proposes to seek confirmation of a Plan under Section 1129(b) of the Bankruptcy Code).  These other requirements include, among other things, that the Plan comply with the applicable provisions of Title 11 and other applicable law, that the Plan be proposed in good faith, and that at least one impaired class of creditors vote to accept the Plan.  The Debtor believes that the Plan satisfies all other applicable requirements of Section 1129(a) of the Bankruptcy Code.

### B. Confirmation without Acceptance of All Impaired Classes

The Bankruptcy Court may confirm a plan even if not all impaired classes accept the Plan.  For the Plan to be confirmed over the rejection of an impaired class, the proponent must show, among other things, that the plan does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class that has not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides:  (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain, on account of its claim, property that has a value as of the Effective Date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interest of such class will not receive or retain, on account of such junior claim or interest, any property unless the senior class is paid in full.  The Bankruptcy Court must further find that the economic terms of a plan do not unfairly discriminate as provided in Section 1129(b) of the Bankruptcy Code with respect to the particular objecting class.

**THE DEBTOR BELIEVES THAT THE PLAN HAS BEEN STRUCTURED SO THAT IT WILL SATISFY THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND CAN BE CONFIRMED OVER THE REJECTION OF THE PLAN BY SECURED CREDITORS, IF A CRAMDOWN IS REQUESTED. HOWEVER, THE AFFIRMATIVE VOTE OF THE UNSECURED CREDITORS IS NEEDED TO ALLOW FOR PLAN APPROVAL.   THE DEBTOR BELIEVES THAT THE UNSECURED CREDITORS WILL SUPPORT THE PLAN SINCE THE**

**ALTERNATIVE, LIQUIDATION, WILL LIKELY PAY SECURED AND PRIORITY CREDITORS THE MAJORITY OF THE ESTATE'S ASSETS, LEAVING LITTLE OR NO RETURN TO UNSECURED CREDITORS.**

### C. Other Requirements for Confirmation

In order to obtain confirmation of the Plan, the requirements of Section 1129 of the Code must be satisfied. These requirements include but are not limited to findings that the Plan complies with the applicable provisions of Chapter 11 of the Code, that the Debtor has complied with the applicable provisions of Chapter 11 of the Code, that the Plan has been proposed in good faith and not by any means forbidden by law, and at least one class of impaired claims has voted to accept the Plan. The Debtor believes that the Plan satisfies all the statutory requirement of Chapter 11 of the Bankruptcy Code.

#### 1. BEST INTEREST OF CREDITORS

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each class, that each holder of a claim or interest of such class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date, that is not less than the amount that such person would receive or retain if the Debtor was, on the effective date, liquidated under Chapter 7 of the Bankruptcy Code. The Debtor believes that this test will be satisfied.

#### 2. FINANCIAL FEASIBILITY

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the bankruptcy court, the bankruptcy court must determine that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. The Debtor believes that it will be able to fulfill its obligations under the Plan.

Attached hereto as Exhibit C is the Debtor's projection demonstrating the feasibility of the Plan. Exhibit C was prepared by Debtor's management from historical data and a projection model that incorporates the transition of the Debtor from its prior operation to operations with a centralized operations center in Texas. The projections contained in Exhibit C assume that revenue will be produced as projected by use of the current facilities and equipment. The Debtor believes that they are sufficient to support the additional business and it believes its aggressive marketing campaign of its properties will continue to increase its revenues. This pro forma indicates that the Debtor will be able to survive on a post-confirmation basis.

To the extent revenue of the Debtor is insufficient to fund the payments on the Effective Date, equity will be sought to fund the Plan.

### D. Cram-Down - Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code contains provisions for confirmation of a Plan even if the Plan is not accepted by all impaired classes, provided that at least one impaired class of claims has accepted it (determined without including any acceptance by any insider holding a claim of such class). These "cram-down" provisions, for confirmation of a Plan despite the non-acceptance of one or

more impaired classes of claims or interests, are set forth in Section 1129(b) of the Bankruptcy Code.

In the event that any impaired class of claims does not accept the Plan by the requisite majority set out in the introduction, the Debtor must demonstrate to the Bankruptcy Court, with respect to each impaired class which does not accept the Plan that the Plan does not discriminate unfairly, and is "fair and equitable" with respect to that class.  Under the Bankruptcy Code, a Plan is considered "fair and equitable" with respect to secured claims, unsecured claims or interest, as the case may be, if the following conditions are met:

    (a)    <u>Secured Claims</u>.  The holders of such claims retain their liens, to the extent of the allowed amount of their secured claims, and that each holder of such a claim receive on account of such secured claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in the collateral.

    (b)    <u>Unsecured Claims</u>.  Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value as of the effective date of the Plan equal to the amount of its allowed claim, or (ii) the holder of any claim or interest that is junior to the claims of the dissenting class will not receive or retain any property under the Plan.

The Debtor believes that the Plan meets the "fair and equitable" test and does not discriminate unfairly with respect to any class of creditors or interest holders.  Therefore, the Plan may be confirmed, even if it is rejected by the holders of allowed claims and interests.

## IV.  CONCLUSION

The information provided in this Disclosure Statement is intended to assist you in voting on the Plan in an informed fashion.  If the Plan is confirmed, you will be bound by its terms. Accordingly, you are urged to make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan.

*Robert Kubbernus by /s/ Melissa A. Haselden*

By:_____

ROBERT KUBBERNUS, President

OF COUNSEL
WEYCER, KAPLAN, PULASKI & ZUBER, P.C.
EDWARD L. ROTHBERG
State Bar No. 17313990, Fed. I.D. No. 2780
HUGH M. RAY, III
State Bar No. 24004246, Fed. I.D. No. 22090
1400 Summit Tower
Eleven Greenway Plaza
Houston, Texas 77046
Telephone:   (713) 961-9045
Facsimile:     (713) 961-5341

ATTORNEYS FOR DEBTOR