IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 08-36737-H4-11 |
| | § | HOUSTON, TEXAS |
| SKYPORT GLOBAL, | § | |
| COMMUNICATIONS, INC., | § | FRIDAY, |
| INC., | § | AUGUST 7, 2009 |
| DEBTOR. | § | 8:43 A.M. TO 12:17 P.M. |

#157 OBJECTION TO CLAIM
#265 CONFIRMATION HEARING
#290 MOTION TO APPROVE MODIFICATIONS TO PLAN

VOLUME I OF II, PAGES 1 - 152

BEFORE THE HONORABLE JEFF BOHM
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| FOR THE PLAINTIFF: | SEE NEXT PAGE |
| FOR THE DEFENDANT: | SEE NEXT PAGE |
| COURTROOM DEPUTY: | EVANGELINE ATTAWAY |
| COURT RECORDER: | PAULA CRAWFORD |

PREPARED BY:

JUDICIAL TRANSCRIBERS OF TEXAS, INC.
P.O. Box 925675
Houston, Texas 77292
(713) 697-4718 (office) ◊ (713) 697-4722 ( fax)

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*Judicial Transcribers of Texas, Inc.*

APPEARANCES:


FOR THE DEBTOR:                    EDWARD L. ROTHBERG, ESQ.
                                  HUGH M. RAY, ESQ.
                                  WEYCER KAPLAN PULASKI
                                   & ZUBER
                                  11 GREENWAY PLAZA, SUITE 1400
                                  HOUSTON, TX  77046


FOR AEGIS TEXAS VENTURE, LP:      JASON M. RUDD, ESQ.
                                  DIAMOND MCCARTHY TAYLOR
                                   & FINLEY, LLP
                                  909 FANNIN, SUITE 1500
                                  HOUSTON, TX  77010



FOR DRACO CAPITAL:                JOHN E. MITCHELL, ESQ.
                                  JASON IVASCU, ESQ.
                                  VINSON & ELKINS, LLP
                                  2001 ROSS AVE., SUITE 3700
                                  DALLAS, TX  75201


FOR DIGITAL NETWORKS, LLC:        JOSHUA EPPICH, ESQ.
                                  PORTER & HEDGES, LLP
                                  1000 MAIN ST., 36TH FLOOR
                                  HOUSTON, TX  77002-6336


FOR BALATON GROUP, INC.:          C. MICHAEL BLACK, ESQ.
                                  2444 TIMES BLVD., SUITE 222
                                  HOUSTON, TX  77005

FOR ADVANCED PROJECTS
  INTERNATIONAL:                  CALVIN C. BRAUN, ESQ.
                                  ORLANDO & BRAUN LLP
                                  3401 ALLEN PARKWAY, SUITE 101
                                  HOUSTON, TX  77019

FOR CENTURY TEL:                  REBECCA KINCHEN, ESQ.
                                  REX RAINACH, ESQ.
                                  ATTORNEY AT LAW
                                  3622 GOVERNMENT ST.
                                  BATON ROUGE, LA  70806-5720

**INDEX**

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| ROBERT KUBBERNUS | | | | |
| by Mr. Rothberg | 57 | . | 100 | . |
| by Mr. Mitchell | . | 66 | . | . |
| | | | | |
| DOUGLAS WHITWORTH | | | | |
| by Mr. Ray | 105 | . | . | . |
| | | | | |
| ADRIEN POULIOT | | | | |
| by Mr. Mitchell | 108 | . | 133 | . |
| | | FURTHER 141 | | |
| by Mr. Ray | . | 127 | . | 135 |
| | | | | |
| DOUGLAS WHITWORTH | | | | |
| by Mr. Ray | 145 | . | . | . |
| by Mr. Mitchell | . | 146 | . | . |


| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| Debtor's Exhibits 1 through 21 | 31 | 31 | 32 |
| | | | |
| Draco's Exhibit Number 1 | 83 | 83 | 83 |
| Draco's Exhibit | | | |
|   Number 2, page 1 | 88 | 88 | 88 |
| Draco's Exhibit | | | |
|   Number 2, page 2 & following | 117 | 117 | 117 |
| Draco's Exhibits | | | |
|   Numbers 3 through 7 | 32 | 32 | 32 |

4

1          **Houston, Texas; Friday, August 7, 2009; 8:43 a.m.**

2          **THE COURT:** Good morning.  Please be seated.  This

3     is the 8:30 hearing.  It's SkyPort Global Communication, Inc.

4     It's a Chapter 11, 08-36737.  And today we've got -- let's

5     see, Docket 157 is an objection to the claim of Digital

6     Networks, LLC, and there's a settlement announcement to be

7     made.  And then Docket 265 is the plan, the confirmation

8     hearing.  And then Docket 290 is some modifications to the

9     plan.

10          So good morning, and let me get appearances

11    from counsel please.  Mr. Rothberg, Mr. Ray, you want to start

12    off since you represent --

13          **MR. ROTHBERG:** Yes.  Good morning, Your Honor.  Ed

14    Rothberg and Hugh Ray for the debtor SkyPort Global

15    Communications.

16          **THE COURT:** Thanks.  Please, Mr. Rudd.

17          **MR. RUDD:** Good morning, Your Honor.  Jason Rudd,

18    R-U-D-D, on behalf of Aegis Texas Venture, LP.

19          **THE COURT:** Thanks.  Good morning.

20          **MR. MITCHELL:** Good morning, Your Honor.  John

21    Mitchell and John Ivascu, Vinson & Elkins, on behalf of Draco

22    Capital, Inc.  And also with me today is the president of

23    Draco Capital, Mr. Adrien Pouliot.

24          **THE COURT:** All right.  Good morning.

25          Please.

1          **MR. EPPICH:**  I'm Joshua Eppich from Porter & Hedges

2     on behalf of Digital Networks, LLC.

3          **THE COURT:**  Thanks.  And would you spell your last

4     name because my ERO here will inevitably ask me.

5          **MR. EPPICH:**  E-P-P-I-C-H.

6          **THE COURT:**  Thanks.

7          **MR. BLACK:**  Good morning, Your Honor.

8          **THE COURT:**  Good morning.

9          **MR. BLACK:**  Michael Black for Balaton Group, Inc.,

10    an interested party.

11          **THE COURT:**  All right.  Mr. Black, thanks.

12          **MR. BRAUN:**  Your Honor, Calvin Braun, B-R-A-U-N, on

13    behalf of Advanced Projects International.

14          **THE COURT:**  Thanks, Mr. Braun.  Good morning.

15          **MS. KINCHEN:**  Good morning, Your Honor.  Rebecca

16    Kinchen, on behalf of Century, an interested party.

17          **THE COURT:**  Come on up because we're not picking up

18    your voice.

19          **MS. KINCHEN:**  Rebecca Kinchen, here on behalf of an

20    interested party, Century.

21          **THE COURT:**  And Ms. Kinchen, how do you spell your

22    name, please.

23          **MS. KINCHEN:**  K-I-N-C-H-E-N.

24          **THE COURT:**  Thanks.

25          **MR. RAINACH:**  I'm Rex Rainach.  I also represent

1    CenturyTel.

2              **THE COURT:**  And --

3              **MR. RAINACH:**  R-A-I-N-A-C-H.

4              **THE COURT:**  Thanks.  Okay.

5                   Mr. Rothberg and Mr. Ray, why don't we -- you

6    want to take care of the settlement announcement first on

7    Digital Networks?

8              **MR. RAY:**  Yes, Your Honor.

9              **THE COURT:**  All right.  Please come on forward.

10             **MR. RAY:**  Your Honor, for the record Hugh Ray.  As

11   Your Honor has been aware in this proceeding we've had a lot

12   of disputes with Digital Networks including a claim objection

13   that was filed.  We've decided to compromise the claim

14   objection through the following compromise.  It is, we

15   believe, just a compromise of their claim objection to the

16   extent that was any -- and it's furthermore just something

17   we're doing in the ordinary course but to the extent that

18   there's any dispute or disagreement we wanted to be sure it

19   was clear on the record.

20                  So if Your Honor will bear with me for the next

21   five minutes I'm going to read this settlement into the

22   record.

23             **THE COURT:**  Okay, please.

24             **MR. RAY:**  "The SkyPort fair access policy throughput

25   limits applicable to Digital Networks, LLC, and on this

1    Digital will be equal to 85 percent of the maximum monthly

2    throughput per system namely as follows:  for 128 system

3    3,442,500, for 256 system 6,895,200, for 384 system

4    10,327,500, for 512 system 13,770,000, for 768 system

5    20,665,000, for a 1024 system 27,540,000, for a 1536 system

6    41,310,000, for a 2048 system 55,080,000.

7                "These SkyPort throughput limits are one-way

8    limits, i.e., the same limit upstream as downstream, not in

9    the aggregate.  For example, on a 128 -- 128 system the

10   upstream throughput limit would be 3,442,500 and the

11   downstream throughput limit would be 3,442,500, not the total

12   upstream and downstream limit of 3,442,500.

13               "Number two.  At the end of each month

14   beginning at the end of August, there will be a look-back at

15   prior month's usage to determine if any system has actual

16   utilization warranted to need to bump such system up or down.

17   The logistics of such look-back would be as follows:

18               "(a) for each system that goes above the

19   particular system throughput with any given month it would be

20   bumped up to the appropriate level of service for the coming

21   month and the invoice for the look-back month, i.e., the

22   previous month plus printing would be bumped to the next

23   appropriate level, upward level of service and invoiced at the

24   rate of the higher level of service for the look-back month.

25   For example, if there is a 128 by 128 system and the upstream

1  throughput exceeds the 3,442,500 kilobyte limit for a 128

2  system but is less than the 6,895,200 kilobytes' limit of a

3  256 system, the system would be adjusted to a 128/256 and

4  invoiced for the prior month at the higher 256 rate for the

5  upstream.

6  "(b) for each system that has usage below the

7  particular system's throughput limit in a given month, it

8  would be bumped down to the next appropriate downward level of

9  service for the coming month and the invoice for the look-back

10  month would be bumped down to the nearest -- to the next

11  downward level of service and invoiced at the rate of the

12  lower level of service for the look-back month.  For example,

13  if there's a 256 by 256 system and the upstream throughput

14  falls below the 128 throughput limit of 3,442,500 the system

15  would be adjusted to 128 instead of 256 and invoiced for the

16  prior month at the lower 128 rate for the upstream.

17  "Number three.  SkyPort will provide Digital

18  with a monthly report for its look-back calculations for

19  Digital's approval and authorization before any changes are

20  made in the monthly SkyPort invoices issued.

21  "Number four.  Digital shall have the option to

22  engage I-Direct to certify the monthly reports from SkyPort.

23  They shall be responsible for the payment of I-Direct for such

24  certifications.

25  "Number five.  The monthly look-back will not

1    change the commission date of any system or its contract date

2    and end date.

3              "Number six.  The throughput level set forth in

4    number one above will not be changed during the term of the

5    network services agreement between Digital and SkyPort and no

6    changes to the fair access policy that SkyPort adopts will

7    apply to Digital if such changes result in an increased

8    financial obligation to Digital or result in an increase in

9    the level of service provided to Digital or its customers.

10             "Number seven.  Digital will draw up its

11   administrative plan for warranty overcharges and debt sight

12   billing in return for SkyPort agreeing to pay $50,000, which

13   would be paid in the form of offsets against SkyPort's monthly

14   invoice to Digital for the seven months beginning with the

15   August invoice."

16             That's the entire compromise, Your Honor.  I'm

17   sorry to have taken five minutes of your time.

18        **THE COURT:**  Well, it's -- we say, Mr. Ray, since I

19   just ended up dealing with a case where counsel read a

20   settlement into the record that was sort of a stream-of-

21   consciousness from the halls outside and subsequently, after

22   the other counsel told me that was right, that a week or two

23   later it turns out it wasn't.  They left out a bunch of stuff

24   and the whole thing got unraveled.  So you obviously have read

25   it into the record because you sat down and wrote it out

1    presumably with the help of your opposing counsel, so as far

2    as I'm concerned it's probably the better way to go, however

3    boring and mundane your voice may sound as you read it.

4              Let me ask counsel whether he agrees with all

5    of the terms of the settlement that you just recited into the

6    record.

7         **MR. EPPICH:**  Your Honor, I agree with the terms of

8    the settlement; however, I'd like to reread paragraph 5, just

9    for clarification.

10        **THE COURT:**  All right.

11        **MR. EPPICH:**  "The monthly look-back adjustments will

12   not change the commission date of any system or its contracts

13   start and end date."

14        **THE COURT:**  Okay.  Mr. Ray, is that a correct

15   recitation based upon notes you have?

16        **MR. RAY:**  Yes, Your Honor.

17        **THE COURT:**  Okay.  Do you want to reduce this to an

18   agreed order or are you comfortable --

19        **MR. RAY:**  Your Honor, just dismiss the claim

20   objection or deny the administrative claim, either way.  They

21   are not going to assert an administrative claim and so I think

22   the motion's been dealt.  The claim objection's been dealt

23   with.

24        **THE COURT:**  Okay.  What we'll do is set forth on the

25   docket sheet that settlement terms were announced into the

1     record.  And what you're telling me is the objection's become

2     moot?

3             **MR. RAY:**  The objection's become moot as does any

4     motion for an administrative claim to the extent one is filed.

5             **THE COURT:**  Okay.  So we will reflect that on the

6     docket sheet the objection became moot; no administrative

7     claim.

8                     Is that acceptable to you, Counsel?

9             **MR. EPPICH:**  Yes, Your Honor.

10            **THE COURT:**  All right.  Good.  Then I think we've

11    taken care of that matter.

12            **MR. RAY:**  Thank you, Your Honor.

13            **MR. EPPICH:**  Thank you.

14            **THE COURT:**  Thank you.  Let's see.

15                    Mr. Rothberg or Mr. Ray, do you want to review

16    ballots?

17            **MR. ROTHBERG:**  Yes, Your Honor.  I'll do it.  Ed

18    Rothberg for the debtor.

19                    Your Honor, these are the exhibit books that we

20    delivered to your chambers --

21            **THE COURT:**  Got it.

22            **MR. ROTHBERG:**  -- Wednesday night, has the ballot

23    summary in it.  And that is Exhibit Number --

24            **THE COURT:**  Eight.

25            **MR. ROTHBERG:**  Eight.  And that is -- we believe,

1    Your Honor, that the plan has been accepted by all classes,

2    except we did get a reject vote from Aegis in Class 2B but we

3    believe that --

4          **THE COURT:**  I was looking here.  Footnote 1 says,

5    "Deemed accepted Rudy Sweetwater."  So in other words,

6    Class 2A you've got CenturyTel.  What you're saying is that

7    they were in a class in and of themselves, that they didn't

8    cast a ballot, but because the plan treats them that they're

9    deemed to have accepted under the Rudy Sweetwater case.

10          **MR. ROTHBERG:**  Yes, sir, Your Honor.  And

11    Mr. Rainach is here for CenturyTel and I believe he's --

12          **THE COURT:**  All right.  Mr. Rainach?

13          **MR. RAINACH:**  Yes, sir.

14          Your Honor, we began negotiations on the

15    compromise that ended up being the plan amendments.  We were

16    waiting until yesterday to get all the documents, the

17    implementing documents so we have everything squared away as

18    far as CenturyTel is concerned and we would like to withdraw

19    our objection.

20          **THE COURT:**  Okay.  And you want to vote

21    affirmatively for the plan.

22          **MR. RAINACH:**  We're going to just stand on

23    withdrawal and --

24          **THE COURT:**  Okay.

25          **MR. RAINACH:**   -- now you guys can go forward.

13

1    Thank you.

2              **THE COURT:**  Let me ask you this.  In other words,

3    what you're telling me is you don't oppose confirmation of the

4    plan as modified pursuant to the negotiations you've

5    conducted.

6              **MR. RAINACH:**  That's correct.

7              **THE COURT:**  Thanks.  Okay.  So I don't know -- I

8    don't think the Fifth Circuit has ever ruled one way or the

9    other on the Rudy Sweetwater ruling.  I think the Rudy

10   Sweetwater ruling makes sense though so I'm willing to follow

11   it until the Fifth Circuit or a district judge above me tells

12   me I should not.

13              Mr. Rudd?

14              **MR. RUDD:**  Your Honor, I don't know how the courts

15   handle this.  We have an objection to that deemed -- would you

16   like for us to address that now or --

17              **THE COURT:**  Yes.  Go ahead and articulate, please.

18              **MR. RUDD:**  Your Honor, unlike the Sweetwater case,

19   and I know the Court has written an opinion, simply following

20   the Sweetwater case in another deal, these -- both of these

21   opinions were made to a creditor who essentially doesn't

22   participate at all in the planned process.  They don't file a

23   ballot; they don't file an objection; they don't appear at the

24   confirmation hearing.  They just are MIA completely the

25   process.  And therefore, the Court says, well, they're not

14

1    here so I -- but I deem them accepted.  They've slept through

2    the entire process.

3                     CenturyTel had not done that.  CenturyTel filed

4    an objection on the docket against the plan.  CenturyTel is

5    here in court today and has, in fact, been engaged in

6    discussions with the debtor for -- you know, off and on for

7    the last several weeks.  So they actively participated and

8    they did not -- purposefully, intentionally did not file a

9    ballot.  That's a very different factual situation from what

10   the Court sees in Sweetwater and other cases.

11                    Now, also there's a significant amount of case

12   law that says that the Sweetwater-type of deeming a ballot, or

13   deeming a class having accepted the plan when no one calls a

14   ballot is a somewhat extreme remedy, that is something that is

15   not expressly expressed in the Bankruptcy Code.  The

16   Bankruptcy Code essentially says that you look at classes that

17   vote and you look at ballots actually filed.

18                    Also, Mr. Rothberg, in the debtor's disclosure

19   statement and the ballot form that was sent out now both say

20   that if you don't file a ballot your vote doesn't count.

21   There's no discussion in there of have a class deemed accept

22   plan if no one in that class files a ballot.  So I think

23   there's numerous exceptions here to what is a fairly narrowly

24   tailored, fairly extreme result by allowing a class to accept

25   a plan.  And the issue is that those who offered can't confirm

1    the plan unless CenturyTel is deemed to have voted in favor of

2    it.  But that's the only way he can confirm it because he

3    doesn't have an appearing second class otherwise.

4            **THE COURT:**  Mr. Rothberg, do you want to respond?

5            **MR. ROTHBERG:**  Well, Your Honor, I guess the only

6    thing I can say -- I mean, the legal issues I think are fairly

7    clear.  You've written on it.  I think the fact that

8    CenturyTel is hear announcing and withdrawing their objection

9    and that they're agreeing to the treatment and the plan

10   modification should be sufficient for the Court to determine

11   that they've accepted the plan.

12           Why it is Mr. Rainach doesn't want to state

13   that on the record, I don't know, but he did state they accept

14   the treatment that's negotiated in the plan modifications, so

15   that sounds like an acceptance to me.  So I think it could be

16   easily deemed to be an accepted vote in both Class 2A, which

17   is their secured claim, and in Class 4, which is the general

18   unsecured claim.

19           **THE COURT:**  Let's see.  Mr. Rudd, I think you've

20   preserved any appeal point, if we ever get to the point, so

21   the record is as clear as I can get it.  I think Rudy

22   Sweetwater does apply.  And actually, Mr. Rudd, I understand

23   your argument.  And this -- my thought process is if you

24   accept the proposition that bankruptcy is supposed to be, or

25   at least -- there's two tracts of bankruptcy.  One is, you

1    know, get ready for a cram-down plan; the other is negotiate

2    and try to reach a consensual plan.  If you accept that theory

3    of how the bankruptcy process should work, then my thought

4    process is Mr. Rothberg and Mr. Rainach have conducted

5    negotiations, have reached agreement on how CenturyTel should

6    be treated, and that therefore what they have done is

7    consistent with what the bankruptcy process is all about.

8             And therefore it seems to me it's even more

9    compelling of an argument that I should apply the Rudy

10   Sweetwater-deemed-acceptance theory here because unlike Rudy

11   Sweetwater what we had, as you point out, a creditor that just

12   stood on the sidelines.  Here I've got a creditor that got

13   into the game and has negotiated and come out -- you know, if

14   I -- holding hands and singing *Kum Ba Yah* with Mr. Rothberg

15   and the debtor.  So it seems to me that if Rudy Sweetwater

16   stands for the proposition that we ought to have a deemed

17   acceptance for someone who sits on the sidelines, it seems to

18   me there's even more compelling argument that we ought to have

19   a deemed acceptance for someone who's gotten involved in the

20   game and said, Hey, I'm willing to support the plan as

21   modified.

22            So I'm comfortable saying that Rudy Sweetwater

23   applies.  The fact that this creditor doesn't want to

24   physically take out a ballot and vote yea doesn't bother me as

25   much, Mr. Rudd, as it bothers you, and maybe it'll bother an

1  appellate judge above me.  It seems to me what's important is

2  substance over form, and what I've heard from counsel for

3  CenturyTel is they've negotiated with Mr. Rothberg; they are

4  happy with the modified plan and don't oppose its

5  confirmation.  And it seems to me that that's all the more

6  reason why I should apply the deemed acceptance.  So I'll go

7  ahead and do that but I think, Mr. Rudd, you have preserved

8  the point on appeal should it ever get to that point.

9         **MR. RUDD:**  Thank you.

10        **THE COURT:**  All right.  Okay.

11              So, Mr. Rothberg, that gets us then

12  to -- you've 2A is an impaired class.  Am I right?

13        **MR. ROTHBERG:**  Yes, Your Honor.

14        **THE COURT:**  So you've got one impaired class, 2A

15  voting yea; you've got a second impaired -- that's Class 4

16  that allowed general unsecured claims voting yea.

17        **MR. ROTHBERG:**  Correct, Your Honor.

18        **THE COURT:**  We've got Aegis is Class 2B voting nay.

19        **MR. ROTHBERG:**  Correct, Your Honor.

20        **THE COURT:**  We've got the allowed securities claim

21  of Balaton voting yea.  Is that impaired class?

22        **MR. ROTHBERG:**  Yes, Your Honor.  Yes, but that is an

23  insider.

24        **THE COURT:**  Fair enough.  Okay.  Bear with me.  I'm

25  just trying to -- so we've got two impaired classes, 2A and 4,

1    that are not insiders.

2         **MR. ROTHBERG:**  Correct, Your Honor.

3         **THE COURT:**  So you've hurdled over the requirement

4    of having at least one non-insider impaired class voting yes.

5         **MR. ROTHBERG:**  That's correct, Your Honor.

6         **THE COURT:**  2B's voting no; 3 is voting yes.  It's

7    impaired but it's an insider.  Class 5, insiders, looks like

8    you've got a tie vote, so that's Class 5.  And then Class 1

9    is -- we don't even have to worry about -- lot of priority

10   claims.

11        **MR. ROTHBERG:**  And we've had -- part of

12   our -- there's one claim in that class which is State of Texas

13   and we negotiated --

14        **THE COURT:**  You negotiated with them.

15        **MR. ROTHBERG:**   -- the State of Texas and we did a

16   modification for their treatment.

17        **THE COURT:**  Okay.  They didn't submit a ballot.

18        **MR. ROTHBERG:**  Correct.

19        **THE COURT:**  Okay.  So let's see.  Then we needed to

20   go to cram-down because of Aegis' objection.

21        **MR. ROTHBERG:**  In terms of the 1129(b)2(A)

22   establishing that they're retaining liens and getting payments

23   of value equal to the amount of the claim.

24        **THE COURT:**  Got you.  Okay.  And then we've got

25   Draco's exhibits and at least as I read the pleadings, you are

19

1   taking the position that they ought not be allowed to

2   participate due to, I guess, lack of standing, and in the

3   alternative, bad faith trafficking and claims theory.

4          **MR. ROTHBERG:**  That's correct.

5          **THE COURT:**  Okay.  I also noticed an emergency

6   motion.  I was on the bench, been on the bench a lot this week

7   and went till 6:30 last night and had an emergency TRO so I

8   didn't get to read pleadings until late last night.  And I

9   understand, Mr. Rudd, you filed a motion to quash.  So where

10  are we on that discreet issue, if there's any resolution or

11  not?

12         **MR. ROTHBERG:**  Your Honor, we've been

13  discussing -- Mr. Ray had been discussing that with Mr. Rudd

14  yesterday and Mr. Rudd did produce some documents to us late

15  last night and some additional ones this morning.  There

16  probably are more that we need to get but I -- at this point I

17  think we can just hold on that motion.

18         **THE COURT:**  Okay.  And you're not by any means

19  telling me we can't go forward on confirmation today for

20  failure of Mr. Rudd's client to produce documents.

21         **MR. ROTHBERG:**  Correct.

22         **THE COURT:**  Okay.  Mr. Rudd, you want to make any

23  comment on this issue?

24         **MR. RUDD:**  On the motion to quash, Your Honor, just

25  that we received the subpoena, I believe it was, on Wednesday,

1    asking for every document related to the debtor in existence,

2    and so we had contacted Mr. Rothberg's office to try to see if

3    we could get some narrowing of that request, and although we

4    were not able to reach that agreement before I filed my motion

5    to quash I think subsequent discussion with Mr. Ray they gave

6    us two discreet areas where they were important for

7    production.  As to the first area that related to documents

8    involving communications with Draco and we produced, I

9    believe, about 400 pages of documents last night in electronic

10   format to the debtors related to that.

11            The second question, my request related to

12   Aegis' internal documents regarding the approval or analysis

13   of this proposed settlement that was discussed with debtors on

14   July 23.  We produced some documents this morning.  I'm not

15   sure of the exact page count but it was maybe three or four

16   documents totaling maybe 20 pages.  And then we also withheld

17   two documents on a claim of privilege, which we produced a

18   privilege log for that.

19            I will say I'm not aware of any other documents

20   that are out there based on my discussions with my client, but

21   I will also say that we did this production in about a 24-hour

22   turnaround in order to try and facilitate the process.  So

23   whenever we're doing production on such a quick turnaround,

24   it's always difficult to ensure that you've received

25   everything.  So -- in fact, I think we have resolved it but

1     that's where things stand and if they want to leave it in

2     abeyance for further proceedings I'd be comfortable with that

3     as well.  But I think we've resolved it.

4            **THE COURT:**  Normally I would have set it for today

5     but I just didn't get to it till last night.  So -- okay, we

6     squared that circle at least for now.  What we'll do is we'll

7     keep it on the docket.  Let's see how today goes.

8                Then let me go to Draco.  I guess the question

9     I have is so we have a separate and discreet hearing first in

10    order to determine whether Draco's conduct as the debtor has

11    alleged is of the category that I should not allow them to

12    participate or do you want to go forward with the plan

13    confirmation hearing and have a sort of simultaneous hearing

14    allowing Draco to participate but if I conclude after hearing

15    testimony that their ballot should be stricken and they should

16    not be allowed to participate -- do you have a preference?

17           **MR. ROTHBERG:**  Yes, sir.

18           **THE COURT:**  And obviously I'm going to ask Draco's

19    counsel the same questions.

20           **MR. ROTHBERG:**  I would like to have a at least

21    preliminary hearing on Draco's stand.  And I think that the

22    issue of -- you know, the discovery that you received from

23    Mr. Rudd last night was pretty enlightening as to what

24    happened.  We were kind of under some misperceptions in our

25    pleadings that we filed because we thought Mr. Pouliot

1     appeared last week.  He's really been involved in this,

2     unbeknownst to us, since April.  So -- and that may have an

3     impact on the determination as to whether he's -- you know,

4     whether his solicitations were -- violated 1125 or not.  There

5     were ongoing negotiations; we were not aware of any of that.

6                     And I really haven't had an opportunity to

7     think through whether that's grounds for bad faith or not

8     consistent with our previous allegation in the motion.

9     However, I think the standing issue is very clear and very

10    easy to determine within maybe half-hour, 45 minutes, can be

11    done mostly on argument.  And I would like to do that because

12    I think the confirmation hearing would be much cleaner if you

13    decide that Draco doesn't have standing.  I think it would go

14    much quicker and much cleaner so --

15             **THE COURT:**  Okay.  Mr. Mitchell, do you have any

16    objection to that approach?

17             **MR. MITCHELL:**  I don't, Your Honor.  May I be heard

18    for a second?

19             **THE COURT:**  Please.

20             **MR. MITCHELL:**  We have to explain who Draco is real

21    quick without getting into the standing arguments too much,

22    but it's basically an equity interest holder and the majority

23    of interest holder, the parents of the debtor.  And I don't

24    know that the Court's had an opportunity to study studied the

25    disclosure statement too much.

1          **THE COURT:**  I have, and we've actually done a chart

2    so I think I got it.

3          **MR. MITCHELL:**  Perfect.  I think you'll see from the

4    disclosure statement there's a suggestion that you have SkyCom

5    which is a non-debtor parent and then SkyPort which is the

6    debtor parent.  And then there's -- representations have been

7    made throughout the disclosure statement in this case that

8    Balaton Group is the 58 percent equity interest holder in

9    SkyCom.  And then there's multiple other equity interest

10   holders.  Draco's position is that that is not true, Your

11   Honor, and we'd have exhibits that we've handed up and if we

12   need to get an evidentiary hearing we'll show that.

13         Balaton may hold 58 percent of the shares in

14   name but that would only be in record name only.  There's an

15   entity called ClearSky limited partnership which actually

16   holds 48 percent of the shares.  I put this in my brief.  And

17   Draco Capital is a limited partner in ClearSky.  Now, if the

18   Court will take a look at the debtor's plan and what is

19   proposed which is outlined our objection, the debtor is

20   proposing to do a confirmation --

21         Let me just go directly to standing, Your

22   Honor, is to collapse a non-debtor parent into the subsidiary

23   and them deem the equity interest holders of the parent as the

24   equity interest holders of the debtor and then expunge their

25   equity interest and issue all of the stock in the reorganized

1    debtor, the Balaton Group. And we're saying that's an
2    impermissible collapse of a non-debtor into the debtor on the
3    day that the plan would go into effect and then wiping out the
4    equity as far as -- in effect, if the Court will look at
5    ballots, the debtor solicited the alleged equity interest
6    holder. The parent never solicited the parent's self which is
7    actually the only show owner of this estate.

8            We believe that our interest, Draco's interest,
9    in that limited partnership gives us the minimal party and
10   interest standard with economic interest at stake here which
11   is being effected by this plan. This Court knows the parties'
12   standards are very -- they're very liberal, a lot of parties
13   with economic interest to be heard. And Draco, clearly, has
14   an economic interest and, clearly, has standing to be heard in
15   this case.

16           In addition, out of an abundance of caution, we
17   bought one claim, Your Honor. Now, that is not claims
18   trading, not fraudulent claims trading, but we purchased one
19   claim to ensure that we have standing, Your Honor. We're not
20   going to hide it any other way. It wasn't an investment; it
21   wasn't claims trading. It was to ensure that we had standing.
22   We filed our notice under Rule 3002. Yes, there's a 20-day
23   waiting and it was argued that we didn't attached evidence of
24   our claim. I think the evidence showed that, that actually
25   this purchase was made via telephone. There is no notice sale

1    green or anything else, and in fact, to ensure that the 20-day

2    waiting period wasn't needed, we actually had the seller of

3    the claim sign the notice of transfer and filed that right

4    away with the Court.  We weren't hiding behind

5    anything -- filed it, and there's no need for the 20-day

6    waiting period.  The 20-day waiting period's to give notice to

7    the alleged seller so actually they did sell a claim.  Here we

8    actually had you sign it.  So there really is no need for that

9    20-day waiting period.  But that was the purpose behind the

10   claim.

11             Lastly, with respect to our alleged fraudulent

12   acts about it, we filed a brief I think about four o'clock

13   yesterday, Your Honor.  I don't know if you've had an

14   opportunity to look at it.

15             **THE COURT:**  I have not.

16             **MR. MITCHELL:**  Okay.  Appreciate if the Court does

17   get an opportunity to take a look at it because there have

18   been some very serious allegations made against Draco Capital

19   with respect to its act of conduct in this case and they

20   continue to be made today.  I think what the Court's going to

21   hear when it hears evidence is that Draco Capital approached

22   two secure creditors on a confidential basis, discussing

23   whether or not there was an alternative to the restructuring

24   process here.

25             And I think what the Court's going to see is

1    this wasn't the situation that you see in some of the other

2    cases.  We talk about that case of solicitation on 125.  There

3    were secret ballots being mailed out, secret disclosure

4    statements being mailed out, secret plans being mailed out.

5    No, there was too sophisticated financial institutions

6    represented by counsel who are in the courtroom here today

7    that were approached.  And there were negotiations about a

8    possible alternative restructure.  It happens all the time in

9    Chapter 11.  And that's what took place.

10               And those continue to take place.  And, in

11   fact, the exclusivity period expired during this case.  It's

12   expired today.  No plan was followed.  We put a motion

13   specifically on file but at the end of the day, Your Honor, I

14   don't even know that we needed to.  I filed no plan; I

15   circulated no plan.  Yes, there were term sheets circulated

16   but as Judge Hauser said in the *Heritage* case that's not

17   improper to do that.  That's happens all the time --

18          **THE COURT:**  Why do you think exclusivity is

19   terminated?

20          **MR. MITCHELL:**  Because, Your Honor, they filed the

21   plan on May 22 and 60 days after that would be July 21 and

22   there was no word from this Court extending that 60-day

23   period.

24               Now, Your Honor, I'd like to address a point.

25   We looked at that last week before we filed our motion to

1    terminate exclusivity and we came to the conclusion that we

2    believe exclusivity ran on July 21.  I believe Draco had the

3    right to file a plan, file a disclosure statement and ask that

4    this Court set it for hearing because there is no order

5    extending that 60-day period.  Now, in an abundance of

6    caution, before I read my motion to terminate exclusivity, we

7    filed in abundance of caution and did not say one word about a

8    plan we were proposing.  The only parties that knew anything

9    about a possible alternative in restructuring were two senior

10   team secured lenders and the debtor.  The debtor is the party

11   that filed our offer letter of record with this Court and

12   circulated it for all to see.  So we really tried to --

13           **THE COURT:**  Who were the two --

14           **MR. MITCHELL:**  -- do things right.

15           **THE COURT:**  Okay.  Who were the two senior secured

16   parties?

17           **MR. MITCHELL:**  Well, I'm sorry.  They were

18   CenturyTel and Aegis --

19           **THE COURT:**  Okay.

20           **MR. MITCHELL:**  -- represented by Mr. Rainach and by

21   Mr. Rudd in the courtroom today.

22           **THE COURT:**  Okay.

23           **MR. MITCHELL:**  It was all done at arm's length

24   between counsel and I'm certainly not trying to hide behind

25   anything.  I've looked at the same documents and produced them

1    and put them all in front of you.  I'm not objecting -- not

2    hiding behind anything.  We approached the two large creditors

3    in this case with the most economic interest at stake and

4    conducted possible alternative restructurings.  Obviously

5    termination of exclusivity would have to be sought -- all the

6    different things you have to go through and all the

7    things -- there were no secrets side bills or anything, and I

8    think the evidence will show it.

9            Happy to proceed as you like.  The one thing I

10   would ask is that we would like to be heard on standing at

11   some point.  We'd like the opportunity to proceed.

12   Additionally, there's some serious allegations over our head.

13   At some point I would like to have that bad faith wrongful

14   solicitation issues brought before the Court as soon as

15   possible because we can't go a long period of time.  I have no

16   such allegations hanging over my client's head.

17        **THE COURT:**  So let's see.  If logic tells me then we

18   should have, since both Mr. Mitchell and Mr. Rothberg, you're

19   willing to do a separate hearing, logic says we should do

20   standing first and then if I conclude that standing does

21   exist, then the next issue would be has some kind of bad faith

22   conduct been committed such that even though Draco has

23   standing it shouldn't be allowed to vote, and then assuming I

24   find no such conduct has occurred, that would allow Draco to

25   participate in the plan hearing; and if I find that Draco has

1     had bad conduct, then it wouldn't be allowed.

2               I pretty much have planned all day for this.

3     I've got a few other matters set but I think we can probably

4     pull this off.  Okay.  Then why don't we do this.  Let me

5     call -- I've got one matter set for nine o'clock.  It's a

6     status conference; it shouldn't take too long.  Why don't I

7     give you all a five- -- why don't we say a ten-minute break to

8     9:25.  If either of you want to chat about stipulated exhibits

9     or anything like that.  Let me get through this status

10    conference and this other Chapter 11 I have which won't take

11    very long and then we'll come right back to you.  Don't leave;

12    don't move anything off the table or anything like that.

13    Okay?

14              **MR. MITCHELL:**  Thank you, Your Honor.

15              **THE COURT:**  Thanks.

16         **(Recess from 9:17 a.m. to 9:48 a.m.)**

17              **THE COURT:**  We're back on the record in SkyPort

18    Global Communications, Inc., Case Number 08-36737.

19              Mr. Rothberg, Mr. Mitchell -- how -- let's see.

20    Have we got exhibits here?  (Pause.)  Partnership agreement,

21    okay.  So --

22              **MR. ROTHBERG:**  Your Honor, we -- first if we could

23    do -- Mr. Rainach wanted to make an announcement --

24              **THE COURT:**  Sure.

25              **MR. ROTHBERG:**   -- to get admitted pro hac.

1          **MR. RAINACH:**  Your Honor, we've filed our motion.

2     The motion's already on the docket for me to be admitted pro

3     hac vice.  And I'd like you to release our local counsel --

4          **THE COURT:**  Sure.  The -- could we get a docket

5     number?

6          **THE CLERK:**  329.

7          **THE COURT:**  329.

8          **MR. RAINACH:**  Yes, sir, 329.

9          **THE COURT:**  You're a member in good standing of

10     the --

11          **MR. RAINACH:**  Louisiana Bar.

12          **THE COURT:**  Louisiana Supreme Court?

13          **MR. RAINACH:**  Yes, sir.

14          **THE COURT:**  And are you licensed to practice in

15     federal district court?

16          **MR. RAINACH:**  All the federal district courts in

17     Louisiana.

18          **THE COURT:**  And you're in good standing.

19          **MR. RAINACH:**  Yes, sir.

20          **THE COURT:**  Good.  Let me sign off.  I'm just going

21     to change the United States District Judge to United States

22     Bankruptcy Judge because otherwise --

23          **MR. RAINACH:**  You get a promotion.

24          **THE COURT:**  Well, otherwise both I think the

25     President, Congress and probably some judges in this

1    courthouse would wonder.  I've signed off on the order.  We'll

2    get it on the docket.  If you want to release local counsel,

3    you can.

4              MR. RAINACH:  Thank you.

5              THE COURT:  Thanks.  Mr. Rothberg, let's see.  I've

6    got a debtor's Exhibit --

7              MR. ROTHBERG:  Your Honor, I think I talked with

8    Mr. Mitchell before the hearing and we have an agreement on

9    exhibits --

10             THE COURT:  Okay.

11             MR. ROTHBERG:  -- that'll make it much easier to

12   through the opening statements and what have you.  We had

13   delivered a book to Your Honor of Exhibits 1 through 20 --

14             THE COURT:  Right.

15             MR. ROTHBERG:  -- which I believe Mr. Mitchell has

16   agreed that all would be admitted.

17             THE COURT:  Okay.  Mr. Mitchell?

18             MR. MITCHELL:  That is correct, Your Honor, as well

19   as I think you have a 21.

20             MR. ROTHBERG:  And 21.  That's the exhibit that we

21   just found last night.

22             THE COURT:  And now I see this number is 21 so

23   I'm -- it's a debtor's -- Mr. Rothberg, your handwriting's

24   almost as bad as mine.  debtor's Exhibit 21.  I'll put it in

25   the book and so, Mr. Mitchell, you stipulate the admissibility

1       of debtor's Exhibits 1 through 21.

2               **MR. MITCHELL:**  Yes, sir.  That's correct.

3               **THE COURT:**  So admitted.

4           **(Debtor's Exhibits 1 through 21 marked and received.)**

5               **THE COURT:**  Mr. Mitchell -- and Mr. Mitchell you've

6       got Draco's exhibits here.

7               **MR. MITCHELL:**  Correct, Your Honor.  We discussed

8       those and we have seven exhibits, Your Honor.

9               **THE COURT:**  Yes, sir.

10          (Draco's Exhibit 1 through 7 marked.)

11              **MR. MITCHELL:**  And we agreed to Exhibits 3 through 7

12      being admitted.

13              **THE COURT:**  Mr. Rothberg, do you stipulate 3 through

14      7?

15              **MR. ROTHBERG:**  Yes, Your Honor.

16              **THE COURT:**  Then Draco's Exhibits 3, 4, 5, 6 and 7

17      are admitted without objection.

18          **(Draco's Exhibits 3 through 7 received.)**

19              **MR. MITCHELL:**  I didn't ask Mr. Rothberg, but I take

20      it that's for all purposes today.

21              **MR. ROTHBERG:**  Sure.

22              **MR. MITCHELL:**  For everything today.  And then we

23      had a little debate, Your Honor, walking debate, as to who

24      should go first on the standing issue.

25              **THE COURT:**  Yes.

1          **MR. MITCHELL:**  And I think we just said we'd leave

2     it up to you.

3          **THE COURT:**  Bear with me one minute.  I'm just

4     putting down partnership agreement.  I want to have a

5     description of your Exhibit 21, so it's for ClearSky

6     Investments, LP.

7               Well, let's see.  In terms of -- Mr. Rothberg,

8     am I right in saying you all have objected to  -- I'm looking

9     at the docket.

10          **MR. MITCHELL:**  Your Honor, whatever I filed -- that

11     makes it easier --

12          **THE COURT:**  I'm just --

13          **MR. ROTHBERG:**  We did object to their standing

14     investments, Your Honor.

15          **THE COURT:**  Yes.  And the question is did -- who

16     filed the pleading first on standing?  Presumably it was the

17     objection after they filed an objection to the plan.

18          **MR. ROTHBERG:**  Correct.

19          **MR. MITCHELL:**  That's correct, Your Honor.

20          **THE COURT:**  So it seems to me, Mr. Rothberg, you

21     should go first.  And by the way counsel can examine witnesses

22     sitting from the table or standing at the podium.  It does not

23     matter to me.  The most important to me is that we pick up

24     your voice.

25          **MR. ROTHBERG:**  Okay.  Your Honor, I think it's

34

1    helpful to divide this into two issues.  One is the standing

2    with respect to the claim that was purchased.  And I think we

3    can do that one on argument and the record which is Docket

4    Number 298, which I did not bring a copy of, but that's the

5    document where the claim was assigned.

6              **THE COURT:**  Right.

7              **MR. ROTHBERG:**  And then the second part of it would

8    be the issue about the standing as an equity holder for

9    ClearSky.

10             So if we look at the assignment -- the notice

11   of assignment of the claim -- are you there, sir?

12             **THE COURT:**  I'm there.

13             **MR. ROTHBERG:**  You're there?

14             **THE COURT:**  Yes.

15             **MR. ROTHBERG:**  If -- Your Honor, Rule 3001(e)2 is

16   what applies to claim assignments and that assignment requires

17   that the party purchasing the claim file evidence of the

18   transfer.  Okay.  I think Mr. Mitchell said earlier that there

19   is no assignment; there is no evidence of transfer.  It was

20   done over a phone call which, we would submit, Your Honor,

21   that the document that's been submitted is not -- does not

22   comply with the Rule because there's no evidence of the

23   transfer, number one.

24             Number two, his statement on the record that in

25   that transfer document there's a statement there that says

1    that the claim seller waives the 20-day notice.  We would

2    submit, Your Honor, that that's hearsay.  That's an out-of-

3    court statement by someone who's not here, who can't testify

4    that he's agreed to waive that.

5         **THE COURT:**  What you're saying is even though there

6    is a signature of one Brian Skimmons, you're telling me that's

7    hearsay, that he actually has to take the stand and so

8    testify.

9         **MR. ROTHBERG:**  Well, about -- unless he complied

10   with the rule and had an evidence of transfer.  Normally, you

11   have an assignment document.  It says I assign you the proof

12   of claim; it's acknowledged by a notary, but it doesn't comply

13   with the rule.  Also, Your Honor, the -- I don't think you

14   really can waive the 20-day notice period.  I think that the

15   whole purpose of the 20-day notice period and the rule is to

16   prevent exactly what -- what could be happening here is that

17   somebody just pops in and files a notice in order to get a

18   distribution.  And so the safeguard against that is for you to

19   file the notice -- the clerk sends the notice to the Claimant

20   and then the Claimant has 20 -- at the address that's in the

21   schedule.

22              And then the Claimant has the chance to object,

23   to say, wait a second, I didn't do that.  And that whole

24   procedure is being avoided on the basis of an unauthenticated

25   not-in-front-of-a-notary signature by an out-of-court party

1   who's not here to testify.  I would also submit, Your Honor,

2   that if you see the date of that -- I think it's dated August

3   1 and was filed August 2.

4          **THE COURT:**  Dated August 1, filed August 2.

5          **MR. ROTHBERG:**  Okay.  Under -- I saw this last

6   night, Your Honor.  I didn't put it in my pleadings.  Under

7   Bankruptcy Rule 3018 creditors who want to are entitled to

8   vote on the plan or creditors who are holding claims on the

9   date the disclosure statement is approved --  this disclosure

10  statement was approved on July the 8th or the 9th.  And that

11  claim was not purchased until after --

12         **THE COURT:**  That's a different kettle of fish,

13  though, isn't it?

14         **MR. ROTHBERG:**  Right.

15         **THE COURT:**  I mean, we're arguing standing here.  If

16  I hold that this, that Draco has standing presumably --  you

17  going to argue 3018 at the plan confirmation hearing of saying

18  you can't count their vote.

19         **MR. ROTHBERG:**  Right.  And I would do that.  And as

20  a practical matter it didn't make any difference because the

21  vote was so small that it doesn't influence the acceptance or

22  rejection of the class.  I --

23         **THE COURT:**  But simply because you can't vote, does

24  that deprive you of standing?

25         **MR. ROTHBERG:**  I would submit it does, Your Honor.

1 Again, I looked at this last night and haven't had an

2 opportunity to research it, but it seems to me if you can't

3 vote, what can you do?  I mean, it's --

4    **THE COURT:**  I don't think I've ever confronted the

5 issue either.  That's why I was asking.  Okay.

6    **MR. ROTHBERG:**  Your Honor, as to the -- and maybe it

7 makes more sense to -- and that concludes my presentation.

8    **THE COURT:**  Four arguments:  No evidence of the

9 transfer; it's hearsay; can't waive the 20-day notice; 3018

10 applies.

11    **MR. ROTHBERG:**  Right.

12    **THE COURT:**  I got you.

13    **MR. ROTHBERG:**  And if you would like Mr. Mitchell to

14 address that.

15    **THE COURT:**  Yes.  Let's have Mr. Mitchell respond to

16 those.

17    **MR. ROTHBERG:**  And then we'll go into the

18 ClearSky --

19    **THE COURT:**  Yes, sir.  Now, let's see.  Mr.

20 Rothberg, just so I square the circle.  On this particular

21 issue you don't want to call any witnesses.

22    **MR. ROTHBERG:**  That's correct.

23    **THE COURT:**  Thanks.

24    **MR. MITCHELL:**  Your Honor, maybe it's best if I just

25 address these kind of one by one.

1          **THE COURT:**  Sure.

2          **MR. MITCHELL:**  I also showed up without my notice of

3     transfer but I know what it says.  I know you have it in front

4     of you, Your Honor.

5          **THE COURT:**  I do.

6          **MR. MITCHELL:**  I think that's an unfair

7     characterization of the rule and actually I think the best

8     place to start is actually the text of the rule.  I think as

9     we all know and applied literally and doesn't lead to and

10    resulting and of course applied, but basically just with

11    respect to this actual claim, I just want -- I think the Court

12    needs to understand there's no proof of claim filed.  The

13    reason there's no proof of claim filed is it was

14    scheduled -- it wasn't scheduled as disputed or unliquidated

15    or contingent on the debtor's schedules.  So this individual,

16    a former employee, and I believe the debtor disputes

17    that -- didn't have a disputed claim.  So that's why there's

18    no attachment of a proof of claim form or something alone

19    those lines.

20          Secondly --

21          **THE COURT:**  Hold on a minute.  Let me read through

22    the --

23          **MR. MITCHELL:**  Certainly.

24          **THE COURT:**  You agree it's (e)(2), 3001(e)(2) that

25    applies.

1          **MR. MITCHELL:**  Yes, sir.  Because --

2          **THE COURT:**  Let's just read through it.

3          **MR. MITCHELL:**  Well, it could be (e)(1) as well.

4     That's the problem here.  It's not exactly clear which one

5     because there is no proof filed.

6          **THE COURT:**  All right.  Hold on.  Transfer of claim

7     other than for security before proof filed.  3001(e)(1) says,

8     if a claim has been transferred other than for security before

9     the proof of claim has been filed, the proof of claim may be

10    filed only by the transferee or an indenture trustee.  And so

11    what you're saying is, well, there's no proof of claim that's

12    been filed so, at least impliedly, 3001(e)(1) isn't

13    applicable.

14         **MR. MITCHELL:**  Well, this is before proof has been

15    filed, Your Honor.  If a claim has been transferred, other

16    than for security, which is the case here --

17         **THE COURT:**  Yes.

18         **MR. MITCHELL:**  -- before proof of claim has been

19    filed.  No proof of claim was ever filed.  There was never a

20    requirement to file a proof claim.

21         **THE COURT:**  Yes.

22         **MR. MITCHELL:**  The proof of claim may be filed only

23    by the transferee --

24         **THE COURT:**  Yes.

25         **MR. MITCHELL:**   -- or an indentured trustee.  And

1    that would be us.  Now, we did not file a proof of claim.

2    There was no requirement.  So this is really just addressing,

3    now, for filing I believe in the proof of claim document.

4         **THE COURT:**  All right.  So then we go to 3001(e)(2).

5    If a claim other than one based on a publicly traded note,

6    bond or debenture has been transferred -- so far that

7    fits -- right? --

8         **MR. MITCHELL:**  Uh-huh.

9         **THE COURT:**  -- other than for security after the

10   proof of claim has been filed, evidence of the transfer shall

11   be filed by the transferee.  And what you're saying is that

12   because no proof of claim had been filed here by Mr. Skimmons,

13   therefore you didn't need to attach evidence of the transfer.

14        **MR. MITCHELL:**  Well, that would be -- that's one

15   argument, Your Honor.  I think it's not -- I don't there's a

16   rule that addresses this exact point, but I'm happy to live

17   within the confines of 3001 and -2.  I don't think the rule

18   addresses this exact situation.  But 3001(e)(2) says, evidence

19   of the transfer shall be filed by the transferee.  Now, we

20   have evidence of the transfer.  It's a signature from the

21   transferor, Mr. Skimmons.  That's evidence of his intent to

22   transfer it to the transferee.  He signed that document.  Mr.

23   Rothberg says, well, now, it's not a sworn statement.  There's

24   nothing in the rule that says it has be a sworn statement like

25   on a sworn account.  It's evidence of the transfer.

1          **THE COURT:**  Was there a separate document signed

2     entitled, assignment of claim?

3          **MR. MITCHELL:**  No, Your Honor.  And here's -- and

4     I'm happy to put my client on the stand if Mr. Rothberg

5     objects, but let me at least explain.  If have to I'll have

6     Mr. Pouliot back us up.

7          **THE COURT:**  All right.

8          **MR. MITCHELL:**  I understood he had a conversation.

9     And that's what I told the Court.  As I understand now he's

10    correcting me -- my apologies; it was an email exchange.  I

11    didn't know that; I don't have it with me.  He had it on his

12    laptop.  I understand I'm surprising Mr. Rothberg; there was

13    no intent there.  There was an email exchange.  He's happy to

14    hand you his laptop.  There may be an objection.  I'm not

15    trying to do something untoward here.  That's how that played

16    out.

17              I'm happy to put Mr. Pouliot on the stand; he

18    can tell you that and his laptop if you want to read it, but

19    that's what it was; it was an email exchange on a small claim

20    and therefore we filed a proof of claim.  The 20-day period,

21    Your Honor -- with respect to that 20-day period, our point is

22    this that the purpose behind that 20-day period is to protect

23    the transferor.  It's designed to protect the transferor

24    because the clerk mails it out to the transferor and says, did

25    you really assign this claim?  If I had just filed it with my

1       signature or my client's signature on it, anybody could be
2       filing fraudulent claims or assignments of claims out there to
3       get votes or to have standing or otherwise.
4                    **THE COURT:**  Yes.
5                    **MR. MITCHELL:**  Here you basically don't need it.  If
6       you've got the transferor signed -- the transfer will always
7       need a 20-day period.  That was our point behind them.  That's
8       was our argument is.
9                         With respect to the voting issue, Your Honor,
10      it really is irrelevant because based on of his voting
11      tabulation he counts our vote as a no vote, and either way it
12      wouldn't affect it even if -- you know, if we weren't allowed
13      to vote or it'd count as a no vote, either way his argument
14      doesn't carry the class so I really don't think there's any
15      impact there.  I don't think's really relevant to today.  With
16      respect to standing, though, certainly the party-in-interest
17      standard under 1109 would be greatly rewritten if the Court
18      were to find that only parties entitled to vote have standing
19      to raise and be heard.  You have all types of creditor who are
20      unimpaired, fully impaired, that don't get a right to vote;
21      you have creditors that have no obligation to vote.  There's
22      no obligation to vote -- that no less are being mistreated
23      under a plan or otherwise have objections to a plan.  They
24      want to raise and be heard for their treatment under the plan.
25      Voting is just one element of confirmation.  There's a whole

1    lot of other elements that have to be met and you'd think that

2    would be greatly narrowing the standing under 1109 according

3    to procedures if the Court would --

4              Those are our arguments, Your Honor.

5         **THE COURT:**  Thanks.  I'm going to noodle these.

6              Mr. Rothberg, let me get you back to the podium

7    and let you make argument number 2.

8         **MR. ROTHBERG:**  And on that one, Your Honor, I will

9    have some testimony as well, but I think we can start off with

10   what's in the pleadings and the admitted exhibits.  Draco is

11   asserting standing in its pleadings as a limited partner of

12   ClearSky Investments.  Okay.  So yesterday we pulled up the

13   partnership agreement of ClearSky Investments which is now

14   Exhibit 21 --  it's been admitted -- to see what rights

15   Mister -- I'm sorry, Draco, would have to come to this Court

16   to assert rights on behalf of the limited partnership because

17   what his assertion is is that not that Draco owns the stock of

18   SkyCom.  His assertion is that ClearSky Investments, LP, owns

19   the stock of SkyCom and he is a limited partner of ClearSky

20   Investments.  So if we look at page 3 of the partnership

21   agreement --

22        **THE COURT:**  All right.  I don't see that the pages

23   are numbered --

24        **MR. ROTHBERG:**  At the top.

25        **THE COURT:**   -- but I'm just going to turn to the

44

1    third page.  Oh, there it is.

2              **MR. ROTHBERG:**  They're numbered at the top.

3              **THE COURT:**  Okay.

4              **MR. ROTHBERG:**  We'll see that in paragraph N that

5    general is defined as ClearSky Management, Inc.  That's the

6    general partner of ClearSky Investments, Limited.

7              **THE COURT:**  Okay.  I'm there.

8              **MR. ROTHBERG:**  Okay.  I believe we'll get through

9    testimony that Draco or Mr. Pouliot are not shareholders or

10   officers or directors of ClearSky Management, Inc.

11             If you then flip to page 9 --

12             **THE COURT:**  I'm there.

13             **MR. ROTHBERG:**  Okay.  If you have the Article 4

14   titled Management, first one 4.1 --

15             **THE COURT:**  Yes.

16             **MR. ROTHBERG:**  -- rights and duties of limited

17   partnership.

18             **THE COURT:**  Yes.

19             **MR. ROTHBERG:**  Except as may hereafter be permitted,

20   a limited partner shall take no part whatever in control,

21   management, direction or operation if there's a

22   partnership -- shall have no power to act for the partnership.

23   4.2, first sentence, Powers of the partnership shall be

24   exercised by or under the authority of and business and

25   affairs of partnership shall be managed by the direction of

1    the general partner.

2              4.3.  General partner shall have full, complete

3    and exclusive power to manage and control the partnership and

4    shall have authority to take any actions it deems necessary.

5    And then it has a laundry list of the powers.  If you skip

6    over to the next page you'll see that in Paragraph G it says

7    the general partner has the ability to sue and be sued,

8    complain and defend on the name on behalf of the partnership.

9    So -- and then H continues that to do all acts, take part in

10   any proceedings, which this is a proceeding, dealing with

11   partnership property.

12             And then 4.6 says, no partner is an agent of

13   the partnership solely by virtue of being a partner.

14             So under the terms of this partnership

15   agreement, it's our position that only the general partner can

16   be here complaining about SkyCom, if indeed SkyCom is an asset

17   of this partnership, which we dispute.

18        **THE COURT:**  Do me a favor.  Can you go over to

19   this -- unfortunately, I got to preserve the boards.  Can we

20   use this flip over, grab a magic marker and I want to make

21   sure Mr. Mitchell agrees with the -- can I get the Ed Rothberg

22   view of -- because I'm looking at a chart that we did in

23   chambers.  I want to make sure y'all agree with -- that we're

24   all on the same page.

25        **MR. MITCHELL:**  May I stand over here and watch, Your

1    Honor?

2            **THE COURT:**  Yes, please.  I've got upper left.  You

3    can draw -- just put the name Draco.  And then maybe southeast

4    draw an arrow, you know, for a couple -- right there.  Whoa.

5    ClearSky.  And draw an arrow due south for two inches.  I've

6    got SkyCom.  And then draw another arrow two inches due south

7    and I've got SkyPort.  And then from SkyCom could you go

8    northeast with an arrow -- no, I'm sorry.  SkyCom -- excuse

9    me.

10           **MR. ROTHBERG:**  SkyPort.

11           **THE COURT:**  Yes, SkyCom.

12           **MR. ROTHBERG:**  SkyCom.

13           **THE COURT:**  Good.  And right there put Balaton.  So

14   I've got ClearSky and Balaton having an interest in SkyCom

15   which is the parent of SkyPort, with Draco having an interest

16   or a limited partner interest in ClearSky.  That's how I had

17   etched it out with some good help of one of my interns.

18                   First of all, do you agree?

19           **MR. ROTHBERG:**  We agree with everything except that

20   ClearSky does not own any stock in SkyCom.

21           **THE COURT:**  And is --

22           **MR. ROTHBERG:**  We have -- with our evidence we can

23   put on later today.

24           **THE COURT:**  It's -- why don't we put -- is

25   it? -- it's ClearSky.  Why don't we put INV right next to Sky

1     so we're talking ClearSky Investments.  There's no other

2     entity, is there, other than ClearSky Investments, with the

3     name ClearSky in it, or am I wrong on that?

4               **MR. MITCHELL:**  You're incorrect.

5               **MR. ROTHBERG:**  It was -- the GP was --

6               **THE COURT:**  I'm incorrect.

7               **MR. MITCHELL:**  I'm sorry.  There's a GP and LP.

8               **THE COURT:**  Okay.  So the ClearSky -- okay.  So your

9     point, Mr. Rothberg, is ClearSky Investments has no interest

10    in SkyCom.

11              **MR. ROTHBERG:**  Correct.

12              **THE COURT:**  And Mr. Mitchell, you agree or disagree?

13              **MR. MITCHELL:**  I disagree with it, Your Honor.

14              **THE COURT:**  Okay.  So that's key point, or at least

15    one point --

16              **MR. MITCHELL:**  Correct.

17              **THE COURT:**   --  that we've got to resolve.

18                   Does Draco have any interest in ClearSky

19    Investments, Mr. Rothberg?

20              **MR. ROTHBERG:**  Yes, Draco is a limited partner --

21              **THE COURT:**  Got you.

22              **MR. ROTHBERG:**   -- in ClearSky Investments.

23              **THE COURT:**  And Mr. Mitchell, you agree with that.

24              **MR. MITCHELL:**  That is correct.

25              **THE COURT:**  Okay.  So key issue is whether ClearSky

1          Investments has any interest in SkyCom.

2                    **MR. ROTHBERG:**  That's one of them.

3                    **THE COURT:**  What's another?

4                    **MR. ROTHBERG:**  The issue is is that Draco as a

5          limited partner does not have the right -- and I hope drawing

6          this doesn't mess it up -- does not have the right to come

7          down, all the way down here and assert the rights of ClearSky

8          as a shareholder with the parent because they're a limited

9          partner, not the general partner.

10                    **THE COURT:**  Who's the general partner of ClearSky

11         Investments?

12                    **MR. ROTHBERG:**  Okay.  The general partner is

13         ClearSky Management, Inc.

14                    **THE COURT:**  And we put GP and I've drawn an arrow

15         somewhere and we put that name out there.

16                    Mr. Mitchell, do you agree that that's --

17                    **MR. MITCHELL:**  Yes.  That that is the general

18         partner?

19                    **THE COURT:**  Yes.

20                    **MR. MITCHELL:**  Yes, Your Honor, I do.

21                    **THE COURT:**  Okay.

22                    **MR. MITCHELL:**  And if I can further clarify

23         something, I don't think Mr. Rothberg -- I'm just --

24                    **THE COURT:**  Please, go ahead.

25                    **MR. MITCHELL:**  His position is that Balaton holds 58

1    percent of SkyCom.  There are some other equity holders at

2    SkyCom, minority, but hold 58 percent.

3              **THE COURT:**  Right.

4              **MR. MITCHELL:**  Our position is Balaton holds roughly

5    9 percent, and then the balance of that 58 percent is split, I

6    believe, about 30/20 between ClearSky LP and then ClearSky GP.

7    And we'll put on evidence to that effect.  But what I'm saying

8    is the GP doesn't have what you normally see of the -- at

9    least our allegation of the .01 percent interest or something

10   along those lines.  You have a significant slow of equity

11   straight from the GP into SkyCom and a significant slow of

12   equity straight from the LPs ClearSky into SkyCom.  I know

13   that's not Mr. Rothberg's position.

14             **THE COURT:**  Sure.  Could you put LP ClearSky?  We

15   got the GP up there; let's put LP right there.  Something

16   tells me if this is up on appeal, very candidly, and the way I

17   view the world, gentlemen, and ladies, is I write for briefing

18   clerks at the district court level, then the district judges,

19   then the briefing clerks at the Fifth Circuit level.  So we're

20   definitely going to be putting a chart in this.

21             **MR. ROTHBERG:**  Would it be helpful if I put Draco as

22   the limited partner?

23             **THE COURT:**  Yes, please.  Just put LP or limited.

24   You can put lim cap P.  Let me just, once again, I was -- we

25   were almost right on our chart here.  Okay.  So your position

1    is, Mr. Rothberg, Draco has no kin -- as a matter of law have

2    no dog in this hunt because it as a limited partner cannot act

3    for ClearSky.

4            **MR. ROTHBERG:**   Correct.  And another point, Your

5    Honor, is that -- and ClearSky, Your Honor, is -- the first

6    I'd ever heard of ClearSky in this case was July 31 when they

7    filed their objection.  And I want to make clear that what we

8    are not -- and another point, before I even get to that.  Mr.

9    Kubbernus who's the CEO of the debtor and also principal of

10    Balaton will testify that Balaton holds the interest in

11    ClearSky Management.

12            Okay?  Now, the point that I wanted to make is

13    that there is no -- if this limited partner has a claim or

14    cause of action in this ClearSky or ClearSky Management or

15    Balaton or Mr. Kubbernus, we are not affecting that in the

16    plan.  We are not seek a release of it.  I'd never heard of

17    ClearSky before; ClearSky's name isn't in the plan, disclosure

18    statement or anything.  And so if he -- if Draco has a problem

19    with the way this is handled and their remedy is to go here,

20    here and here, not to come to Bankruptcy Court and blow our

21    plan.  That's -- and that's the way the law's supposed to

22    work.  The limited partner is not supposed -- has no

23    management rights.

24            **THE COURT:**  And Mr. Rothberg, tell me how much do

25    you -- in your judgment, your client, Balaton owns how much of

1    SkyCom?

2         **MR. ROTHBERG:**  Fifty-eight percent.

3         **THE COURT:**  Fifty-eight percent.  And who owns the

4    remaining 42 percent?

5         **MR. ROTHBERG:**  We have a -- we had filed a schedule

6    with the Court.

7         **THE COURT:**  Yes, I just want to put it up on the

8    chart.

9         **MR. ROTHBERG:**  Oh, it's numerous small numbers.  I

10   think the next largest was CenturyTel?

11        **THE COURT:**  I tell you what.  Let's do this.  Take a

12   blue pen.  Under Balaton just put 58 percent.

13        **MR. IVASCU:**  A hundred minus 58.

14        **MR. MITCHELL:**  A hundred minus 58, Your Honor.  We

15   consent to the little dotted line off to the left that shows.

16   We have that math worked out to 42, whatever it is.

17        **THE COURT:**  Right now let me just focus.  Balaton,

18   according to Mr. Rothberg, owns 58 percent.  You all disagree.

19   I think you said 9.8 percent.

20        **MR. MITCHELL:**  I'm getting the exact numbers for you

21   right now, Your Honor.  And this is an exhibit that we've all

22   stipulated to its admissibility.  9.8, you're correct, Your

23   Honor.  9.8 percent.

24        **THE COURT:**  Okay.  So Mr. Rothberg, take a black

25   pen, if you would.  Under 58 percent just put 9.8 percent.

1    It'll just help me visualize --

2         **MR. ROTHBERG:**  Sure.

3         **THE COURT:**   -- as we work up this chart.  And you

4    all -- have you put a chart in the exhibit book that I missed?

5         **MR. MITCHELL:**  It's not a chart but I can show you.

6    It's something we've all stipulated being admitted.  If you're

7    looking at Mr. Rothberg's --

8         **THE COURT:**  What tab?

9         **MR. MITCHELL:**   -- tab.  It's my Tab 3, Your Honor.

10        **THE COURT:**  Your Tab 3.

11        **MR. MITCHELL:**   Correct.  If you go --

12        **THE COURT:**  It's just -- when I -- it's easier for

13   me to look at charts so I'm --

14        **MR. MITCHELL:**  That wasn't it, Your Honor.

15   It's -- I'm sorry.  It's the second page, the back side of the

16   second page of Tab 3.

17        **THE COURT:**  I'm with you.  Okay.

18        **MR. MITCHELL:**  And if you look down almost to the

19   bottom you'll see off to the left-hand side --

20        **THE COURT:**  Yes.

21        **MR. MITCHELL:**   -- where it says Balaton Direct.

22        **THE COURT:**  Yes.

23        **MR. MITCHELL:**  And then you have ClearSky to GP --

24        **THE COURT:**  Yes.

25        **MR. MITCHELL:**   -- and ClearSky to LP.  And then if

1    you go to the percentages out to the side, those are the

2    percentages that we allege and how they're split up among the

3    LP --

4            **THE COURT:**  I got you.

5            **MR. MITCHELL:**   -- the GP and Balaton Direct.

6            **THE COURT:**  Okay.

7            **MR. MITCHELL:**  Is this where you want this?

8            **THE COURT:**  That's perfect.  Yes.  That just helps

9    me focus a bit.  Okay.

10                So Mr. Rothberg, you're going to argue in this

11   particular hearing that you're about to adduce testimony on is

12   that Draco has no standing because (a) it's a limited partner

13   of ClearSky Investments and your client's in the debtor's

14   Position.  ClearSky Investments, does not have an interest in

15   SkyCom.

16           **MR. ROTHBERG:**  Yes.  And as to the evidentiary part,

17   I think we've essentially stipulated that Draco's a limited

18   partner.

19           **THE COURT:**  Yes.

20           **MR. ROTHBERG:**  We have the partnership agreement.

21   So the testimony I was going to put on was going to focus more

22   on the ownership.

23           **THE COURT:**  And Mr. Mitchell, you stipulate, I

24   assume, that Draco's a limited partner of ClearSky.

25           **MR. MITCHELL:**  Correct.  But I have a different

1    legal argument and it's not an evidentiary argument on the

2    party-of-interest standard, and that is that we would ask the

3    Court to focus on the economic impact of the pact and whether

4    or not that makes up a party-in-interest.  It's not the

5    control issue that we're arguing here with respect to the GPs

6    and we don't dispute that, that we're not the GP of ClearSky.

7    But it's our economic investment in ClearSky and how it is

8    impacted under the plan and that's what makes us have a party-

9    in-interest.

10              **THE COURT:**  Plan says we're going to collapse SkyCom

11   and SkyPort.  Right?

12              **MR. MITCHELL:**  Correct.

13              **THE COURT:**  And Mr. Rothberg, if ClearSky

14   Investments has an interest in SkyCom, do you stipulate to

15   that or you don't?

16              **MR. ROTHBERG:**  ClearSky?  We don't believe ClearSky

17   has any interest --

18              **THE COURT:**  Okay.

19              **MR. ROTHBERG:**   -- any stock ownership in SkyCom.

20              **THE COURT:**  So that's why you're taking the position

21   that Mr. Mitchell's argument on economic interest doesn't kick

22   in because your argument is ClearSky has no interest at all in

23   SkyCom; whereas his argument is it does.

24              **MR. ROTHBERG:**  That's correct.

25              **THE COURT:**  Let me ask you this, Mr. Rothberg.  If

1    ClearSky did have an interest in SkyCom, would you concede
2    then that Draco is a party-in-interest?
3            **MR. ROTHBERG:**  No, Your Honor.  I think under the
4    partnership agreement it has to be the general partner to
5    assert those rights.
6            **THE COURT:**  But if --
7            **MR. ROTHBERG:**  Otherwise, it would be like having a
8    shareholder -- I used to use the analogy for GM because -- but
9    now they're no more.  But it used to be like having a
10   shareholder of GM show up at a lawsuit complaining about
11   something that GM was doing.  You can't do that.  That's not
12   the way -- we have derivative suits; we have procedures to
13   deal with those kind of issues -- and that this is not the
14   right way to do that.
15           **THE COURT:**  I understand the argument -- before we
16   go on.  This is helpful to me.
17           **MR. ROTHBERG:**  Okay.
18           **THE COURT:**  And this may take longer than I thought
19   today.  So Mr. Rothberg, then, if you want to adduce any
20   testimony -- if you want to make any further opening arguments
21   on this particular area please feel free to do so.  Then, I'll
22   allow you to adduce testimony.  Obviously, Mr. Mitchell, same
23   for you.
24           Let me ask Mr. Rudd.  You were standing.  I
25   want to make sure that no other counsel who was standing

1   looking at this chart that we've created -- if you have any

2   comments you want to make, please do so.

3          **MR. RUDD:**  I have no comments on the chart

4   specifically.  We may need to comment as to interpretation of

5   party-in-interest and if that gets to that point, but actually

6   we have no further comment.

7          **THE COURT:**  Thanks.

8          **MR. ROTHBERG:**  Could I have just a moment to figure

9   out which witness I want to call?

10         **THE COURT:**  Sure.  And while you do that, I'm going

11  to call the 10:30 docket because I see that both individuals

12  are here.  So this will take 30 seconds and Mr. Rothberg you

13  can visit with your client as to who you want to call.

14     **(Court attends to other matters from 10:21 a.m. to**

15  **10:23 a.m.)**

16         **THE COURT:**  Okay.  That takes care of the 10:30

17  docket.  We now then return to SkyPort Global Communications,

18  Inc., Case Number 08-S36737.

19             Mr. Rothberg, do you want to call -- I think I

20  heard you say you wanted to call Mr. Kubbernus.

21         **MR. ROTHBERG:**  Yes, sir.

22         **THE COURT:**  All right.  Please, Mr. Kubbernus, come

23  on forward.  Ms. Attaway will swear you in.  Once again we are

24  on the issue of whether Draco has standing.

25     **(Whereupon, the oath was administered to the witness.)**

1          **THE COURT:**  Mr. Kubbernus, once you get seated, if

2     you would state your full name for the record and spell your

3     last name.  And before I -- please.

4          **THE WITNESS:**  Full name is Robert Kubbernus.

5     Kubbernus is spelled K-U-B-B-E-R-N-U-S.

6          **THE COURT:**  Thanks.  And Mr. Rothberg, Mr. Mitchell,

7     let me give you copies each of -- when we were on break

8     there -- this is my Cypresswood Land partner's opinion.  I'm

9     using this because I discussed party-in-interest and standing

10    in that case specifically if you want to look at it and I'll

11    certainly give you a chance to look at it before we do

12    arguments.  Oh, upper right-hand side where it says page 10 of

13    38, page 11 of 38, looks like I started on page 11 of 38 where

14    I talk about party-in-interest on the upper left-hand side.

15    It sort of goes on for a page or so.  I just want y'all to

16    have a frame of reference because that's my frame of

17    reference.

18               Mr. Rothberg, please.

19          **DIRECT EXAMINATION OF ROBERT KUBBERNUS**

20    **BY MR. ROTHBERG:**

21    Q    Mr. Kubbernus, what's your position with the debtor,

22    SkyPort Global Communications, Inc.?

23    A    I'm the CEO of the company.

24    Q    And how long have you held that position?

25    A    I've held that position since November 2008.

ROBERT KUBBERNUS -- DIRECT BY MR. ROTHBERG                    58

1    Q    And was that after the bankruptcy filing?

2    A    That was after the bankruptcy filing.

3    Q    Okay.  Can you just briefly describe for the Court what

4    you've been doing at SkyPort since after the bankruptcy

5    filing.

6    A    Since stepping in as a CEO we had to make some pretty

7    drastic, take some drastic steps in turning around the

8    company.  At that particular time it was burning around net

9    losses per month around half a million.  Its monthly expenses

10   were about 950,000.  We had to figure out ways of getting that

11   down to match revenue which was significantly less than that.

12        So we put in place a management team consisting of

13   Douglas Whitworth, the CFO, Bruce Dunlop on the chief

14   operation side and addressed all those issues in the company,

15   including a number of layoffs that had to occur, right-sizing

16   the company, right-sizing all the different contracts from

17   capacity suppliers to -- every service in the company had to

18   be analyzed, investigated, turned around, changed, rebid, that

19   sort of thing.  Today we can report that we've got the expense

20   rate of the company down to around 400,000, revenue in the

21   450- to $500,000 range.  I still consider that cash-neutral,

22   but it's got positive EBITDA at this point, so I am working

23   with -- on the customer side had to spend a lot of time with

24   the customers getting them settled down.

25        It's critical infrastructure; it's a very important

ROBERT KUBBERNUS -- DIRECT BY MR. ROTHBERG                    59

1    part of their business.  They had to have satisfaction and

2    understand that the company was going to survive or they had

3    to immediately move off to another service provider.  They

4    can't go without this type of service.  So we had to settle

5    down the customers and make sure that they stuck around while

6    in Chapter 11.

7    Q    Now, are you familiar with the corporate structure of

8    SkyPort and SkyCom?

9    A    Yes, I am.

10   Q    And are you familiar with the corporate -- the

11   partnership of ClearSky Investments?

12   A    Yes, I am.

13   Q    Okay.  So is -- let's talk about SkyPort for a minute.

14   At the time of the bankruptcy was Mr. Pouliot a member of the

15   board of directors of SkyPort?

16   A    Yes, he was.

17   Q    Okay.  Now, is SkyCom the parent of SkyPort?

18   A    Yes, it is.

19   Q    And were you an officer or director of SkyCom?

20   A    Yes, I was.

21   Q    And was Mr. Pouliot an officer of director of SkyCom?

22   A    Yes.

23   Q    Now, you've heard us discuss Exhibit Number 21.  It's in

24   front of you.  ClearSky Investments, LP.  Correct?

25   A    Correct.

ROBERT KUBBERNUS -- DIRECT BY MR. ROTHBERG

60

1    Q    Okay.  Can you tell the Court what the purpose was for

2    that partnership to be formed?

3    A    The purpose of the partnership.  It was created a number

4    of years ago back in 2006, at the beginning of 2006.  But

5    later on in 2005, Balaton, I was approached by CenturyTel and

6    the management team to acquire their ownership, their interest

7    in SkyCom, SkyPort.  So Balaton went ahead and negotiated with

8    them and put together a transaction to acquire it.  The

9    company was in Chapter 11 at that time so we were the

10   successful bidder, if you will, of pulling the company

11   together out of Chapter 11 and finish off the transaction with

12   CenturyTel.

13        We then looked at what would be the requirements of

14   the company going forward and how much cash would it need and

15   so we had done our analysis and created a limited partnership

16   to go and raise additional capital for the company.  And the

17   limited partnership is ClearSky Investment.  So as Balaton we

18   also created ClearSky Management.

19   Q    Okay.  Let me ask you about that.  Is ClearSky

20   Management, Inc., the current general partner of ClearSky

21   Investments, Limited?

22   A    Yes.

23   Q    Okay.  And who -- tell me about the corporate structure

24   of ClearSky Management, Inc.  Who were the principals; who

25   owns the stock?

1   A    Balaton Group.

2   Q    Balaton Group owns the stock of Clear -- and who are the

3   officers and directors?

4   A    Of --

5   Q    ClearSky Management, Inc.

6   A    Robert Kubbernus.

7   Q    Robert Kubbernus.  Okay.  So I think you testified that

8   the amount, that this partnership was formed to raise money to

9   assist SkyCom and SkyPort.  Correct?

10  A    Correct.

11  Q    And how much money was supposed to be raised?

12  A    $10 million.

13  Q    $10 million.  Now, at that time when this was being done,

14  did Balaton own the stock of SkyCom?

15  A    Yes.

16  Q    Okay.  And so the partnership agreement was supposed to

17  raise $10 million.  Right?

18  A    Correct.

19  Q    Okay.  What was supposed to happen to Balaton's stock if

20  ClearSky Investments raised the full $10 million.

21  A    It would assign it to ClearSky.

22  Q    Okay.  Did the partnership raise the $10 million?

23  A    No, it did not.

24  Q    How much did it raise?

25  A    Approximately 7 million.

ROBERT KUBBERNUS -- DIRECT BY MR. ROTHBERG

62

1    Q    Seven million.  Okay.  Can you turn to page 7 of Exhibit
2    21.
3    A    [No audible response.]
4    Q    Are you there?
5    A    Yes, I am.
6    Q    Okay.  In the first full paragraph in the middle of it
7    there's a sentence says, If the maximum aggregate -- do you
8    see that?
9    A    Yes.
10   Q    Could you just read for the Court.
11   A    If the maximum aggregate initial class A limited
12   partnership capital contribution of $10 million are completed
13   Balaton and Watershed will assign all of their participation
14   rights in the Exhibit B agreements to the partnership and the
15   partnership will acquire stock representing approximately 76
16   percent of the issued outstanding shares of SkyCom together
17   with common stock purchase warrants which, if exercised by the
18   partnership, would increase its fully diluted ownership
19   position to 82 percent, excluding any dilution resulting from
20   further capitalization of SkyCom.
21   Q    Okay.  So stop there for a second.  If the partnership
22   raises $10 million then Balaton and Watershed would then
23   convey 82 percent of SkyCom to ClearSky.  Correct?
24   A    Correct.
25   Q    Okay.  Read the next sentence.

ROBERT KUBBERNUS -- DIRECT BY MR. ROTHBERG

63

1     A    If less than the maximum aggregate initial class A

2     limited partners capital contribution of 10 million are

3     completed the partnerships' participation in the acquisition

4     and restructuring of SkyCom will be proportionately reduced

5     and Balaton and Watershed may retain any participation rights

6     which have not been assigned to the partnership.

7     Q    Okay.  So did the partnership raise the $10 million?

8     A    No, it did not.

9     Q    How much did it raise?

10    A    Approximately 7 million.

11    Q    Okay.  So is it your understanding that since it didn't

12    raise the 10 million that Balaton and Watershed was not

13    required to transfer the SkyCom stock to ClearSky?

14    A    Correct.

15    Q    Okay.  I would like you to take a look at Exhibit 18 in

16    the notebooks.

17    A    **(Perusing documents.)**

18    Q    No, in the thick notebook.  Exhibit 18.  Okay.  And

19    that's been admitted, but can you just identify that for the

20    Court?

21    A    This is the SkyCom Technologies Corporation consolidated

22    financial statements, audited financial statements, for year

23    ending December 31, 2006-2007.

24    Q    And who conducted this audit?

25    A    Hine and Associates.  No, this one is actually by

1    Deloitte.

2    Q    And was it a regular practice for -- and this is the

3    consolidated for SkyCom.  Right?

4    A    Correct.

5    Q    And does it include SkyPort as well?

6    A    Yes, it does.

7    Q    Okay.  And was it a regular practice prior to bankruptcy

8    for SkyCom and SkyPort to get audited financial statements?

9    A    It has always been since inception an audited company so

10   from 2002 forward it's all audited.

11   Q    Okay.  Does this audited financial indicate who the

12   equity holders are of SkyCom?

13   A    Yes, it does.

14   Q    And can you point the Court to the page and place where

15   that is?

16   A    Along with a series of -- you will see the share

17   transactions on page 4, consolidated statement of changes in

18   stock ownership and deficiency equity -- or deficit equity.

19   So not by name but by number you can see the stock issuances.

20   And there's also references to the notes in the back that

21   clearly, ad nauseam, actually give you all the different share

22   transactions over the course of the -- since inception

23   basically.  And that would be starting on --

24   Q    Page 17.  To page 17, note 6.

25   A    Related party transactions.  Yes, it starts there,

1    continues on.  The debenture notes are also -- it goes on to

2    describe all financing transactions as well but it also speaks

3    about the convertible debentures as they convert into stock.

4    That is starting on page -- they start on page 13 but, yes,

5    the relevant stuff is on page 17.

6    Q    Seventeen.  And then if you look at -- what about note 8

7    on page 19?

8    A    Yes.  It refers to Balaton's position.  Is that your

9    question?

10   Q    Yes.

11   A    Yes.

12   Q    Now, is there any reference in these audited financial

13   statements to ClearSky Investments as being a stockholder of

14   SkyCom?

15   A    No, not that I've found.

16   Q    Okay.  Now, take a look at Exhibit 17.

17   A    Yes.

18   Q    And can you identify that for the Court?

19   A    Stock certificate in SkyCom issued to Balaton Group for

20   133,000,000 shares.

21   Q    And what percentage of SkyCom is that?

22   A    I don't have the full cap table but that, with all other

23   shareholdings, is 58 percent or greater.

24   Q    So Mr. Kubbernus, is it your testimony that Balaton owns

25   58 percent of SkyCom?

1    A   Yes.

2    Q   And are you 100 percent positive of that?

3    A   Yes, I am.

4          **MR. ROTHBERG:**  I'll pass the witness, Your Honor.

5          **MR. MITCHELL:**  Cross-examination, Your Honor.

6          **THE COURT:**  Please.

7          **MR. MITCHELL:**  There are your notes.

8          **THE COURT:**  That may be the first voluntary

9    production of documents this week that I've seen, gentlemen.

10           Please, Mr. Mitchell.

11          **MR. MITCHELL:**  Thank you, Your Honor.

12          **CROSS-EXAMINATION OF ROBERT KUBBERNUS**

13    **BY MR. MITCHELL:**

14    Q   Mr. Kubbernus, good morning.  We've met before but my

15    name is John Mitchell and I represent Draco Capital.  I'd like

16    to talk to you a little bit about your testimony just now.  I

17    think you started off early in your testimony saying Mr.

18    Pouliot used to be a member of the board of SkyPort.  Is that

19    correct?

20    A   Yes.

21    Q   Okay.  And that he was a director of SkyPort?

22    A   Yes.

23    Q   Okay.  And maybe an officer but you weren't sure about an

24    officer.

25    A   I don't --

1    Q    Okay.  Why would he have held the directorship position
2    in SkyPort?
3    A    Oh, I met him years ago.  He has invested in ClearSky.
4    He had a lot of aptitude in the broadcast face and, you know,
5    there was no question about it.  And we discussed his helping
6    out or being a board member of SkyPort, SkyCom.
7    Q    But it wouldn't be fair to say that he was made a member
8    of the board because of his investment in the SkyCom, SkyPort
9    operations and enterprise.
10   A    I think that flows into the decision process.  There's a
11   number of board members that made no investment.  So there's
12   board members that make investment, board members that don't
13   make investment.  It does factor into it, yes.
14   Q    So he did make an investment in the SkyCom enterprise.
15   A    In ClearSky.
16   Q    ClearSky.  Right.  But not in the SkyCom enterprise?
17   A    Not that I'm aware of.
18   Q    Okay.  But he was a board member of SkyPort.  You agree
19   with that.
20   A    Yes.
21   Q    Okay.  My question is is why would he have had a board
22   seat at SkyPort.  Did he have an investment in the SkyPort
23   enterprise?
24   A    No.
25   Q    No investment at all?

1    A    In SkyPort, no.

2    Q    Okay.  So it's your testimony he has no economic interest

3    in SkyPort or SkyCom.

4    A    SkyPort or -- no.

5    Q    Or Draco Capital.  When I say Mr. Pouliot I'm including

6    his investment vehicle, Draco Capital.

7    A    Correct.

8    Q    Okay.  All right.  I want to clarify.  I think you said

9    that you are the general partner or you're the president of

10   Balaton.  What is your relationship to Balaton?

11   A    Balaton?  I'm the CEO of Balaton.

12   Q    CEO of Balaton.  And Balaton is what to ClearSky

13   Management, Inc.?

14   A    It is the owner of ClearSky Management.

15   Q    Okay.  All right.  Who is the president or CEO of

16   ClearSky Management, Inc.

17   A    Robert Kubbernus.

18   Q    Robert Kubbernus.  Okay.  All right.  And ClearSky

19   Management, Inc., is the general partner of ClearSky Limited

20   Partnership.  Is that correct?

21   A    Correct.

22   Q    Okay.  All right.  I want to turn your attention to

23   debtor's Exhibit 21.

24          **MR. MITCHELL:**  Did you put it in the binder?  It's

25   the partnership agreement we were just talking about.

1    **BY MR. MITCHELL:**

2    Q    Debtor's Exhibit, excuse me, 21.  It's the partnership

3    agreement for ClearSky Investments Limited Partnership.

4    A    I have no 21.

5         **THE COURT:**  You can approach, Mr. Mitchell, and show

6    him.

7         **MR. MITCHELL:**  It's the --

8         **THE WITNESS:**  Okay.  Got it.

9         **MR. MITCHELL:**  It's been marked and admitted as

10   debtor's Exhibit 21.

11   **BY MR. MITCHELL:**

12   Q    I'd like to call your attention to Section 2.6.  It's at

13   the bottom of page 6 of debtor's 21.

14   A    (Perusing documents.)

15   Q    Do you see --

16   A    Yes, I do.

17   Q    -- Section 2.6?  And can you read that?  It's the

18   beginning of the paragraph about the purpose.

19   A    Okay.

20   Q    You see where it says the purpose of the ownership --

21   A    Yes, I do.

22   Q    -- is to increase the maximum aggregate initial Class A

23   limited partner's maximum capital contributions of $10 million

24   to acquire debt and equity securities of SkyCom Technologies

25   and its wholly owned subsidiary SkyPort International.  You

1    see that?

2    A    Yes, I do.

3    Q    All right.  So you would agree with me that the sole

4    purpose of this ClearSky Limited Partnership was to raise

5    capital to invest in SkyCom and SkyPort.

6    A    Correct.

7    Q    Okay.  Now, I would like you to turn the page to page 7.

8    And I want to refer to the remainder of paragraph 2.6.  In the

9    middle you testified that if the maximum -- and reading the

10   sentence, If the maximum aggregate initial Class A limited

11   partners capital contribution of $10 million are completed,

12   Balaton and Watershed will assign all of their participation

13   rights in the Exhibit B agreements to the partnership and

14   partnership will acquire stock representing approximately 76

15   percent of the issued stock.  Do you see that?

16   A    Yes, I do.

17   Q    Okay.  And your testimony was that the limited

18   partnership did not raise the 10 million.

19   A    Correct.

20   Q    But it did raise 7 million.

21   A    Correct.

22   Q    Okay.  But nevertheless you don't believe that Balaton

23   was under any obligation to assign to shares in SkyCom to the

24   limited partnership.  Is that right?

25   A    Oh, to meet the -- you have to meet the threshold of 10

1    million.

2    Q    You have to meet the 10 million.

3    A    Yes.

4    Q    Okay.  So if you get $9,999,000 there's no obligation to

5    transfer any shares to the limited partnership.

6    A    Now, is that -- if I may elaborate.

7    Q    Please do.

8    A    There's other factors in here as well, such as the

9    general partner's remedy to foreclose out any positions for

10   nonpayment.  So there's a number of issues other than just

11   this issues that gives the general partner all of the equity

12   ownership and therefore, Balaton, the ownership.

13   Q    Okay.  Let's take a look at the last sentence of

14   Paragraph 2.6.  It says, If less that the minimum aggregate

15   initial Class A limited partners capital contributions of U.S.

16   10 million are completed, the partnership's participation in

17   the acquisition in restructuring of SkyCom will be

18   proportionately reduced and Balaton and Watershed may retain

19   any participation rights which have not been assigned to the

20   partnership.  You see that sentence?

21   A    Yes, I do.

22   Q    Okay.  So the partnership raises 7 million and do you not

23   agree with me that at that point $7 million proportionately

24   worth of SkyCom stock should have been transferred to the

25   limited partnership?

ROBERT KUBBERNUS -- CROSS BY MR. MITCHELL

1    A    Assigned.

2    Q    Or should have been assigned.

3    A    Or pro rata depending on the events that occur from 2006,

4    '07, '08 and '09.

5    Q    So not at this point.  There was no obligation upon the

6    raising of the $7 million --

7    A    At that --

8    Q     -- to assign any interest in SkyCom to ClearSky.

9    A    A proportionate amount, but it was entitled to -- Balaton

10    had the right to, if not reaching the 10 million, to deal with

11    the ownership of that stock.

12    Q    Let me understand that answer.

13    A    Okay.

14    Q    A proportionate amount.  So you would agree that there

15    was an obligation to assign a proportionate amount to

16    ClearSky.

17    A    No.

18    Q    Okay.  Why not?

19    A    Because the partnership owes Balaton a large deficiency.

20    Balaton has foreclosed that position out and taken all

21    ownership back.

22    Q    Okay.  So at the time the cash was raised there was no

23    obligation to assign the shares.  Is that right?

24    A    Under the terms of the agreement.

25    Q    Okay.  So what I'd like to know because, see, as I'm

ROBERT KUBBERNUS -- CROSS BY MR. MITCHELL

1    reading this paragraph.  As I read it --

2         **MR. ROTHBERG:**  Your Honor, I think I'm going to

3    object to this whole line of questioning.  Let me explain.  I

4    think this has to do with a dispute potentially between

5    ClearSky Investments, LP, and its limited partner, which is

6    not before this court.  It's not relevant.

7         **THE COURT:**  Go ahead, Mr. Mitchell.  Do you want to

8    respond?

9         **MR. MITCHELL:**  I do want to respond, Your Honor,

10   because I'm laying the foundation that in fact those shares

11   were assigned on a pro rata basis, notwithstanding the fact

12   that $10 million wasn't raised.  I'm going to produce evidence

13   as we go on here that the shares were assigned, and they

14   absolutely were assigned.

15        **MR. ROTHBERG:**  I'll withdraw the --

16        **MR. MITCHELL:**  If they weren't assigned then I would

17   like to know why they weren't assigned, which then, I think,

18   still goes to our standing argument because what we would

19   argue at confirmation is that the furtherance of this

20   plan -- if this Court confirms this plan and allows this Court

21   to collapse SkyCom, it's a furtherance of -- dare I say it,

22   Your Honor? -- a scheme to wipe out the interest of investors

23   like my client who invested in SkyCom believing they were

24   getting an equity interest in SkyCom.  And this is going to be

25   the end of that for investors like Draco and we're arguing

1    that the Court shouldn't be allowed -- or shouldn't the debtor

2    to do it.

3         **THE COURT:**  I'll overrule the objection.  I think

4    the line of questioning, at least so far, Mr. Rothberg, goes

5    to the issue of economic interest of Draco.  So I'll overrule

6    the objection.  You can go ahead, Mr. Mitchell.

7    **BY MR. MITCHELL:**

8    Q    I'll just ask one follow-up question on that and I'll

9    move on, Mr. Kubbernus.  Were the shares or any shares of

10   SkyCom ever assigned to ClearSky?

11   A    No, they were held by Balaton.

12   Q    Okay.  Oh, they were held by Balaton.  Were they held for

13   the beneficial interest of ClearSky?

14   A    Possibly.

15   Q    Possibly.  What do you mean by possibly?

16   A    Well, we never hit the 10 million.

17   Q    Okay.

18   A    And we had to foreclose out our position and take them

19   back.

20        **MR. MITCHELL:**  I'm sorry, Your Honor.  I did say I

21   was going to lay this one question.

22   **BY MR. MITCHELL:**

23   Q    But I'm not sure I understand when you say you held them

24   possibly for the beneficial interest of ClearSky, what do you

25   mean by that?

1    A    Well, they're owned by Balaton; Balaton is the owner of

2    them.

3    Q    Okay.  And does Balaton as record owner of them hold them

4    for the benefit of ClearSky?

5    A    Not anymore, no.

6    Q    Oh, okay.  Did it ever?

7    A    The plan -- the limited partnership contemplates that if

8    we meet the thresholds and if other events don't occur as

9    well.

10   Q    Okay.  So it's a very simple question.  Did Balaton at

11   any time hold shares of SkyCom for the beneficial interest of

12   ClearSky, LP and GP?

13   A    Yes.

14   Q    When did that occur?

15   A    2006, 2007?

16   Q    Okay.

17   A    Exact dates I don't have.

18   Q    All right.  And what percentage of shares did Balaton

19   hold?  And we're talking about shares of SkyCom.  And so we

20   can all talk apples to apples here, we've got an allegation of

21   58 percent of the shares of SkyCom held by Balaton.  So of

22   that 58 percent, what percentage in 2006-2007 did Balaton hold

23   for the benefit of SkyCom?

24   A    I don't have those records.

25   Q    Not SkyCom -- excuse me.  ClearSky.

1    A    Of ClearSky.  I don't have those records here.

2    Q    Do you know if it was more than 10 percent?

3    A    So say the question again.

4    Q    I'm trying to understand.  It was somewhere between 0 and

5    58 percent so I'd like to know what percentage.  Was it de

6    minimis amount, 2 percent?  Was it a significant amount, 40

7    percent?  Can you give me a range.

8    A    No, I can't.  I don't have the records here.  I

9    don't -- I can't --

10   Q    And you have no recollection.

11   A    No.

12   Q    Okay.  Well, regardless of what the percentage was, does

13   Balaton today hold shares of SkyCom for the benefit of

14   ClearSky?

15   A    No.

16   Q    Okay.  And when did it no longer hold them for the

17   benefit of ClearSky?

18   A    Soon as ClearSky started to default on its obligations to

19   the general partner and to Balaton.

20   Q    Okay.  And what obligations were those?

21   A    The cost to run the partnership.

22   Q    Uh-huh.

23   A    The obligations of the partnership to the managing

24   partner all had to be kept up and maintained.  Nobody wanted

25   to continue with the partnership and fund the partnership.  So

1      the partnership has to deal with its business, and the general

2      partner has to either front the bill for audits, for

3      management, for the running of the partnership.

4      Q    And so how does that process work?  Does a demand get

5      made; does an equity call get made?  How does that process

6      work, and in furtherance of that, if there's no response, does

7      Balaton just forfeit the shares?  What happens?  Are demand

8      letters sent; does it just take the shares back?  At some

9      point they were for the beneficial interest of ClearSky.

10            You're saying ClearSky defaults on its obligations

11     to the partnership.  Okay.  How does that work?  I don't

12     understand.  What does Balaton do then to start taking shares

13     back in its own name?

14     A    It forecloses out its position and takes it back.

15     Q    It forecloses.  Did notice get sent out to the investors

16     that --

17     A    No.

18     Q    No notice was sent out.

19     A    No.

20     Q    So no notice was given to Draco or other investors in

21     ClearSky.

22     A    No.

23     Q    It just does  it -- and does it do that just by book

24     entry in the books, just starts taking shares back?  Is that

25     what happened?

ROBERT KUBBERNUS -- CROSS BY MR. MITCHELL                    78

1      A    For -- yes.  For --

2           **MR. ROTHBERG:**  Your Honor, I'm going to object to

3      the form of the question because what Mr. Mitchell established

4      was that the shares are owned by Balaton.  Okay.  But for the

5      benefit of the limited partnership.  So there's no transfer of

6      rough stock certificates.  It's this beneficial interest that

7      is --

8           **MR. MITCHELL:**  Which is an economic interest, Your

9      Honor.

10          **MR. ROTHBERG:**  I'm not disputing that; I just want

11     to be clear -- I want the record to be clear what he's asking

12     and what he's not asking.

13          **THE COURT:**  All right.  The last issue we were just

14     on was about foreclosure is what I heard the testimony about

15     and What I was somewhat confused on is the issue of

16     foreclosing.  Presumably there's some kind of debt outstanding

17     that hasn't been paid.  Was -- I don't.  The language here on

18     page 7, I don't see any reference to debts owed or

19     foreclosure.  Let me try asking you a couple of questions

20     myself, Mr. Kubbernus.

21               I'm looking at the sentence on page 7 that

22     begins, If the maximum aggregate initial Class A limited

23     partners capital contributions of 12 million are completed.

24     My understanding is your testimony is they absolutely were not

25     completed.  Ten million, it never came in.  Am I correct?

1          **THE WITNESS:**  Correct.

2          **THE COURT:**  Okay.  And so because 10 million never

3     came in, do I understand your testimony to be that Balaton and

4     Watershed never assigned their participation rights to

5     ClearSky Investment.

6          **THE WITNESS:**  We had the right to --

7          **THE COURT:**  Now, listen to my question.  The 10

8     million never came in.  Correct?

9          **THE WITNESS:**  Correct.

10         **THE COURT:**  Because the 10 million never came in, is

11    your testimony that Balaton and Watershed never assigned,

12    never partitioned rights to ClearSky Investments?

13         **THE WITNESS:**  Correct.

14         **THE COURT:**  That's a yes-or-no answer.

15         **THE WITNESS:**  Correct.  That's -- yes.

16         **THE COURT:**  Never assigned.

17         **THE WITNESS:**  Never assigned.

18         **THE COURT:**  Okay.  Now, the next sentence says, If

19    less that the maximum aggregate of 10 million are completed,

20    the partnership's participation in the acquisition and

21    restructuring of SkyCom will be proportionately reduced and

22    Balaton and Watershed may retain any participation rights

23    which have not been assigned to the partnership.  Your

24    testimony is 7 million, roughly, was brought in.  Correct?

25         **THE WITNESS:**  Correct.

1          **THE COURT:**  Okay.  As a result of that 7 million

2     being brought in, was there any stock of SkyCom assigned,

3     transferred or otherwise conveyed to ClearSky Investments.

4              **THE WITNESS:**  It never did get transferred, no.

5              **THE COURT:**  So at no point, in your judgment, has

6     ClearSky Investment ever owned any stock of SkyCom.

7              **THE WITNESS:**  No, they have not.

8              **THE COURT:**  Thank you.  You may proceed.

9              **MR. MITCHELL:**  Thank you, Your Honor.

10    **BY MR. MITCHELL:**

11    Q    Mr. Kubbernus, let me turn to the big binder now I call

12    the debtor's exhibits --

13    A    Those?

14    Q    I'd like you to turn to Tab 18, page 19.

15    A    **(Perusing documents.)**

16    Q    You see paragraph 8, Financing transactions?

17    A    Yes.

18    Q    Okay.  First sentence says, On February 16, 2006, the

19    company entered into an equity placement agreement in the

20    amount of $4 million with Balaton Group, Inc., et al.

21         Do you see that sentence?

22    A    I do.

23    Q    Okay.  Do you know what "et al" means?

24    A    And additional parties.

25    Q    And others.

1    A    Others.

2    Q    Who are the others that that refers to?

3    A    Watershed Fund.

4    Q    Watershed Fund.  Okay.  And then it says that the company

5    issued ballots on 133 million 333, et cetera, shares of the

6    company's common stock.

7    A    Correct.

8    Q    And the company means SkyCom.  Isn't that correct?

9    A    Correct.

10   Q    Okay.  All right.  Then we have on February 15,

11   2006 -- all right.  Balaton Group, Inc., et al., and/or the

12   Watershed Funds.  So now we've got Balaton and Watershed and

13   still some others.  So what others is that talking about on

14   the second paragraph.

15   A    I think it still refers to Watershed.  I --

16   Q    Really, that's just a typo, then?

17   A    I don't know.  I have no opinion on that other than

18   Watershed and Balaton.

19   Q    Okay.  And then further in the next sentence and in fact

20   throughout here it discusses Balaton Group, Inc., et al.,

21   acquiring equity rights in SkyCom.  You would agree with that,

22   wouldn't you, by conversion of debentures that are purchased

23   into shares of SkyCom.  Is that correct?

24   A    That's correct.

25   Q    Okay.  All right.  But you don't know who the et al

1    refers to.

2    A    I'm assuming it's Watershed.

3    Q    Again.  Okay.  It's not referring to ClearSky and its

4    investors?

5    A    No.  None of the documents with the purchase agreement

6    refer to ClearSky either.

7    Q    Okay.  Let me ask you to pick up the small notebook.  And

8    I'd like you to turn to Exhibit 1.  It's ClearSky Investments,

9    LP, February 2006.  Do you see that document?

10   A    I do.

11   Q    Have you seen this document before?

12   A    Yes, I have.

13   Q    What is this document?

14   A    This is a confidential investment memorandum.

15   Q    I'd like you to flip through all the pages of the

16   document, and other than the exhibit sticker on the bottom,

17   does it appear to be a complete and accurate copy of the

18   confidential investment memorandum?

19   A    Yes, it does.

20   Q    Okay.  Does it look like it's been altered in any way?

21   A    It does not.

22   Q    Who prepared this document?  Do you know?

23   A    It's probably a collaboration of a number of people in

24   the office at that time.

25   Q    All right.  And this would be your office?

1    A    Balaton's office, yes.

2    Q    Okay.  Under your supervision?

3    A    [No audible response.]

4    Q    Yes.

5    A    Yes.

6    Q    And so would you have approved this document being

7    prepared and sent out?

8    A    Yes.

9    Q    Okay.

10         **MR. MITCHELL:**  All right.  Your Honor, I would like

11   to admit into evidence Exhibit 1, the confidential

12   investment --

13         **THE COURT:**  I think we've -- oh, excuse me.  We

14   don't --

15         **MR. MITCHELL:**  No, 1 and 2 have not been admitted.

16         **THE COURT:**  Yes.  One and 2 not been admitted.

17              Mr. Rothberg, any objection?

18         **MR. ROTHBERG:**  Just a minute.  No objection, Your

19   Honor.

20         **THE COURT:**  Exhibit 1 of Draco's admitted without

21   objection.

22       **(Draco's Exhibit 1 received.)**

23   **BY MR. MITCHELL:**

24   Q    What's the purpose of this document?

25   A    Describes in summary form investment opportunity in

1    SkyPort International.

2    Q    And this was the document that was used to solicit funds

3    of investors in ClearSky, wasn't it?

4    A    Correct.

5    Q    Okay.  And it's clear here that the purpose of the funds

6    would be to acquire shares in SkyCom and the SkyPort

7    operations.  Isn't that right?

8    A    Correct.

9    Q    Okay.  And in fact when these funds were solicited -- I'm

10   sorry.

11          **MR. MITCHELL:**  I withdraw the question, Your Honor.

12   My apologies.

13          **THE COURT:**  All right.

14   **BY MR. MITCHELL:**

15   Q    Who is the partnership?  Take a look at the very first

16   paragraph, the very first paragraph under Investment

17   highlights, ClearSky Limited Partnership.  You see where it's

18   defined as the partnership?

19   A    Yes.

20   Q    Okay.  All right.  Would you agree with me that the

21   intent of this memorandum was to -- well, let me rephrase the

22   question.  It was always the intent that the partnership would

23   acquire the shares of SkyCom.  Isn't that right?

24   A    Well, I rely on the document so do you want me to read

25   the document or --

1    Q    No, that's fine.  I'll ask -- okay, fair enough.  If you

2    can go to page 3 of this document.  See, Use of proceeds on

3    page 3?

4    A    Yes.

5    Q    Okay.  You can go to what I call little three in the

6    hole; it's little Roman numeral three.  You see that?

7    A    Yes.

8    Q    Okay.  The partnership will purchase an aggregate 133

9    million shares of common stock.  Do you see that?

10   A    Yes.

11   Q    So it was always intended, wasn't it, that the

12   partnership, being ClearSky would purchase the shares?

13   A    According to this document, yes.

14   Q    Okay.  That you supervised and prepared.  Isn't that

15   right?

16   A    Correct.

17   Q    Okay.  All right.  I'd like you to turn to Exhibit 2,

18   please.  I'd like you to take a look at Exhibit 2 and then

19   there are several pages behind there.  I'm going to be asking

20   you questions about this document so I'd like to --

21   A    Okay.

22   Q     -- become familiar with it first, if you don't mind.  My

23   question's going to be do you recognize the email and the

24   exhibits that were attached.  But I don't want to rush you,

25   so --

1    A    I recognize it.

2    Q    Okay.  And I'm not asking you to recognize where Mr.

3    Pouliot forwarded it to me, just the part below.

4    A    Okay.

5    Q    Now, let's a look at page 1 of that exhibit, the email

6    cover sheet.  And do you see the email on October 28, 2008,

7    from you to Mr. Adrien Pouliot?

8    A    Yes.

9    Q    Okay.  And do you recall sending this email to Mr.

10    Pouliot?

11    A    Vaguely, yes.

12    Q    Vaguely?  Okay.  And do you recall that as attachments to

13    this email were the draft and pages behind it?

14    A    That I don't recall.  They could have been attached.

15    Q    Could have been.  You just don't recall.  Okay.  Well --

16    A    That's -- it's in French here so is that -- does that

17    mean there's an attachment to it?

18    Q    Well, let me ask you this?  Do you have any reason to

19    believe that this email wasn't sent by you and this isn't an

20    accurate reproduction of the email that you sent on October

21    28?

22    A    Oh, I -- your question is, is it possible this

23    isn't -- what's your question?

24    Q    I'm asking if you recall sending this email to Mr.

25    Pouliot.

1    A    Yes.  I vaguely remember this.

2    Q    Okay.  But you don't necessarily remember about the

3    documents attached.

4    A    No.  But if it's referring to financial statements, I was

5    reminded that you were a board member of the LP, did not sign

6    off on the 2006 consolidated and non-consolidated statements.

7    We need your signature on these 2006 statements.  It doesn't

8    show an attachment.  I can't give you an opinion on that but

9    I'm assuming I would have attached the financial statements.

10   Q    Okay.  I don't want to get ahead of myself here.  I need

11   to get this into evidence first so --

12   A    Okay.

13        **MR. MITCHELL:**  At this point, Your Honor, I'd like

14   to offer Exhibit 2 into evidence.

15        **THE COURT:**  Mr. Rothberg, any objections?

16        **MR. ROTHBERG:**  Well, Your Honor, I don't object to

17   the emails but if he's asserting that the attachments attached

18   to the email I don't think he's established a foundation for

19   that.

20        **MR. MITCHELL:**  May I respond, Your Honor?

21        **MR. ROTHBERG:**  Sure.

22        **MR. MITCHELL:**  You know, I really am not going to

23   argue that too strenuously because I've heard the testimony

24   and I understand.  I can either put my client on the stand or

25   maybe we can reach an agreement where we admit the cover email

1   into evidence.  But I do need to ask Mr. Kubbernus about the

2   attachments.  If -- I either need to reserve the right to

3   recall him later once they do get into evidence or I can ask

4   questions subject to an ultimate ruling later on.

5           **MR. ROTHBERG:**  Your Honor, I think there's a way,

6   easier way to do that.  I think he can just -- I think the

7   email can be admitted and then Mr. Mitchell can just ask Mr.

8   Kubbernus questions, are these the consolidated finance -- the

9   statements of the company.  And if he says yes, then they can

10  be admitted.  If is point is is he wants to show that they

11  were attached to the email, then that's where I have the issue

12  But at to whether these are statements are not,

13  I -- certainly, he can ask him questions about that and try to

14  get a foundation.

15          **THE COURT:**  Let me go back for a minute.  You don't

16  object to the introduction, to my admitting into the record

17  the first page of Exhibit 2.  Is that correct?

18          **MR. ROTHBERG:**  Correct, Your Honor.

19          **THE COURT:**  The first page of Exhibit 2 is admitted.

20      **(Draco's Exhibit 2, page 1 received.)**

21          **THE COURT:**  The remaining pages are not yet admitted

22  based upon the objection that Mr. Rothberg has lodge, which I

23  think was a fair objection.

24              Mr. Mitchell, I will certainly allow you to

25  call your client to prove these up, or if you need to call Mr.

1    Kubbernus back to the stand you can do that again if by asking

2    him questions know you still can't get these in.

3            **MR. MITCHELL:**  Understood, Your Honor.

4            **THE COURT:**  Okay.

5    **BY MR. MITCHELL:**

6    Q    Why would you have sent this email to Mr. Pouliot?

7    A    Good afternoon, Adrien.  I was reminded that you are a

8    board member of the LP, did not sign, or as a board member of

9    the LP, did not sign off on the 2006 consolidated and non-

10   consolidated statements.  We need your signature on the 2006

11   statements.

12   Q    And you had sent it to him because he was a board member

13   of ClearSky?

14   A    Yes.

15   Q    Please turn to Exhibit 3.  This has already been admitted

16   into evidence.  I'm calling your attention to the email dated

17   June 17, 2008.  You see this from you to several different

18   recipients.

19   A    (Perusing documents.)

20   Q    You see this email?

21   A    Yes.

22   Q    Okay.  Do you recall sending this email to Mr. Pouliot

23   and others?

24   A    I don't recall this specific one.

25   Q    You don't.

ROBERT KUBBERNUS -- CROSS BY MR. MITCHELL

90

1   A    No.

2   Q    Well, it's already been admitted into evidence.  It

3   purports to be an email from you to Mr. Pouliot.  Says here,

4   find attached the tables for the different stages of events,

5   and then, importantly, and how it will impact its

6   shareholders.  Do you see that?

7   A    Yes.

8   Q    Okay.  Do you know anything -- do you know why that would

9   say how it will impact shareholders?  What were you referring

10  to?  Do you recall?

11  A    Time frame June 17, '08.  I think that was in the middle

12  of a merger go-public strategy.  And so there's some impact

13  analysis that the analysts in the company were doing and so

14  I'm assuming that's what it's referring to.

15  Q    Okay.  Take a look at the next page behind it.  You see a

16  spreadsheet title, SkyCom capitalization roll-out table?

17  A    Yes.

18  Q    Okay.  And do you recall the spreadsheet being prepared?

19  A    Again, this would have been a staff member preparing

20  this.

21  Q    But you don't recall attaching it to this email and

22  sending it out as an attachment to the email.

23  A    Well, this specific one, I do not.  It's quite possible.

24  Q    Okay.  Well, take a look at the top of this table.  Do

25  you see in the upper right-hand corner, it says, current

ROBERT KUBBERNUS -- CROSS BY MR. MITCHELL

1    ownership, step one?  Do you see that?

2    A    I see that.

3    Q    And then below it says SkyCom.

4    A    I see that.

5    Q    And it says percent ownership.

6    A    Correct.

7    Q    You see that?

8    A    Yes.

9    Q    Okay.  So -- and this is a roll-out as I understand.

10   What was the roll-out that was being contemplated?

11   A    Well, in any sort of merger or transaction like a go-

12   public strategy, you roll up the stock or you roll out the

13   stock into a public entity.  So I'm assuming that's what it's

14   referring to is the roll-out into the public company --

15   Q    And so what did the --

16   A    -- or the exchange.

17   Q    -- spreadsheet had been prepared to show current equity

18   and then the roll-out and kind of what the ultimate

19   capitalization will be if it's all ultimately consummated?

20   A    If it -- yes, if it all comes together.

21   Q    Okay.  So it says, SkyCom and percent ownership.  Now,

22   I'd like you to turn to the back side of that same page.  You

23   can turn the page and look at the back.

24   A    Yes.

25   Q    Okay.  You go all the way down.  It says Balaton Direct.

1    Do you see that?

2    A    Yes.

3    Q    And it says 9.8 percent.

4    A    Yes.

5    Q    And underneath that it says, ClearSky GP.

6    A    Correct.

7    Q    And it says 14.64 percent.

8    A    Correct.

9    Q    All right.  And then ClearSky LPs.

10   A    Yes.

11   Q    34.17 percent.

12   A    Correct

13   Q    Okay.  So at this time were ClearSky GP and ClearSky LP,

14   were they direct equity interest holders in SkyCom?

15   A    Well, that's what this shows.  I didn't --

16   Q    But you don't recall this table.

17   A    No.

18   Q    Okay.  And you don't know why you would be addressing Mr.

19   Pouliot with an email showing how it would impact the

20   shareholders.

21   A    Oh, there was a lot of tabulations done the corporate

22   finance group which was Blackmont on what the roll-out would

23   look like if this happened, if that happened.  I think there

24   was a lot of analysis going on at the time -- numerous,

25   numerous emails, different analysis -- if this happens, if

1    that happens.  So it's analytics more than anything.

2    Q    But ClearSky and these are not direct shareholders of --

3    A    Well, it shows them as ClearSky LPs --

4    Q    Right.

5    A     -- 251 million shares.

6    Q    So they did hold shares in --

7    A    Well, according to this.

8    Q    And you don't recall supervising this chart being

9    prepared, reviewing the draft --

10   A    A thousand charts were prepared.  I have to assume that I

11   have seen this one and worked on this one or reviewed it with

12   any number of the staff member and the corporate finance

13   company and all the rest of it.  So I'm not denying that this

14   is valid or not valid, it's just that I think you're asking me

15   did I create it or supervise it and I can't absolutely say I

16   supervised it or created it.  There's --

17   Q    So is it your testimony --

18   A     -- 18 people working at the company.

19   Q     -- this is an incorrect chart of the structure of

20   ownership of SkyCom.  Would you say that's incorrect?

21   A    As at when?

22   Q    As at the time that you sent it which is June 17, 2008,

23   which would be about three months before the case filed, if I

24   recall when petition date was.  So last summer, so about three

25   months prior to this case being filed.  This chart suggests

ROBERT KUBBERNUS -- CROSS BY MR. MITCHELL

1    that ClearSky GP and LPs own 34, 44 -- excuse me, 48 percent

2    of SkyCom.

3    A    Yes.  See there's no date on this chart so I

4    can't -- because it doesn't sound right, but I

5    can't -- there's no date on the chart.

6    Q    You just don't know.

7    A    I just don't know.

8    Q    All right.

9          MR. MITCHELL:  Your Honor, may I approach this chart

10   over here?

11         THE COURT:  Sure.

12         MR. MITCHELL:  Mr. Kubbernus, can you see this from

13   over there?

14         THE WITNESS:  Yes.

15         MR. MITCHELL:  Your Honor, I can take it over there.

16         THE COURT:  Yes.  Why don't you take it over there,

17   be easier.

18       (Pause.)

19         THE COURT:  Sorry we can't use the boards but I need

20   them for some other hearings, so --

21         MR. MITCHELL:  A bit more?  I'm going to tump this

22   over in a second, Your Honor.

23         THE COURT:  Yes, that's fine.  I can see it too.

24   BY MR. MITCHELL:

25   Q    Okay.  Question for you:  What is your relationship with

ROBERT KUBBERNUS -- CROSS BY MR. MITCHELL

1    Balaton again?

2    A    CEO.

3    Q    You're the CEO of Balaton.

4    A    Yes.

5    Q    And are you the controlling shareholder of Balaton?

6    A    No.

7    Q    No.  You don't own the majority of the shares in Balaton.

8    A    No.

9    Q    How about you or affiliated family members or

10   partnerships or ventures that you control?

11   A    Yes.  There's a structure in place where a family trust

12   owns Balaton ultimately.

13   Q    Okay.  So you or others affiliated with you control --

14   A    Yes.

15   Q    -- the majority of shares of Balaton.

16   A    Yes.

17   Q    And you're the CEO.

18   A    I'm the CEO.

19   Q    Okay.  All right.  I think you said that Balaton, and

20   correct me if I'm wrong, also controls ClearSky or is the GP

21   of ClearSky Management.  What's the relationship between

22   Balaton and ClearSky.

23   A    It owns, controls and is the manager of ClearSky

24   Management.

25   Q    Okay.  And then ClearSky Management is the GP of

1    ClearSky, LP.  Correct?

2    A    Correct.

3    Q    Which, it's your testimony, has no equity interest in

4    SkyCom.

5    A    Today it does not.

6    Q    Okay.  May I ask you a question?  Who is the CEO of

7    SkyCom?  Not SkyPort, SkyCom.

8    A    I'm assuming it's me and that it was --

9    Q    But you don't know.  I mean --

10   A    Well, I'm assuming it's me, that the lawyers properly

11   papered this when I stepped in.  I'm assuming.

12   Q    What do you mean you stepped in?

13   A    When I became the CEO in November as a result of the

14   Chapter 11.

15   Q    Okay.  Who was the CEO prior?

16   A    Pat Brant.

17   Q    Of SkyCom?

18   A    That I'm not sure of.

19   Q    Okay.

20   A    That I'm not sure.  I'd have to look at the corporate

21   records just to see if that was all papered properly.

22   Q    Well, who asks on behalf of SkyCom?  Who signs its

23   papers; who -- on the legal side, on the business side?

24   A    Today?

25   Q    Yes.  Who runs it?

1   A    I do.

2   Q    Okay.  Is SkyCom represented in this case; have counsel?

3   A    Does SkyCom have counsel?

4   Q    Yes.

5   A    I'm assuming it is Ed Rothberg.

6   Q    Mr. Rothberg's SkyCom's counsel, non-Debtor equity

7   interest holder --

8   A    Oh, maybe --

9   Q     -- that holds a single --

10  A    Now, maybe not.  He's counsel of SkyPort.

11  Q    Right.

12  A    SkyCom we haven't really retained any --

13  Q    So it's had no representation in this case.

14  A    Of all the lawyers, probably not.  It has not

15  retained -- in this case has not retained anybody.

16  Q    So on the business side you act on behalf of SkyCom but

17  on the legal side there's nothing.

18  A    Correct.

19  Q    Okay.  How about ClearSky?  Who -- does the limited

20  partnership have representation?

21  A    Yes.  They're named in the partnership agreement as well.

22  Q    Who is that?

23  A    Wilson Boucalich [phonetic]

24  Q    Okay.  Have they appeared in the case?

25  A    No.

1    Q    Did they get notice of the case?  Do you know?

2    A    Yes.

3    Q    How so?  Did they have a creditors meeting?

4    A    They're on the entire distribution list.

5    Q    All right.  How about the general partner?

6    A    The general --

7    Q    Now, you said Balaton is the --

8    A    Yes.

9    Q     -- partner of the general partner or is the --

10   A    Yes.  Balaton receives everything so by default

11   ClearSky's getting it as well.

12   Q    And does ClearSky have separate legal representation?

13   A    ClearSky Management?

14   Q    Uh-huh.

15   A    Well, the conflict is identified in the partnership

16   agreement, that Wilson represents all the parties there.

17   Q    Let me make sure I understand what the plan is that's

18   being proposed, and that is on the effective date of the plan

19   SkyCom --

20   A    Yes.

21   Q     -- will merge into SkyPort.  Is that correct?

22   A    Correct.

23   Q    Okay.  And the equity interest holders of SkyCom, which

24   you assert is Balaton and some others that we're not talking

25   about right now.  They will become the equity interest holders

1    of SkyPort.  Isn't that right?

2    A    Correct, if that's the --

3    Q    And then --

4    A    If that's the mechanical way it works.

5    Q    And then being the equity interest holder to the debtor,

6    those equity will be expunged and Balaton will receive as a

7    creditor 100 percent of the equity in the new debtor.  Isn't

8    that right?

9    A    Yes.  We're also a creditor right at the SkyPort level as

10   well.

11   Q    Exactly what I'm talking about.

12   A    Okay.

13   Q    Balaton has a claim --

14   A    Right.

15   Q     -- both debt and pre-petition unsecular.

16   A    Correct.

17   Q    And after this merger into SkyPort is accomplished,

18   equity gets wiped out and all the equity gets -- and the new

19   reorganized debtor gets issued the Balaton.

20   A    Correct.

21   Q    Okay.  What new money is Balaton putting in, besides the

22   defining --

23            MR. ROTHBERG:  Your Honor, this goes beyond standing

24   issue.

25            MR. MITCHELL:  I'll withdraw the question, Your

1    Honor.  It's a fair point.

2              **THE COURT:**  All right.

3              **MR. MITCHELL:**  Your Honor, I have no further

4    questions.

5              **THE COURT:**  Mr. Rothberg, any redirect?

6              **MR. ROTHBERG:**  Yes, sir.

7              **THE COURT:**  Please.

8              **REDIRECT EXAMINATION OF ROBERT KUBBERNUS**

9    **BY MR. ROTHBERG:**

10   Q    Turn in Mr. Mitchell's notebook to that Exhibit 3.

11   That's capitalization roll-out table.  Are you there?

12   A    I'm here.

13   Q    Okay.  Look at the second page of the spreadsheet.

14   A    The back page or the --

15   Q    Yes, the back.  It's on the back page.

16   A    I have it.

17   Q    And you see up the page a way there's a Balaton Group,

18   Inc., amount of shares.

19   A    Yes.

20   Q    How much is that?

21   A    431,963,000.

22   Q    And what percent is that?

23   A    Fifty-eight percent.

24   Q    Okay.  Now, let's look down at Balaton Direct.  Where it

25   says Balaton Direct, to your understanding, what does that

1    mean?

2    A    Well, Balaton has, through the whole process over the

3    three years directed -- invested directly in all the various

4    entities with its own capital.

5    Q    Okay.  So would you take the 58.61 percent and then add

6    the 9.8 percent?

7    A    Possibly.  I don't have the spreadsheet to do the

8    calculations so I can't -- I'd have to run the numbers

9    reverse, forward and backward to make sure that the math does

10   work.

11   Q    Okay.  Look at the next line item.  It says ClearSky GP

12   Balaton

13   A    Yes.

14   Q    Is it -- and how much percentage is owned by ClearSky GP

15   Balaton?

16   A    14.64 according to this.

17   Q    Is it your understanding that that means that's owned by

18   ClearSky, LP?

19   A    No, it's not.

20   Q    Who's it owned by?

21   A    The general partner.

22   Q    Okay.  Not by the LP.  Right?

23   A    Correct.

24   Q    So if you added up the 58 and the 9 and the 14, wouldn't

25   that be Balaton's ownership, based on this table?

1    A    Correct.

2    Q    Okay.  Now, I think you testified that that -- does this

3    purport to be a representation of the register, shareholder

4    register, of SkyCom at whatever time it was produced which it

5    has no date on it?

6    A    It's a roll-out table so it's not a share register; it's

7    not a --

8    Q    Okay.  So was this -- this was prepared in connection

9    with some merger activity.

10   A    I believe so.

11   Q    So is it fair to say that this is just projection of what

12   the equity would look like?

13   A    Yes.

14   Q    So this is not an accurate depiction of what the

15   ownership interest in SkyCom looks like.

16   A    Yes.  And I'm jumping off that page and don't mean to do

17   that to you but when I look at the writing on the other side,

18   it's talking about a rights offering, CPC which is a form of a

19   public entity in Canada.  So I'm looking at this language

20   assuming that this is dealing with the potential of rolling

21   into a public shell.

22   Q    So is this -- and then when you look at the next few

23   pages there's some other projections.  Is that correct?

24   A    Yes.

25   Q    So in your view, does this document accurately depict the

1    ownership interest of SkyCom at any particular time?

2    A     No.  No, it's projection on if certain events happen is

3    what it looks like.  If I were reading this roll-out table and

4    then I look at the rights offering in here and the pricing on

5    the rights offering, CPC existence, merger of Lavelle

6    [phonetic] and SkyCom, which is a transaction that never

7    happened, step 2, step 3, with a rights offering, which is a

8    further investment into SkyCom -- I'm assuming that's

9    referring into SkyCom; Lavelle to public RTO step 4, and then

10   a bunch of further analysis after that.

11   Q     Okay.  Let's look now at Exhibit Number -- at Draco's

12   Exhibit Number 1.  And you remember Mr. Mitchell asked you a

13   few questions about that.  That was the offering memorandum to

14   acquire -- for ClearSky to acquire stock in SkyCom.  Right?

15   A     Yes.

16   Q     Just look at the first page and read the second -- the

17   first line of the second paragraph.

18   A     The maximum proceeds of this offering, if completed, will

19   support the acquisition and restructuring of SkyCom and

20   SkyPort by the partnership.

21   Q     Did this memorandum contemplate the completed offering of

22   $10 million?

23   A     Yes.

24   Q     And where does that show on the memorandum?  Does that

25   show right up at the top where it says 10,000 per unit,

1    maximum a thousand units?

2    A    Yes.  And then 10 million off to the side.

3    Q    And I think you already testified that 10 million was

4    never raised.  Correct?

5    A    Correct.

6         **MR. ROTHBERG:**  No further questions, Your Honor.

7         **THE COURT:**  Any recross, Mr. Mitchell?

8         **MR. MITCHELL:**  No, Your Honor.

9         **THE COURT:**  All right.  You can step down, Mr.

10   Kubbernus.

11        **(Witness excused.)**

12        **THE COURT:**  Mr. Rothberg, do you have any other

13   witnesses you want to call?

14        **MR. ROTHBERG:**  Your Honor, we would like to call Mr.

15   Whitworth but Mr. Ray had worked with Mr. Whitworth regarding

16   his testimony, so if I could have him ask the questions.

17        **THE COURT:**  That's fine.

18        **MR. ROTHBERG:**  We've kind of split up the work.

19        **THE COURT:**  That's fine.  No problem with that.

20        Come on forward.  Ms. Attaway will swear you in.

21        **(Whereupon, the oath was administered to the witness.)**

22        **THE COURT:**  Once you get situated, if you'd state

23   your full name for the record and spell your last name.

24        **THE WITNESS:**  Douglas Whitworth, W-H-I-T-W-O-R-T-H.

25        **THE COURT:**  Thanks, Mr. Whitworth.

1          Mr. Ray, please.

2          Can I have you move that microphone just a

3    little bit towards you there.  Thank you, sir.

4              **DIRECT EXAMINATION OF DOUGLAS WHITWORTH**

5    **BY MR. RAY:**

6    Q    Mr. Whitworth, what is your current job?

7    A    CFO of SkyPort.

8    Q    What qualifications do you have to me a chief financial

9    officer?

10   A    I'm a CPA; I had six years with KPMG, been doing

11   accounting for over 20 years now.

12   Q    When you were --

13             **THE COURT:**  Hold on a second.  Can I ask you to move

14   closer.  Can you pull that mike toward you a little bit

15   further.

16             **THE WITNESS:**  Yes.

17             **THE COURT:**  There you go.  Thanks.

18   **BY MR. RAY:**

19   Q    Okay.  So you're a CPA; you were with KPMG for six years.

20   When you were with KPMG, what did you do?

21   A    Primarily an auditor.

22   Q    You did audit work.  Now, has the debtor produced audited

23   financial statements prior to the bankruptcy proceedings?

24   A    Yes, we have.

25   Q    How many years of audited financial statements?

1    A    From inception 2002 forward.  The last audit was for

2    2007.

3    Q    Okay.  And were you -- when did you start working for the

4    debtor?

5    A    In June of 2006.

6    Q    Have you been present when the debtor's books and records

7    were audited?

8    A    Yes.

9    Q    Were you present when the auditors inquired as to the

10   shares and the share ownership of the debtor?

11   A    Yes, I was.

12   Q    What happened when the debtor's auditors asked for shares

13   and who did they say owned them?  Who did the auditors

14   conclude owned them?

15   A    Well, basically we worked off of a list of shareholders

16   that they then proceeded to do their audit procedures on that

17   list of shareholders.

18   Q    Okay.  How -- audit procedures test the facts of what has

19   been proposed by the debtor.  Is that correct?

20   A    Yes, that is correct.

21   Q    Okay.  So they tested the debtor's audit -- the share

22   register.  Is that true?

23   A    Yes.

24   Q    And who did they conclude owned the shares of the debtor,

25   the majority of the shares of the debtor?

1    A    Well, per my understanding and recollection they had a

2    complete list of shareholders and Balaton was listed as the

3    primary shareholders of the company.

4    Q    Okay.  The majority shareholder.

5    A    Yes.

6    Q    Okay.  With SkyCom's books -- and this was one audit for

7    SkyCom and SkyPort.  Right?

8    A    That is correct, yes.

9    Q    You were present for that.

10    A    Yes.

11    Q    You actually saw.

12    A    I was present for the 2007 -- 2005, 2006 and 2007 audits.

13    Q    Okay.  Did you ever see or here any -- that the auditors

14    conclude that ClearSky owned shares in the debtor?

15    A    No.  I was not aware that ClearSky was a shareholder of

16    SkyCom.

17    Q    Okay.

18           **MR. RAY:**  Pass the witness, Your Honor.

19           **THE COURT:**  Mr. Mitchell, any cross?

20           **MR. MITCHELL:**  No questions, Your Honor.

21           **THE COURT:**  All right.  You can step down.  Thanks.

22        **(Witness excused.)**

23           **THE COURT:**  Mr. Rothberg, Mr. Ray, any other

24    witnesses?

25           **MR. ROTHBERG:**  No other witnesses, Your Honor.

ADRIEN POULIOT -- DIRECT BY MR. MITCHELL                108

1          **THE COURT:**  All right.  Mr. Mitchell, do you want to

2     call any witnesses?

3          **MR. MITCHELL:**  Yes, Your Honor.  I'd like to call

4     Mr. Adrien Pouliot, president of Draco Capital.

5          **THE COURT:**  All right.  Thanks.

6          Mr. Pouliot, come on forward.  Ms. Attaway will

7     swear you in.

8      **(Whereupon, the oath was administered to the witness.)**

9          **THE COURT:**  Once you get settled in, if you would

10    state your full name for the record and spell your last name.

11         **THE WITNESS:**  Adrien Pouliot, P as in Peter,

12    O-U-L-I-O-T.

13         **THE COURT:**  Thanks.

14             Mr. Mitchell, please.

15         **MR. MITCHELL:**  Thank you, Your Honor.  I did hand

16    his business card to the court reporter, too, just to make

17    sure we had it spelled correctly.

18         **THE COURT:**  Thanks.

19             **DIRECT EXAMINATION OF ADRIEN POULIOT**

20    **BY MR. MITCHELL:**

21    Q    Mr. Pouliot, since this is your first time testifying in

22    this courtroom, why don't you please take a minute to explain

23    to the Court who you are, who Draco Capital is and what you

24    believe its relationship is to this case.

25    A    Well, I've been in business for 25 years, Your Honor.

ADRIEN POULIOT -- DIRECT BY MR. MITCHELL

1    I've been involved with -- I practiced law for five years

2    first and then I joined my father's business in broadcasting

3    in Canada in 1984 and became chief operating officer, chief

4    executive officer.  This was a public company that went, like

5    all companies, through ups and downs, and did some

6    restructuring there also.  Back in the early '90s we sold that

7    business for total enterprise value of close to $700 million

8    in 1997.

9           And then I bought a business, also in the

10   telecommunications field, which I turned around and improved

11   profitability by 2000 percent and basically sold that one to

12   Bell Canada in 2005.  And then I decided to take more of a

13   backseat approach and diversify my approaches and my

14   investments so I invested in -- I'm now invested in four

15   companies through Draco Capital and that's my personal holding

16   company.

17   Q    Draco Capital -- let me take a step back.  When did you

18   first become involved with either the Balaton Group or Mr.

19   Robert Kubbernus, and kind of explain how that relationship

20   evolved.

21   A     Through a mutual acquaintance, Mr. Robert Mendel, we -- I

22   met Mr. Kubbernus in 2005.  Mr. Kubbernus approached me to

23   invest a partnership ClearSky Investments, LP, the purpose of

24   which was to take SkyPort out of bankruptcy and operate it and

25   hopefully I'd make money and sell it.

1    Q    When did this occur?

2    A    This was in 2005, as I recall.  2005-2006.

3    Q    2005.  Okay.  Did these discussions take place over a

4    period of time?

5    A    Yes.  We met a number of times.  I did some due

6    diligence.  The first step that I agreed to was to loan money

7    to the company and then after that that loan was converted to

8    equity -- to equity in ClearSky.

9    Q    In ClearSky.  Okay.  I'd like to turn your attention to

10   Exhibit 1 and that's in the thin notebook.

11   A    Yes.

12   Q    Take a look at that document.  Do you recognize the

13   document?

14   A    Yes, I do.

15   Q    What is that?

16   A    It's a confidential information memorandum that Mr.

17   Kubbernus gave me with respect to the proposed investment in

18   ClearSky Investments.

19   Q    Okay.  What was your understanding as to the investment

20   that he was soliciting?  What would ClearSky receive in

21   exchange for raising capital?

22   A    Well, the idea was that ClearSky would eventually become

23   the shareholder of SkyCom/SkyPort.

24   Q    Okay.  And did you understand that the goal was to raise

25   $10 million?

1    A    Yes, I did.

2    Q    Okay.  And that was either through conversations with Mr.

3    Kubbernus or reading the document or how?

4    A    Correct, both.

5    Q    Both.  Okay.

6    A    And also the partnership agreement.

7    Q    Okay.  What was your understanding as to what would

8    happen if the full 10 million wasn't raised?

9    A    Then -- the restructuring was driven by Mr. Kubbernus and

10   the Balaton Group.  Watershed was really not -- it was not

11   really an operating entity and never came in the picture

12   really.  So Balaton and Mr. Kubbernus came in, worked to take

13   the company out of Chapter 11, and the idea was that we would

14   raise $10 million to take it out of Chapter 11.  And if the

15   whole $10 million was raised then the interest that Balaton

16   had acquired by, for example, making an agreement with

17   CenturyTel to buy debentures -- basically, you know, all of

18   the ownership that they had acquired through this

19   reorganization would flow to -- would be assigned to ClearSky

20   in proportion to the amount raised out of this capital raised.

21   Q    And are those called participation interests?  Is

22   that --

23   A    Right.  Exactly.

24   Q    That's how -- is that routine in business dealings --

25   A    Yes, yes.

1    Q    -- in your experience.

2    A    Sure.

3    Q    Please take a look at Exhibit 2.  Well, let me

4    ask -- before we go into Exhibit 2, let me ask you another

5    question.  Ultimately did you -- or excuse me, did Draco make

6    a capital contribution, an investment in ClearSky?

7    A    Yes.  Draco invested $3-1/2 million into ClearSky.

8    Q    Okay.  Did others invest in ClearSky?

9    A    Yes.  There was about $7 million raised in ClearSky.

10   That was not enough money.  It turned out that it was enough

11   money initially to take the company out of Chapter 11 and we

12   did the deal that, way and the way that the $3 million

13   shortfall was dealt with is that ClearSky was supposed to buy

14   a debenture from CenturyTel and pay $3 million.  Because we

15   didn't have that $3 million we simply paid CenturyTel through

16   a note.  So we got all of the interests that were purported to

17   be purchased here with 7 million instead of 10 million.  So we

18   had the whole thing but we paid CenturyTel with a note instead

19   of paying them cash.

20   Q    Do you know whatever happened with that note to

21   CenturyTel?

22   A    Well, that note was supposed to be repaid and within a

23   year it was not repaid.  It became a default but CenturyTel

24   never called the note back.  And there was an -- actually it

25   was half a million dollars that was paid of the 3 million and

1   the $2 1/2 million that was still outstanding was exchanged

2   for a note owed by SkyCom, I think.

3   Q    Now, when the $7 million was raised, was it your

4   understanding that ClearSky held the participation interest in

5   SkyCom, that it should have held.

6   A    Yes.  And it was my understanding that we held 100

7   percent ownership.

8   Q    And why was that your understanding?

9   A    Well, because we did the deal.  I mean, we found another

10  way to do the deal and we needed only $7 million.  We didn't

11  need the 10 million; we needed the 7 million to acquire all of

12  the rights.  And so my understanding was that we had 100

13  percent.

14  Q    And I guess, how was that understanding?  Who told you?

15  What type of documentation was given to you?  How did you come

16  to that understanding?

17  A    Well, you know, I supposed I just looked at the

18  documentation.  We had a discussion --

19  Q    You say "we"?  I'm sorry.

20  A    Mr. Kubbernus and I.

21  Q    Oh, this is Mr. Kubbernus.

22  A    Yes, sure.

23  Q    That's what I'm trying to get.  Okay.

24  A    Absolutely.  And there was never -- I don't recall any

25  conversation saying, well, you know, we have transferred only

1    70 percent of the interest.  My understanding was through

2    conversation that, yes, we owned -- we, meaning ClearSky,

3    owned 100 percent.  Now, we owned 100 percent and, of course,

4    the GP, according to the partnership agreement, has a right

5    when the whole things get liquidated if we sell.  He gets a

6    right to -- he gets a kicker, if you want, of 30 percent.  But

7    the ownership was to be with ClearSky Investments, LP.

8    Q    Now, these types of situations, though, in your

9    experience, is it common for the stock to be held in a certain

10   person's name?

11   A    Well, I mean, you know, you can -- you know, I've been

12   myself a general partner in limited -- public and traded

13   limited partnerships.  And normally the general partner would

14   sign documents or would act saying I'm the general partner

15   acting on behalf of limited partnership.  In this case the

16   documentation afterwards was signed by Balaton but, no, I

17   didn't feel like I did because ClearSky Management was owned

18   by Balaton, so I didn't really object to that.  But in my mind

19   it was always clear that ClearSky was the owner of all these

20   units, of all these shares.

21   Q    After the transaction closed did Mr. Kubbernus ever

22   address you and other investors as the shareholders?

23   A    Absolutely.

24   Q    And this would be how, through correspondence, meetings?

25   How did that occur?

1    A    Well, all the time.  I mean, you know, basically I

2    understand that Mr. Kubbernus wanted to deal with the public,

3    deal with bankers, investors, as, you know, representing

4    Balaton and ClearSky being kind of in the back, and I didn't

5    really mind about that.  I mean, if you wanted to show that

6    Balaton was a big company and, you know, nice website and make

7    that representation, that was fine.  But it was already clear

8    in my mind together that, you know, all this was owned by

9    ClearSky.  And -- well, I mean, we've talked about the

10   financial statements; that kind of confirmed.

11   Q    Well, I want to talk about financial statements.  Exhibit

12   2, please, on the small -- do you have that open?

13   A    Yes.

14   Q    Okay.  The email below the one where he forwarded it to

15   me but the email from Mr. Kubbernus to Adrien Pouliot on

16   October 28.  Do you see that?

17   A    Yes.

18   Q    Okay.  Do you recall getting this email?

19   A    Yes.

20   Q    Okay.  And then I'd like you to take a look at the

21   documents behind the email and familiarize yourself.

22   A    And these were attached to the email.

23   Q    All of these.  Please go through them all.

24   A    Everything was attached, yes.

25   Q    Okay.  You're convinced of that.

1    A    Yes.

2    Q    All right.  Now, the very last two pages of those

3    documents --

4    A    Yes.

5    Q     -- we have two signatures.  Do you recognize those

6    signatures?

7    A    I seem to have Mr. Kubbernus.

8    Q    Okay.  On both pages.

9    A    On both pages.

10    Q    Okay.  Now, these documents were attached to the email.

11    What did you understand these documents to be?

12    A    I understood these documents to be the consolidated and

13    non-consolidated financial statements of ClearSky.

14         **MR. ROTHBERG:**  Offer them first.  He said they were

15    attached but I don't think I remember Mr. Pouliot saying they

16    were attached.

17         **THE WITNESS:**  They were attached.

18         **MR. MITCHELL:**  I'm going to offer them.

19         **THE COURT:**  He did say that.

20         **MR. ROTHBERG:**  Oh, did he?  Okay.

21         **MR. MITCHELL:**  Okay.  I'm going to have it offered

22    right now then.  I'm sorry.  I offer Exhibit 2 into evidence.

23         **THE COURT:**  Okay.  Well, if you've got page 1 --

24              Yes, Mr. Rothberg, any objection?

25         **MR. ROTHBERG:**  (No response.)

1      **THE WITNESS:**  Well, basically --

2      **THE COURT:**  Whoa.

3      **THE WITNESS:**  I'm sorry.  Sorry, Your Honor.

4      **THE COURT:**  Mr. Rothberg, any objection?

5      **MR. ROTHBERG:**  Well -- no objection.

6      **THE COURT:**  Okay.  Then the remaining pages of

7   Draco's Exhibit 2 are admitted.

8      **(Draco's Exhibit 2, page 2 and following, received.)**

9      **THE COURT:**  Please, Mr. Ray.

10     **MR. MITCHELL:**  Thank you.

11  **BY MR. MITCHELL:**

12  Q    Do you remember receiving this email?

13  A    Yes, I do.

14  Q    Okay.  Did it surprise you that you received this email?

15  A    Oh, no.

16  Q    Why not?

17  A    Because I was -- first, I was the director of ClearSky

18  Management and secondly, I -- my company, Draco, was the

19  largest investor, or one of the largest investors in ClearSky.

20  Q    And what did you understand Mr. Kubbernus to be asking

21  you to do here?

22  A    Well, he wanted me to sign the consolidated and non-

23  consolidated financial statements of ClearSky as a member.  He

24  mentioned board member of the LP but what he meant was board

25  member of the GP.  An LP doesn't have a board.  It's

1    governed -- it's managed by the GP.  And I was a director of

2    the GP.  And I had asked to be a director of the GP when I

3    converted this loan I was talking about earlier into the

4    equity of ClearSky.

5    Q    Okay.  So -- and these were the consolidated and non-

6    consolidated financials of which company?

7    A    Of ClearSky.

8    Q    Of ClearSky.  Okay.  These financial statements, did you

9    ever sign them?

10   A    No.

11   Q    Okay.  The financial statements -- in fact, these

12   financial statements were sent to you after SkyCom had -- or

13   excuse me, SkyPort had filed a Chapter 11.  Isn't that right?

14   A    They were sent to me on October 28.

15   Q    Okay.  Do the financial statements make any

16   representations with respect to ClearSky's ownership or

17   investment in SkyCom?

18   A    Yes, they do.

19   Q    Okay.  Could you please point out to the Court where that

20   is established in these documents.

21   A    (Perusing documents.)  Okay.  If you go into -- you have

22   to look at the non-consolidated financial statements which is

23   like the second group of -- well, basically, the third page of

24   Tab 2.  You have ClearSky Investments, LP, non-consolidated

25   financial statements.  So that gives you the picture of what's

1    in ClearSky.  And if you go into assets, long-term assets, you

2    have investment and convertible debenture, note --

3    Q    What page are you on?

4    A    I'm on page 2 of the non-consolidated financial

5    statements December 31, 2006, of ClearSky.

6    Q    Page 2.  Okay.

7         **MR. MITCHELL:**  Your Honor, are you there?

8         **THE COURT:**  Let me ask -- you're looking at the page

9    where it says long-term investments, investment in convertible

10   debenture, note 5, $3 million.

11        **THE WITNESS:**  Correct, Your Honor.

12        **THE COURT:**  I'm with you.  Go ahead, Mr. Mitchell.

13        You have that page, Mr. Mitchell?  In other words,

14   your witness and I are on the same page; you're not there yet.

15        **MR. MITCHELL:**  I am not there but now I am.

16        **THE WITNESS:**  Now we're on the same page.

17        **MR. MITCHELL:**  All right.  Now, sir.  And I think I

18   interrupted Mr. Pouliot's answer to tell everybody to get the

19   same page.

20   **BY MR. MITCHELL:**

21   Q    Go ahead, please.

22   A    So basically this page confirms -- confirmed that

23   ClearSky Investments was the investor or held the investment

24   in the convertible debentures and investments in common shares

25   that are explained further in note 5 and 6.

ADRIEN POULIOT -- DIRECT BY MR. MITCHELL

1    Q    And where is note 5 and 6?

2    A    And note 5 and six basically says that --

3    Q    I'm sorry.  Which page is that on?

4    A    I'm on page 8 --

5    Q    Eight?

6    A     -- of the notes.

7    Q    So that's about three pages back to page 8.

8    A    Right.

9    Q    And would that be, just for everybody's reference,

10   starting with the paragraph 4 on the top, due from subsidiary?

11   A    Right.  That's that page.  And what we're looking at are

12   notes 5 and 6.  Note 5 says that Balaton purchased from

13   CenturyTel the convertible debentures for $20 million face

14   value which are convertible into the common shares of SkyCom.

15   And then I think the relevant paragraph here is the following

16   paragraph which says, Balaton Group, Inc., assigned its

17   interest in SkyCom to the partnership.

18   Q    Anything else?

19   A    Well, I think note 6 is also relevant.  If you look at

20   the first paragraph it explains that Balaton Group provided $4

21   million under the security purchase agreement to acquire the

22   units or the shares of SkyCom.  And then the third paragraph

23   says, these common shares were then assigned to ClearSky

24   Investments, LP.

25   Q    At any time did Mr. Kubbernus advise you that the shares

1    of SkyCom were not held by ClearSky?

2    A    Never.

3    Q    These documents say "draft for discussion."  Why would

4    they have that stamp on there.

5    A    I don't know, particularly because they were signed by

6    Mr. Kubbernus, so I'm not sure why they had this "draft for

7    discussion."  He wanted me to sign draft for discussion

8    documents and normally you don't sign them -- you don't ask

9    your director to sign them when they're in draft form, you

10   say.  You ask the director to sign them when they're final.

11   So I assume that he had not mistakenly sent the draft forms

12   instead of the finals.

13   Q    You've read the partnership agreement for ClearSky LP?

14   A    Yes, I have.

15   Q    Are you aware of any provision in the partnership

16   agreement which would allow Balaton to foreclose on shares?

17   A    No, sir.

18   Q    I'd like you to turn to Exhibit 3, please.

19   A    Yes.

20   Q    Okay.  Do you recognize Exhibit 3?

21   A    Yes.  This is an email that Mr. Kubbernus sent to the

22   board of directors of SkyPort.

23   Q    Okay.  It discusses a rights offering and cap table roll-

24   out.

25   A    Right.

1    Q    What did you understand that transaction to be?

2              **THE COURT:**  What page are you on?

3              **MR. MITCHELL:**  I'm sorry.  Exhibit 3, page 1, Your

4    Honor.  It's the email from Mr. Kubbernus to several different

5    people.

6              **THE COURT:**  I'm with you.  Okay.

7              **THE WITNESS:**  So this email is --

8              **THE COURT:**  Hold on.  What's the question again?

9              **MR. MITCHELL:**  I'm sorry.  The question is -- it

10   describes a cap table roll-out and I just asked him what was

11   his understanding of the transaction.

12             **THE COURT:**  All right.  Thanks.

13             **THE WITNESS:**  Well, first, this is an email that was

14   sent by Mr. Kubbernus to the whole board as well as cc to

15   David Samuels who was the CFO of Lavelle which was a kind of a

16   satellite company; Jim Vetter, who was the controller of

17   Lavelle System; and Brogan Taylor, who was the vice president,

18   asset management, of Balaton Group, and who

19   basically -- Mr. Taylor was the one who kind of looked after

20   all of the asset management of Balaton.

21                  So we were in the throes of trying to find more

22   financing for SkyPort/SkyCom and one of the proposals that

23   Mr. Kubbernus had come up with was to the do a transaction

24   that's allowed under Canadian securities law to fund start-ups

25   and small businesses.  And so the idea was to merge -- take

1    the existing structure as it stood -- and merge it with a

2    shell.  And it's kind of a reverse takeover.  And this merger

3    was public so you kind of reverse takeover the business and it

4    becomes public by doing that, by doing it that way.

5              So Draco is the holder of the units of ClearSky

6    and is going to be this proposed reverse takeover by this

7    public shell and I wanted to know what am I going to end up

8    with; you know, what's the end result of this merger?  I'm

9    going to become owner of the shares of this new public entity

10   and I just wanted to understand how many shares of that new

11   entity I would have.  This was a relatively complex

12   transactions; there was a lot of things happening.  There was

13   going to be a merger of Lavelle and SkyCom; then this was

14   going to be a rights issue; then this was going to be a public

15   reverse takeover of that shell to Lavelle.  So it was quite a

16   fairly complex transaction.  So I asked Mr. Kubbernus -- I

17   said what is the end result --

18             **MR. RAY:**  Your Honor --

19             **THE WITNESS:**   -- of all this.

20             **MR. RAY:**  Sorry.  At this point I think he's gone

21   on.  I don't think --

22             **THE COURT:**  I agree.  I think I need some more Q and

23   A on this one.  I'll sustain the objection.

24   **BY MR. MITCHELL:**

25   Q    Let's go ahead and take a look at the first page of the

ADRIEN POULIOT -- DIRECT BY MR. MITCHELL

124

1    roll-out table.

2    A    Right.

3    Q    Do you see that?

4    A    Yes.

5    Q    It says current ownership step one, SkyCom

6    percent -- what did you understand that to mean?

7    A    This was the current situation.

8    Q    The current situation for what, for who?

9    A    For the whole -- this was the cap table or the

10   shareholder list, the current shareholder list when Mr.

11   Kubbernus sent me this email on June 17, 2008.

12   Q    And that's shareholders of SkyCom.

13   A    Of SkyCom.  Correct.

14   Q    Okay.  All right.  Now, if you can turn to the next page;

15   that's on the back side of that page.

16   A    Yes.

17   Q    Can you go down to where it says Balaton Group, Inc., see

18   below?  Do you see that?

19   A    Yes.

20   Q    And then there's a 58.61 percent.

21   A    Correct.

22   Q    Okay.  And then below that you have Balaton Direct,

23   ClearSky GP and ClearSky LPs.  Do you see that?

24   A    Yes, I do.

25   Q    Okay.  When you read this table did you understand what

1    that meant?

2    A    Yes, I did.

3    Q    And what did you understand that to mean?

4    A    Well, basically you have the table which shows total of

5    736 million -- well, 737 million shares.  These were all the

6    shares outstanding of SkyCom in that within those 737 million

7    shares, Balaton was the registered shareholder for 432

8    million.  And that 432 million represented 58, 58 percent of

9    the stock.  And that was basically what was registered in the

10   corporate records.  It doesn't mean that you're the beneficial

11   owner; it just means that you're registered.  And then below

12   that you have a breakdown -- that's where it says, see below.

13   You have a breakdown of what that 432 million shares are and

14   basically you have Balaton Direct, where Balaton held directly

15   9.8 percent of the shares, and then you had the combination of

16   ClearSky GP/ClearSky LP which was the other 48 percent.  And

17   my understanding was that if at the end of the day this whole

18   transaction occurred and we -- and basically ClearSky was

19   amalgamated or dissolved or wound up into this public company,

20   ClearSky would no longer exist and we would hold shares of

21   this public company.  So the LPs would get their share and the

22   GP would get his share.  Under the partnership agreement, when

23   there is a dissolution the GP has a right to get as a, I

24   guess, as a reward for his efforts he gets 30 percent of the

25   assets and the LPs get 70 percent of the assets.  So since

1    ClearSky was being dissolved what this meant is that the GP

2    Balaton, and this was basically, not the GP, but the

3    subsidiary but no Balaton, was going to get 14.6 percent of

4    that wind-up of ClearSky and the LPs would be 251 million

5    shares which was the 34 percent.

6    Q    Again, so this is basically -- is it a fair

7    statement -- it's kind of a realization of the economic

8    interest in the investment.  Is that right?

9    A    Correct.

10          **MR. MITCHELL:**  If I can approach, Your Honor

11          **THE COURT:**  Sure.

12   **BY MR. MITCHELL:**

13   Q    So your investment is here from Draco into ClearSky LP.

14   A    That's right.

15   Q    And that investment is how much?

16   A    Three and a half million dollars.

17   Q    Okay.  Have you read the debtor's plan?

18   A    Yes.

19   Q    And do you understand what the debtor is proposing to do

20   with respect to the collapse of SkyCom into SkyPort?

21          **MR. RAY:**  Your Honor, I'm going to object on the

22   basis of relevance.

23          **MR. MITCHELL:**  It goes exactly to the relevance,

24   Your Honor.

25          **THE COURT:**  I'll limit.  It's overruled, Mr. Ray.

1    It goes to the issue of economic interest.

2                    I'll overrule.  You can proceed.

3              **MR. MITCHELL:**  Thank you, Your Honor.

4    **BY MR. MITCHELL:**

5    Q    Do you understand what the debtor is proposing with

6    respect to its plan vis-a-vis collapsing SkyCom into SkyPort?

7    A    Oh, yes, I do.

8    Q    Okay.  And what will be the impact of your investment in

9    ClearSky if that is allowed to happen?

10   A    My investment is wiped out.

11   Q    Okay.

12             **MR. MITCHELL:**  No further questions, Your Honor.

13             **THE COURT:**  Mr. Ray, cross?

14                  **CROSS-EXAMINATION OF ADRIEN POULIOT**

15   **BY MR. RAY:**

16   Q    Mr. Pouliot, I've never met you before.  My name is Hugh

17   Ray.  I'm counsel for the debtor.

18             Real quick, do you hold an original share

19   certificate for the debtor?  You don't, do you?

20   A    Me personal -- no, no.

21   Q    You don't hold one for SkyCom either.  Right?

22   A    You mean Draco, I suppose.  No.

23   Q    Okay.  You're represented individually by Vinson Elkins

24   or just as Draco?

25   A    I'm represented --

1          **MR. MITCHELL:**  And I'll stipulate we only appeared

2     on behalf of Draco but depending on where these questions go I

3     may need to confer and take a recess.  I don't know where he's

4     going with this.

5          **MR. RAY:**  Rule 2019.

6          **THE COURT:**  Okay.  Do you want a break to visit with

7     him?

8          **MR. MITCHELL:**  No, I don't think I need to.  I mean

9     I'll let him take a few more questions if that's all right,

10    Your Honor, and see where it's going.

11         **THE COURT:**  All right.  Mr. Ray, go ahead.

12    **BY MR. RAY:**

13    Q    Does Vincent Elkins represent you individually or --

14    A    I don't think so but I can hire them right now.

15    Q    Okay.  But they represent other companies.  Right?

16    A    Sorry?

17    Q    They represent other companies that you have an interest

18    in.

19    A    Well, they represent Draco.

20    Q    To your knowledge they don't represent any other company

21    that you have an interest in.  Right?

22    A    To my knowledge, correct.

23    Q    Now, the financial statements that you were looking at

24    that were Exhibit Number 2, Draco's Exhibit Number 2, those

25    were 2006 financial statements.  Right?

1    A    That's correct.

2    Q    Not 2007, not 2008.  Right?

3    A    Correct.

4    Q    Okay.  Let's back up.  In 2006 you paid $3.5 million to

5    ClearSky.  Right?

6    A    Correct.

7    Q    Did you get, at any time from 2006 until the day you

8    walked in this courtroom, a share certificate of SkyCom?

9    A    I did not.

10   Q    And from 2006 until the day you walked in this courtroom,

11   did you demand a share certificate of SkyCom in writing?

12   A    I did not.

13   Q    Did you hear Mr. Whitworth's testimony earlier --

14   A    Yes, I did.

15   Q     -- about the audit?  Any reason to disbelieve anything

16   he said?

17   A    Well, I would say that Mister -- if I had been counsel I

18   would have asked Mr. Whitworth, who gave you the shareholder

19   list?

20   Q    Okay.

21   A    So, you know, I'm not disbelieving -- I'm sure Mr.

22   Whitworth's testimony is true in his view.  My issue though

23   is, first of all, the register -- the corporate

24   register -- doesn't give you who are the beneficial owners and

25   secondly, it's not clear who gave Mr. Whitworth the list.

1    Where did the list come from?

2    Q    Let me ask you another question.  Have you ever seen an

3    original share certificate of SkyCom with your own eyes?

4    A    Yes.

5    Q    Okay.  Did it have an endorsement on it that restricted

6    its transfer any designated beneficial interest?

7    A    There was a restriction, yes.

8    Q    Okay.  Did it say anything about ClearSky?

9    A    No, it didn't.

10   Q    Okay.  You have -- do you have any reason to disbelieve

11   that the audited financial statement -- well, let's put it

12   this way.  You're not an auditor.  Right?

13   A    Correct.

14   Q    You haven't paid for an independent audit of SkyCom or

15   SkyPort.

16   A    Not directly.

17   Q    And as a board member of SkyCom and SkyPort you would

18   have signed off on the audits in 2007.  Right?

19   A    Correct.

20   Q    And in 2007 the auditors said nothing about ClearSky in

21   their report.

22   A    Right.

23   Q    Okay.  But you signed off on them anyway.

24   A    Right.

25   Q    Wait a minute.  You said you had this beneficial interest

1   in SkyCom and yet you're signing off on financial statements
2   that don't say anything about ClearSky.
3   A    That's right.  There's no problem with that.  If you're
4   the registered shareholder of a company --
5   Q    Sir, could I ask --
6   A    -- it doesn't mean you have a beneficial --
7        **MR. MITCHELL:**  Your Honor, Your Honor --
8        **THE COURT:**  Hold on a minute.
9        **MR. RAY:**  I don't think there's a question pending.
10       **THE COURT:**  He's -- that's correct so he's answered
11  the question.  And let me say, Mr. Mitchell, you'll have a
12  chance to take him on redirect.
13       **MR. MITCHELL:**  Thank you, Your Honor.
14       **THE COURT:**  All right.  Mr. Ray, please.
15  **BY MR. RAY:**
16  Q    Are you -- you're not here to give a legal opinion as to
17  Canadian law.
18  A    Absolutely not.
19  Q    Okay.  And you're not in American law.
20  A    No, I'm not.
21  Q    Right.  And the only one who's going to determine what
22  the law is is the judge.  Right?
23  A    Right.
24  Q    Okay.  And you admit that if financial statements say
25  "draft for discussion" that you shouldn't sign them.  Right?

ADRIEN POULIOT -- CROSS BY MR. RAY

1    A    Well, normally you don't sign "draft for discussion"

2    financial statements, normally.

3    Q    Because they're drafts.  Right?

4    A    Well, because they're drafts; they could be wrong.  But

5    normally if the CEO of the company sends you a document

6    which -- sends you "draft for discussion" financial statements

7    which he has signed, then I would think that they're no longer

8    "draft for discussion."

9    Q    Sir, aren't you on an audit committee of a university in

10   Canada?

11   A    Yes, I am.

12   Q    And as a member of an audit committee of a university in

13   Canada, even if someone signs off on something, are you just

14   going to take it at face value or are you going to do some

15   diligence?

16   A    Well, I wouldn't -- I would ask him why is it still draft

17   for discussion.

18   Q    Ah.  Did you do that here?

19   A    No, I didn't.

20   Q    Okay.  And as a member of an audit committee -- what

21   university is that in Canada that you're a member of the audit

22   committee?

23   A    McGill University.

24   Q    McGill?

25   A    McGill University.

1    Q    Okay.  And as a member of that audit committee, would you

2    have allowed the CEO of McGill to submit financial statements

3    with his signature on them with the word draft for discussion

4    written on them?

5    A    I would have told him you should sign the financial

6    statements without draft for discussion.

7    Q    Thank you.

8            **MR. RAY:**  No more questions, Your Honor.

9            **THE COURT:**  Mr. Mitchell, any redirect?

10           **MR. MITCHELL:**  Yes, Your Honor.

11           **THE COURT:**  Please.

12               **REDIRECT EXAMINATION OF ADRIEN POULIOT**

13   **BY MR. MITCHELL:**

14   Q    Mr. Pouliot, there was discussion with respect to you

15   being on the audit committee.  What university is this again?

16   A    McGill University.

17   Q    All right.  And in fact, with respect to the audit

18   financials that have been discussed, you approve the audit

19   financials.  Is that right?

20   A    At McGill?

21   Q    No, no, no.

22   A    Oh, sorry.

23   Q    I'm sorry.  At SkyPort, I believe.  These are the

24   Deloitte audit financials.

25   A    You're talking of the ClearSky or the SkyCom?

1    Q    Well, there was some discussion.  That's what I'm trying

2    to find out, what he was asking you.  You signed off on

3    some -- there was some question and answer about you signing

4    off on audited financials that didn't mention ClearSky.  Do

5    you recall that on your cross-examination?

6    A    I did not sign SkyCom financial statements.

7    Q    Okay.

8    A    And I did not ClearSky financial statements.

9    Q    What financial statements of any of these entities, other

10   than Draco --

11   A    I would have signed off on SkyPort financial statements,

12   signed -- I mean, approved SkyPort financial statements

13   because they are -- I was on the board of SkyPort.

14   Q    Okay.  And those are the financial statements which don't

15   reference ownership by ClearSky.  Is that right?

16   A    No, the SkyPort financial statements -- what we have here

17   are the SkyCom financial statements, but the SkyPort financial

18   statements would simply say that the only shareholder is

19   SkyCom.  Right?  So that's -- sure, I mean, that's -- so

20   that's not a problem.

21   Q    Okay.  With respect to who I represent, I'm not sure

22   where that went, but who made the investment in ClearSky?

23   A    Draco.

24   Q    Who bought the claim from Mr. Skinner or whatever his

25   name was?

1    A    Skimmons.  Draco did.

2    Q    Draco.  Okay.  All right.  So the party with the economic

3    interest that appearing in this Court today is Draco Capital.

4    A    Correct.

5    Q    Okay.  That's who my law firm represents.

6    A    Correct.

7    Q    Have you ever, or -- excuse me, has Draco ever retained

8    Vinson & Elkins to your knowledge for anything else?

9    A    No.

10   Q    Okay.

11         **MR. MITCHELL:**  Your Honor, for the record, if we

12   ever did appear on another party, we would certainly file a

13   2019 statement.  If there's -- one of my colleagues with a big

14   firm has an appearance on here I don't know about I probably

15   don't -- we represent Draco.  Thank you.  No further

16   questions.

17         **THE COURT:**  Any recross?

18         **MR. RAY:**  Yes, Your Honor.

19         **THE COURT:**  All right.

20         **RECROSS-EXAMINATION OF ADRIEN POULIOT**

21   **BY MR. RAY:**

22   Q    You said something I just need to clarify.  You said

23   SkyPort has financial statements and you were on the board of

24   SkyPort.  Right?

25   A    That's correct.

1    Q    Now, actually, if you'll look at Exhibit Number 18 you

2    see there were consolidated financial statements of SkyCom and

3    SkyPort.  Right?  SkyCom --

4              **THE COURT:**  Hold on.  Hold on.  That's a question.

5    Let's let him answer that first.

6              **THE WITNESS:**  Exhibit 18?

7              **THE COURT:**  Let's let him get there too.

8              **THE WITNESS:**  Yes.  I'm sorry, but what's your

9    question?

10   **BY MR. RAY:**

11   Q    That is not a SkyPort financial statement of Deloitte;

12   it's a combination, a consolidated SkyCom/SkyPort.

13   A    Correct.  Which I would not have seen because I'm not a

14   director.

15   Q    Well, you wouldn't have seen the audited financial

16   statement of the parent company?

17   A    Correct.  I'm not on the board of SkyCom; I'm on the

18   board of SkyPort.

19   Q    In the context of attempting to do a public offering you

20   wouldn't have looked at?  Is that your testimony?

21   A    I was -- sorry.  What's the question?

22   Q    Were there any other audited financial statements of the

23   debtor besides the one that is Exhibit Number 18?  Was there a

24   separate audited financial statement done just with the

25   debtor?

1   A     Yes.

2   Q     And that's a different audited financial statement.

3   A     Yes.  I mean -- I just want to clarify.  I'm a director

4   of SkyPort.

5   Q     Right.

6   A     So the board of directors of SkyPort has the authority to

7   approve the financial statements of SkyPort, not of SkyCom,

8   not of ClearSky, not of Draco, not of anybody else.  The board

9   of SkyCom will approve the consolidated financial statements

10  of SkyCom.  In the same way as for --

11  Q     So you're saying that there was a separate audited

12  financial statement.

13  A     My recollection, yes.

14          **THE COURT:**  I'm sorry.  A separate audited what?

15  **BY MR. RAY:**

16  Q     A separate audited financial statement --

17  A     My recollection, yes.

18  Q      -- separate from its parent.

19  A     Yes.

20  Q     And you're sure about that because you saw it and you

21  approved it.

22  A     Well, my recollection is that we had different financial

23  statements for SkyPort.

24  Q     Okay.  And if Mr. Whitworth's recollection is different

25  from yours, is Mr. Whitworth incorrect?

1    A    I would probably think that Mr. Whitworth is correct.

2    Q    Okay.

3    A    And I could be mistaken.

4    Q    And Exhibit Number -- okay.  It's possible you're

5    mistaken about that and Exhibit 18 is the only financial

6    statement.  Yes.

7    A    Possibly.

8    Q    And Exhibit Number 18 is -- and I don't want to write on

9    your blackboard without permission.  If I were --

10            **THE COURT:**  Blackboard you can't.

11            **MR. RAY:**    -- the page without permission.

12            **THE COURT:**  You're welcome to write on that, Mr.

13   Ray, that is on the chart with Draco, ClearSky and so forth.

14   **BY MR. RAY:**

15   Q    Okay.  Just so the record's clear, the financial

16   statements that are Draco's Exhibit Number 2 are 2006

17   financial statements.  Right?

18   A    Correct.

19   Q    And the Exhibit Number 18 is 2007.  Right?

20   A    Correct.  2006 and 2007.

21   Q    And 2007.  Both.

22   A    That's right.  Both, right.  And the 2006 ClearSky

23   financial statements have a subsequent note --

24   Q    I saw.  I saw because --

25   A     -- which covers 2007 events.

1    Q    I understand but they're the 2006 financial statements.

2    A    Right.

3    Q    And there have never been ClearSky financial statements

4    given to you that you've seen for 2007 or 2008.

5    A    That's correct.  I've asked for them but did not get

6    them.

7    Q    Okay.  So the only financial statements you have seen for

8    ClearSky are 2006 financial statements.  Right?

9    A    Correct.

10   Q    And under the partnership that would have been before the

11   whole $10 million was raised.

12   A    Well, the $10 million was never raised.

13   Q    Well --

14   A    Actually, 7 million was raised in the partnership and

15   then 6 million was raised outside of the partnership.

16   Q    The 7 -- are you saying that the partnership agreement

17   was altered in an oral fashion or by custom?

18   A    In what sense?

19   Q    The partnership agreement's in writing.  Right?

20   A    Correct.

21   Q    And that controls the deal.  Whatever --

22   A    Yes, that's --

23   Q    Whatever other deal you may have, you agree that the only

24   deal in the partnership agreement is the written document.

25   Right?

1    A    The partnership agreement is -- the partnership is

2    governed by the partnership agreement.  Correct.

3    Q    And that agreement calls for $10 million US.  Correct?

4    A    Yes, yes.

5    Q    Okay.  It doesn't give any options for other forms of

6    consideration like Canadians.

7    A    Correct.

8    Q    Okay.  So the ClearSky financial statement was done

9    before the conclusion of the effort to raise the money to

10   obtain the shares that you're talking about.  Right?

11   A    No.

12        **(Pause.)**

13        **THE WITNESS:**  Those financial statements -- do you

14   understand my answer?

15        **THE COURT:**  Hold on.  You answered his question.

16        **THE WITNESS:**  Okay.

17        **THE COURT:**  Mr. Ray, your next question.

18        **THE WITNESS:**  All right.

19   **BY MR. RAY:**

20   Q    When you acquired the plan of Mr. Skimmons, how much did

21   you pay him?

22   A    $1,500 US.

23        **MR. MITCHELL:**  Your Honor, this goes well beyond the

24   scope of a recross; however, I'm happy to indulge Mr. Ray so

25   long as I'm not limited if I need to get up and do some

1    redirect.

2          **THE COURT:**  I'll certainly give you a chance for

3    redirect.  I think when you were last asking him questions you

4    inquired about who purchased the claim and he said Draco, so I

5    think Mr. Ray is probably -- to that extent the door was open

6    for him to ask this question.  You will have an opportunity

7    for redirect.

8          **MR. MITCHELL:**  Okay.  I was telling you that in

9    response to who I represented, but understood --

10   **BY MR. RAY:**

11   Q    Mr. Skimmons was paid with a check?

12   A    Correct.

13   Q    That agreement was discussed in email?

14   A    Correct.

15   Q    And the email and the check were not filed with the

16   Bankruptcy Court, were they?

17   A    I haven't filed anything but I guess you should ask my

18   lawyer, but I don't think so.

19   Q    Thank you.

20          **MR. RAY:**  That's all.

21          **THE COURT:**  Redirect, please.

22          **MR. MITCHELL:**  I'll try to keep it limited, Your

23   Honor.

24          **FURTHER REDIRECT EXAMINATION OF ADRIEN POULIOT**

25   **BY MR. MITCHELL:**

1    Q    The big book, Mr. Pouliot, the debtor's Exhibits.

2    A    Yes.  Exhibit?

3    Q    Exhibit 18, please.

4    A    Eighteen, yes.

5    Q    Okay.  These are purported to be the SkyCom Technology

6    Corporation audited financials.

7    A    Correct.

8    Q    Did you review and sign these financials?

9    A    I did not sign them and my recollection was that I

10   approved SkyPort financial statements.  But if Mr. Whitworth

11   said that there were no SkyPort financial statements, then I

12   must have approved these.

13   Q    Do you recall signing these?

14   A    I don't recall.

15   Q    Okay.  All right.  But Exhibit 2 in the small notebook,

16   Draco's exhibits --

17   A    Yes.

18   Q    All right.  These were signed by Mr. Kubbernus, weren't

19   they?

20   A    Yes, they were.

21   Q    Okay.  And they were delivered to you by Mr. Kubbernus.

22   A    Yes, sir.

23   Q    Now, if you could take a look at about three to four

24   pages back there's a cover letter from -- it looks like an

25   auditor, whoever prepared the financial statements.  Do you

143

1  see?  It says chartered account number.

2  A    Yes, I do.

3  Q    Okay.

4        THE COURT:  Hold on, Mr. Mitchell.  You're on

5  Draco's Exhibit 2?

6        MR. MITCHELL:  Yes, sir.

7        THE COURT:  And what page?

8        MR. MITCHELL:  One, two -- the back side of the

9  third page back.

10        THE COURT:  All right.  The one that says, review

11  engagement report.

12        MR. MITCHELL:  Yes, sir.

13        THE COURT:  All right.  I'm with you.  Thanks.

14        MR. MITCHELL:  Okay.

15        THE WITNESS:  I'm not sure I have the right page

16  here.

17        THE COURT:  You can approach if you want to get him

18  on the same page.

19        MR. MITCHELL:  This one right here, cover letter

20  inside.

21        THE WITNESS:  Oh.  Which -- okay, the first ones.

22  Okay.

23  BY MR. MITCHELL:

24  Q    Do you have your chartered accountant slip?  Is that the

25  name of a firm?

144

1    A    No.

2    Q    No.  Okay.  Do you know who prepared these?

3    A    No.

4    Q    Okay.  This is a cover letter by somebody who purports to

5    prepare them.  Is that right?

6    A    Correct

7    Q    All right.  And what's it dated?

8    A    July 27, 2007.

9    Q    2007.  Okay.  Well, when did the ClearSky Investment and

10   offering close when the initial shares of SkyCom were

11   acquired?

12   A    In 2006.

13   Q    In 2006.

14   A    Yes.

15   Q    So these were prepared subsequent to that closing of that

16   transaction.

17   A    Yes.

18   Q    Okay.  In fact, they were delivered to you by Mr.

19   Kubbernus even a year after that.  Isn't that right?

20   A    Yes.

21            **MR. MITCHELL:**  No further questions, Your Honor.

22            **THE COURT:**  Mr. Ray, any further recross?

23            **MR. RAY:**  No, Your Honor.  I would like to call Mr.

24   Whitworth.

25            **THE COURT:**  Okay.  Well, hold on.  Let me ask Mr.

1    Mitchell if he has any --

2              You can step down.  Thank you.

3         **(Witness excused.)**

4              **THE COURT:**  Do you have any other witnesses?

5              **MR. MITCHELL:**  No, Your Honor, I do not.

6              **THE COURT:**  All right.  Mr. Ray, you can recall Mr.

7    Whitworth for rebuttal purposes.

8                   Mr. Whitworth, you been sworn so we don't need

9    to swear you in again; you can just take the stand.

10                  Please.

11        **(Witness recalled.)**

12             **DIRECT EXAMINATION OF DOUGLAS WHITWORTH**

13   **BY MR. RAY:**

14   Q    Mr. Whitworth, as the chief financial officer of the

15   debtor, are you familiar with the consolidated and audited

16   financial statements --

17   A    Yes.

18   Q     -- prepared by Deloitte and Touche.

19   A    Yes, I am.

20   Q    Were they always consolidated with SkyCom Technologies

21   Corporation, the parent?

22   A    That is correct.

23   Q    You sure of that?

24   A    Yes.

25             **MR. RAY:**  That's all I have, Your Honor.

1          **THE COURT:**  All right.

2          **MR. RAY:**  Oh, I guess I -- I'm sorry.

3          **THE COURT:**  All right.

4          **MR. RAY:**  If I may be allowed.

5     **BY MR. RAY:**

6     Q    Were there ever separate financial statements prepared

7     just for the debtor SkyPort that were audited by auditors?

8     A    There was no audited financial statements prepared just

9     for SkyPort.

10         **MR. RAY:**  Thank you, Your Honor.

11         **THE COURT:**  All right.  Mr. Mitchell, any cross?

12         **MR. MITCHELL:**  Yes, sir.

13              **CROSS-EXAMINATION OF DOUGLAS WHITWORTH**

14    **BY MR. MITCHELL:**

15    Q    Were there any unaudited financial statements prepared

16    for SkyPort?

17    A    Yes, there were internal unaudited financial statements.

18    Q    Okay, unaudited financial statements.  And were those

19    financial statements ever circulated to the directors of

20    SkyPort, to your knowledge?

21    A    Yes, they were.

22    Q    Okay.  They were circulated.  And that would include

23    individuals like Mr. Pouliot.

24    A    Yes.  That's correct.

25    Q    Okay.  All right.  And these are consolidated financials

1    in Tab 18.  Isn't that right?

2    A     That is correct.

3    Q     Okay.  But internally there are separate financial

4    statements that are maintained by the company --

5    A     Yes.

6    Q      -- for SkyCom and SkyPort.

7    A     That is correct.

8          **MR. MITCHELL:**  No further questions, Your Honor.

9          **THE COURT:**  All right.  Any redirect?

10         **MR. RAY:**  No questions.

11         **THE COURT:**  You can step down.

12       **(Witness excused.)**

13         **THE COURT:**  Okay.  I think we're ready for closing

14   arguments.  Am I right, Mr. Rothberg, Mr. Mitchell?  Mr.

15   Rothberg or Mr. Ray, you can make closing arguments.

16              It's 12:10.  Why don't I give each of you no

17   more than five minutes, and then, frankly, I'm going to give

18   you all a lunch break while I noodle the issues.  And I'll

19   come -- after lunch I'll make a ruling and we'll try to go

20   from there.

21              Mr. Rothberg, please.

22         **MR. ROTHBERG:**  All right.  I think we've already

23   argued about this purchase of the claim so I don't want --

24         **THE COURT:**  Yes.  I feel comfortable that that has

25   been argued.  I've got my notes; I just need to --

1            **CLOSING ARGUMENT ON BEHALF OF THE DEBTOR**

2            **MR. ROTHBERG:**  Your Honor, as to the issue of

3    standing of Draco we would urge the Court that in order to

4    have standing according to the opinion you gave us, a party

5    has to be a creditor or an equity holder.  Mr. Pouliot

6    admitted that he has no stock certificate.  He has none;

7    ClearSky has none; Draco has none in SkyPort.  He is not a

8    creditor of SkyPort.  Setting aside Skimmons he is not an

9    equity holder in SkyPort; Draco's not an equity holder in

10   SkyPort.

11            He is claiming that he has some type of

12   beneficial interest.  Okay.  I don't think the facts are

13   really in dispute.  I think the facts were pretty consistent.

14   So the question is really does this beneficial interest raise

15   him to the level of standing.  But the problem is is that

16   that's where there is a dispute.  There's a dispute between

17   Balaton and ClearSky and Draco as to whether they had a

18   beneficial interest.  That's not an issue for this Court to

19   decide.

20            That has -- I would submit, Your Honor, the

21   Court has no jurisdiction over ClearSky, no jurisdiction over

22   ClearSky Management, no jurisdiction over Draco.  If they want

23   to dispute who owns what, they can go dispute that in Canada

24   court; they can dispute it in state court.  It has no bearing

25   on this case whatsoever.  And the -- so I would submit, Your

1    Honor, that since Draco is not a creditor of SkyPort, not a

2    shareholder of SkyPort, it's not a shareholder of SkyCom

3    either, that they do not have standing to make this argument,

4    this Position today.

5           Now, would there be someone who might have

6    standing, possibly ClearSky Management, Inc., the general

7    partner of ClearSky, possibly?  But even then you would still

8    have the dispute as to whether the shares were owned by

9    Balaton or owned by ClearSky Management and whether there was

10   some percentage ownership difference, and that's all for

11   litigation for another day.  So --

12           **THE COURT:**  All right.  Thanks, Mr. Rothberg.

13           Mr. Mitchell.

14   **CLOSING ARGUMENT ON BEHALF OF DRACO CORPORATION**

15           **MR. MITCHELL:**  Your Honor, I don't read this your

16   decision.  I didn't have much of a chance to look at it but

17   obviously you know it inside and out.  I don't read it as

18   narrowly as Mr. Rothberg would have the Court interpret it and

19   I'm reading here, I think you cited the API decision.  To meet

20   the requirement of a constitutional standing, a party must

21   show it has suffered an injury in fact that is concrete and

22   particularized in actual or imminent fairly traceable the

23   challenged action of the opposing party which would be the

24   debtor here likely to be redressed by a favorable decision.

25           Party must have a personal stake.  Now, you do

1     go on which talk -- and you do suggest that you can't be

2     asserting a third party's rights.  Mister --  and I want to

3     address that head on.  And Mr. Rothberg says, well, wait a

4     minute.  Maybe if somebody does have standing that would be

5     ClearSky.  Well, who controls ClearSky?  Mr. Kubbernus.  Who

6     controls the LP?  Mr. Kubbernus.  Who controls Balaton?  Mr.

7     Kubbernus.  Who controls SkyCom?  Mr. Kubbernus.  Who was

8     retained by Mr. Kubbernus to represent all those parties'

9     interests in this transaction which collapses a non-debtor

10    into a debtor and wipes out Draco's investment?  There's

11    nobody, Your Honor.

12                There is a clear, direct economic impact on

13    Draco's interest if this plan is confirmed and I don't read

14    the party for standings as literally or -- excuse me -- as

15    tightly -- in fact, I'd to quote a decision from the First

16    Circuit.  "Party interest encompasses not only an entity's

17    holding claims against the debtor but an entity who pecuniary

18    interest might be directly and adversely affected by the

19    proposed action."  That's the Western Auto Supply decision,

20    the First Circuit, Your Honor.  I'm happy to read the cite if

21    you'd like it, but I think we've established that here.  We're

22    not asking the Court to try non-debtor litigation; it's the

23    debtor's plan that is wiping out equity interest of a non-

24    debtor.  I can't hammer that home hard enough, Your Honor.

25                THE COURT:  I think necessarily I have to, for

1   purposes of today's ruling, I necessarily have to make a

2   decision as to whether ClearSky, Inc., owns some kind of

3   interest in SkyCom.  I don't think I've got any choice but to

4   make that decision unless you tell me --

5          **MR. MITCHELL:**  That's -- no, no, no.  That's

6   correct, Your Honor.  And here's why.  It's because the debtor

7   has proposed a plan that basically improperly subsequently

8   consolidates a non-debtor into a debtor and expunges the

9   equity interest.  They've asked you to approve a plan that

10  expunges a non-debtor's equity interest and therefore the

11  debtor has put that issue before the Court.  You do have to

12  decide, Your Honor, or otherwise, don't confirm the plan on

13  bankruptcy grounds.  And we do think it's non-confirmable for

14  that very reason regardless of who the equity interest holders

15  are.  That's non-confirmable.

16          But nevertheless, we believe we've met the

17  minimal requirements of a party-in-interest for the direct

18  economic impact of what's going on here and we ought to have

19  the opportunity to raise and be heard for all purposes in the

20  confirmation.

21          **THE COURT:**  Thank you.

22          **MR. MITCHELL:**  Thank you, Your Honor.

23          **THE COURT:**  It's 12:15.  Why don't we take a break

24  till 1:30.  And let me noodle through these issues, look at

25  the exhibits, and, frankly, do a little research.  I'll come

1   back out and make a ruling at 1:30 and then we'll go from

2   there.  Okay.  You can leave everything in the courtroom; no

3   one's going to come in here and rifle your papers.  I'll see

4   you back at 1:30.  I appreciate the arguments and the

5   professionalism that y'all have shown.  I certainly think I

6   understand what the arguments are.  So the burden's on me.

7            Thanks.

8       **(End Volume I at 12:17 p.m.)**

9

10

11

12

13

14

15   *I certify that the foregoing is a correct transcript from*

16   *the electronic sound recording of the proceedings in the*

17   *above-entitled matter.*

18   */s lmartin*

19   _____

20   *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

21   *JTT JOB/INVOICE # 27746; VOLUME I OF II; PGS. 1-152*

22   *DATE: AUGUST 24, 2009*

23

24

25            * * * * *
            *Judicial Transcribers of Texas, Inc.*