IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 08-36737-H4-11 |
| | § | HOUSTON, TEXAS |
| SKYPORT GLOBAL | § | |
| COMMUNICATIONS, INC., | § | FRIDAY, |
| | § | AUGUST 7, 2009 |
| DEBTOR. | § | 2:06 P.M. TO 4:23 P.M. |

<u>#157 OBJECTION TO CLAIM</u>
<u>#265 CONFIRMATION HEARING</u>
<u>#290 MOTION TO APPROVE MODIFICATIONS TO PLAN</u>

<u>VOLUME II OF II, PAGES 153 - 225</u>

BEFORE THE HONORABLE JEFF BOHM
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

SEE NEXT PAGE

COURTROOM DEPUTY:  EVANGELINE ATTAWAY

COURT RECORDER:  PAULA CRAWFORD

PREPARED BY:

JUDICIAL TRANSCRIBERS OF TEXAS, INC.
P.O. Box 925675
Houston, Texas 77292
(713) 697-4718 (office) ◊ (713) 697-4722 ( fax)

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
                        APPEARANCES:


    FOR THE DEBTOR:                  EDWARD L. ROTHBERG, ESQ.
                                     HUGH M. RAY, ESQ.
                                     WEYCER KAPLAN PULASKI
                                      & ZUBER
                                     11 GREENWAY PLAZA, SUITE 1400
                                     HOUSTON, TX  77046


    FOR AEGIS TEXAS VENTURE, LP:     JASON M. RUDD, ESQ.
                                     DIAMOND MCCARTHY TAYLOR
                                      & FINLEY, LLP
                                     909 FANNIN, SUITE 1500
                                     HOUSTON, TX  77010



    FOR DRACO CAPITAL:               JOHN E. MITCHELL, ESQ.
                                     JASON IVASCU, ESQ.
                                     VINSON & ELKINS, LLP
                                     2001 ROSS AVE., SUITE 3700
                                     DALLAS, TX  75201


    FOR DIGITAL NETWORKS, LLC:       JOSHUA EPPICH, ESQ.
                                     PORTER & HEDGES, LLP
                                     1000 MAIN ST., 36TH FLOOR
                                     HOUSTON, TX  77002-6336

    FOR BALATON GROUP, INC.:         C. MICHAEL BLACK, ESQ.
                                     2444 TIMES BLVD., SUITE 222
                                     HOUSTON, TX  77005

    FOR ADVANCED PROJECTS
      INTERNATIONAL:                 CALVIN C. BRAUN, ESQ.
                                     ORLANDO & BRAUN LLP
                                     3401 ALLEN PARKWAY, SUITE 101
                                     HOUSTON, TX  77019

    FOR CENTURY TEL:                 REBECCA KINCHEN, ESQ.
                                     REX RAINACH, ESQ.
                                     ATTORNEY AT LAW
                                     3622 GOVERNMENT ST.
                                     BATON ROUGE, LA  70806-5720
```

### INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DOUGLAS WHITWORTH | | | | |
| by Mr. Ray | 189 | . | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|

See Volume I for Exhibits.

1    **Houston, Texas; Friday, August 7, 2009; 2:06 p.m.**

2                                    **RULING**

3         **THE COURT:**  Okay.  Now we're going to return to

4    SkyPort Global Communications, Inc., Case Number 08-36737.

5    And we're on the confirmation hearing, although at this point

6    we're on a discreet issue, and that is whether Draco,

7    D-R-A-C-O, is a party-in-interest with standing to prosecute

8    an objection to the plan that has been filed and is up for

9    confirmation.

10              I don't think there's any doubt that I've got

11   jurisdiction over this dispute under 28 U.S.C. Section 1334,

12   28 U.S.C. 157(b)(2)(A), (b)(2)(O), certainly under the general

13   catch-all of 157(b)(2), even though it's not necessarily in

14   the enumerated list.  This kind of proceeding could only arise

15   in a Chapter 11.  I suppose it's a core proceeding under 28

16   U.S.C. 157(b)(2)(L) as in Larry, because it relates to

17   confirmation of the proposed plan.

18              And I've heard -- this is on the debtor's

19   objection to Draco having standing -- I''ve heard testimony

20   from Mr. Kubbernus, Mr. Whitworth, and I'm sure I will

21   mispronounce his name, but Mr. Pouliot.  And I think all of

22   them, and so find, that they are all credible witnesses.  I

23   didn't find anybody trying to dodge answering the questions

24   posed to them, or somehow being evasive or otherwise

25   dishonest.  So I think they're all credible.

1          The applicable law -- let's see, we've got,

2     first of all, and I'll cite the opinion that I handed out,

3     it's the one I wrote in *Cypresswood Land Partners*, which is

4     2009 Westlaw 136021, although I'm just citing other law.  And

5     this is on definition of a party-in-interest under 1109(b).

6     There are enumerated categories:  one is whether if you're a

7     creditor -- and that's one of the reasons, one of the bases

8     that Draco is arguing, is that it is a creditor by virtue of

9     holding a claim from the notice of transfer and assignment

10    that it filed, which is Docket 298.

11          The docket sheet in the main case was filed

12    on August 2, 2009, which noticed a transfer of Draco Capital,

13    Inc. purchasing the claim of Brian Skimmons, S-K-I-M-M-O-N-S,

14    for it looks 20,823.03 is the claim amount.

15          And then in the alternative, the argument

16    from Draco Capital is that it's a party-in-interest because,

17    under the standards of API, which is a Minnesota Bankruptcy

18    Court case that I cited in *Cypresswood*, and then there's also

19    plenty of other case law, or at least some other case law, and

20    Mr. Mitchell cited, I think from the 1st Circuit, you're a

21    party-in-interest if -- you've got to demonstrate

22    constitutional and prudential standing.

23          Constitutional standing you've got to show

24    that you've suffered an injury in fact that's concrete and

25    particularized, and actual or imminent, fairly traceable to

1    the challenged action of the opposing party, and likely to be

2    redressed by a favorable decision.  The party must have a

3    personal stake in the outcome of the controversy as to assure

4    concrete adverseness.  The injury in fact must be palpable.

5    Injury need not be current; it can be a threatened injury.

6    That's constitutional standing.

7                    And then the prudential hurdle that you've

8    got to go over is to show that you're not asserting a

9    third-party's rights, and that you're dealing with a specific

10   injury.

11                    And let me address the issue of the notice of

12   transfer of the -- and assignment of the proof of claim.  I'm

13   going to begin by citing my colleague, Judge Barbara Hauser,

14   in the Northern District of Texas.  The findings of fact here

15   are that this notice was filed.

16                    The testimony is -- there's no documents

17   attached to this notice -- the testimony is that Mr. Skimmons'

18   claim was paid by check and that there are some email

19   communications between Draco Capital and Mr. Skimmons, the

20   email -- the particular email exchange between Mr. Pouliot,

21   who is, obviously, a principal of Draco.

22                    Judge Hauser writes -- and I've written two

23   cases that have certainly tested her arguments.  These have

24   been in my consumer cases, but I don't see any reason why they

25   shouldn't apply to the business bankruptcy case as well.

1    Let's see if I can find the language I want.

2                    Judge Hauser writes, even assuming that

3    E-Cast, which is the creditor in her case, is correct, i.e.

4    that rule 3001(e) does not require an entity who purchases or

5    takes an assignment of a claim before a proof of claim is

6    filed, even if that rule does not require filing evidence of

7    the transfer, Judge Hauser writes, Rule 3001(e) does not

8    purport to excuse a creditor's compliance with the other

9    subsections of Rule 3001.

10                   While E-Cast argues -- and E-Cast once again

11   is a creditor in her case -- that rule 3001(c) does not

12   require it to attach a transfer document to its proof of

13   claim, the Court disagrees.  Rule 3001(c) states that when a

14   claim is based on your writing, the original or a duplicate

15   shall be filed with the proof of claim.

16                   Here E-Cast's claims are clearly based on

17   certain writings, i.e. the assignment or other transfer

18   document, along with the underlying account documents.  E-Cast

19   is not the original creditor, it is an entity trying to step

20   into the original creditor's shoes by virtue of a written

21   agreement between them to which agreement the debtors were not

22   a party.

23                   In short, E-Cast's claims against the debtors

24   are based on that written assignment.  Therefore, Rule 3001(c)

25   expressly requires that an original or duplicate of that

1    writing by filed with E-Cast's proof of claim.  Nor is the

2    Court persuaded by E-Cast's argument that Rule 3001(a) does

3    not require it to file evidence of a transfer.

4            E-Cast correctly notes that Rule 3001(a)

5    provides that a proof of claim shall conform substantially to

6    the appropriate official form.  E-Cast points to Item 9 of the

7    official form that says, you know, attach supporting

8    documents, and E-Cast says, well, the laundry list of

9    documents doesn't include an assignment, so therefore they

10   don't need to attach it.

11           And Judge Hauser says, No, that's not going

12   to buy it, the form says attach supporting documents such as,

13   and that the phrase "such as" is not a limiting list, in fact,

14   it's just the opposite, it requires you to attach any such

15   documents.

16           Lastly, E-Cast urges the Court to reconsider

17   its ruling because in its view the Court really places

18   unnecessary and undue burdens on debt purchasers, and that the

19   Court's concerns about the integrity of the claims process can

20   be protected in other ways.  And Judge Hauser doesn't accept

21   that.  She says, the fact that a party's business practice

22   makes it difficult to produce evidence to prove its case does

23   not permit courts to ignore evidentiary rules in deciding a

24   disputed matter.

25           In my consumer cases I have -- and I'll cite

1    two cases I've written, one is in re *Gilbreath*,

2    G-I-L-B-R-E-A-T-H, 395 BR 356.  The other is -- that was last

3    year, that one; the other one is *DePugh*, which is 2009 Westlaw

4    1867693.  And in my *Gilbreath* case I said, look, there I've

5    got an assignee of a proof of claim who doesn't attach

6    documents evidencing that it's the assignee, and the debtor

7    objected.  I sustained the objection on the grounds that you

8    need to attach your assignment documents, or in this case

9    here, the check, the email showing that there's

10   correspondence; and the same is true in *DePugh.*

11                   And the reason for all this goes back to what

12   Judge Hauser is saying, 3001(e), which counsel argued today,

13   is when the transferor and the transfer are in a flight.  So

14   if Mr. Skimmons had come in here today and said, hey, I'm

15   still owed that claim, and Draco steps up and said, no, no, we

16   bought it, that's where you look to 3001(e).

17                   But where I've got a claimant, or an

18   assignee, an alleged assignee of a claimant versus the debtor,

19   as I read Judge Hauser's opinion on it, I think she's right,

20   I'm supposed to look at 3001(a), 3001(c) and ask, okay, have

21   documents been attached to the proof of claim or the notice of

22   transfer showing the debtor, here's how we got this claim, and

23   here's how much we paid for it.

24                   And here, no such documents were attached,

25   even though they could have been, and should have been

1   attached.  So with respect to the proof of claim and the

2   notice of transfer assignment, if you will, of Mr. -- not the

3   proof of claim, but the claim of Mr. Skimmons, I'm going to

4   find -- I find legally I conclude that Draco does not hold

5   Mr. Skimmons' claim because it has not complied by -- with the

6   appropriate rules of attaching the documents evidencing the

7   assignment, that is the check and the email exchange.

8                   Now let me go over to the other issue, which

9   is this issue of whether Draco -- whether ClearSky owns stock

10  in SkyCom.  It seems to me if ClearSky does own stock in

11  SkyCom, then Draco, as a limited partner of SkyCom, is a

12  party-in-interest because I don't think there's any doubt that

13  we would have constitutional standing and prudential grounds

14  based upon the API case insofar as this plan would clearly

15  affect ClearSky, Inc. and Draco's interest.

16                  And so as best I can tell by looking at this

17  partnership agreement, which is Debtor's Exhibit 21, there is

18  a section in here that says, Governing law, State of Delaware.

19  This is a partnership agreement that's a Delaware limited

20  partnership, that's what ClearSky Investments, L.P. is.

21                  So we were scouring, me meaning some of my

22  interns and I and the briefing clerk, for Delaware law.  Let's

23  see, we've got from the Chancery Court in Newcastle County in

24  1994, this is 1994 Westlaw 30517, 1994 Westlaw 30517.  And

25  then the other opinion is *Brown v Fenemore*, which is 1977

163

1    Westlaw 2566.

2              Those were the two cases we've found so far.

3    I guess let me start by making some comments and findings.

4    This Exhibit 21, I think, is the governing document.  I think

5    I can make findings that we've got ClearSky Investments, L.P.

6    as an entity in which Draco is a limited partner; the general

7    partner is ClearSky Management, Inc., which is a Delaware

8    corporation.

9              We've got Balaton, B-A-L-A-T-O-N, owning

10   ClearSky Management, Inc., and we have a family trust,

11   Mr. Kubbernus owns Balaton, and I don't think there's any

12   dispute that Balaton owns stock in the entity known as SkyCom,

13   the issue of how much stock, and I don't think there's any

14   dispute, and I so find, that SkyCom is the parent company who

15   owns 100 percent of the stock of SkyPort Global

16   Communications, Inc., which is the debtor entity in front of

17   me today with its plan.

18             Draco contends that ClearSky Investments,

19   L.P. owns stock in SkyCom; the debtor says, No, it doesn't.

20   This partnership agreement, and I'm now referencing this

21   page 7, the reference, and I'll quote the language, "If the

22   maximum aggregate initial class A limited partners capital

23   contributions of $10 million are completed, Balaton and

24   Watershed will assign all of their participation rights in the

25   Exhibit B agreements to the partnership, and the partnership

1     will acquire stock representing approximately 76 percent of
2     the issue now standing shares of SkyCom together with common
3     stock purchase warrants, which, if exercised by the
4     partnership, would increase its fully diluted ownership
5     position to 82 percent excluding any dilution resulting from
6     further recapitalization of SkyCom."
7                    And if we had had $10 million brought in by
8     ClearSky Investments, L.P., I don't think there'd be any
9     dispute that it owns stock in SkyCom.  The testimony is clear
10    and unequivocal from everybody that ten million was not
11    brought in, ten million in cash at least.
12                    So we have this second sentence that I'm
13    going to read, "If less than" -- and, again, this is from
14    Section 2.6 of the partnership agreement for ClearSky
15    Investments, L.P. which is Debtor's Exhibit 21 -- "If less
16    than the maximum aggregate initial class A limited partner's
17    capital contribution of $10 million were completed, the
18    partnership's participation in the acquisition and
19    restructuring of SkyCom will be proportionally reduced, and
20    Balaton and Watershed may retain any participation rights
21    which have not been assigned to the partnership."
22                    It's that language which I will say is less
23    than crystal clear to me as to what it means, but it's that
24    language that's at the center of today's dispute.
25                    I've got testimony, and I so find, that Draco

1    holds no stock certificate, never asked for any stock

2    certificate, that I've got audited financials from 2007 and

3    2008 of -- consolidated audited financials of SkyCom and its

4    sub SkyPort where there is no reference to ClearSky being a

5    shareholder.  I've got no evidence in the record about a

6    register, you know, a company register showing ClearSky.

7    Those are all findings of fact.

8                    Exhibit 1 of Draco says the maximum proceeds

9    of this offering, if completed, will support the acquisition

10   and restructuring of SkyCom and SkyPort by the partnership,

11   and to the extent words are supposed to mean something, and I

12   think they are, the word says, the phrase says "if completed"

13   which suggests to me, just like going back to the language in

14   the partnership agreement, it says, If you produce $10 million

15   in cash, you're going to get stock, which impliedly says to

16   me, if you don't, then you're not going to get stock, unless

17   there's some other provision in this thing that says you are

18   going to get stock.

19                   This second sentence, which I said was less

20   than clear to me, it is not clear to me that if you come up

21   with less than ten million, that you're going to get some

22   stock.  It's not exactly clear to me that if you don't come up

23   with less than ten million, you're not going to get some

24   stock, but this second sentence, or this last sentence in this

25   paragraph 2.6, just unfortunately is not well drafted, at

1 least on this point.

2     We've got -- I think it's fair to say that

3 all the parties here are sophisticated.  I mean I've got, you

4 know -- at least the people who testified strike me as

5 sophisticated.  Mr. Kubbernus, Mr. Whitfield [sic],

6 Mr. Pouliot have all got -- I mean I've got an accountant, a

7 comptroller, I've got a lawyer, he may be from Canada, but he

8 holds a law degree, sits on the board of a McGill University,

9 which is an extremely good university.  Mr. Kubbernus

10 obviously didn't get to where he got by being unsophisticated,

11 so I don't think I've got some kind of, you know,

12 unsophisticated person who's been duped.

13     This Exhibit 2, an exhibit that there was a

14 lot of testimony about, that is Draco Exhibit 2, with this

15 email where there's reference to the Balaton Group having

16 assigned its interest in SkyCom to ClearSky.  It says, Draft

17 for discussion, and I can only draw the inference that -- I

18 don't have any hard testimony from Mr. Kubbernus, he said, I

19 recollect from the testimony and my notes, that this was one

20 of several documents.  He could have sent it himself, or it

21 could have been sent by somebody else.

22     But as between an audited financial

23 statement -- I mean on the side of my holding, there is no

24 stock ownership by ClearSky Investments of SkyCom on that side

25 of the ledger, no pun intended.  I've got no stock

1    certificate, no evidence of any corporate ledgers showing

2    ClearSky Investments as a shareholder, audited financials

3    which seems to me the testimony given by Mr. Whitfield [sic]

4    on rebuttal establishes that Mr. Pouliot, as a director of

5    SkyPort, had to have seen those audited financials and signed

6    off on them.  I'm willing to make that finding based upon the

7    testimony.

8                     That's what I've got on the ledger side,

9    among other things, saying no stock ownership by ClearSky of

10   SkyCom, and on the other side of the ledger I've got this

11   Exhibit 2, which argues that it does own stock, although it

12   says, Draft for discussion on these documents, and the

13   documents are dated -- it says, December 31, 2006.  The email

14   is August 2 -- excuse me -- October 28 '08.

15                    I don't know -- it's still unclear to me why

16   Mr. Kubbernus was sending '06 unaudited statements to Mr.

17   Pouliot.  We're up to October of '08.  I've got in the record

18   that we've got audited financials for '07 and '08, although by

19   October of '08 you couldn't possibly have audited financials

20   for '08 done, but you sure would for '07.  Although I don't

21   have a date in the record as to when the audited for '08 --

22   '07 were finished.

23                    What I don't understand is why I got 2006

24   draft for discussion documents being sent over from Mr.

25   Kubbernus to Mr. Pouliot in October of '08.  What I do know is

1      that if you go back, take a walk down memory lane to 2006,

2      you've still got this possibility in place of $10 million

3      being brought in.

4                    So it's conceivable to me that somehow

5      these -- I don't know when these audited statements --

6      unaudited non-consolidated statements dated December 31, 2006

7      were done, but at the time they were done, it's conceivable to

8      me that the stock agreement -- excuse me -- the partnership

9      agreement 2.6 was still in play in terms of the ten million

10     was still coming in, or that there was still a chance the ten

11     million would come in, and therefore these unaudited

12     statements were assuming that the ten million were going to

13     come in, which is why we've got, you know, Balaton Group

14     assigned its interest in SkyCom, the assumption was that the

15     ten million was going to come in, and maybe that's why Draft

16     for discussion is put on here.

17                   But what I've got is a less than convincing

18     document in terms of convincing me, Gee, this shows that

19     ClearSky had gotten stock interest in SkyCom.  So when I look

20     at all the exhibits, and then I go to Delaware law, this one

21     case that I cited says, Delaware corporations may rely almost

22     exclusively on the stock ledger to determine the record

23     holders eligible to vote in an election.  Where the company's

24     ledgers show record ownership, no other evidence of

25     shareholder status is necessary.

1          One inference I can draw is where the

2   company's ledgers show no record ownership, no other

3   evidence -- and there is no other evidence of ownership that I

4   could conclude there is no ownership, it says in this case,

5   and Mrs. Testa, the woman who was claiming she had ownership,

6   couldn't produce any certificate evidencing her ownership.

7   Moreover, her name was not recorded in the company's ledger as

8   a shareholder.

9          And so the Court said, Look, there's not

10  stock certificate, no evidence in the ledger -- no evidence

11  showing that the corporate ledger had her as a shareholder,

12  and it says, "In the face of no positive evidence of ownership

13  to contradict the stock ledger, plaintiff has failed to bear

14  her burden of proof."

15          Well, here it seems to me -- I told Mr.

16  Rothberg he needed to go first, he would do enough testimony,

17  it seems to me, to meet the debtor's burden of saying, Hey, no

18  stock interest, and so the burden switched over to Draco, and

19  Mr. Mitchell appropriately put his client on the stand, and I

20  think adduced and did as good a job as he could to adduce

21  evidence and testimony that Draco does have stock ownership,

22  given the documents.

23          I'm concluding that he hasn't -- Draco hasn't

24  hurdled over its burden, based upon, again, my reading of the

25  documents, and my reading of the Delaware case law.  This

1    *Brown v Fenemore* document, or opinion, says, Preliminarily

2    it's settled that the status of a stockholder in a corporation

3    is not dependent on the issuance to him of a certificate of

4    stock, a certificate being only an indicia of ownership.

5              So I have here no stock certificate, so at

6    least there's an indicia of non-ownership by ClearSky

7    Investments of SkyCom.  But what the Delaware court here is

8    saying is that's not the only thing I should focus on, and so

9    that's why I've been looking at these other documents, and the

10   testimony, and this particular court here said, you know,

11   there was testimony adduced in the form of minutes of the

12   Board of Directors that clearly established the existence of a

13   subscription agreement between the corporation and the

14   Fenemores.

15             So here, the testimony I've got here, I don't

16   have, in my judgment, the -- I've got the existence of an

17   agreement, but in this case ten million was not brought in,

18   and this second sentence that I've read in Section 2.6 doesn't

19   convince me that if you bring in less than ten million, you

20   still get stock, also based upon the testimony that I heard

21   really from all the witnesses.

22             And it is telling to me that I've got a

23   sophisticated individual who's running Draco whose never asked

24   for a stock certificate, which I think is indicative that --

25   you would think if you thought you owned you would ask for a

1    stock certificate, or at least insist that you be in the

2    register.

3                    Even if you are friendly, or you're a

4    business associate, a sophisticated person, particularly who

5    holds a law degree, it seems to me holding a belief that his

6    company owned stock would have asked for, insisted, in fact,

7    upon stock certificates.

8                    So the Delaware statutes also discuss the

9    need to deliver a certificated security.  They also reference

10   delivery of an un-certificated security.  The reason I cite

11   it, and it's 8-301 of the Delaware Code, Commerce and Trade

12   Code, I cite it simply to show that the statute there

13   references stock certificates, and I think underscores the

14   importance that that state gives to having a stock

15   certificate; even if it's only an indicia, it's nevertheless

16   an important indicia.

17                   And in this case before me I've gotten no

18   stock certificate, and I think that's a huge strike in favor

19   of the debtor and against Draco.

20                   So those are my findings of fact and

21   conclusions of law that I make under Bankruptcy Rule 7052 and

22   9014.  To the extent any finding of fact is construed as

23   conclusion of law is adopted as such, and vice versa, I am

24   going to reduce my thoughts to writing.  I think I owe it to

25   counsel and their clients; it's easily conceivable to me that

172

1    Draco would want to appeal.

2                        And it seems to me Mr. Mitchell, and Mr. Ray,

3    and Mr. Rothberg did a good job putting on the case, and I owe

4    it them and their clients to reduce my thoughts to writing,

5    and obviously leave it to an Appellate Court, if Draco decides

6    to appeal, to tell me I'm wrong.

7                        I will, in my written, probably add and

8    reference some of the exhibits and some of the testimony.  I

9    wanted to make my ruling on the record now so that we can

10   continue to go forward, and so that obviously all the parties

11   will know where they stand in terms of the confirmation

12   hearing.  But I can assure you I will reduce my thoughts to

13   writing so that if it is upon appeal the Appellate Court will

14   have something in writing as opposed to a transcript of my

15   stream of consciousness here.

16                       Let me ask if there's any questions about my

17   ruling.  Mr. Rothberg, you first.

18              **MR. ROTHBERG:**  No, Your Honor.

19              **THE COURT:**  Mr. Mitchell?

20              **MR. MITCHELL:**  Your Honor, they're actually

21   found -- so you are finding that Draco is not a party-in-

22   interest in the proceeding?

23              **THE COURT:**  I am, yes --

24              **MR. MITCHELL:**  Okay.

25              **THE COURT:**   -- because the transfer, I find, is

173

1    unenforceable and because I find that ClearSky does not hold

2    stock in SkyCom.  It seems to me necessarily I must make the

3    legal conclusion under API that Draco does not have

4    constitutional standing and -- has not established

5    constitutional standing or prudential grounds that the API

6    case discusses because if it doesn't, if ClearSky doesn't owe

7    SkyCom, I don't see how that interest kicks -- that financial

8    interest kicks in.

9            So that is my ruling, yes.  I appreciate your

10   referencing it.  I will certainly reference it in writing.

11        **MR. MITCHELL:**  May I ask one clarification, or

12   question of the Court?

13        **THE COURT:**  Sure.

14        **MR. MITCHELL:**  Early on in his presentation, Mr.

15   Rothberg suggested that this may be related to third-party

16   disputes, and nothing is being impacted with respect to if

17   there's lawsuits outside the Chapter 11.

18            I believe that the plan, as currently drafted

19   with the exculpation provisions the effect of the releases in

20   light of the collapse it proposed, actually will have the

21   impact of basically being a third-party release.  I don't need

22   to address that before the Court.

23            But what I would like to do at the

24   appropriate time during the confirmation hearing though, is

25   ask to reconsider your ruling with respect to being a party-

1    in-interest, if I can show that the release does, in fact, and

2    the exculpations that are being granted -- or requested under

3    the plan, would  have the impact of basically being a third-

4    party release such that if my client, Draco Capital, believes

5    it has a claim against a non-debtor in this structured

6    transaction, we don't believe that any relief granted under

7    the confirmation of this plan should impact that claim.

8    That's what I'm trying to do here, is preserve that.

9                    And so I will certainly speak with

10   Mr. Rothberg separately about this, because he's made several

11   representations that's not the intent, maybe we can work that

12   out.  If we can't, I'd like to ask the Court to reconsider

13   your ruling about my standing as part -- excuse me -- Draco's

14   standing as party-in-interest with respect to that narrow

15   issue.

16            **THE COURT:**  The answer is, I will, because --

17            **MR. MITCHELL:**  Okay.

18            **THE COURT:**  -- that's a separate point from the --

19            **MR. MITCHELL:**  Correct.

20            **THE COURT:**  -- notion of stock ownership, and, in

21   fact, if I confirm a plan that, you know, that effectuates a

22   release such as Draco could not prosecute, no question you're

23   a party-in-interest.

24            **MR. MITCHELL:**  Thank you, Your Honor.  And I'll --

25            **THE COURT:**  Okay.

1          **MR. MITCHELL:**   -- visit with --

2          **THE COURT:**  Yes.

3          **MR. MITCHELL:**   -- Mr. Rothberg.

4          **MR. ROTHBERG:**  Your Honor, if I might, I did state

5     that on the record, I support that.  I can work with

6     Mr. Mitchell on drafting language for the confirmation order

7     that makes sure that that's not -- that wasn't the intention

8     and we can do like a notwithstanding anything herein; it's not

9     intended to take -- have that result.

10          **THE COURT:**  Fair enough.  Fair enough.

11          **MR. MITCHELL:**  I think we have it preserved, Your

12    Honor.

13          **THE COURT:**  Well, what I was going to say is, but I

14    will also permit, and I recognize given the time you may have

15    time to work out that language now.  If Mr. Mitchell wants to

16    stay in court, and if during the presentation of the plan

17    confirmation hearing he feels that in some way, shape, or form

18    Draco is in jeopardy based upon testimony that's being given,

19    and wants to stand up so that he gets you to the podium to

20    say, you know, it ain't so.

21               I'll let him do it for this reason, if you're

22    in some other court in some other state at some other time,

23    what I don't want to have happen is for some other attorney --

24    obviously, Mr. Rothberg, it wouldn't be you, but it might be

25    some attorney in New York or Delaware or Canada saying, Here's

1   a transcript from Bohm's hearing and this witness said X, and

2   Bohm confirmed the plan.  I want to make sure we've got a

3   clear a record as we can so that no other court, no other

4   jury, is going down that path.

5               **MR. ROTHBERG:**  Understood, Your Honor.

6               **THE COURT:**  Okay.

7               **MR. MITCHELL:**  Thank you, Your Honor.

8               **THE COURT:**  And, again, I'll reduce my thoughts to

9   writing; I'll try to do it as quickly as I can.  And I

10  appreciate the presentation everybody made.

11              Okay.  So that gets us now, confirmation

12  hearing.  We still go -- have a crammed down hearing because

13  Mr. Rudd's client's objecting.

14              Am I right?  You haven't settled?

15              **MR. RUDD:**  We haven't, Your Honor, but I would like

16  to speak to that one minute.

17              **THE COURT:**  All right.

18              **MR. RUDD:**  During the lunch break, I -- we had

19  received some reports from both sides, both the debtors and

20  from Draco, that there were discussions to try to resolve in

21  the ultimate resolution of the company.  You know, Draco has

22  put forth a motion to remain exclusivity with -- and although

23  it hasn't been to the Court for post-plan, it was at least

24  discussed with the debtors in terms of our proposed plan.

25              The idea was that there was some discussions

1    on how the debtor and Draco could work together and maybe

2    combine efforts to come up with a better deal for everyone

3    involved.  There was some discussions along those lines

4    yesterday, which weren't a party to, and my understanding is

5    progress was made, but that there were some sticking points

6    that the parties just couldn't get past.

7                   And having heard what those sticking points

8    are, I'm frankly convinced that it's kind of ludicrous that

9    they can't get over that issue.  And I think that a mediation

10   would, given the fact that we're obviously not going to

11   complete the plan confirmation today, that a mediation might

12   benefit everyone involved in order to get past that point to

13   where the debtors, creditors, Draco, everyone will wind up

14   with a better plan that's uncontested, and it gets done

15   quickly and beneficially to everyone.

16                   Now, I proposed that to both parties earlier.

17   My understanding is Draco is willing to go to mediation.  I

18   understand that the debtors are reluctant to do so because of

19   timing issues and maybe other concerns, and they can speak for

20   themselves on that, but frankly I would like to ask the Court

21   to consider that, to consider appointing a mediator in order

22   to try to resolve the remaining disputes.

23             **THE COURT:**  Mr. Rudd, I'm probably in a minority of

24   judges; I won't send people to mediation unless everyone comes

25   up to the podium, and I mean everyone who's involved, and says

1   they want it.  I won't force people into mediation.

2          **MR. RUDD:**  Understood, Your Honor.

3          **THE COURT:**  So, Mr. Rothberg, Mr. Ray, I'll look

4   over to you, if you want to mediate, I'll get everybody up to

5   the podium and you can tell me.  I have, so that you all know,

6   a fairly heavy docket.  I've got to be out somewhat so my

7   month of August is not -- I don't have a lot of time I can

8   give you subsequently.

9            So, Mr. Rothberg, I need to hear from you.

10  And by the way, I plan on going into the evening, I wasn't

11  planning on stopping at 5:00 today, if that's a concern.

12  Okay.

13         **MR. ROTHBERG:**  Your Honor, we don't believe

14  mediation would be useful, and we have to get out of

15  bankruptcy to keep this company alive.  So we just prefer to

16  go forward.

17         **THE COURT:**  Okay.  Then let's go forward.

18         **MR. RUDD:**  One other issue, Your Honor.

19         **THE COURT:**  Yes.

20         **MR. RUDD:**  I think this morning we kind of set

21  forth the schedule of how the day would go.  My understanding

22  was is that we would first address the issue as to standing

23  for Draco, and then we would then address the allegations

24  related to the bad faith solicitation.  And so my

25  understanding is that was going to be the next issue on the

1    docket.

2                      So I wanted to see if that has changed, and

3    say that my understanding is that's what we'd be doing and

4    that's what I would like to see be done at this point.

5            **THE COURT:**  Do we need to do that?  If Draco is not

6    voting, is not a party-in-interest, do we need to get into

7    that argument?

8            **MR. MITCHELL:**  Your Honor, in light of that, I

9    don't think we do, but I'd like some clarification from the

10   debtor because if I'm not a party-in-interest, and -- then I

11   don't think my objections stand, if I'm understanding, I don't

12   want --

13           **THE COURT:**  No, that's right.

14           **MR. MITCHELL:**   -- and I think probably my motion

15   for termination of exclusivity probably needs to be withdrawn,

16   and I'd be happy to do that, or whatever.

17                      So that being said, and if my vote doesn't

18   count, we do have allegations of, in responses from the

19   debtor, that they've been damaged; that, you know, sanctions,

20   I believe, have been suggested, both criminal and civil, and

21   otherwise.  I'd like to get those issues on the table.

22   Personally, I think the issue's moot.

23                      However, if the debtor's not willing to take

24   the same position, that the issue's moot, and that those

25   claims no longer need to be addressed or asserted against my

1    client, so be it.  But if he wants to continue to press those

2    claims and rights, I would ask that we not have that hanging

3    over our heads and we address that right now.

4           **THE COURT:**  Okay.  Guys, what I've got before me is

5    a confirmation hearing.  There's nothing before me against

6    Draco on bad faith, or any kind of sanctions hearing, or

7    criminal, or anything.  I've got the confirmation hearing, I

8    have the settlement with Digital Network, that was done at the

9    start.

10          What we've been doing obviously since is

11   trying to determine the scope of the confirmation hearing and

12   whether Draco was going to be a party-in-interest.  We've now

13   made that determination, so I don't think I need to get into

14   bad faith conduct with Draco as it relates to soliciting a

15   plan because Draco's not part of the confirmation hearing now,

16   and therefore it seems to me we're left with the debtor has to

17   prove up 1129(a), and because Mr. Rudd's client has objected,

18   1129(b).  Okay?

19          **MR. ROTHBERG:**  Agreed, Your Honor.

20          **THE COURT:**  So, Mr. Rothberg, it's your client's

21   burden on 1129(a) and 1129(b), and I don't even think I need

22   an opening statement; I've read the pleadings.  I think what I

23   need to do is hear testimony.

24          **MR. ROTHBERG:**  But I just -- I have a couple of

25   announcements on some objections that were made --

1           **THE COURT:**  All right.

2           **MR. ROTHBERG:**   -- that have been --

3           **THE COURT:**  That I'm certainly -- housekeeping

4     matters like that, fine.  I just don't need legal argument on

5     1129(a) and (b) up front.  I'll certainly want closing

6     arguments after the evidence has been introduced.

7           **MR. RUDD:**  And, Your Honor, I'd like to make just a

8     quick announcement when Mr. Rothberg is done.

9           **THE COURT:**  All right.

10          **MR. ROTHBERG:**  Your Honor, just very briefly,

11    before we put on the evidence, I wanted to -- we had six

12    objections to confirmation.  Intelsat was document 275 --

13          **THE COURT:**  Right.

14          **MR. ROTHBERG:**   -- and we had reached an agreement

15    with them and they voted in favor of the plan.  And so that

16    objection to confirmation is moot.  That was docket 275.

17          **THE COURT:**  Gotcha.

18          **MR. ROTHBERG:**  Hunter Communications is a party to

19    an executory contract.  They filed an objection to

20    confirmation at docket 304.  We have amended our plan Exhibit

21    A, which is the list of contracts that are being assumed and

22    rejected.  We had sent that to Hunter Communications; they've

23    agreed, and they authorize me to announce that the objection

24    is withdrawn.

25          **THE COURT:**  Okay.

182

1          **MR. ROTHBERG:**  Okay.  We had an objection from
2    CenturyTel -- oh, I'm sorry, that was docket 304 --
3          **THE COURT:**  Right.
4          **MR. ROTHBERG:**   -- we had an objection from
5    CenturyTel, docket 291.  I believe Mr. Rainach has announced
6    on the record that he withdrew 291.
7          **THE COURT:**  That is correct.
8          **MR. ROTHBERG:**  We had two objections from Draco,
9    which are 293 and 299, which I believe are now moot by virtue
10   of your ruling.
11         **THE COURT:**  Agreed.
12         **MR. ROTHBERG:**  And, Your Honor, so that the only
13   objection that I have record of was Aegis, which is docket
14   number 294.  And what I would point out, Your Honor, is
15   that -- and that objection addresses the plan prior to
16   modification.
17              We had settlement meetings with Aegis and
18   CenturyTel and reached agreements and modified the plan.  We
19   were surprised when they decided to vote no.  I assume they
20   have the right to vote no after we thought they weren't.
21              But be that as it may, I think -- and we're
22   still intending to put up our 1129(a) evidence, and our -- to
23   prove cram down on their claim down on their claim, but I
24   think that the rest of their objections should be -- is moot
25   because it's to the wrong plan.  It's to the plan that was

183

1    filed 2/23, not the plan as modified.  When the modification

2    is filed, it's the plan now as modified that's before the

3    Court, and there was no objection filed to that plan as

4    modified.

5            **THE COURT:**  Okay.  And so what you're saying is

6    that their objection, as it presently is pending in writing,

7    is not on point because your amended plan fixed some, if not

8    all of the points.

9            **MR. ROTHBERG:**  Correct, Your Honor.

10           **THE COURT:**  Okay.  I think the best thing to do,

11   Mr. Rothberg, is go ahead and adduce our testimony, and when

12   Mr. Rudd cross-examines, you're entitled to object if you

13   think he's cross-examining on a point that he objected to your

14   initial plan that's been taken care of by your amended plan.

15           **MR. ROTHBERG:**  Okay.  That's fine, Your Honor.

16           **THE COURT:**  Yes.

17           **MR. ROTHBERG:**  I'm just pointing that out.  I'm

18   not --

19           **THE COURT:**  Okay.

20           **MR. ROTHBERG:**  -- trying to duck that, putting on

21   the case or anything like that.

22           **THE COURT:**  Okay.

23           **MR. ROTHBERG:**  And with that, Your Honor, I'm going

24   to have -- Mr. Ray was going to put on our witnesses for the

25   confirmation.

184

1        **THE COURT:**  All right.  Mr. Rudd, you wanted to

2   make a statement?

3        **MR. ROTHBERG:**  Yes, I've got two things, Your

4   Honor.  The first thing is, as to our objections to the plan

5   and both the issue that we're now apparently a cram down, I

6   think if I were able to make a brief opening statement, I

7   might be able to limit it to what our particular objections

8   were to try to see -- so that -- so at least the debtors know

9   exactly, you know, what --

10       **THE COURT:**  All right.

11       **MR. RUDD:**   -- I'm after there.

12       **THE COURT:**  Please.

13       **MR. RUDD:**  The other thing is too, my client and

14  Draco, because of everything kind of flipping over on what was

15  anticipated for this afternoon, I need to speak with my client

16  for about five minutes to try to discuss completions with him.

17  But it being such --

18       **THE COURT:**  I couldn't hear you.  To?

19       **MR. RUDD:**  I need about five minutes to discuss a

20  couple of issues with my client, who's asked me if I would ask

21  for just a five minute recess so that I can confer --

22       **THE COURT:**  I'll give you five minute recess, but

23  what I want to make clear though is this, I'd allocated the

24  entire day today for this, and I figured I might go into the

25  evening.  So what I don't want to do is get stuck where, you

1  know, you come back and tell me, oh, we need another five or

2  ten minutes, and other five or ten minutes, another five or

3  ten minutes.  Okay?

4          **MR. RUDD:**  I'm not going to do that, Your Honor.

5          **THE COURT:**  Okay.

6          **MR. RUDD:**  Five minutes and we're done.

7          **THE COURT:**  You want to do an opening statement

8  first, and then talk with your client, or vice versa?

9          **MR. RUDD:**  I would like to talk with my client

10  first, if --

11          **THE COURT:**  All right.

12          **MR. RUDD:**  -- the Court will indulge me.

13          **THE COURT:**  We'll come back at three o'clock.

14  Okay.

15          **MR. RUDD:**  I appreciate it.  Thank you, Your Honor.

16          **THE COURT:**  Thanks.

17          **THE CLERK:**  All rise.

18      **(Recess from 2:52 p.m. to 3:12 p.m.)**

19          **THE CLERK:**  All rise.

20          **THE COURT:**  Please be seated.

21              Mr. Rudd, have you had an opportunity to

22  visit with our client?

23          **MR. RUDD:**  I have, Your Honor, and I used that time

24  productively to also talk with the debtors and Draco to try to

25  see what we can do to try to make this a consensual plan.

1          **THE COURT:**  Okay.

2          **MR. RUDD:**  My understanding is, is there's a

3    tentative agreement between Aegis and the debtor to make

4    modification to the treatments, so we withdraw our objection,

5    and have a consensual plan.  I believe it is subject to

6    approval at this point to CenturyTel, the other secured

7    creditor, and I don't believe we've heard back from them.

8                    Is that correct?

9          **THE COURT:**  Well, what I can do is this, I've got

10   three reaffirmation agreement hearings, which won't take very

11   long, but if you all want, I can send you out for another 10

12   or 15 minutes and ask you to come back.  Is that helpful?

13                   Why don't I ask you to come back, how about

14   at -- what is it, 3:40.  Okay.  Thanks.  Yes, Ms. Attaway will

15   open the so-called jury room, even though I don't think there

16   will ever be any juries in this courtroom, but we call it the

17   jury room just for tradition purposes, I guess.  Maybe it was

18   wishful thinking by some prior Article 1 judge that maybe

19   became an Article 3 judge.  I don't know, but she'll open up

20   the room and you all can go in there and visit, and I'll see

21   you all back at 20 of 4:00.

22         **MR. RUDD:**  Thank you, Your Honor.

23         **THE COURT:**  Thanks.

24         **MR. RUDD:**  We appreciate your patience.

25         **THE COURT:**  All right.

1        **(Recess from 3:14 p.m. to 3:35 p.m.)**

2                **THE COURT:**  Okay.  Next up, or shall I say we'll

3        return to the SkyPort Global Communications Chapter 11 case,

4        Case Number 08-36737.

5             **(Pause.)**

6                **THE COURT:**  All right.  We're back on the record in

7        the SkyPort Global Communications Chapter 11 case, 08-36737.

8                        And, Mr. Rothberg, you want to start?

9                        You all can sit down, please.  Please.

10               **MR. MITCHELL:**  May I ask a quick question, Your

11       Honor?

12               **THE COURT:**  Yes.

13               **MR. MITCHELL:**  I was hoping I might be able to --

14       I'm going to stay -- may I release Mr. Ivascu, and also my

15       client, Mr. Pouliot?  There's --

16               **THE COURT:**  Absolutely.

17               **MR. MITCHELL:**  Thank you, Your Honor.

18               **THE COURT:**  Yes.  Okay.  You all have a good

19       weekend and a safe trip wherever you're traveling.

20               **MR. IVASCU:**  Same to you.

21               **THE COURT:**  Mr. Rothberg, I'll let you come to the

22       podium, please, tell me where you all stand.

23               **MR. ROTHBERG:**  Thank you, Your Honor.  We

24       negotiated with Mr. Rudd and Aegis to slightly modify the

25       treatment that's in the modification.

1          **THE COURT:**  Okay.

2          **MR. ROTHBERG:**  The changes that -- the modification

3    provides that they have an $800,000 note payable over time,

4    and that they could convert $100,000 of that note to 5 percent

5    equity interest --

6          **THE COURT:**  Okay.

7          **MR. ROTHBERG:**   -- in the company.  We're going to

8    delete that provision and just give them 5 percent equity

9    interest in the company currently.

10          **THE COURT:**  Okay.

11          **MR. ROTHBERG:**  And I believe with that change,

12    which we can do, I think, in the confirmation order, I believe

13    that Mr. Rudd is willing to withdraw his objection and vote to

14    accept the plan.

15          **THE COURT:**  Mr. Rudd?

16          **MR. RUDD:**  That's correct, Your Honor.  Thank you

17    for your patience and giving us a chance to confer.  But we

18    have reached that agreement along the lines Mr. Rothberg said.

19    I think we can include it in the confirmation --

20          **THE COURT:**  Okay.

21          **MR. RUDD:**   -- order, and we'll withdraw our

22    objection to the plan and be willing to support the plan as

23    modified with the agreement announced on the record.

24          **THE COURT:**  All right.  Thanks.

25                Then it seems to me then we just need to

189

1    prove up -- tell me if you disagree -- on the 1129(a)

2    elements.

3            **MR. ROTHBERG:**  Correct, Your Honor.

4            **THE COURT:**  Okay.  Let me ask you to go ahead and

5    do that.

6            **MR. ROTHBERG:**  Okay.  I'm going to turn that over

7    to Mr. Ray.

8            **THE COURT:**  All right.  Mr. Ray?

9            **MR. RAY:**  Thank you, Your Honor.

10              I call to the stand Douglas Whitworth.

11           **THE COURT:**  All right.  Mr. Whitworth, come

12    forward.  Out of an abundance of caution, let's have Ms.

13    Attaway swear you in.  I think we've already done it, but just

14    out of an abundance of caution.  Please.

15       **(Witness sworn.)**

16           **THE COURT:**  Thanks.  I mean the hearing earlier was

17    on a discreet topic, or discreet issue, so I thought let's do

18    it again.

19              State your full name for the record, and

20    spell your last name, please.

21           **THE WITNESS:**  Douglas Whitworth, W-H-I-T-W-O-R-T-H.

22           **THE COURT:**  Thanks.

23             Mr. Ray, please.

24         **DIRECT EXAMINATION OF DOUGLAS WHITWORTH**

25    **BY MR. RAY:**

DOUGLAS WHITWORTH -- DIRECT BY MR. RAY                                    190

1   Q    Mr. Whitworth, we've talked about this before, just so we

2   save some time, I'm not going to replow old ground.  You are

3   the chief financial officer of the debtor, you're a former

4   account with KPMG, you're a certified public accountant and

5   have been for decades, and you're currently -- and you held

6   the position of chief financial officer since 2006.  Is that

7   correct?

8   A    No, I was comptroller --

9   Q    Sorry.

10  A    -- since -- until November of 2008.

11  Q    Okay.  Other than that, everything else I've said is

12  correct?

13  A    That is correct.

14  Q    Okay.  So can you tell me briefly what the condition was

15  of the debtor at the beginning of this case?

16  A    You know, obviously we were in dire financial straights.

17  We had exhausted all of our resources and credit terms with

18  our vendors, we had significant vendor debt, we had gone

19  through all of the capital that we had, and we were threatened

20  to be shut down by our major supplier, Intelsat.

21  Q    Okay.  Intelsat, what was -- what were they owed at the

22  time that they threatened to shut us down?

23  A    They were owed approximately a million dollars.

24  Q    Okay.  And the Virginia -- where was the debtor being

25  managed from?

1   A    We had a team headquartered in Reston, Virginia.  Pat

2   Brandt [phonetic] was the CEO; David Samuels was the CFO of

3   Lavelle [phonetic], acting CFO of SkyCom; Jim Vedder,

4   comptroller of Lavelle, acting comptroller of SkyCom.

5   Q    Okay.  What were the salaries of the people in Virginia

6   that they were bringing in?

7   A    Pat Brandt was paid approximately 450,000; David Samuels

8   250,000; Brian Skimmons, the CEO, about approximately 200,000;

9   Jim Vedder approximately 200,000.

10  Q    Okay.  And the debtor was hemorrhaging cash?

11  A    Yes, extremely.

12  Q    Okay.  Now, all the management was in Virginia.  Where

13  was the debtor's operations?

14  A    The operations were here in Houston, Texas at our --

15  centered in Ellington Air Force Base.

16  Q    Okay.  How did the debtor -- what did the debtor start

17  doing during the bankruptcy case to stop hemorrhaging cash and

18  start a positive cash flow?

19  A    Well, we eventually shut down the Reston office --

20  Q    You shut down the Reston office?

21  A    Yes.  And --

22  Q    What was the lease like in Reston, what were the lease

23  terms up there?

24  A    I think it was a three or four lease.  I'm not sure

25  exactly.

1   Q    And how much was paid a month?

2   A    Nine to ten thousand is what I think the monthly rent

3   was.

4   Q    And that lease was rejected?

5   A    Yes.

6   Q    Okay.  What happened to the people in Reston who were

7   being paid those --

8   A    They were --

9   Q     -- very high salaries?

10  A    They were let go.

11  Q    Okay.  And where is management now located?

12  A    We were all centralized here in Houston at the teleport

13  at Ellington Air Force Base.

14  Q    Okay.  Now, what happened to -- Intelsat was providing

15  all the satellite services to the debtor, what happened to

16  those services?

17  A    We were able to successfully negotiate for an alternative

18  supplier, EchoStar, at a significantly reduced rate and

19  significantly reduced capacity, or amount of bandwidth we were

20  buying, and successfully transferred over to EchoStar from

21  Intelsat.

22  Q    Okay.  Intelsat, in addition to it million dollar

23  unsecured claim, was asserting an administrative claim in the

24  $700,000 range.  Is that correct?

25  A    Yes, that is correct.

1    Q    Okay.  And that's gone now, that's been compromised.

2    A    We were able to settle with Intelsat, yes.

3    Q    Okay.  What other actions were taken, if you recall, to

4    make the debtor a positive cash flow?

5    A    We scrubbed through all of our expenses, looked at --

6    renegotiated with Alpheus for terrestrial circuits that

7    carries all the signals through the terrestrial side.  We were

8    able to renegotiate with the electric company, switched

9    electric companies.

10            Just scrubbed down all of our expenses.  We reduced

11   staff at the teleport to just to the critical -- the bare

12   essentials of what we needed to operate.  Able to

13   significantly reduce all of our costs across the board down

14   to -- so that they were in line with our revenue.

15   Q    Okay.  So how is the revenue doing today as opposed to on

16   the first day of the case?  How's it doing now?

17   A    Well, you know, we had some drop in revenue, some

18   customers left because of the bankruptcy, or were leaving,

19   they were not able to renew.  But, you know, we were able to

20   stabilize the revenue at approximately the $500,000 range, and

21   get our expenses down to the 400- and $450,000 range.

22   Q    So what's the EBITDA every month?

23   A    It's approximately -- it runs around $50,000 a month.

24   Q    $50,000 a month positive EBITDA today.

25   A    That is correct.

1   Q    Okay.  Did you participate -- oh, and so, just for the

2   record, Intelsat's issues have been compromised, Aegis estate

3   issues have been compromised, CenturyTel's issues have been

4   compromised --

5   A    You mean settled?

6   Q    Settled, yes.

7   A    Yes.

8   Q    Sky -- CompuCom --

9   A    CompuCom.

10  Q     -- DataCom, Hunter --

11  A    Digital Networks.

12  Q     -- Digital Networks, all of these entities that had

13  issues during the bankruptcy case have all been resolved.

14  A    Yes, that is correct.

15  Q    Okay.  So did you participate in the preparation of the

16  Chapter 11 plan and the disclosure statement?

17  A    Yes, I did.

18  Q    And the amendments and modifications to the plan and

19  disclosure statement?

20  A    Yes, that is correct.

21  Q    Okay.  Can you briefly describe the terms of the plan?

22  A    Well, briefly, SkyPort is to continue operations under

23  the plan; it's to pay all of its admin expenses; priority

24  claims at plan confirmation with the exception of the taxing

25  authority which is going to be paid over time; it's to pay,

1    you know, to pay Aegis $800,000 with the modifications that we

2    just agreed to, we're going to pay them -- give them 5 percent

3    stock in SkyPort; CenturyTel is to be paid 1.5 million on a

4    monthly basis, and that's going to be amortized over 15 --

5    Q    Not 1.5 million a month --

6    A    Yes.

7    Q    -- 1.5 million --

8    A    Amortized over 15 years with a balloon at year five.

9    Q    Okay.  With monthly payments.

10   A    Yes, and the same true with Aegis is that 800,000 is

11   going to be paid monthly -- on a monthly basis amortized over

12   four years with a balloon at year three.

13   Q    Okay.  What happens to the unsecured creditors?

14   A    The unsecured creditors will be paid $300,000.

15   Q    Right.  And I think we discussed earlier today that

16   Balaton that holds equity and an unsecured claim and a DIP

17   claim is forfeiting whatever claims it has as DIP lender, an

18   unsecured lender and equity interest holder, that those have

19   been cancelled, and new equity is being issued to Balaton.

20   A    That is correct.

21   Q    All right.

22   A    And I think that all equity holders in SkyPort will be

23   extinguished.

24   Q    Okay.  In SkyPort.  And now what are the net operating

25   loss carry overs -- can you explain to the Court real quick,

1    an NOL carry over, what is that?

2    A     Well, basically it's a net operating loss which is

3    basically if you have a tax loss of a million dollars, the IRS

4    allows you to offset future income with that million dollars.

5    So if I lost a million dollars this year, next year and I

6    earned a million dollars, I can offset that with --

7    Q     Okay.

8    A     -- the past NOL.

9    Q     Okay.  So what are the NOLs of SkyCom and its parent?

10   A     SkyCom has an approximately $15 million NOL, and Sky --

11   well, excuse me, SkyPort --

12   Q     The debtor, SkyPort.

13   A     -- the subsidiary, yes --

14   Q     The subsidiary.

15   A     -- has a $15 million NOL, and SkyCom, the parent

16   company, has an approximately $2 million NOL.

17             **THE COURT:**  Can I ask you to put that chart back?

18             **MR. RAY:**  Over there?

19             **THE COURT:**  No, no, just flip the page back.

20             **MR. RAY:**  Oh, okay.

21             **THE COURT:**  Thanks.  It just helps me --

22             **MR. RAY:**  Yes, which one is the sub.

23             **THE COURT:**  That's correct.

24   **BY MR. RAY:**

25   Q     So we've got $15 million at the sub, and about $2 million

1    at the parent.

2    A    That is correct.

3    Q    Now, the change -- there was a change in the original

4    plan and the modified plan.  Correct?

5    A    That is correct.

6    Q    The original facility -- what was the major change

7    between the original and the modified?

8    A    Well, the major change was that -- there were two plans,

9    or two treatments for the secured lenders under the original

10   plan, either they were going to be paid 800,000 for their

11   combined debt, split however we could agree -- they could

12   agree on, or 1.5 -- it was 1.7 million paid out over time.

13   The 800 would be paid lump sum; 1.7 over time.

14   Q    Okay.  And how did this -- the modification which you've

15   described as the current treatment, how did that affect the

16   unsecured creditors, positively or negatively?

17   A    It affected them positively.  Basically with -- under the

18   original plan, with all -- you know, I believe that the

19   secured lenders had a total claim of approximately $5 million,

20   you take the 800,000 that they were going to get, that would

21   leave a $4.2 million unsecured claim that went into the

22   unsecured pool.

23         Now with -- they are getting the combined $2.3

24   million, you offset that against the five, so that will be a

25   $1.5 million decrease in the unsecured pool, thus increasing

1    the amount that the -- the percentage that the unsecured

2    creditors would get.

3    Q   Just so we're clear, two things.  Number one, before the

4    modification, Intelsat had a million dollar unsecured claim,

5    and after the modification they had a million dollar unsecured

6    claim.  Right?

7    A   That is correct.

8    Q   Okay.  And before the modification the total amount of

9    unsecured claims was higher than after the modification.

10    Right?

11    A   That is correct.

12    Q   Okay.  So the modification including how the unsecureds

13    are getting paid out of a pot of money.  Is that right?

14    A   Yes.

15    Q   So the lower the number of unsecured claims, the greater

16    the pro rata distribution of unsecured credit.  Right?

17    A   That is correct.

18    Q   So now you're paying the unsecureds more through the

19    modification.

20    A   Yes, that is correct.

21    Q   Okay.  Where were you on July 23, 2009 at about 9:00

22    a.m.?

23    A   I was in your offices, conference room A, in a mediation

24    conference with Aegis and CenturyTel.

25    Q   Okay.  Who was there for there debtor?

DOUGLAS WHITWORTH -- DIRECT BY MR. RAY                    199

1    A    I was there, myself, Robert Kubbernus, the CEO of

2    SkyPort, you were there, Ed Roth was there as our counsel.

3    Q    Ed Rothberger -- Ed Rothberg?

4    A    Ed Rothberg, yes.

5    Q    I've only worked for him for eight years.

6         **(General laughter.)**

7    **BY MR. RAY:**

8    Q    And your -- and who was there for CenturyTel?

9    A    CenturyTel, Rex Rainach and Stuart Ewing, I believe he

10   flew in on their jet that morning; he was the CFO of

11   CenturyTel.

12   Q    And who was there for Aegis?

13   A    Kevin Dracon and Jason Rudd.

14   Q    Okay.  So were the -- there were -- what happened at the

15   conclusion of that meeting?

16   A    Basically we had reached a settlement agreement, it took

17   us about six hours to come to some type of a settlement, and a

18   term sheet was drafted outlining the settlement agreement that

19   all parties had agreed to.

20   Q    Okay.  And then after that settlement agreement, the plan

21   modification?

22   A    Yes, then the plan modification was drafted and

23   submitted.

24   Q    Okay.  And does the plan modification incorporate the

25   terms of the settlement approved by Aegis and CenturyTel --

DOUGLAS WHITWORTH -- DIRECT BY MR. RAY                    200

1   A    Yes, it --

2   Q    -- especially as was modified just now.  Right?

3   A    Yes, it does.

4   Q    Okay.  And the negotiations were arms length.  Right?

5   A    Oh, yes.  Yes.

6   Q    Okay.  You have prepared a projected statement of

7   operations, that's Exhibit Number 12 in the big book.

8   A    Yes, I have.

9   Q    Did you use your accounting expertise to prepare those?

10  A    Yes, I did.

11  Q    Those have been admitted into evidence.  Right?  Yes,

12  they have.

13  A    Yes, my understanding.

14  Q    So and those show that the debtor will in the future be

15  able to pay the amounts that come to it.  Is that correct?

16  A    Yes, it does.

17  Q    And it shows that the debtor will continue to positively

18  cash flow, if not improve?

19  A    That is correct.

20  Q    To the best of your knowledge, does the plan comply with

21  the applicable provisions of Title 11?

22  A    Yes, it does.

23  Q    To the best of your knowledge, has the debtor complied

24  with the applicable provisions of Title 11?

25  A    Yes, to the best of my knowledge.

DOUGLAS WHITWORTH -- DIRECT BY MR. RAY

201

1   Q    Has the plan been proposed in good faith?

2   A    Yes, it has.

3   Q    Had the plan been proposed by any means forbidden by law?

4   A    Not to my knowledge.

5   Q    Okay.  Does the plan provide that all payments to be made

6   for costs and expenses incurred during the case are reasonable

7   and subject to court approval?

8   A    Yes.

9   Q    Does the plan disclose the identity of the individuals

10  who will serve as officers after confirmation?

11  A    Yes, it does, myself as CFO, Robert Kubbernus, CEO, and

12  Bruce Dunlop, as COO.

13  Q    Okay.  Just curious, you said the CEO at the beginning of

14  the case was getting paid $450,000 a year.  How much is the

15  new CEO, Robert Kubbernus, going to take home?

16  A    12,500 a month, which is approximately 150,000 a year.

17  Q    Okay.  How about yourself?

18  A    I'm paid approximately 112,000 a year.

19  Q    And how much was the CFO getting paid at the beginning of

20  the case, if you know?

21  A    250,000.

22  Q    Okay.  Other than those three, is there anyone else

23  you're expecting to be an officer of the company?

24  A    No.

25  Q    I left off the COO; he's getting paid less than 100,000.

1   Is that right?

2   A    He's getting paid -- no, he's getting paid approximately

3   120,000.

4   Q    120,000.  Tell me, is your employment, Mr. Kubbernus'

5   employment, and Mr. Dunlop's employment consistent with the

6   interest of creditors and security -- equity security holders

7   and with public policy?

8   A    Yes, it is.

9   Q    Will your -- okay, we've discussed your compensation.

10   Does any governmental regulatory commission have jurisdiction

11   over the rates charged by the debtor, to the best of your

12   knowledge?

13   A    To my knowledge, no.

14   Q    Okay.  Does the plan provide that the holders of

15   administrative and priority claims will be paid in full?

16   A    Yes, except for the taxing authority who's agreed to a

17   scheduled pay out.

18   Q    They'll be paid in full, the question is the time frame.

19   A    Yes, yes, that's correct.

20   Q    They'll be paid in full.  Okay.

21        **THE COURT:**  Mr. Ray, let me ask, this estimated

22   administrative plan that we had for I think 85,000, is

23   there -- do I understand that that is also going to be paid in

24   cash in full?

25        **MR. RAY:**  Or put into the disputed claims reserve

1    in cash, one of the two.

2              **THE COURT:**  Thanks.

3    **BY MR. RAY:**

4    Q    How much cash is the debtor going to have on the

5    effective date, if you know?

6    A    My estimation is we're going to have approximately 200-,

7    $250,000 in cash, plus the 100,000 reserve that Balaton will

8    put in.

9    Q    So that's sufficient to pay the administrative plans in

10   full?

11   A    Yes.

12   Q    Okay.  At least those that need to be paid on the

13   effective date.  Right?

14   A    Yes, that is correct.

15   Q    Right.  Does the plan provide that unsecured creditors

16   will receive more than they would in a Chapter 7 liquidation?

17   A    Yes, it does.

18   Q    How much would the unsecured creditors receive in a

19   Chapter 7 liquidation?

20   A    I would estimate zero.

21   Q    Why?

22   A    Basically the secured creditors would receive any

23   proceeds from the liquidation of the assets, and leaving

24   nothing for the unsecured creditors.

25   Q    Have all fees been paid to the United States Trustee and

1   the Clerk of Court?

2   A    Yes, they have.

3   Q    Are there any retiree benefit plans that need to be

4   continued by this Court?

5   A    No.

6   Q    In your opinion, is this plan in the best interest of the

7   estate and its creditors?

8   A    Yes.

9   Q    Has at least one class of impaired claims accepted the

10  claim -- plan?

11  A    Yes.

12  Q    Is the confirmation likely to be followed by the need for

13  further financial reorganization or a liquidation?

14  A    No.

15  Q    Does the plan provide for the payment of future US

16  Trustees fees?

17  A    Yes, it does.

18  Q    Do you request the Court to confirm the plans?

19  A    Yes, I do.

20        **MR. RAY:**  I think that's all, Your Honor.  Can I

21  have a second?

22        **THE COURT:**  Sure.

23     **(Pause.)**

24        **MR. RAY:**  Pass the witness, Your Honor.

25        **THE COURT:**  Mr. Rudd, do you want to examine?

1          **MR. RUDD:**  No, Your Honor, no questions at this

2     time.

3          **THE COURT:**  Okay.  Mr. Mitchell, although that I

4     have ruled that your client does not have standing, let me

5     make sure that I square the circle.  Based upon the testimony,

6     I don't believe that we've got anything in the record that

7     puts your client in harm's way with respect to the release

8     issue, but I want to make sure that you agree with me.

9          **MR. MITCHELL:**  That's correct, Your Honor, of the

10    record I've heard so far.  Absolutely.

11         **THE COURT:**  Thanks.

12              **Then you can step down.  Thanks.**

13         **(The witness was excused.)**

14         **THE COURT:**  Mr. Ray, Mr. Rudd, were there any other

15    witnesses you want to put on?

16         **MR. RAY:**  That's all, Your Honor.

17         **THE COURT:**  Okay.

18         **MR. RAY:**  We rest.

19         **THE COURT:**  Let's see, Mr. Rudd, you have any --

20    accept it, I assume you do not want to put on anybody?

21         **MR. RUDD:**  No, I do not, Your Honor.  We support

22    the plan.

23                          **RULING**

24         **THE COURT:**  Okay.  Then let's see, it seems to me I

25    can -- for purposes for the confirmation hearing, I go back to

1    the hearing this morning when Mr. Rothberg and Mr. Mitchell

2    had exhibits introduced; for Draco's exhibits we have Exhibits

3    1 through 21 having been admitted already; for the debtor

4    that's true also for this confirmation hearing.

5              I've heard testimony from one witness,

6    Mr. Whitworth, who I find to be a very credible witness.

7    There's no question I've got jurisdiction over this matter

8    under 28 U.S.C. 157(b)(2)(A), (b)(2)(L) as in Larry because

9    it's a confirmation hearing, and (b)(2)(O) because it has an

10   adjustment of the debtor/creditor relationship and the equity

11   holder relationship.  I only have to go through -- the debtor

12   only has to meet his burden under 1129(a) because we have no

13   classes voting against in wake of Mr. Rudd announcing that his

14   client is now favoring the plan confirmation.

15             The debtor, as the proponent of the plan, has

16   the burden on all the elements of 1129(a); there's plenty of

17   case law for that.  I'll cite one, *Internet Navigator, Inc.*,

18   it's 289 BR 128.  The debtor must satisfy its burden by a

19   preponderance of the evidence, and that's the 5th Circuit case

20   of *Briscoe Enterprises* from the 5th Circuit in 1993, 994 F2nd

21   1160.

22             And here I can make a finding very

23   comfortably that the debtor has met its burden of proof by a

24   preponderance on all the applicable elements of 1129(a).

25   Let's go through them.  1129(a)(1), the plan complies with

1    applicable provisions of Title 11, including the requirements

2    of 1122 and 1123(a) and (b) of the Code.

3                   We've got proper classification of class 1,

4    class 2A, class 2B, class 3, class 4, and class 5.  And we've

5    got which classes are specified as impaired and unimpaired,

6    and therefore 1123(a)(2) is satisfied.  And the plan provides

7    for the same treatment by the debtor for each claim or

8    interest in each respective class, thereby satisfying

9    1123(a)(4).

10                   And, finally, the plan provides for adequate

11   and proper means for its implementation, including it

12   re-vested the property, it's keeping on existing management,

13   Mr. Kubbernus, Mr. Whitworth, Mr. Dunlop, and I think is worth

14   noting that their per annum salaries are less than the other

15   predecessors, substantially less actually.

16                   And the plan provides for various other means

17   for implementation.  We're going to have a rehabilitative plan

18   here and this debtor's going to continue to operate.  So

19   1129(a)(1) is met; 1129(a)(2) is also satisfied.  This plan

20   proponent has complied with applicable provisions of Title 11,

21   the primary one here is getting its disclosure statement

22   approved under the *Metrocraft* standards, so 1125 has been met.

23   And I think that takes care of pretty much 1129(a)(2).

24                   1123(a)(3), the plan is clearly proposed in

25   good faith and not by any means forbidden by law.  That's the

1    *Sun Country* case from the 5th Circuit, 764 F2nd 406; also the

2    *Public Financing Corp v Freeman* case, 712 F2nd 219 where the

3    5th Circuit explained that good faith is a fact question for

4    the Court, and I'm supposed to view it in sort of -- in light

5    of the totality of the circumstances.

6                    As a totality of the circumstances test here,

7    I've got a company that's operational, it's cut back from its

8    Virginia operations, it's cut back on salaries of its

9    principal officers, it's cut deals with a lot of its

10   creditors.  This is almost a blueprint for how a Chapter 11

11   case should go for those people who say that bankruptcy is

12   both a combination of litigation and negotiation.

13                   The twin pillars of bankruptcy are being met;

14   the twin pillars according to the 5th Circuit being discharge

15   of the debtor and payment of claims, and that's being

16   accomplished by confirmation of this plan, particularly where

17   we've got all claims lined up so that all classes are voting

18   in favor.  So I'm concluding the 1129(a)(3) is easily met

19   under the totality of the circumstances that have been set

20   forth in the testimony of Mr. Whitworth.

21                   1129(a)(4), all payments for services or

22   costs in connection with the debtor's Chapter 11 case are

23   subject to Court approval.  There's no question that's the

24   case, based upon orders that I have entered here.

25                   And 1129(a)(4) is designed according to what

1    the 5th Circuit teaches us.  It's designed to ensure that

2    payments for professional services connected with this case

3    will be subject to the Court's approval, and I -- and also to

4    a determination of reasonableness.

5                    I have no doubt the professionals in this

6    case will file their fee applications, and we'll get into

7    making those findings at that time.  Therefore, I conclude

8    1129(a)(4) has been met by what's already been entered on the

9    docket in terms of approvals of professionals.

10                    1129(a)(5), the plan discloses the identify

11   and nature of compensation of insiders proposed to serve the

12   reorganized debtor, and such individuals' continuance in

13   office is consistent with the interest of creditors and public

14   policy.  The testimony from Mr. Whitworth is we've got the

15   identification of the officers who are insiders who are

16   continuing to stay on, what their salaries are going to be.

17   Given their backgrounds, it's certainly in the interest of the

18   creditors of this company that they stay on.

19                    And I might add, since I just got a copy of

20   it yesterday, my former briefing clerk, Mike Schuster

21   [phonetic], just published in the *Houston Law Review*, as to

22   what the phrase "public policy" encompasses for purposes of

23   1129(a)(5), and I'll certainly make a conclusion that it's in

24   the public policy that this plan be confirmed.

25                    It's in public policy that 1129(a)(5) -- I

1    conclude that confirmation of this plan is not only in the

2    interest of creditors, it's in the interest of public policy

3    this company remains an operational company, employees remain

4    on board, services are provided.  That is clearly in the

5    public policy, or in the interest of public policy.  So

6    1129(a)(5) is satisfied.  It's certainly consistent with the

7    interest of creditors getting paid, that existing management

8    stay on right now.

9              1129(a)(6) is inapplicable here.  1129(a)(7)

10   is the so-called best interest of creditors test.  We've got

11   all impaired classes now voting yes.  And the test is there

12   for satisfied.  And certainly these creditors are willing to

13   receive property as a result of the plan payments, so a value

14   not less than the amount they would receive in a Chapter 7.

15   And the testimony is clear on that.  Therefore, 1129(a)(7) is

16   met.

17             1129(a)(8), each class of claims and

18   interests have either accepted the plan, or are subject to

19   cram down here.  We've got all impaired classes now voting

20   yes, so we don't need to go to cram down.  1129(a)(8) is met.

21             1129(a)(9), we've got administrative

22   expenses.  Testimony from Mr. Whitworth is they're going to be

23   paid, or they're going to be put into the disputed -- the

24   account for disputed claims, such as the estimated claim that

25   I made the other day in a hearing.  So 1129(a)(9) is met,

1    we've got plenty of cash to cover the administrative expense

2    claims.  This debtor is more flush with cash then at least

3    most debtors I've seen recently, and that's good.  1129(a)(9)

4    is therefore met.

5                    1129(a)(10), we've got at least one class of

6    impaired creditors voting, so that -- they're voting in favor

7    of the plan, so that element is satisfied.  1129(a)(11),

8    confirmation of the plan is not likely to be followed by the

9    liquidation or the further financial reorganization of the

10   debtor.  Mr. Whitworth clearly testified to that effect.

11                   And I think it's worth citing the 5th Circuit

12   case of *Briscoe Enterprises* that stands for the proposition

13   that there's no requirement of a guarantee of success, only a

14   reasonable assurance of commercial viability is required.

15   That's the *Briscoe* case on pages 1165 and 1166, 5th Circuit,

16   994 F.2d 1160.

17                   Mr. Whitworth's testimony shows that there

18   is, it seems to me, a reasonable assurance of commercial

19   viability for SkyPort Global, and there's a reasonable

20   probability of success for this plan, so 1129(a)(11) is

21   satisfied, particularly given the fact that we're flush with

22   cash and we've got ongoing operations that are doing well.  So

23   1129(a)(11) element is met.

24                   1129(a)(12), Mr. Whitworth testified the US

25   Trustee fees are current, so that's satisfied.  1129(a)(13) is

1    inapplicable.  1129(a)(14) is inapplicable, there's no

2    domestic support obligations in this one.  1129(a)(15) is also

3    in applicable because this debtor is not an individual.

4    1129(a)(16) is applicable, all transfers of property under the

5    plan are made in accordance with applicable provisions of non-

6    bankruptcy law, and I'm comfortable based upon my review of

7    the amended plan, that that's true.

8            So I'm able to legally make legal conclusions

9    that all the elements that are applicable in this case under

10   1129(a) are met, through the testimony of Mr. Whitworth, which

11   is credible, and through the exhibits that have been

12   introduced, Exhibits 1 through 21 of the debtor, and therefore

13   I am happy to confirm the plan.

14           Let me ask, Mr. Rothberg, Mr. Ray, I assume

15   that we don't have a confirmation order ready yet in the wake

16   of, A, negotiations with Mr. Rudd, and, B, negotiations with

17   Mr. Mitchell over the issue of the release.  Am I right?

18           **MR. ROTHBERG:**  That's correct.  Your Honor, I did

19   prepare a confirmation order, but it does need some revisions.

20           **THE COURT:**  Okay.  Obviously if -- I think what I

21   would like to do then is, if you would prepare it, have Mr.

22   Rudd sign off as to form and substance, have Mr. Mitchell sign

23   off as to form only.  There's no way I'm going to get my

24   written opinion done on my ruling on standing over the next

25   week, and maybe not even over the next two weeks; I've got to

1    be out of town at some seminars and for my dad's 80th

2    birthday.

3               So I think what I want to do, obviously, is

4    get the confirmation order on the docket recognizing that

5    Mr. Mitchell, or his client, may want to be appealing my

6    ruling from earlier today.  My thought is to get an order

7    simultaneously on file with the confirmation order, and then

8    I'll work diligently on getting an opinion.

9               I used to -- I much prefer, and I've done it

10   in every instance except one I think where I get my memorandum

11   opinions on file simultaneously with my orders.  But in this

12   case though we've got alignment, we'll get the two orders on

13   file, and then I'll just let the parties know that I'll work

14   as diligently as I can on getting the opinion done on the

15   ruling.  And so if you're designating a record, you may have

16   to wait a week or two or three before I get that opinion done.

17          **MR. ROTHBERG:**  Did you want us, Your Honor, to

18   draft the order on the standing?

19          **THE COURT:**  Sure, you can take a crack at it,

20   please, and just have Mr. Mitchell sign off as to form only.

21          **MR. ROTHBERG:**  Yes, I'm just contemplating based on

22   the findings and --

23          **THE COURT:**  Yes.

24          **MR. ROTHBERG:**   -- the conclusions in the record.

25          **THE COURT:**  Yes.  And I don't mind if you put in

1      there that I'll be doing a memorandum opinion, it's just that
2      it's not going to be on the docket simultaneously.  But I do
3      want you to know that I will work diligently on it, so that if
4      it does go up on appeal and some appellate court's saying,
5      Well, where is Bohm's written stuff, it will eventually get on
6      there.

7              MR. ROTHBERG:  We'll prepare that, Your Honor, and
8      submit it to Mr. Mitchell for review.

9              THE COURT:  I will want to hold a status conference
10     in the case.  Today we're, what, at the -- Mr. Rothberg, let
11     me ask, when did -- how -- when did you anticipate getting
12     this case closed?

13             MR. ROTHBERG:  Well, Your Honor, I think we have
14     three issues to deal with post-confirmation.  We're going to
15     have claim objections, we have some preference cases we need
16     to pursue, and the fee applications.  And so I'm anticipating
17     that we'll probably be around for a few more months.

18             THE COURT:  Okay.  The reason I ask is, this is
19     obviously a much bigger case than -- typically, on the smaller
20     Chapter 11s I've been insisting that we actually attach a pay
21     out schedule to the confirmation order so that people know,
22     you know, month one after the effective date who's being paid
23     and how much, and, you know, where to send the payments to.

24                     I think this client's more sophisticated so I
25     don't think we need to do that.  But I will want to hold a

1    status conference in a couple of months and just ask questions

2    like, okay, are payment, have they begun, how much, because I

3    want to make sure that the actual intent of the Code is met.

4                    And what I've discovered is, you know,

5    sometimes people don't get payments out, in some instances

6    because they're confused so they don't get them out on time,

7    they don't know where to send them.  I want to make sure that,

8    you know, the creditors here are getting paid.

9                    And so I won't require that we attach a

10   payment schedule to the order, but I will want, during a

11   status conference, and I may hold a couple of them, just ask

12   the question, okay, bring me a list of people who, you know,

13   payments have been made, how much, just to make sure that that

14   twin pillar, or that second pillar of payment of claims is

15   being made.

16            **MR. ROTHBERG:**  Your Honor, one thing I would

17   mention, and this was part of the negotiation with the

18   creditors, is the actual initial plan payments for pre-

19   petition creditors does not start till the end of this year.

20            **THE COURT:**  Yes.

21            **MR. ROTHBERG:**  And then the -- so what we would be

22   doing is dealing with the administrative claims --

23            **THE COURT:**  Which --

24            **MR. ROTHBERG:**   -- initially, so.

25            **THE COURT:**   -- is important to me as well.  I

1    mean --

2            **MR. ROTHBERG:**  Oh, absolutely.

3            **THE COURT:**   -- you know --

4            **MR. ROTHBERG:**  We want to get the administrative

5    claims paid.  There's no question --

6            **THE COURT:**  And --

7            **MR. ROTHBERG:**   -- about it.

8            **THE COURT:**   -- but I will want to hold it

9    somewhere -- I will want to hold a status conference at some

10   point where the question is put, Have the unsecured claimants

11   been -- now started receiving payments.  If so, how much and

12   whose got them.  So we may not get out of this case until

13   December 31, or maybe March 31 of 2010.  I mean I'm acutely

14   aware we've got US Trustees fees burning, and I'm sure the

15   reorganized debtor is going to want to get out from under them

16   as quickly as possible.

17                  Let me ask -- okay, let me start around the

18   horn.  Mr. Rothberg or Mr. Ray, any questions or comments then

19   where we're at right now?

20           **MR. ROTHBERG:**  Yes, the only point, and I think I

21   understood you to say that, is we're going to -- we want to

22   get the confirmation order and the other orders signed fairly

23   quickly so that --

24           **THE COURT:**  Yes.

25           **MR. ROTHBERG:**   -- we could at least -- the company

1    emerges.  We won't do a final decree --

2              THE COURT:  Right.

3              MR. ROTHBERG:   -- but the company emerges.  And

4    there is actually a hurricane coming to Hawaii, that this

5    company serves for the emergency response --

6              MR. RAY:  No, they won't take the contract if we're

7    in bankruptcy.

8              MR. ROTHBERG:  Right.

9              MR. RAY:  We need to have that confirmation.

10             THE COURT:  Yes, well, I mean what to be able to

11   say, or what I want this company to be able to say, since that

12   I've confirmed the plan, is, Hey, the order's gotten on the

13   docket --

14             MR. ROTHBERG:  Right.

15             THE COURT:   -- and we are now a reorganized

16   debtor, which at least in some instances, from a publicity or

17   PR standpoint --

18             MR. ROTHBERG:  Right.

19             THE COURT:   -- helps.

20             MR. ROTHBERG:  Right.  That's why we needed to move

21   along quickly.

22             THE COURT:  Absolutely.  And I'm here -- all next

23   week I'm in Galveston, Thursday, Friday for a seminar, but

24   I'll be coming back Friday.  The quicker we get the order in,

25   the better.  I also want to simultaneously sign the order on

1    the standing so that, as I said, if there's going to be an

2    appeal, we've got at least both those orders on the docket;

3    they can be appealed.

4         **MR. ROTHBERG:**  We'll try to do it -- we'll try to

5    upload something early next week.

6         **THE COURT:**  Okay.  Just give Ms. Stennis, if you

7    would, notice.  I'll put -- we'll put you down on the docket

8    sheet, Mr. Rothberg, as responsible for both orders.

9              Ms. Attaway's handing me a note here.

10             Yes, bear with me, I'll get to that in a

11   minute.

12        **THE CLERK:**  Okay.  Thanks.

13        **THE COURT:**  Mr. Rudd, let me go over to you, any

14   other issues you -- any issues you want to raise, any points

15   you want to make?

16        **MR. RUDD:**  No, Your Honor.  I wanted, as far as the

17   effective date, I know that payments are going to start the

18   end of December, were we looking at an effective date on what

19   day?

20        **MR. ROTHBERG:**  Just 10 days after confirmation.

21        **MR. RUDD:**  Ten days after confirmation.

22        **MR. ROTHBERG:**  Right.

23        **MR. RUDD:**  Okay.

24        **THE COURT:**  Okay.  We'll -- let's definitely put

25   that in the confirmation order.

1        **MR. RUDD:**  That's why I was looking for

2   clarification so we'd know what date we were shooting for.

3        **THE COURT:**  Let me ask you, Mr. Rothberg, I may as

4   well ask the question, you already have a chart made up on,

5   you know, starting in December here the unsecured creditors,

6   here's, you know, the administrative claimants, you know,

7   here's how much people are going to be paid.

8        **MR. ROTHBERG:**  Yes, Your Honor, our Exhibit Number

9   20, Your Honor, is the administrative claim analysis, which

10   shows -- and what administrative claims have to be paid.

11        **THE COURT:**  Yes.

12        **MR. ROTHBERG:**  Obviously the fee applications won't

13   be paid until the Court approves a fee application, but these

14   would be paid on the effective date, or as in the case of API,

15   if we haven't resolved with them, deposit it into the disputed

16   claim reserve.

17        **THE COURT:**  Yes, and --

18        **MR. ROTHBERG:**  As to -- oh, I'm sorry.  Go ahead.

19        **THE COURT:**  No, go ahead.

20        **MR. ROTHBERG:**  As to the unsecured creditors, we

21   had a claim analysis that's a part of our disclosure

22   statement --

23        **THE COURT:**  Yes.

24        **MR. ROTHBERG:**   -- but we haven't really scrubbed

25   that for claim objections.

1          **THE COURT:**  Yes.

2          **MR. ROTHBERG:**  You see, we think we can reduce the

3     denominators, so to speak --

4          **THE COURT:**  Yes.

5          **MR. ROTHBERG:**   -- so that we can make a higher

6     return to the creditors.  But we have not -- we were waiting

7     for confirmation.  We didn't want to spend money and effort on

8     objecting to claims --

9          **THE COURT:**  I'm with you.

10          **MR. ROTHBERG:**   -- if we didn't have confirmation,

11     so.

12          **THE COURT:**  At the last status conference that we

13     hold in this case, whenever that may be, what I'll probably

14     ask is that we have some chart where we've got a list of all

15     the allowed unsecureds, all the -- just so that we know what

16     the universe of allowed unsecureds is.

17          **MR. ROTHBERG:**  We actually do that for ourselves in

18     every case so that we can tell the client, here's what you

19     need to pay.

20          **THE COURT:**  Yes, well, I appreciate it, because I

21     do want to make sure now that we've got the plan confirmed

22     that we, you know, we get claims paid.  I want to make sure I

23     keep faith with the system, and I'm sure your client does too,

24     and I know you do.

25              Let's see, Mr. Mitchell, let me go over to

1    you.  Any questions, comments?

2               **MR. MITCHELL:**  No, Your Honor, I've actually been

3    taking my time her to go ahead and get some suggested language

4    with respect to the releases --

5               **THE COURT:**  Okay.

6               **MR. MITCHELL:**   -- tweaking a little bit of the

7    order.  It's nothing, I don't think, that's objectionable, and

8    I'll get those, as soon as we're done here, over to Mr.

9    Rothberg.

10              **THE COURT:**  Thanks.

11              **MR. MITCHELL:**  Thank you.

12              **THE COURT:**  Then I think we've squared the circle

13    on everything.  Am I right?

14              **MR. ROTHBERG:**  Yes, I think so.

15              **THE COURT:**  I appreciate the hard work of

16    everybody, and needless to say, I hope that the reorganization

17    allows the company to succeed beyond its wildest dreams, and

18    it seems to me it's in a good area in the field it's in.  So I

19    think this is a good example of where a Chapter 11 is working

20    the way it's supposed to work.  So I'll look forward to

21    getting the confirmation order and the order on standing.

22               Ms. Attaway is going to ask me when we want

23    to have the status conference.  My thought -- and to her

24    credit, she's bugging me, and she should -- end of September.

25    That sound reasonable?

1          **MR. ROTHBERG:**  Sure.

2          **THE COURT:**  Why don't we go September 30?

3     **(Pause.)**

4          **THE COURT:**  How about Friday, October 15 -- excuse

5     me, Friday, October 16?

6          **MR. ROTHBERG:**  That should be fine, Your Honor.

7          **THE COURT:**  Okay.  Let's do 1:30.  Yes, let's do

8     1:30.  I've got a trial scheduled that day, but what I'll do

9     is send them out to a late lunch and we'll do 1:30.  I don't

10    anticipate the status conference taking that long, but I just

11    want to square the circle on where we are on administrative

12    claims.

13              On the hearing we had the other day where I

14    landed on $85,000, did I hear you say a few minutes ago you're

15    negotiating and you may actually be able to come to a

16    settlement, or do you think we're going to need to go ahead

17    and tee it up.  And I'm not casting your feet in concrete, I'm

18    just trying to get a sense.

19         **MR. ROTHBERG:**  Yes.  I think that's already

20    scheduled, Your Honor.

21         **THE COURT:**  Yes.

22         **MR. ROTHBERG:**  And we -- Mr. Braun did call us in

23    the middle of the confirmation preparations to see if we could

24    reach a settlement, and we just did not have the time to sit

25    down and talk with him.  But we -- as you say, litigation,

1    negotiate.  We --

2              **THE COURT:**  Yes.

3              **MR. ROTHBERG:**  -- do that all the time and we're

4    more than happy to talk to Mr. Braun about trying to resolve

5    that.

6              **THE COURT:**  What I'd like to do is get a hearing

7    sooner rather than later.  A lot of that stuff is fresh is my

8    head, and just it would be easier to me -- for me, it may not

9    be easier for you all, so, but if we're going to -- if you're

10   going to tee it up, I guess I'd rather do it, you know, maybe

11   within the next four to eight weeks as opposed to --

12             **MR. ROTHBERG:**  Well, I think this already --

13             **THE COURT:**   -- 12 or 16.

14             **MR. RAY:**  Well, Your Honor, actually that's an

15   interesting situation.  Here's how I understood what was going

16   on.  There was a claim of -- there was a motion to pay an

17   administrative claim that was filed.  That's what's actually

18   on the docket.  It was objected to by us; we said we didn't

19   owe the administrative claim.  The Court then estimated for

20   purposes -- two purposes, voting and distribution, that claim,

21   which means I think we can pay it at that number, or put it in

22   the disputed claims reserve.

23                  What has not yet happened is what we talked

24   about at the hearing the other day, which is a lawsuit by the

25   debtor against API for breach of contract.  We haven't gotten

224

1    around to filing that.

2              THE COURT:  Okay.

3         MR. RAY:  So I think what we do is we put --

4              THE COURT:  Somehow I had in my mind that you had.

5    Somehow I had in my mind that it was an adversary already

6    filed.

7         MR. RAY:  It's not even an adversary proceeding

8    yet, so what we'll --

9              THE COURT:  Okay.

10        MR. RAY:   -- put 85,000 in the disputed claims

11   reserve, and then we will have to tee up a claim objection and

12   put all the lawsuit together --

13             THE COURT:  Yes.

14        MR. RAY:   -- in that context.

15             THE COURT:  Yes.

16        MR. RAY:  So, I'm sorry, we're not ready for that.

17   And we may not do that because it may --

18             THE COURT:  Fair enough.

19        MR. ROTHBERG:   What I'm thinking we could do to

20   try to speed it up, because there's a scheduling order on the

21   motion to pay the admin claim, which --

22             THE COURT:  Yes.

23        MR. ROTHBERG:   -- I think has a hearing in

24   September.  I mean we'd like to get it resolved quickly.  We

25   could put -- if Mr. Braun doesn't have an issue with it, we

1   could put the adversary on file and try to merge it all

2   together, but.

3           **THE COURT:**  Yes, I was -- in my brain I was

4   associating that scheduling order with a lawsuit that I

5   thought you'd filed.  But you're right, you hadn't filed it

6   yet.  Fair enough.

7           **MR. ROTHBERG:**  Okay.

8           **THE COURT:**  I've got my notes, I can always go back

9   to the tape.  Move it as quickly as you can, but I'll withdraw

10  my statement in thinking that we can try it in four weeks.

11          **MR. RAY:**  Thank you, Your Honor.

12          **THE COURT:**  Okay.  Good.  You all have a great

13  weekend.  I'll look forward to getting the two orders next

14  week.  And, again, I appreciate your hard work and

15  professionalism.

16                  We'll be in recess.

17      **(Proceedings adjourned at 4:22 p.m.)**

18  *I certify that the foregoing is a correct transcript from*

19  *the electronic sound recording of the proceedings in the*

20  *above-entitled matter.*

21  */s lmartin*

22  _____

23  *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

24  *JTT JOB/INVOICE # 27746; VOLUME II OF II, PGS. 153 - 225*

25  *DATE: AUGUST 24, 2009*